# EXHIBIT B

# PUT AGREEMENT

THIS PUT AGREEMENT (this "Agreement"), dated as of December 31, 2007, is by and among: Care Investment Trust Inc. ("REIT"), a Maryland corporation; ERC Sub, LLC ("Buyer GP"), a Delaware limited liability company; ERC Sub, L.P. ("Buyer"), a Delaware limited partnership (such Buyer, REIT and Buyer GP, the "CRE Companies"); and the Sellers ("Sellers") and Managing Owners ("Managing Owners") each identified on the signature pages hereto (such Sellers and Managing Owners, the "Seller Parties"). Capitalized terms used herein but not defined herein shall have the meanings accorded thereto in that certain Contribution and Purchase Agreement (the "Purchase Agreement") by and among Buyer, Sellers, Managing Owners, CHI and Cambridge 114, dated as of the date hereof.

## RECITALS

WHEREAS, as of the Effective Time, each Seller Party owns the outstanding ownership interest in the company (each a "Company" and collectively, the "Companies") listed next to such Seller Party's name on Exhibit A hereto in the percentages set forth on Exhibit A hereto;

WHEREAS, in the event of a Change in Control (as defined herein) of one of the CRE Companies, the Seller Parties desire to have the option to sell all of their outstanding ownership interests in the Companies to the applicable CRE Company, and the CRE Companies have agreed to provide such option to the Sellers Parties, each on the terms and conditions set forth herein; and

WHEREAS, Buyer GP is the general partner of Buyer and a wholly-owned subsidiary of the REIT.

NOW, THEREFORE, in consideration of the foregoing and of the promises and mutual covenants contained herein, the parties hereby agree as follows:

## I. PUT OPTION

1.1. <u>Change in Control</u>.

(a) The applicable CRE Company shall send the Seller Parties Representative written notice (the "Notice") within ten (10) days of (i) execution of a letter of intent or term sheet that provides for any merger, consolidation or other transaction that constitutes either: (A) the acquisition by a Person other than an Affiliate of any of the CRE Companies or CIT Healthcare, LLC (such CRE Companies and CIT Healthcare, LLC, the "CIT Companies"), in a transaction or series of related transactions of an aggregate of fifty percent (50%) or more of the shares of voting stock of the REIT, fifty percent (50%) or more of the voting membership interests of Buyer GP, or fifty percent (50%) or more of the units of voting partnership interest of Buyer, as applicable, outstanding immediately prior to the acquisition; or (B) any sale or liquidation of all or substantially all of the assets of any of the CRE Companies (other than to an Affiliate of any of the CIT Companies), or any merger or consolidation to which any of the CRE Companies is a party and as to which none of the CIT Companies or an Affiliate of the CIT Companies is a surviving entity or the majority owner of the surviving entity; or (ii) engagement by REIT of external management that is not CIT Healthcare, LLC or one of its Affiliates (collectively, a "Change in Control"). Notwithstanding anything in this Agreement to the contrary, as long as the CRE Companies maintain operating control, the transfer by any of the CRE Companies of its ownership interest in all or any portion of income, expense, profit, gain or loss allocations or distributions allocable or payable to such CRE Companies to any other Person shall not constitute a Change in Control.

1746623.13

(b)     The Seller Parties agree that the information contained in the Notice (to the extent not public information) is of a confidential and proprietary nature. Each of the Seller Parties agrees that at all times it will maintain the confidentiality of the content of the Notice, the fact that the Notice has been delivered and any information, documents, or instruments delivered to a Seller Party pursuant to the terms, conditions, and covenants hereof and will only disclose such Notice, information, documents, and instruments to its duly authorized officers, members, partners, directors, representatives, and agents. The Seller Parties recognize that any breach of this Section 1.1(b) would result in irreparable harm to the CIT Companies and their Affiliates and that therefore the CRE Companies shall be entitled to an injunction to prohibit any such breach or anticipated breach, without the necessity of posting a bond, cash, or otherwise, in addition to all other legal and equitable remedies available to them.

(c)     Within fourteen (14) Business Days after receipt by the Sellers Parties Representative of the Notice, if the Seller Parties desire to exercise the Put Right (as hereinafter defined), the Seller Parties Representative shall provide to the CRE Companies written notice of its intent to require the purchase (the "Put Right") of all but not less than all of each Seller Party's ownership interest in each Company (the "Put Interests").

(i)     In the event that the CRE Companies fail to receive timely notice of the Seller Parties Representative's intent to exercise the Put Right, the Put Right shall immediately expire and shall be of no further force or effect.

(ii)    In the event that the Seller Parties Representative provides timely notice of its intent to exercise the Put Right, the applicable CRE Company or the Buyer on or before but no later than the effective date of the transaction resulting in the Change in Control shall purchase and the Seller Parties shall sell the Put Interests at a price payable in cash equal to the Redemption Price (as defined in Section 1.2). At the closing of the purchase and sale of the Put Interests (the "Put Closing"), subject to the Seller Parties obtaining any required consents in writing, (i) each Seller Party shall transfer the Put Interests free and clear of all Liens, except for the transfer restrictions in the Constituent Documents of each Company and any financing by and between any Company and Buyer, and (ii) the applicable CRE Company or Buyer shall pay the Redemption Price to the Seller Parties.

(iii)   Notwithstanding anything contained herein to the contrary, the Seller Parties' Put Right and the applicable CRE Company's purchase obligation hereunder is subject to the receipt before the Put Closing of the consent of any lender holding debt of the Companies secured by Liens on the Real Property owned or leased by the Companies to the extent that such consent is required under the agreements evidencing such loans. The Put Right shall immediately expire and shall be of no further force and effect in the event that a required consent in writing has not been obtained on or before the later of (i) thirty (30) days after the determination of the Redemption Price or (ii) ten (10) Business Days prior to the closing date of the Change in Control transaction set by the parties in the definitive agreements for such Change in Control transaction.

Section 1.2.   Redemption Price.  For purposes of Section 1.1(d), "Redemption Price" shall mean an amount equal to the fair market value of the Put Interests. Such fair market value will be determined as follows:

(a)     The fair market value shall be determined by mutual agreement of the Seller Parties Representative and the applicable CRE Company, which determination shall be final and binding on the parties hereto; provided, however, if the Seller Parties Representative and the applicable CRE Company do not agree on the fair market value within ten (10) Business Days after notice is given by one

of them to the other of a request for determination of fair market value, the fair market value shall be determined as follows:

    (i)    The Seller Parties Representative and the applicable CRE Company shall jointly select a Qualified Appraiser (as defined below). If a Qualified Appraiser is agreed to and jointly selected by the Seller Parties Representative and the applicable CRE Company within ten (10) Business Days after a request is made by either of them to make the joint election, the appraiser so selected shall promptly determine the fair market value of the Put Interests, which determination shall be final and binding on the parties hereto. If they fail to jointly select a Qualified Appraiser within ten (10) Business Days after a request to make the joint selection is made by either of them, then the Seller Parties Representative and the applicable CRE Company shall each select one Qualified Appraiser. If either the Seller Parties Representative or the applicable CRE Company fails to name to the other a Qualified Appraiser within ten (10) Business Days after the notice by the other that it has selected a Qualified Appraiser (such notice to be in writing and to identify such appraiser by name), the Qualified Appraiser that has been timely selected shall be instructed to promptly determine the fair market value of the Put Interests, which determination shall be final and binding on the parties hereto, and such Qualified Appraiser shall be deemed to have been jointly selected pursuant to Section 1.2(e). If two Qualified Appraisers have been timely selected, they shall be instructed to promptly determine, independently of the other, the fair market value of the Put Interests.

    (ii)    If two Qualified Appraisers are selected and either appraiser fails to deliver its report, within thirty (30) days after the first appraiser delivers its report to the Seller Parties Representative and the applicable CRE Company containing the fair market value of the Put Interests as determined by such appraiser, the determination of the fair market value of the Put Interests of the appraiser who has delivered his report to the Seller Parties Representative and the applicable CRE Company shall be determinative of the fair market value of the Put Interests and shall be final and binding on the parties hereto.

    (iii)    If two Qualified Appraisers are selected, both appraisals are delivered within the 30-day period described above, and the difference between the two amounts of their determinations of the fair market value of the Put Interests does not exceed 10% of the greater of such amounts, then the fair market value of the Put Interests shall be the average of the fair market value of the Put Interests as determined by each of the two appraisers.

    (iv)    If two Qualified Appraisers are selected, both appraisals are delivered within the 30-day period described above, and the difference between the two amounts so determined exceeds 10% of the greater of such amounts, then such two appraisers shall select a third Qualified Appraiser who shall determine the fair market value of the Put Interests. Of the three appraisals, the appraisal which differs most in terms of dollar amount from the average of the three appraisals shall be excluded and the average of the remaining two appraisals shall be final and binding upon the parties hereto.

    (v)    In the event that a third Qualified Appraiser is to be selected and the original two appraisers fail to agree on the selection of the third Qualified Appraiser within ten (10) Business Days after notice to both appraisers of the need for a third appraiser, the third Qualified Appraiser shall be designated by the original appraisers, whose determination shall be binding upon the parties. The third Qualified Appraiser shall be deemed to have been jointly selected pursuant to Section 1.2(e).

(b) Each appraiser to be appointed pursuant to the appraisal procedures above shall (i) be an investment banking firm or business valuation firm, (ii) not have any bias or material financial or personal ownership in the Companies or the CIT Companies, its partners or members or any Affiliates thereof, and (iii) have experience in valuing businesses or assets to be valued, as applicable, which, to the extent possible, are similar in character to the Companies (each a "Qualified Appraiser").

(c) Any determination of fair market value shall be based upon the terms and conditions of this Agreement, and under no circumstances shall the Qualified Appraisers appointed add to, modify, disregard or change any of the provisions of this Agreement, and the jurisdiction and scope of such Qualified Appraisers shall be limited accordingly. In addition, in determining the fair market value of the Put Interests the Qualified Appraisers shall take into consideration discounts for lack of control and lack of marketability.

(d) The Seller Parties Representative and the applicable CRE Company shall have the right to submit such data and memoranda to each of the appraisers in support of their respective positions as they may deem necessary or appropriate. The determination of the fair market value of the Put Interests by the Qualified Appraisers in accordance with this Section 1.2 shall be final and binding upon all parties.

(e) The Seller Parties Representative and the applicable CRE Company shall each pay the fees and expenses of the Qualified Appraiser, if any, selected by it and one-half (1/2) of the fees and expenses of the Qualified Appraiser, if any, jointly selected hereunder.

1.3. Seller Parties Representative.

(a) The Seller Parties hereby designate Saada (the "Seller Parties Representative") to serve as the sole and exclusive representative of the Seller Parties with respect to the matters set forth in this Agreement related to the Seller Parties. Notwithstanding anything to the contrary contained in this Agreement, the Seller Parties Representative shall not have any duties or responsibilities except those expressly set forth herein, and no implied covenants, functions, responsibilities, duties, obligations or liabilities on behalf of any Seller Party shall otherwise exist as to the Seller Parties Representative.

(b) The Seller Parties Representative is hereby irrevocably appointed as the agent, proxy and attorney-in-fact for each Seller Party for all purposes specified in this Agreement, including full power and authority on each Seller Party's behalf, (i) to take all actions which the Seller Parties Representative considers necessary or desirable in connection with the defense, pursuit or settlement of any determinations relating to any disputes with the CRE Companies pursuant to this Agreement, including determinations to sue, defend, negotiate, settle and compromise any such claims made by or against the CRE Companies, (ii) to engage and employ agents and to incur such other expenses on the Seller Parties' behalf as the Seller Parties Representative shall deem necessary or prudent in connection with the administration of the foregoing, and to deduct the cost and expense thereof from any sums that may become payable to any Seller Party, (iii) to accept and receive notices to the Seller Parties pursuant to this Agreement, (iv) to take all actions on behalf of any Seller Party in connection with any modification, supplement, amendment or waiver of this Agreement, and (v) to take all other actions and exercise all other rights which the Seller Parties Representative considers necessary or appropriate in connection with this Agreement. It is acknowledged and agreed that such agency and proxy are coupled with an interest, and are, therefore, irrevocable without the consent of the Seller Parties Representative and shall survive the death, incapacity, bankruptcy, dissolution or liquidation of any such Seller Party. All decisions of the Seller Parties Representative shall be binding upon each Seller Party, and no such Seller Party shall have the right to object, dissent, protest or otherwise contest the same.

(c) In the event that the Seller Parties Representative (or any successor Seller Parties Representative appointed in accordance with this Section 1.3) shall die, become incapacitated or resign, the Seller Parties shall designate a successor Seller Parties Representative.

(d) The Seller Parties Representative is authorized to act on behalf of the Seller Parties notwithstanding any dispute or disagreement among the Seller Parties, and the CRE Companies shall be entitled to rely on any and all actions taken by the Seller Parties Representative without any liability to, or obligation to inquire of, any Seller Party even if the CRE Companies shall be aware of any actual or potential dispute or disagreement among the Seller Parties. The CRE Companies are expressly authorized to rely on the genuineness of the signatures of the Seller Parties Representative and, upon receipt of any writing which reasonably appears to have been signed by the Seller Parties Representative, the CRE Companies may act upon the same without any further duty of inquiry as to the genuineness of the writing.

(e) The Seller Parties Representative shall promptly deliver to the Seller Parties any notice received by the Seller Parties Representative on behalf of such Seller Party.

(f) Neither the Seller Parties Representative nor any agent employed by the Seller Parties Representative shall be liable to any Seller Party relating to the performance of the Seller Parties Representative's duties under this Agreement for any errors in judgment, negligence, oversight, breach of duty or otherwise, except to the extent it is finally determined in a court of competent jurisdiction by clear and convincing evidence that the actions taken or not taken by the Seller Parties Representative constituted fraud or were taken or not taken in bad faith. The Seller Parties Representative shall not have any liability for acting upon any notice, statement or certificate believed by the Seller Parties Representative to be genuine and to have been furnished by the appropriate person and in acting or refusing to act in good faith on any matter.

1.4. Additional Assurances. The provisions of this Agreement shall be self-operative and shall not require further agreement by the parties except as may be herein specifically provided to the contrary; provided, however, at the reasonable request and expense of a party, the other parties shall execute such additional instruments and take such additional actions as the requesting party may deem necessary to effectuate this Agreement. In addition and from time to time after the Put Closing, the Seller Parties shall execute and deliver such other instruments of conveyance and transfer, and take such other actions as the CRE Companies reasonably may request, to effectively convey and transfer full right, title and interest to, vest in, and place the CRE Companies in legal, equitable and actual possession of the Put Interests. The Seller Parties shall also furnish the CRE Companies with such information and documents in their possession or under their control, or which Sellers can execute or cause to be executed, as will enable the CRE Companies to prosecute any and all petitions, applications, claims and demands relating to or constituting a part of the Put Interests. Additionally, each party hereto shall cooperate with one another and use their respective reasonable efforts to have their respective present directors, officers and employees cooperate with one another on and after the Put Closing in furnishing information, evidence, testimony and other assistance in connection with any action, proceeding, arrangement or dispute of any nature with respect to matters pertaining to all periods prior to the Put Closing in respect of the items subject to this Agreement, provided that any party hereto will reimburse the other parties hereto for all costs and expenses incurred by the other parties hereto in connection therewith.

## II. NOTICES

All notices and other communications hereunder shall be in writing and shall be given to the parties hereto via facsimile, hand delivery, certified mail, first class postage prepaid, return receipt requested, or nationally recognized and reputable overnight delivery service, addressed to the parties hereto as follows:

| | |
|---|---|
| CRE Companies: | c/o Care Investment Trust Inc.<br>505 Fifth Avenue<br>6th Floor<br>New York, NY 10017<br>Attention: Chief Executive Officer<br>Facsimile: 212-771-9317 |
| with copies to: | Waller Lansden Dortch & Davis, LLP<br>511 Union Street, Suite 2700<br>Nashville, Tennessee 37219<br>Attention: Robert L. Harris<br>Facsimile: 615-244-6804 |
| Seller Parties: | c/o Jean-Claude Saada, Seller Parties Representative<br>1717 Main Street<br>59th Floor<br>Dallas, TX 75201<br>Facsimile: 214-871-7338 |
| with a copy to: | Brill & Johnson, PLLC<br>1360 Post Oak Boulevard<br>Suite 1750<br>Houston, TX 77056<br>Attention: Robert J. Brill, Esq.<br>Facsimile: 713-627-1415 |

Each such notice and other communication shall be deemed, for all purposes of this Agreement, to have been given and received: (i) if given by facsimile, when the facsimile is transmitted to the party's facsimile number specified above and confirmation of complete receipt is received by the transmitting party during normal business hours on any Business Day or on the next Business Day if not confirmed during normal business hours; (ii) if by hand, when delivered; (iii) if by certified mail, first class postage prepaid, return receipt requested, five (5) days after the date on which such notice or other communication is deposited in the United States mail, or (iv) if given by nationally recognized and reputable overnight delivery service, the Business Day on which the records of such delivery service show that such notice was delivered to the party. Any party from time to time may change its address or facsimile number for the purpose of receipt of notices to that party by giving a similar notice specifying a new address or facsimile number to the other notice parties listed above in accordance with the provisions of this Article II.

### III. MISCELLANEOUS

3.1     Fees and Expenses.

(a)     Subject to Section 1.2(e), each party will pay its own costs and expenses incurred in connection with the negotiation, preparation and performance of this Agreement and of the purchase of the Put Interests set forth herein, including, without limitation, the fees and expenses of its counsel, accountants and financial advisors whether or not such transactions are consummated. Notwithstanding the foregoing, the Seller Parties shall bear the costs and expenses incurred in connection with obtaining lender consent to the transactions contemplated by this Agreement.

(b) In the event either party elects to incur expenses to enforce or obtain third-party interpretation of any provision of this Agreement, the prevailing party will be entitled to recover such expenses, including all legal expenses, attorney's fees, costs and necessary disbursements, in addition to any other relief to which such party shall be entitled. The obligation of each party to pay its own expenses set forth in subsection (a) above shall be subject to any rights at law or in equity of the prevailing party arising from the enforcement or interpretation of this Agreement as contemplated in this subsection (b).

3.2 Public Announcement. No party shall prior to the Put Closing, without the approval of the other party, issue any press release or other public announcement concerning the purchase of the Put Interests pursuant to this Agreement or the transactions otherwise contemplated by this Agreement. At and after the Put Closing, the parties will use good faith efforts to agree on the text of a joint public statement or announcement and/or will use good faith efforts to obtain the other parties' approval of the text of any public statement or announcement to be made solely on behalf of a party. Notwithstanding the foregoing, any party may issue a press release or other public announcement concerning the transactions contemplated by this Agreement to the extent required by applicable Law, or to comply with accounting or other disclosure obligations. Nothing contained in this Section 3.2 is deemed to prohibit, limit or restrict communications by either party with Government Authorities, the CRE Companies' Affiliates, or lenders to the Seller Parties or their Affiliates, regarding the transactions contemplated by this Agreement.

3.3 Entire Agreement. Other than that certain Confidentiality Agreement by and among CIT Healthcare LLC, CHI and Cain Brothers RE, LLC dated May 3, 2007, the Purchase Agreement and the other Transaction Documents, this Agreement (together with Exhibit A) contains the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes all prior oral discussions and written agreements with respect thereto (including any term sheet, letter of intent or similar agreement or document relating to the transactions contemplated hereby). There are no restrictions, agreements, promises, warranties, covenants or undertakings other than those expressly set forth herein and in the Purchase Agreement and the other Transaction Documents.

3.4 Amendment and Waiver. This Agreement may be modified, supplemented or amended only by a written instrument duly executed by each of the parties hereto. Any term or condition of this Agreement may be waived at any time by the party entitled to the benefit thereof. Any such waiver must be in writing and must be duly executed by such party. All rights and remedies of the parties to this Agreement are cumulative and not alternative. No failure or delay by any party in exercising any right, power or privilege under this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right power or privilege. A waiver on one occasion shall not be deemed to be a waiver of the same or any other breach, provision or requirement on any other occasion.

3.5 Counterparts; Facsimile Signatures. This Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Signatures on this Agreement by facsimile or other electronic imaging technology shall be deemed to be original signatures for all purposes.

3.6 Governing Law; Construction. This Agreement shall be governed by and interpreted, construed and enforced in accordance with the Laws of the State of New York applicable to a contract executed and performed in such state, excluding any conflicts of law rule or principle that would refer the governance, interpretation, construction or enforcement of this Agreement to the Laws of another jurisdiction, and such application of New York law shall not be vitiated by any allegations of fraud. In as much as this Agreement is the result of negotiations between sophisticated parties of equal bargaining power represented by counsel, the parties hereto agree that no provisions of this Agreement or any related

1746623.13                                    7

document shall be construed for or against or interpreted to the advantage or disadvantage of any party hereto by any court or other Governmental Authority by reason of any party's having or being deemed to have structured or drafted such provision, each party having participated equally in the structuring and drafting hereof.

3.7   **Venue; Waiver of Jury Trial.** To the fullest extent permitted by applicable Law, each party hereto (a) agrees that any claim, action or Proceeding by such party seeking any relief whatsoever arising out of, or in connection with, this Agreement or the transactions contemplated hereby shall be brought only in any New York state court located in New York County or in the Federal district court for the Southern District of New York and not in any other State or Federal court in the United States of America or any court in any other country, (ii) agrees to submit to the exclusive jurisdiction of such courts located in New York County or in the Federal district court for the Southern District of New York for purposes of all legal Proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such Proceeding brought in such a court or any claim that any such proceeding brought in such a court has been brought in an inconvenient forum, and (iv) agrees that a final judgment in any such action or Proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law. EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHTS TO TRIAL BY JURY, FROM WHATEVER SOURCE ARISING, IN CONNECTION WITH ANY LITIGATION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

3.8   **Binding Effect; No Assignment; No Third Party Beneficiaries.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns, including successors by merger or otherwise. Neither this Agreement nor any right hereunder or part hereof may be assigned by any party hereto without the prior written consent of the other parties hereto, except that each of the CRE Companies may assign its rights and obligations hereunder to: (i) any Affiliate of any of the CIT Companies or (ii) any party (other than the CRE Companies) to a definitive agreement executed in connection with a Change in Control transaction and upon any such permitted assignment any continuing obligations of the CRE Companies to Seller Parties under this Agreement shall survive the Closing of the Change in Control transaction. The terms and provisions of this Agreement are intended solely for the benefit of the parties hereto and their respective successors or permitted assigns, and it is not the intention of the parties to confer third-party beneficiary rights upon any other Person.

3.9   **Severability; Invalid Provisions.** It is the intention of the parties hereto that the provisions of this Agreement shall be enforced to the fullest extent permissible under the Laws and public policies of each state and jurisdiction in which such enforcement is sought, and that the unenforceability (or the modification to conform with such Laws or public policies) of any provision hereof shall not render unenforceable or impair the remainder of this Agreement. Accordingly, if any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law: (a) such provisions will be fully severable; (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom; and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms and effect to such illegal, invalid or unenforceable provision as may be possible (or, in the alternative, should any provision contained in this Agreement be reformed or

rewritten by any Governmental Authority, such provision as so reformed shall be fully binding on the parties as if originally a part hereof).

 3.10 <u>Interpretation</u>. In this Agreement, unless the context otherwise requires:

 (a) references to this Agreement are references to this Agreement and to <u>Exhibit A</u> hereto;

 (b) references to Articles, Sections and subsections are references to Articles and Sections of this Agreement;

 (c) subject to the provisions of <u>Section 3.8</u>, references to any party to this Agreement shall include references to its respective successors and permitted assigns;

 (d) the terms "hereof," "herein," "hereby," and derivative or similar words will refer to this entire Agreement;

 (e) the gender of all words herein shall include the masculine, feminine and neuter, and the case of all words herein shall include the singular and plural;

 (f) references to any document (including this Agreement) are references to that document as amended, consolidated, supplemented, novated or replaced by the parties from time to time;

 (g) the descriptive headings and numbers of the Articles, Sections and subsections of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

 (h) the word "including" shall mean including without limitation;

 (i) all Exhibits referred to in or attached to this Agreement are integral parts of this Agreement as if fully set forth herein; and

 (j) references to time are references to local New York, New York time.

 3.11 <u>Time of Essence</u>. With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

**Remainder of page intentionally left blank.**

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

**BUYER:**

ERC Sub, L.P.

By: ERC Sub, LLC, its general partner

By: _____
Name:   F. Scott Kellman
Title:    President and Chief Executive Officer

**BUYER GP:**

ERC Sub, LLC

By: _____
Name: F. Scott Kellman
Title:   President and Chief Executive Officer

**REIT:**

Care Investment Trust Inc.

By: _____
Name: F. Scott Kellman
Title:   President and Chief Executive Officer

**SELLERS:**

_____
Jean-Claude Saada

Cambridge B/R, Inc.

By: _____
Name:   Jean-Claude Saada
Title:    President

Cambridge-Greenville Dallas, LLC

By: _____
Name:   Jean-Claude Saada
Title:    ~~President~~ Managing Member

1746623

Put Agreement
Signature Page

PMC Cambridge of Plano, Ltd.

By: Cambridge-Collin, Inc., its general partner

By: _____
Name:   Jean-Claude Saada
Title:    President

Cambridge-Crown Atrium LLC

By: _____
Name:   Jean-Claude Saada
Title:    ~~Sole Member~~ Managing Member

Cambridge North Texas Holdings, LLC

By: _____
Name:   Jean-Claude Saada
Title:    Managing Member

**MANAGING OWNERS:**

Cambridge Nassau Bay GP LLC

By: _____
Name:   Jean-Claude Saada
Title:    Sole Member

CHMP Manager, LLC

By: _____
Name:   Jean-Claude Saada
Title:    Member

6000 Greenville, Inc.

By: _____
Name:   Jean-Claude Saada
Title:    President

Allen MOB, Inc.

By: _____
Name:  Jean-Claude Saada
Title:   President

Cambridge Onala, Inc.

By: _____
Name:  Jean-Claude Saada
Title:   President

5280 Medical Drive, Inc.

By: _____
Name:  Jean-Claude Saada
Title:   President

Gorbutt MOB, Inc.

By: _____
Name:  Jean-Claude Saada
Title:   President

Cambridge Tarrant, Inc.

By: _____
Name:  Jean-Claude Saada
Title:   President

1746623

Put Agreement
Signature Page

**EXHIBIT A**

| Seller | Managing Owner | Company | Seller's Total Ownership Interest in Company on the Date Hereof | Managing Owner's Total Ownership Interest in Company on the Date Hereof |
|---|---|---|---|---|
| Jean-Claude Saada | Cambridge Nassau Bay GP LLC | Cambridge Nassau Bay LP | 14% limited partnership interest | 1% general partnership interest |
| Cambridge B/R, Inc. | CHMP Manager, LLC | Cambridge Howell Medical Plaza, LLC | 14% membership interest | 1% managing member interest |
| Cambridge - Greenville Dallas, LLC | 6000 Greenville, Inc. | Cambridge Walnut Hill, L.P. | 13.5% limited partnership interest | 1.5% general partnership interest |
| Jean-Claude Saada | Allen MOB, Inc. | Cambridge Allen Partners, L.P. | 14% limited partnership interest | 1% general partnership interest |
| PMC Cambridge of Plano, Ltd. | Cambridge Onalp, Inc. | Cambridge Plano Partners MOB IV, L.P. | 14% limited partnership interest | 1% general partnership interest |
| Cambridge-Crown Atrium, LLC | 5280 Medical Drive, Inc. | Cambridge Westgate Medical Center, L.P. | 13.5% limited partnership interest | 1.5% general partnership interest |
| Jean-Claude Saada | Gorbutt MOB, Inc. | Cambridge Gorbutt MOB, L.P. | 14% limited partnership interest | 1% general partnership interest |
| Cambridge North Texas Holdings, LLC | Cambridge Tarrant, Inc. | Cambridge Southlake Partners, L.P. | 14% limited partnership interest | 1% general partnership interest |

1746623.13