# EXHIBIT C

**SECOND AMENDED AND RESTATED**
**OPERATING AGREEMENT**
**OF**
**CAMBRIDGE HOWELL MEDICAL PLAZA, LLC**
a Louisiana Limited Liability Company

THE MEMBERSHIP INTERESTS REPRESENTED BY THIS DOCUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY JURISDICTION IN RELIANCE UPON EXEMPTION FROM REGISTRATION AS PROVIDED IN THOSE STATUTES. NO MEMBERSHIP INTERESTS MAY BE SOLD OR OFFERED FOR SALE (WITHIN THE MEANING OF ANY SECURITIES LAW) UNLESS A REGISTRATION STATEMENT UNDER ALL APPLICABLE SECURITIES LAWS WITH RESPECT TO THE MEMBERSHIP INTEREST IS THEN IN EFFECT OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THOSE LAWS IS THEN APPLICABLE TO THE MEMBERSHIP INTEREST. A MEMBERSHIP INTEREST ALSO MAY NOT BE TRANSFERRED OR ENCUMBERED UNLESS THE PROVISIONS OF ARTICLE 10 OF THIS AGREEMENT ARE SATISFIED. SEE ARTICLE 13 FOR REPRESENTATIONS AND WARRANTIES REQUIRED BY CLASS A MEMBERS WITH RESPECT TO AN INVESTMENT IN THIS LIMITED LIABILITY COMPANY.

**SECOND AMENDED AND RESTATED**
**OPERATING AGREEMENT**
**OF**
**CAMBRIDGE HOWELL MEDICAL PLAZA, LLC**

This Second Amended and Restated Operating Agreement (the "Agreement") of Cambridge Howell Medical Plaza, LLC (the "Company") is entered into effective the 31st day of December 2007, by and between CHMP MANAGER, LLC (the "Managing Member"), a Louisiana limited liability company, as the managing member; CAMBRIDGE B/R, INC. (the "Cambridge Class A Member"), a Louisiana corporation, and ERC Sub, L.P. (the "CIT Member"), a Delaware limited partnership, as the Class A Members. The Cambridge Class A Member, the CIT Member and any other Person hereafter admitted to the Company as a member are hereafter referred to collectively as the "Class A Members". The Managing Member and the Class A Members are sometimes referred to collectively as the "Members" and individually as a "Member". This Agreement and the related annexes, exhibits and schedules attached hereto contain the entire understanding of the Members relating to the terms, conditions, and covenants of the agreement between them and supersede all prior and contemporaneous written or oral agreements and understandings relating to the subject matter hereof.

**RECITALS:**

A.    Effective as of January 8, 2004, the Articles of Organization (the "Articles") of the Company were duly filed in the office of the Secretary of State of Louisiana.

B.    The Managing Member and the Cambridge Class A Member entered into those certain First Amended and Restated Regulations effective September 22, 2006 (the "First Amended and Restated Regulations").

C.    Pursuant to that certain Purchase Agreement (the "CIT Purchase Agreement"), dated as of December 31, 2007, by and among the CIT Member and certain affiliates of the Managing Member, the Cambridge Class A Member agreed to sell and convey to the CIT Member an 85% Interest in the Company, reducing the Cambridge Class A Member's Interest in the Company to a 14% Interest in the Company.

D.    The Managing Member has a 1% Interest in the Company.

E.    Effective as of the date hereof, the Cambridge Class A Member sold, assigned, transferred, conveyed and delivered to the CIT Member an 85% Interest in the Company pursuant to the CIT Purchase Agreement.

F.    The transaction contemplated by the CIT Purchase Agreement in which the CIT Member acquired an 85% Interest in the Company also involved the acquisition of interests in other Operating Companies from the same or affiliated owners. As an integral part of the transaction, the CIT Member is entitled to a Minimum Quarterly Distribution on a quarterly basis equal to a specified return on the aggregate investment in all Operating Companies until the Conversion Date. If the distribution from the Operating Companies is insufficient to meet the Minimum Quarterly Distribution in any quarter, all or a portion of the distribution that would otherwise go to the Cambridge Class A Member and the Managing Member (in that order) will instead be paid to the CIT Member to the extent necessary to equal the Minimum Quarterly Distribution. In the event one or more of the other Operating Companies is unable to make distributions sufficient to comply with the Minimum Quarterly Distribution for such entity, any shortfall in the Minimum Quarterly Distribution is required to be made up by the distributions of Available Cash from one or more of the other Operating Companies (including the Company) pertaining to the quarter to equal such shortfall. In order to implement the terms of this Agreement, the Members have agreed that, prior to the Conversion Date, all distributions payable to the Members will be paid to the Escrow Agent which will aggregate all such distributions and, if appropriate, pay the distributions as instructed in

order to provide the CIT Member its Minimum Quarterly Distribution. In the event the aggregate distributions of the Operating Companies for a quarter do not equal the Minimum Quarterly Distribution, pursuant to the terms of the Escrow Agreement, the Escrow Agent shall utilize certain amounts or property placed in the escrow account by the Sellers (as defined in the Escrow Agreement). Pursuant to the Escrow Agreement, the Escrow Agent shall inform in writing the relevant general partner or managing member, as the case may be, of the amount of distribution made by such Operating Company that would otherwise be considered distributed first to the Cambridge limited partner or member, as the case may be, and then to the general partner or managing member, as the case may be (in that order) that was actually distributed to the CIT Member (the "Supplemental Distribution"). The books and records of the Company will reflect such distributions as being made by the Company to the CIT Member. To the extent of the Supplemental Distribution, the CIT Member shall receive a special allocation of Profits (first ordinary income and then capital gain) equal to the Supplemental Distribution and the Cambridge Class A Member (first) and the Managing Member (second) will have its respective allocated income reduced accordingly.

G.    As a result of the consummation of the transactions contemplated by the CIT Purchase Agreement, the Managing Member, the Cambridge Class A Member and the CIT Member are the only members of the Company.

H.    The Managing Member, the Cambridge Class A Member and the CIT Member have agreed and the Lender has consented to the amendment and restatement of the First Amended and Restated Regulations as provided in this Agreement.

Any capitalized terms above that are not defined above, shall have the definition as provided subsequently herein.

**NOW THEREFORE,** for and in consideration of the mutual covenants, rights, and obligations set forth in this Agreement, the benefits to be derived from this Agreement, and other good and valuable consideration, the receipt and sufficiency of which each Member acknowledges, the Managing Member, the Cambridge Class A Member and the CIT Member hereby continue the Company under and pursuant to the Act, upon the terms and conditions set forth in this Agreement.

## ARTICLE 1

### Definitions

The following terms, when used with initial capital letters in this Agreement, have the meanings assigned to them in this Article unless the context otherwise requires:

Section 1.1    **Act** means the Louisiana Limited Liability Company Act, and any successor statute, as amended from time to time.

Section 1.2    **Additional Capital Contributions** is defined in Section 4.3.

Section 1.3    **Adjusted Capital Account Deficit** means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)    credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(b)    debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

Section 1.4    **Affiliate** is defined in Section 3.4(e).

Section 1.5    **Agreement** means this Second Amended and Restated Operating Agreement.

Section 1.6    **Annual Budget** is defined in Section 9.2(b)(ii).

Section 1.7    **Articles** are defined in Recital A, and include all amendments thereto.

Section 1.8    **Available Cash** means the positive difference between (i) cash actually received, from time to time, by the Company from the conduct of the Company's business and the sale or refinancing of Company property and (ii) the sum of (a) cash payments actually made, from time to time, by the Company in connection with the conduct of the Company's business, (b) cash which may not be distributed to the Members pursuant to restrictions imposed by any Person not an affiliate of a Member loaning money to the Company for any purpose, and (c) a reasonable reserve not to exceed three (3) months of expenses and debt service. Available Cash generated from the conduct of the Company's business shall be referred to as "Available Cash from Operations", and Available Cash generated from sale or refinancing of Company Property shall be referred to as "Available Cash from Special Event". The determination of the amount of Available Cash from Operations or Available Cash from Special Event shall be made no less than quarterly by the Managing Member. Notwithstanding anything contained herein to the contrary, Available Cash shall not include any of the DB Holdback Reserves (as defined in the CIT Purchase Agreement) in an amount not to exceed the amount set forth on Schedule 1.8 hereto, and such DB Holdback Reserves shall be the sole property of the Cambridge Class A Member.

Section 1.9    **Bankruptcy Event** means any event where the Managing Member: (i) makes an assignment for the benefit of creditors; (ii) files a voluntary petition in bankruptcy; (iii) is adjudged bankrupt or insolvent, or has entered against it an order for relief in any bankruptcy or insolvency proceeding; (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature; (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Managing Member or of all or any substantial part of its properties; or (vii) one hundred twenty (120) days after the commencement of any proceeding against the Managing Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within ninety (90) days after the appointment without the Managing Member's consent or acquiescence of a trustee, receiver or liquidator of the Managing Member or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within ninety (90) days after the expiration of any such stay, the appointment is not vacated.

Section 1.10    **Cambridge Class A Member** is defined in the Preamble.

Section 1.11    **Capital Account** means the tax capital account maintained by the Company for each Member, the initial balance of each of which shall be zero. Each Member's Capital Account shall be increased by (i) the amount of money contributed by such Member to the Company, (ii) the fair market value of property contributed by such Member to the Company (net of liabilities securing such contributed property that the Company is considered to assume or take subject to under Section 752 of the Code), and (iii) allocations to such Member of any income or gain (or items thereof) by the Company, including income and gain exempt from tax and income and gain described in Section 1.704-1(b)(2)(iv)(g) of the Treasury Regulations promulgated under Section 704(b) of the Code, but excluding income and gain described in Section 1.704-1(b)(4)(i) of the Treasury Regulations promulgated under Section 704(b) of the Code; and shall be decreased by (iv) the amount of money distributed to such Member by the Company, (v) the fair market value of property distributed to such Member by the Company (net of liabilities securing such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code), (vi) allocations to such Member of expenditures of the Company described in Section 705(a)(2)(B) of the Code, and (vii) allocations of loss and deduction (or items thereof) from the Company, including loss and deduction described in of Section 1.704-1(b)(2)(iv)(g) of the final Treasury Regulations promulgated under Section 704(b) of

the Code, but excluding items described in clause (vi) above and loss or deduction described in Section 1.704-1(b)(4)(i) or (4)(iii) of the Treasury Regulations promulgated under Section 704(b) of the Code. It is the intention of the Members that each Member's Capital Account shall be maintained in accordance with the rules set forth in Section 1.704-1(b)(2)(iv) of the Treasury Regulations promulgated under Section 704(b) of the Code, and to the extent that the rules set forth therein with respect to the maintenance of Capital Account balances differ from the provisions of this definition of "Capital Account", the rules set forth therein shall apply. A transferee of an interest in the Company shall succeed to the Capital Account of the transferor. A Member who has more than one interest in the Company shall have a Capital Account for each such interest.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Managing Member shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Company or any Member) are computed in order to comply with such Regulations, the Managing Member may make such modification, provided that it will not have a material effect on the amounts distributable to any Member pursuant to Section 7.2 upon a sale of all or substantially all of the assets of the Company. The Managing Member also shall make any adjustments that are necessary or appropriate to maintain equality between the aggregate Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Regulations Section 1.704-1(b)(2)(iv)(q).

Section 1.12 **Capital Contribution** means the total contributions to the capital of the Company which a Member makes pursuant to Article 4 of this Agreement.

Section 1.13 **Change in Control** is defined in Section 9.7(b).

Section 1.14 **CIT Member** is defined in the Preamble.

Section 1.15 **Class A Member** means the Cambridge Class A Member, the CIT Member and any other Person hereafter admitted to the Company as a Class A Member.

Section 1.16 **Code** means the Internal Revenue Code of 1986, as amended.

Section 1.17 **Company** is defined in the Preamble.

Section 1.18 **Contributing Member** is defined in Section 4.5.

Section 1.19 **Control** is defined in Section 9.7(b).

Section 1.20 **Conversion Date** means the date that is the earlier of (i) the seventh anniversary of the effective date of this Agreement or (ii) the first business day of the calendar quarter immediately following the calendar quarter in which the Escrow Release Formula is satisfied.

Section 1.21 **Deadlock** is defined in Section 9.2(d).

Section 1.22 **Defaulting Class A Member** is defined in Section 14.2(a).

Section 1.23 **Depreciation** means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such year or other period; provided, however, that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, further that if the federal income tax depreciation, amortization, or other cost recovery

deduction for such year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Managing Member.

Section 1.24    **Disposition** means any sale, assignment, conveyance, transfer, pledge or hypothecation, by operation of law or otherwise, of any Interest of a Member or any right, title or interest therein or thereto (excluding any assignment of a right to receive cash distributions), including without limitation, disposition upon death or, in case of a Member that is an entity, any sale, assignment, conveyance, transfer, pledge or hypothecation, by operation of law or otherwise, of any interest in such Member; provided, however, that a sale, assignment, conveyance, transfer, pledge or hypothecation by a Class A Member in accordance with Section 10.2(b)(ii) or Section 10.5 shall not be deemed to be a Disposition.

Section 1.25    **Escrow Agent** means Amegy Bank National Association, a national banking association, or its successors and assigns.

Section 1.26    **Escrow Agreement** means the escrow agreement by and among the Escrow Agent, the Company and certain other parties entered into pursuant to the CIT Purchase Agreement. The Members acknowledge and agree that consummation of the transaction contemplated by the Escrow Agreement shall not be deemed to be a breach or violation by any Member of this Agreement.

Section 1.27    **Escrow Release Formula** means the occurrence of both (i) a calendar quarter that is a Qualifying Quarter and is preceded by five consecutive calendar quarters in which at least three of such five quarters are Qualifying Quarters and (ii) during such six calendar quarters, the average of the Buyer's Quarterly Distribution Amounts (as defined in the Escrow Agreement) from all Operating Companies in the aggregate for such six quarters exceeds the average Minimum Quarterly Distribution from all Operating Companies in the aggregate for such six quarters.

Section 1.28    **Events of Default** is defined in Section 14.1.

Section 1.29    **Executives** is defined in Section 9.2(d).

Section 1.30    **First Mortgage** is defined in Section 3.4(b).

Section 1.31    **Fiscal Year** means the fiscal year of the Company, which shall be the calendar year.

Section 1.32    **Gross Asset Value** means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)    The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member and the Managing Member, provided that the initial Gross Asset Value of the assets as of the date hereof owned by the Company shall be as set forth in Schedule 1.32 and provided further that, if the contributing Member is a Managing Member, the determination of the fair market value of any other contributed asset shall require the consent of the CIT Member;

(ii)    The Gross Asset Value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Managing Member as of the following times: (a) the acquisition of an additional Interest by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Company to a Member of more than a de minimis amount of Property as consideration for an Interest; and (c) the liquidation of the Company within the meaning of Regulations Section 1.704-1 (b)(2)(ii)(g): provided, however, that adjustments pursuant to clauses (a) and (b) above shall be made only if the Managing Member reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii)    The Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the distributee

and the Managing Member, provided that, if the distributee is a Managing Member, the determination of the fair market value of the distributed asset shall require the consent of the CIT Member; and

(iv)    The Gross Asset Value of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(*m*), subparagraph (vi) of the definition of "Profits" and "Losses" or Section 8.5(b) hereof; provided, however, that Gross Asset Value shall not be adjusted pursuant to this subparagraph (iv) to the extent the Managing Member determines that an adjustment pursuant to subparagraph (ii) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraph (i), (ii), or (iv) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

Section 1.33    **Institutional Investor** is defined in Section 3.4(c).

Section 1.34    **Interest** means the entire ownership interests and rights of a Member in the Company.

Section 1.35    **Lender** is defined in Section 3.4(b).

Section 1.36    **Liquidation** has the meaning assigned to it in Treasury Regulation 1.704(b)-1(b)(2)(ii)(g) promulgated under Section 704(b) of the Code.

Section 1.37    **Loan** is defined in Section 3.4(b)

Section 1.38    **Management Agreement** is defined in Section 3.1.

Section 1.39    **Managing Member** means CHMP Manager, LLC, a Louisiana limited liability company, and any successor Managing Member pursuant to the terms of this Agreement.

Section 1.40    **Material Adverse Effect** means an event, change or circumstance which would be reasonably expected to have a material adverse effect on the financial condition or results of operations of the business of the Company or the Property.

Section 1.41    **Material Dispute** is defined in Section 9.2(d).

Section 1.42    **Members** means, collectively, the Managing Member and the Class A Members.

Section 1.43    **Minimum Quarterly Distribution** has the meaning assigned to it in the Escrow Agreement.

Section 1.44    **New Managing Member** is defined in Section 12.2(b).

Section 1.45    **Non-Contributing Member** is defined in Section 4.5.

Section 1.46    **Non-Defaulting Members** is defined in Section 14.2(a).

Section 1.47    **Nonrecourse Distribution** is defined in Section 6.3(d).

Section 1.48    **Offer** is defined in Section 10.4.

Section 1.49    **Offeror** is defined in Section 10.4.

Section 1.50    **Old Managing Member** is defined in Section 12.2(b).

Section 1.51    **Operating Companies** has the meaning assigned to "Companies" in the Escrow Agreement.

Section 1.52    **Percentage Interest** means the respective Interest of each Member expressed as a percentage of the Interests owned by all Members. The Percentage Interest of each Member as of the effective date of this Agreement is set forth beside each Member's name on Exhibit "A" to this Agreement.

Section 1.53    **Person** is defined in Section 3.4(e).

Section 1.54    **Prime Rate** means the rate of interest per annum equal to *The Wall Street Journal* prime rate as quoted in the money rates section of *The Wall Street Journal* with adjustments to be made on the same date as any change in the rate, but in no event to exceed the maximum nonusurious rate allowed by law.

Section 1.55    **Profits or Losses** means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.55 shall be added to such taxable income or loss;

(b)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Regulations and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.55 shall be subtracted from such taxable income or loss;

(c)    In the event the Gross Asset Value of any Company Property is adjusted pursuant to Section 8.5 hereof or subparagraph (ii) or (iii) of the definition of "Gross Asset Value", the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(d)    Gain or loss resulting from any disposition of Company Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Property disposed of, notwithstanding that the adjusted tax basis of such Property differs from its Gross Asset Value;

(e)    In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account depreciation for such Fiscal Year or other period, computed in accordance with the definition of "Depreciation";

(f)    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) is requested pursuant to Regulations Section 1.704-11(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

(g)    Notwithstanding any other provision in this Section 1.55, any items which are specially allocated pursuant to Section 6.3 or Section 6.4 hereof shall not be taken into account in computing Profits or Losses.

Section 1.56    **Project** means the Company's real property described on Exhibit "B" attached hereto (the "Land"), plus the improvements thereto, including the medical office building (the "MOB") located thereon and related parking facilities.

Section 1.57    **Property** means all of the real and personal property contributed to or otherwise acquired by the Company.

Section 1.58    **Qualifying Quarter** means any calendar quarter in which the aggregate amount paid to the CIT Member solely from distributions of the Buyer's Quarterly Distribution Amounts for all Operating Companies in the aggregate is equal to or greater than the Minimum Quarterly Distribution payable by the Operating Companies on an aggregate basis as set forth in Exhibit C to the Escrow Agreement.

Section 1.59    **Redemption Price** is defined in Section 9.7.

Section 1.60    **Regulations** means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

Section 1.61    **REIT** means Care Investment Trust Inc., a Maryland corporation and an Affiliate of the CIT Member.

Section 1.62    **Securities Act of 1933** is defined in Section 13.1(d)

Section 1.63    **Selling Member** is defined in Section 10.4.

Section 1.64    **Service** is defined in Section 13.1(b).

Section 1.65    **Term** is defined in Section 2.5.

## ARTICLE 2

### Formation and Name

Section 2.1    **Formation of Company.** The Members have voluntarily associated themselves together for the purpose of continuing the Company pursuant to the laws of the State of Louisiana, including the Act. The provisions of this Agreement, as amended in writing, as provided herein, govern the rights and obligations of the Members unless the Act expressly provides that a particular statute supersedes any provision to the contrary in an operating agreement. The Members agree to continue the existence of the Company in accordance with the provisions of this Agreement and the Act. The Managing Member has previously admitted the Class A Members to the Company pursuant to the terms hereof and the Class A Members have previously joined in the Company pursuant to, and hereby agree to be bound by, all of the provisions of this Agreement. The First Amended and Restated Regulations are hereby amended and restated in their entirety and superseded by this Agreement.

Section 2.2    **Filings.** Subject to the terms and conditions of this Agreement, the Managing Member shall execute such documents and shall take all such other actions as the Managing Member deems necessary or appropriate to permit the Company to transact business under the laws of the State of Louisiana. Subject to the terms and conditions of this Agreement, the Managing Member shall from time to time take appropriate action, including the preparation and filing of such amendments to the Articles and other certificates as may be required under the laws of the State of Louisiana and the filing of such registrations, and amendments thereto, in order to enable the Company to operate the business of the Company in the State of Louisiana or such other state in which the Company has or operates the business. The Class A Members shall execute such documents and instruments and take such other action as may be necessary to enable the Managing Member to fulfill its responsibilities under this Section.

Section 2.3    **Company Name**. The name of the Company shall be, and the business of the Company shall be conducted under the name of, **CAMBRIDGE HOWELL MEDICAL PLAZA, LLC** or such modifications or variations thereof as the Managing Member may determine from time to time, subject to the terms and conditions of this Agreement. The Managing Member shall execute and file such certificates, if any, as are required by applicable law to reflect the Company's operation under an assumed name. The Company has the sole and exclusive right to the Company name and its usage. No Member shall use or permit any Person (other than the Company) to use the name of the Company for any commercial purpose without the approval of all Members.

Section 2.4    **Principal Office**. The principal place of business and office of the Company is located at 1717 Main Street, 59th Floor, Dallas, Texas 75201, or at such other place or places as the Managing Member may from time to time designate by notice to the Class A Members. In addition, the Company may maintain such other offices as the Managing Member deems advisable.

Section 2.5    **Term of Company**. The term of the Company (the "Term") commenced on January 8, 2004, the date the Articles were duly filed with the Secretary of State of Louisiana, and continues perpetually, unless sooner terminated in accordance with the provisions of this Agreement.

Section 2.6    **Name and Designation of Members**. The name and the designation of who is a Managing Member and who is a Class A Member is set forth on Exhibit "A" hereof.

Section 2.7    **Company Expenses**. Except as specifically provided in this Agreement, all limited liability company expenses, including a pro rata share of Escrow Agent fees and expenses, shall be paid from funds which are Company Property. All payments under this Section 2.7 shall be treated as Company costs and expenses for accounting purposes and not as a payment or partial distribution of the Company profits, income, or gains to any of the Members.

Section 2.8    **Licenses and Permits**. The Managing Member shall use its best efforts to obtain, as soon as practicable, and maintain in good standing and in full force and effect during the Term, all licenses and permits needed for the establishment and continued operation of the Project.

Section 2.9    **Registered Office and Agent**. The Company's registered agent in the State of Louisiana is Donald L. Cunningham, Jr., 1600 Bank One Centre, Baton Rouge, LA 70821. The registered agent shall forward a copy of all materials received as a result of being the registered agent to each of the Members at the addresses set forth in this Agreement.

## ARTICLE 3

### Purposes and Powers

Section 3.1    **Purpose**. Subject to the limitations set forth in this Agreement, the purpose of the Company is to (i) acquire, own, advertise, manage, operate, finance, refinance, maintain, lease, and sell the Project; (ii) enter into a management and leasing agreement with Cambridge Healthcare Management, Inc., a Delaware corporation (the "Management Agreement"); and (iii) in general, to do whatever is necessary and proper to effectuate the foregoing in the ownership, operation, and management of the Project. The Company has the power to do everything necessary, advisable, proper or convenient for the accomplishment of the purposes specified above.

Section 3.2    **Title to Company Property**. All property owned by the Company shall be owned by the Company as an entity and, insofar as permitted by applicable law, no Member shall have any ownership interest in any Company Property in its individual name or right, and each Member's Interest shall be personal property for all purposes.

Section 3.3    **Effect of Bankruptcy, Death or Incompetency of a Class A Member**. The bankruptcy, death, dissolution, termination or adjudication of incompetency of a Class A Member shall not cause the termination or dissolution of the Company and the business of the Company shall continue. Upon any such occurrence, the trustee, receiver, executor, administrator, committee, guardian or conservator of such Class A Member shall have all

the rights of such Class A Member for the purpose of settling or managing its estate or property, subject to satisfying the conditions precedent to the admission of such assignee as a substitute Class A Member. Any Disposition by such trustee, receiver, executor, administrator, committee, guardian or conservator of any Interest shall be subject to all of the restrictions hereunder to which such Disposition would have been subject if such Disposition had been made by such bankrupt, deceased, dissolved, liquidated, terminated or incompetent Class A Member.

Section 3.4      **SPE Provisions**. Notwithstanding any other provisions of this Agreement or the Articles, the Members agree as follows:

(a)      **Limited Purpose**. The nature of the business and of the purposes to be conducted and promoted by the Company is to engage solely in the following activities:

(i)      to own, hold, sell, assign, transfer, operate, manage, lease, mortgage, pledge, and otherwise deal with the Land described on Exhibit "B" attached hereto, together with the MOB and all improvements thereon; and

(ii)      to exercise all rights, remedies, and powers not prohibited under the applicable laws of the State of Louisiana necessary or convenient to the conduct, promotion, or attainment of the business or purposes otherwise set forth herein.

(b)      **Prohibited Activities**.

(i)      For so long as any first mortgage lien (a "First Mortgage") in favor of any lender (including, without limitation, Deutsche Banc Mortgage Capital. L.L.C., its successors or assigns) (each, a "Lender") exists on any portion of the Project, the Company shall not incur, assume, or guaranty any indebtedness other than (A) the indebtedness (the "Loan") secured by a First Mortgage, (B) mezzanine debt expressly in accordance with the provisions of any First Mortgage, (C) ordinary course trade payables or expenses in connection with the Project; and (D) any other debt expressly permitted by a First Mortgage.

(ii)      For so long as a First Mortgage exists on any portion of the Project, the Company shall not voluntarily dissolve or liquidate.

(iii)      For so long as a First Mortgage exists on any portion of the Project, the Company shall not consolidate or merge with or into any other entity or convey or transfer its properties and assets substantially as an entirety to any entity unless (A) the entity (if other than the Company) formed or surviving such consolidation or merger or that acquires by conveyance or transfer the properties and assets of the Company substantially as an entirety (1) shall be organized and existing under the laws of the United States of America or any State or the District of Columbia, (2) shall include in its organizational documents the same limitations as set forth in Section 3.4, and (3) shall expressly assume the due and punctual performance of the Company's obligations; and (B) immediately after giving effect to such transaction, no default or event of default under any agreement to which it is a party shall have been committed by the Company and be continuing.

(iv)      For so long as a First Mortgage exists on any portion of the Project, the Company will not voluntarily commence a case with respect to itself, as debtor, under the Federal Bankruptcy Code or any similar federal or state statute without the unanimous consent of all of the Members of the Company.

(v)      For so long as a First Mortgage exists on any portion of the Project, no material amendment to this Agreement may be made without first obtaining approval of the Lender holding a Loan secured by a First Mortgage on any portion of the Project, or, after the securitization of a Loan, only if the Company receives (A) confirmation from each of the applicable rating agencies

that such amendment would not result in the qualification, withdrawal, or downgrade of any securities rating and (B) approval of such amendment by the Lender holding the Loan.

(c)    **Limitation on Transfers**.    Except in connection with mezzanine debt expressly in accordance with the provisions of any First Mortgage and except as permitted in Sections 10.2(b)(ii) or 10.5, no transfer of any direct or indirect ownership interest in the Company may be made such that the transferee owns, in the aggregate with the ownership interests of its Affiliates and family members in the Company, more than a 49% interest in the Company, unless such transfer is conditioned upon the delivery of an acceptable non-consolidation opinion to the Lender holding a Loan secured by a First Mortgage and to any applicable rating agency concerning, as applicable, the Company, the new transferee, and/or their respective owners; provided, however, notwithstanding the limitations on transfers set forth above, up to 85% of the membership interests in the Company may be transferred without the consent of any Lender holding a Loan secured by a First Mortgage to an Institutional Investor (as defined below) provided (i) such Lender receives prior written notice of such transfer and (ii) those Persons responsible for the management of the Project and the Company remain unchanged. For the purposes of this Section 3.4(c), an "Institutional Investor" is any Person that has total assets (in name or under management) in excess of $10,000,000 and capital/statutory surplus, stockholder equity, or net worth of $2,000,000 or more.

(d)    **Indemnification**. Notwithstanding any other provisions of this Agreement, including, without limitation, the provisions of Sections 9.5 and 13.2 hereof, any indemnification of the Members shall be fully subordinated to any obligations respecting the Project (including, without limitation, any First Mortgage).

(e)    **Separateness Covenants**. For so long as a First Mortgage exists on any portion of the Project, in order to preserve and ensure its separate and distinct identity, in addition to the other provisions set forth in this Agreement, the Company shall conduct its affairs in accordance with the following provisions:

(i)    It will establish and maintain an office through which its business shall be conducted separate and apart from those of any Affiliate(s) or, if it shares office space with any Affiliate(s), it shall allocate fairly and reasonably any overhead and expense for shared office space.

(ii)    It will not own any asset or property other than (i) the Project and (ii) personal property in connection with the ownership or operation of the Project.

(iii)    It will not engage, directly or indirectly, in any business other than to own, hold, sell, assign, transfer, operate, manage, lease, mortgage, pledge, and otherwise deal with the Project.

(iv)    It will not enter into any contract or agreement with any Affiliate except upon terms and conditions that are commercially reasonable and substantially similar to those that would be available on an arms-length basis with unrelated third parties.

(v)    It will not incur any indebtedness, secured or unsecured, direct or indirect, absolute or contingent (including guaranteeing any obligation), other than (A) the Loan, (B) mezzanine debt expressly in accordance with the provisions of any First Mortgage, (C) ordinary course trade payables or expenses in connection with the Project, and (D) any other debt expressly permitted by a First Mortgage. No indebtedness other than a Loan may be secured (subordinate or pari passu) by the Project.

(vi)    It will not make any loans or advances to any third party, including any Affiliate or the Managing Member and will not acquire obligations or securities of its Affiliate(s).

(vii)    It will remain solvent and will pay its debts and liabilities from its assets as the same become due and payable.

(viii)    It will do all things necessary to observe organizational formalities and preserve its existence, and it will not materially amend, modify, or otherwise change the Articles or this Agreement without the prior written consent of any Lender or, after the securitization of a Loan, only if the Company receives (i) confirmation from each of the applicable rating agencies that such amendment would not result in the qualification, withdrawal, or downgrade of any securities rating and (ii) approval of such amendment by the Lender holding a Loan.

(ix)    It will maintain all of its books, records, financial statements and bank accounts separate from those of its Affiliate(s) and the Managing Member and will file its own separate tax returns. It will maintain its books, records, resolutions and agreements as official records.

(x)    It will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate and the Managing Member), will correct any known misunderstanding regarding its status as a separate entity, will conduct and operate its business in its own name, and will not identify itself or any of its Affiliates as a division of the other entity.

(xi)    It will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

(xii)    Neither the Company nor the Managing Member will seek or permit the dissolution, winding up, Liquidation, consolidation or merger in whole or in part, of the Company, or acquire by purchase or otherwise all or substantially all of the business or assets of, or any stock or other evidence of beneficial ownership of, any other person or entity.

(xiii)    It will not commingle the funds and other assets of the Company with those of its Affiliates, the Managing Member, any affiliate of the Managing Member, or any other Person.

(xiv)    It will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its funds or assets, as the case may be, from those of any Affiliate, the Managing Member, or any other Person.

(xv)    It shall not pledge its assets or hold itself out to be responsible for the debts or obligations of any other Person.

(xvi)    It shall pay its liabilities out of its own funds.

(xvii)    It shall maintain a sufficient number of employees in light of its contemplated business operations.

(xviii)    It shall not guarantee or become obligated for the debts of any other Person.

(xix)    It shall have a managing member which shall be organized to be a single purpose, "bankruptcy remote" entity.

For purposes of this Agreement, the following terms shall have the following meanings:

"Affiliate" means any Person directly or indirectly controlling or controlled by or under common control with the Company, including, without limitation (i) any Person who has a familial relationship, by blood, marriage or otherwise with any partner or employee of the Company, or any Affiliate thereof, (ii) any officer, director or managing member of the Company and (iii) any Person which receives compensation

for administrative, legal or accounting services from the Company or any Affiliate. For purposes of this definition, "control" when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), estate, custodian, unincorporated organization, or government or any agency or political subdivision thereof.

(f)    **Limitations on Dissolution**.

(i)    The Company shall not terminate or dissolve solely as a consequence of the bankruptcy or insolvency of one or more of the managing members of the Company but the Company shall continue so long as there remains a solvent managing member of the Company.

(ii)    Subject to applicable law, dissolution of the Company shall not occur so long as the Company remains owner of the Project subject to a First Mortgage.

(iii)    Upon the dissociation or withdrawal of the Managing Member from the Company or the bankruptcy, insolvency, or Liquidation of the Managing Member, the CIT Member shall appoint a new Managing Member in accordance with the Provisions of Section 9.7(b)(i) and deliver an acceptable non-consolidation opinion to any holder of a Loan secured by a First Mortgage on the Project and to any applicable rating agency concerning, as applicable, the Company, the new Managing Member, and its owners.

(iv)    The unanimous consent of all Members (including that of the Managing Member) shall be required for the Company to: (A) file or consent to the filing of any bankruptcy, insolvency, or reorganization case or proceeding; institute any proceedings under any applicable insolvency law, or otherwise seek any relief under any laws relating to the relief from debts or the protection of debtors generally, (B) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian, or any similar official for the Company or a substantial portion of its Property; (C) make any assignment for the benefit of the Company's creditors, or (D) take any action in furtherance of the foregoing.

## ARTICLE 4

## Capital Contributions

Section 4.1    **Members' Capital Contribution**. The Managing Member and the Cambridge Class A Member have previously contributed to the capital of the Company in accordance with the First Amended and Restated Regulations.

Section 4.2    **Return of Contributions**. Except as expressly provided herein, no Member shall be entitled to the return of its Capital Contribution or any other contribution to the Company nor entitled to be paid any interest, salary or drawing in respect of either its Capital Account or any Capital Contribution made by it to the Company. No unpaid Capital Contribution shall be deemed or considered to be a liability of the Company or of any Member. Except as expressly provided herein, no Member shall be required to contribute or loan any cash or property to the Company to enable the Company to return any Member's contributions to the Company or to balance Capital Accounts.

Section 4.3    **Additional Contributions**. Subject to Section 4.5 and Section 9.2(a) hereof, the Managing Member and the Class A Members will, upon written notice from the Managing Member, in the ratio of their respective Percentage Interests, make such additional contributions to the capital ("Additional Capital Contributions") of the Company as the Managing Member deems to be necessary to fund one hundred percent

(100%) of the cash needs of the Company in excess of those provided by the conduct of the Company's business, debt financing or capital contributions by the Members otherwise required pursuant to this Article 4. Additional Capital Contributions shall be added to and increase the Capital Account of each Member.

Section 4.4    **Member Contributed Capital Account.**  A contributed capital account shall be maintained for each Member, which account shall have a credit balance equal to that Member's contributions to the capital of the Company, as increased by the value of any Additional Capital Contributions to the Company capital by the Member in that capacity, and as decreased by the amount of distributions made to such Member pursuant to Section 7.2(c) or Section 12.3(c)(iv) hereof.

Section 4.5    **Effect of Failure to Make Additional Contributions.**

(a)    If any Member fails to contribute its proportionate share of the Additional Capital Contributions required in accordance with the terms and conditions of this Agreement and needed by the Company after the expiration of thirty (30) days after the due date of such contribution, as specified in the Managing Member's Notice for Additional Capital Contributions (such Member is hereinafter referred to as a "Non-Contributing Member"), then the other Members, if any, or such of them as elect to do so (the "Contributing Members"), shall be entitled (but not obligated) to contribute the share of such Non-Contributing Member's Additional Capital Contributions. Any Contributing Members who elect to contribute such shares shall have the right to contribute the same in such proportions as they agree amongst themselves, or, in the absence of any such agreement, then in the proportion of their then respective Percentage Interests.

(b)    Upon the classification of a Member as a Non-Contributing Member, such Member's Percentage Interest in the Company shall be diluted on a dollar-for-dollar basis by allocating a portion of the Non-Contributing Member's Percentage Interest to the other Contributing Members who made their pro rata share of the additional Capital Contributions for which the Non-Contributing Member is delinquent, by allocating Additional Percentage Interests to each Contributing Member based on the proportion of each Contributing Member's Additional Capital Contributions to the Company.

(c)    The foregoing remedy is provided in view of the fact that the Interests of the other Members will be put in jeopardy as a result of the actions of a Non-Contributing Member, with potential damages to the other Members in amounts which cannot be foreseen. Each Member hereby agrees that it shall execute and deliver such conveyances, agreements or other documents which may be necessary to confirm and render fully effective the dilution of its Percentage Interest in the Company as herein provided. In the event any appropriate instruments are not delivered after five (5) days' written notice by the Managing Member to the Non-Contributing Member, the Managing Member may, as the Non-Contributing Member's irrevocable agent and attorney-in-fact, execute any such legal instruments conveying, transferring or assigning the diluted portion of the Non-Contributing Member's Percentage Interest and the Members agree that the Managing Member shall not have any individual liability for any actions taken in connection with the foregoing. Such power of attorney granted in favor of the Managing Member shall be deemed to be coupled with an interest and shall survive the death or incompetency of each Class A Member. In the event the Managing Member is the Non-Contributing Member and any appropriate instruments are not delivered after five (5) days' written notice by any other Member to such Non-Contributing Member, any other Member may, as such Non-Contributing Member's irrevocable agent and attorney-in-fact, execute any such legal instruments conveying, transferring or assigning the diluted portion of such Non-Contributing Member's Percentage Interest and the Members agree that such other Member shall not have any individual liability for any actions taken in connection with the foregoing. Such power of attorney granted in favor of such other Member shall be deemed to be coupled with an interest and shall survive the death or incompetency of each such Non-Contributing Member.

## ARTICLE 5

### Company Property

Section 5.1    **Management of Company Property**. The Managing Member has entered into the Management Agreement; provided, however, the Managing Member shall still be responsible on a day-to-day basis to manage, or cause to be managed, all of the Property of the Company and it shall receive only the consideration therefor set forth in Article 11 hereof. Except as specifically set forth in this Section 5.1, the Managing Member shall not enter into any other agreement with any Affiliate of the Managing Member whereby such Affiliate will provide goods or services to the Company.

## ARTICLE 6

### Allocations

Section 6.1    **Profits**. After giving effect to the special allocations set forth in Sections 6.3 and 6.4 hereof, Profits for any Fiscal Year shall be allocated among the Members in the following order and priority:

(a)    First, to the CIT Member, Profits (first items of ordinary income and then items of capital gain if necessary) in the amount, if any, equal to the excess of the cash distribution received by the CIT Member for the period pursuant to Section 7.1 over the amount of cash the CIT Member would have received if cash had been distributed solely in accordance with the CIT Member's Percentage Interest;

(b)    Second, among the Members in proportion to each Member's share of cumulative Losses allocated to the Members under Section 6.2(a) as limited by Section 6.2(b) hereof for all prior Fiscal Years until the cumulative Profits allocated to the Members pursuant to this Section 6.1(b) for the current and all prior Fiscal Years are equal to the cumulative Losses allocated to the Members pursuant to Section 6.2(a) as limited by Section 6.2(b) hereof for all prior Fiscal Years;

(c)    Third, the balance shall be allocated to the Members in the ratio of their respective Percentage Interests.

Section 6.2    **Losses**. After giving effect to the special allocations set forth in Sections 6.3 and 6.4 hereof, Losses for any Fiscal Year shall be allocated as set forth in Section 6.2(a), subject to the limitations in Section 6.2(b).

(a)    Losses for any Fiscal Year shall be allocated among the Members in proportion to their Percentage Interests in the Company.

(b)    The Losses allocated pursuant to Section 6.2(a) hereof shall not exceed the maximum amount of Losses that can be so allocated without causing the CIT Member or the Cambridge Class A Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year. In the event the CIT Member or the Cambridge Class A Member would have an Adjusted Capital Account Deficit as a consequence of an allocation of Losses pursuant to Section 6.2(a), the remaining Losses shall be allocated to the Managing Member.

Section 6.3    **Special Allocations**. The following special allocations shall be made in the following order:

(a)    **Depreciation.**    In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period computed in accordance with Section 1.23 hereof and allocated among the Members as required by Section 1.704-1(b)(2)(iv) of the Regulations.

(b)    **Minimum Gain Chargeback**. Except as otherwise provided in Section 1.704-2(f) of the Regulations, notwithstanding any other provision of this Article 6, if there is a net decrease in partnership minimum gain during any Fiscal Year, each Managing Member and each Class A Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Class A Member's share of the net decrease in partnership minimum gain, determined in accordance with Section 1.704-2(g) of the Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Managing Member and each Class A Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Regulations. This Section 6.3(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

(c)    **Member Minimum Gain Chargeback**. Except as otherwise provided in Section 1.704-2(i)(4) of the Regulations, notwithstanding any other provision of this Article 6, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain (as defined in the Regulations) attributable to a Partner Nonrecourse Debt (as defined in the Regulations) during any Fiscal Year, each Managing Member and each Class A Member who has a share of the Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Regulations, shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Person's share of the net decrease in Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(4) of the Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Managing Member and each Class A Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Regulations. This Section 6.3(c) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Regulations and shall be interpreted consistently therewith.

(d)    **Qualified Income Offset**. In the event any Class A Member unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5), or Section 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Company income and gain shall be specially allocated to each such Class A Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Class A Member as quickly as possible. Provided, however, a distribution to a Member of the proceeds of a nonrecourse liability (hereinafter referred to as a "Nonrecourse Distribution") within the meaning of Section 1.704-2(h)(1) of the Regulations shall not require an allocation of Company income and gain under this Section 6.3(d). Instead, such Nonrecourse Distribution shall increase partnership minimum gain to the extent required by Section 1.704-2(h)(1) of the Regulations, and any increase in partnership minimum gain resulting from a Nonrecourse Distribution shall be allocated to the Members receiving said distribution as required by Section 1.704-2(g)(1) of the Regulations.

(e)    **Gross Income Allocation**. In the event any Class A Member has a deficit Capital Account at the end of any Fiscal Year that is in excess of the sum of (i) the amount such Class A Member is obligated to restore pursuant to any provision of this Agreement and (ii) the amount the Class A Member is deemed to be obligated to restore pursuant to Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the final Treasury Regulations, each such Class A Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 6.3(e) shall be made if and to the extent such Class A Member would have a deficit Capital Account in excess of such sum after all of the allocations provided for in this Article 6 have been made as if Section 6.3(d) and this Section 6.3(e) were not in this Agreement.

(f)    **Nonrecourse Deductions**. Nonrecourse Deductions (as defined in the Regulations) for any Fiscal Year or other period shall be specially allocated to the Class A Members and the Managing Member in the same proportions as their respective Percentage Interests in the Company.

(g)    **Partner Nonrecourse Deductions**. Any Partner Nonrecourse Deductions (as defined in the Regulations) for any Fiscal Year or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Regulations.

(h)    **Section 754 Adjustments**. To the extent an adjustment to the adjusted tax basis of any Company Property pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Section 1.704-1 (b)(2)(iv)(m)(2) or Section 1.704-1(b)(2)(iv)(m)(4) of the Regulations, to be taken into account in determining Capital Accounts, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the Property) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Managing Member and Class A Members in accordance with their respective Interests in the Company in the event Section 1.704-1(b)(2)(iv)(m)(2) of the Regulations applies, or to the Person to whom such distribution was made in the event Section 1.704-1(b)(2)(iv)(m)(4) of the Regulations applies.

Section 6.4    **Section 704(c) Allocations**. Income, gain, loss and deduction with respect to any item of property contributed to the Company shall, solely for federal income tax purposes, be allocated among the Members so as to take into account any difference between the Gross Asset Value of such item of property and its adjusted basis on the date of such contribution, in accordance with the requirements of Section 704(c) of the Code. If the Gross Asset Value of any item of Company Property is adjusted pursuant to Sections 1.32 or 8.5 hereof, then subsequent allocations of income, gain, loss and deduction with respect to such item of Company Property shall take account of any variation between the adjusted basis for federal income tax purposes of such item of Company Property and its newly adjusted Gross Asset Value, in the same manner as provided for in Section 704(c) of the Code. All allocations under this Section 6.4 shall be made in such a manner as the Managing Member shall, in its discretion, determine reasonably reflects the requirements of Section 704(c) of the Code. No allocations pursuant to this Section 6.4 shall be reflected as an adjustment in any Member's Capital Account.

Section 6.5    **Allocations and Distributions Among Members**. In the event of a sale of all or substantially all of the assets of the Company, all allocations to the Members, or a class of Members, in the aggregate pursuant to this Article 6 shall be made to the Members in a manner to cause their ending Capital Account balances to equal as near as possible the cash each such Members will receive pursuant to Section 12.3(c)(iv).  All distributions to a class of Members, in the aggregate, pursuant to Article 7, shall be made to the Members in the proportion that each Member's Percentage Interest bears to the aggregate of the Percentage Interests of all Members entitled to such class distribution.

Section 6.6    **Allocations on Disposition**. Items of income, gain, loss, deduction, and/or credit attributable to any Interest which has been Disposed of pursuant to the terms of this Agreement shall be allocated between the transferor and the transferee:

(a)    for the months prior to the Disposition, to the transferor;

(b)    for the months subsequent to the Disposition, to the transferee; and

(c)    for the month of the Disposition, to the transferor if the Disposition occurs on or before the 15th day of such month and to the transferee if occurring thereafter.

Section 6.7    **Reg. 1.704-1(b)(2)(iv)(g) Adjustments to Capital Accounts**. For purposes of computing the amount of any item of income, gain, loss or deduction to be reflected in the Capital Accounts of the Members, the determination, recognition and classification of such items shall be the same as their respective determination, recognition and classification for federal income tax purposes, except that (a) gain or loss resulting from any disposition of an item of Company Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed with reference to the Gross Asset Value of such item of Company Property, rather than its adjusted basis for federal income tax purposes and (b) depreciation, amortization or other cost recovery deductions with respect to an item of Company Property shall be computed with reference to the Gross Asset Value of such item of Company Property rather than its adjusted basis for federal income tax purposes.

## ARTICLE 7

### Cash Distributions

Section 7.1     **Operating Distributions**.  The Managing Member shall cause the Company to make cash distributions to the Members of Available Cash from Operations, at such times as cash is available, and in such amounts as the Managing Member may determine and consistent with Section 7.3, as follows:

    (a)     First, in payment of all loans (subject to the provisions of the First Mortgage) and other liabilities of the Company to the Members; and

    (b)     Second, the balance, if any, in accordance with the Members' respective Percentage Interests;

provided, however, that, notwithstanding the foregoing, including (a) above, prior to the Conversion Date, the Managing Member shall cause the Company to make quarterly cash distributions of Available Cash from Operations for the benefit of the CIT Member equal to the CIT Member's Minimum Quarterly Distribution from all Operating Companies in the aggregate (including distributions otherwise made to the Cambridge Class A Member and Managing Member but for the actions of the Escrow Agent's actual distribution to the CIT Member as communicated to the Managing Member by the Escrow Agent); and provided, further, that, notwithstanding the foregoing, prior to the Conversion Date, the Managing Member shall cause the Company to make all distributions of Available Cash from Operations to the Escrow Agent on behalf of the Members.

Section 7.2     **Distributions from Sales or Refinancing**.  The Managing Member shall cause the Company to make cash distributions of Available Cash from Special Event (as defined in Section 1.8 of this Agreement) to the Members at such times and in such amounts as the Managing Member may determine after giving effect to Section 7.3, as follows:

    (a)     First, in payment of all third-party costs incurred in connection with the sale or refinancing of the Project;

    (b)     Second, in payment of all liabilities of the Company to third-party creditors of amounts then due or if upon a sale of all or substantially all of the assets, all outstanding liabilities of the Company to third-party creditors;

    (c)     Third, in payment of all loans and other liabilities of the Company to the Members; and

    (d)     Fourth, the balance, if any, in accordance with the Members' respective Percentage Interests.

Section 7.3     **Cash Distribution Requirements**.  The Managing Member shall use its reasonable best efforts to cause the Company to distribute all Available Cash from Operations and Available Cash from Special Event in accordance with the terms of this Agreement.

## ARTICLE 8

### Fiscal Matters

Section 8.1     **Fiscal Year, Company Books, Financial Statements and Reports**.

    (a)     The Fiscal Year of the Company is the calendar year.  The Company's books shall be kept in accordance with U.S. generally accepted accounting principles, consistently applied; shall be maintained in the business office of the Company or in the office of its accountants; and shall be available for inspection by the Members during reasonable business hours. The Managing Member may, at Company

expense, engage accountants to keep and audit the books and records of the Company, prepare tax returns, and perform other accounting services for the Company. The Managing Member shall cause to be delivered to each Member the following within ninety (90) days after the end of each Fiscal Year:

> (i)    U.S. federal income tax Form K-1 and any similar forms required by any state or local taxing authority; and

> (ii)    any other information concerning the Company reasonably necessary for the preparation of the Members' federal and state income tax returns.

The Managing Member, upon showing "Good Cause", shall be entitled to a reasonable extension of the ninety (90) day period. "Good Cause" shall be determined without regard to the foreseeability of such cause. All financial statements and reports shall be prepared at the expense of the Company.

> (b)    In addition to the reporting obligations of the Managing Member set forth elsewhere in this Agreement, the Managing Member shall deliver to the CIT Member:

> (i)    a balance sheet and statements of cash flow and operations of the Company no later than: (1) 15 business days following the end of each of the first 11 calendar months and (2) 20 business days following the end of the calendar month ending December 31;

> (ii)    quarterly statements of cash flow and operations of the Company no later than 15 business days following the end of each of the first three fiscal quarters;

> (iii)    annual statements of cash flow and operations of the Company no later than 20 business days following the end of the Fiscal Year;

> (iv)    simultaneously with the delivery of the quarterly and year-end financial statements, a certificate by the chief executive officer and the chief financial officer of the Managing Member as to the accuracy and completeness of the financial statements provided by the Managing Member;

> (v)    if requested by the CIT Member based on its review of the questionnaires prepared and delivered by the Managing Member pursuant to Section 8.1(c) below, good faith projections of the amount of gross income to be derived by the Company that the CIT Member specifies may not qualify for the 95% income test of section 856(c) of the Code (the Company's activities producing such income to be identified by the CIT Member) within five (5) calendar days of such request; and

> (vi)    in connection with the quarterly and year-end financial statements, no later than 20 business days following the end of each of the first three fiscal quarters and no later than 25 business days following the end of the Fiscal Year, such supplemental financial statement information pertaining to the Company's properties and assets or operations as the CIT Member in its reasonable discretion may, upon reasonable notice, request.  In addition, upon the CIT Member's reasonable request and, upon reasonable notice, the Managing Member will use its reasonable best efforts to deliver (i) the financial information enumerated above within a shorter time period than outlined above, and (ii) such other financial information concerning the Company and its properties and assets as is reasonably necessary, as determined by the CIT Member, for the preparation of filings with the Internal Revenue Service or the U.S. Securities and Exchange Commission by the REIT or its Affiliates.

> (c)    The Managing Member, at the request of the CIT Member and no more frequently than quarterly, shall forward to Cambridge Healthcare Management, Inc. questionnaires prepared by the CIT Member and reasonably acceptable to the Managing Member that are relevant to the determination of whether any income generated by a Project would violate the terms of Section 9.2(c).  The Managing

Member shall use its commercially reasonable efforts to ensure that such questionnaires are completed and returned to the CIT Member within thirty (30) calendar days after such questionnaires are received by the Managing Member.

(d)     At the expense of the CIT Member, subject to advance written notice, the Managing Member shall permit necessary and reasonable access by the CIT Member or its agents to all of the Company's books and records as determined necessary in the CIT Member's reasonable discretion, including for the purpose of performing one or more audits at the expense of the CIT Member. Notwithstanding any provision in this Agreement to the contrary, the Company shall not be required to incur an expense that arises solely as a result of the CIT Member's affiliation with the REIT and its status as a publicly-traded company.

(e)     In the event that (i) the Managing Member fails to comply with the provisions of Sections 8.1(b), (c) or (d), (ii) the CIT Member provides the Managing Member with written notice of the Managing Member's failure to comply, (iii) the cause of such failure to comply is within the Managing Member's control and (iv) the Managing Member has not cured such failure to comply within five days (or, in the event such five-day period includes a weekend preceded or followed by a Friday or Monday, respectively, that is a national bank holiday, six days) of such notice, the CIT Member may, at its sole discretion and at the expense of the Managing Member, perform or cause to be performed the obligations of the Managing Member pursuant to the provisions of Section 8.1(b), (c) or (d) that are described in such notice.

(f)     The Managing Member agrees to indemnify, defend and hold harmless the Class A Members from and against any and all losses, liabilities, damages, dues, assessments, fines, penalties, fees, costs (including court costs and costs of appeal and including costs with respect to enforcement of an indemnity claim), taxes, amounts paid in settlement and expenses (including attorney's, accountant's or other professional's fees) that the Class A Members or their Affiliates incur as a result of, or with respect to (and whether or not in connection with any third-party claim) the non-compliance with or failure to perform any agreement or covenant contained in Section 8.1.

Section 8.2     **Company Bank Accounts**. All funds of the Company shall be deposited in its name in an account or accounts maintained at a national or state bank designated by the Managing Member. Checks shall be drawn upon the Company and shall be signed by the Managing Member or any Person designated by the Managing Member in writing.

Section 8.3     **Subchapter K**. Any provision hereof to the contrary notwithstanding, solely for United States Federal income tax purposes, each of the Members hereby recognizes that the Company will be subject to all provisions of Subchapter K of Chapter 1 of Subtitle A of the Code; provided, however, the filing of U.S. Partnership Returns of Income shall not be construed to extend to the purposes of the Company or expand the obligations or liabilities of the Members.

Section 8.4     **Tax Returns**. The Managing Member shall cause to be prepared and filed all tax returns and statements, if any, which must be filed on behalf of the Company with any taxing authority, and shall submit copies of all such returns and statements to the Members.

Section 8.5     **Reg. 1.704-(1)(b)(2)(iv)(f) Revaluations of Property**. On the occurrence of either of the following:

(a)     a contribution of money or other Property (other than a *de minimis* amount) to the Company by a new or existing Member as consideration for an Interest in the Company; or

(b)     a distribution of money or other Property (other than a *de minimis* amount) by the Company to a retiring, withdrawing, or continuing Member as consideration for an Interest in the Company, then the Managing Member shall determine the Gross Asset Value of each item of Company Property as of the date the event described in Section 8.5(a) or (b) occurs. Upon the revaluation of all items of Company Property in accordance with this Section 8.5, the Members' respective Capital Accounts shall

be adjusted in the same manner as if each item of Company Property had been sold at its newly determined Gross Asset Value.

Section 8.6    **Section 754 Election**. Immediately prior to the admission of the CIT Member, the Company shall make an election under Section 754 of the Code in the case of distributions of Company Property within the provisions of Section 734 of the Code or in the case of a Disposition of an Interest in the Company permitted by this Agreement made within the provisions of Section 743 of the Code, the Company shall file an election under Section 754 of the Code in accordance with the procedure set forth in the applicable Regulations.

Section 8.7    **Meetings**.

(a)    The Members shall meet at least once during each Fiscal Year to discuss the Annual Budget for the succeeding Fiscal Year and other matters of Company business. Special meetings of the Members may be held at any time or place whenever called by the Managing Member, or by written request of any Class A Member, notice thereof being given to each Class A Member by the Managing Member.

(b)    Notwithstanding the foregoing, meetings may be held at any time without formal notice provided all of the Members are present or those not present shall at any time waive or have waived notice thereof. Except as otherwise specifically provided herein, notice of any special meetings shall be given at least ten (10) days previous thereto by written notice delivered personally, by facsimile transmission or by mail. If given by mail, such notice shall be deemed to be delivered three (3) days after being delivered to the postal service.

(c)    At the request of any Member, the Members may participate in a regular or special meeting by, or conduct the meeting through, the use of any means of communication by which all Members participating may simultaneously hear each other during the meeting. A Member participating in a meeting by this means is deemed to be present in person at the meeting.

(d)    A quorum shall consist of a majority of the Members so long as such majority includes the CIT Member and the Cambridge Class A Member; provided, however, that if a meeting of the Members shall have been noticed in accordance with this Section 8.7, and a quorum fails for the absence of the CIT Member or the Cambridge Class A Member, then the meeting shall be adjourned by the Managing Member until a quorum is present.

(e)    Any action required to be taken at a meeting of the Members, or any other action which may be taken at a meeting of the Members, may be taken without a meeting if the affirmative vote of the Members is obtained that is otherwise required by this Agreement. The action must be evidenced by one or more written consents describing the action taken and shall be filed with the Company records reflecting the action taken.

## ARTICLE 9

### Managing Member

Section 9.1    **Rights and Powers of the Managing Member.** Subject to the limitations set forth in Section 3.4 and Section 9.2 of this Agreement, and to the limitations imposed upon it by applicable law, the Managing Member (i) shall have full, exclusive and complete authority and discretion to manage and control in accordance with the terms of this Agreement, and shall make all decisions affecting, the Company business; (ii) shall have full authority to effectuate the purposes of the Company and to take any action required, permitted or authorized pursuant to the terms of this Agreement; and (iii) shall have full power to exercise all rights and powers generally inferred or conferred by law in connection therewith, including, without limitation, the right and power to:

(a)    acquire by purchase, lease, or otherwise any real or personal property which may be necessary, convenient, or incidental to the accomplishment of the purposes of the Company;

(b)    operate, maintain, finance, refinance, improve, construct, grant options with respect to, sell, convey, assign, mortgage, and lease any real estate and any personal property necessary, convenient, or incidental to the accomplishment of the purposes of the Company; all permits, licenses, entitlements, easements and appurtenances to real estate shall be issued to and taken in the name of the Company or, if taken in the name of another entity, shall be assigned to the Company;

(c)    execute any and all agreements, contracts, documents, certificates, and instruments necessary or convenient in connection with the management, maintenance, and operation of the Company Property, or in connection with managing the affairs of the Company, including executing amendments to this Agreement and the Articles in accordance with the terms of this Agreement pursuant to any power of attorney granted by a Class A Member to the Managing Member;

(d)    execute any and all agreements, contracts, documents, certificates and instruments obligating the Company to guarantee the repayment of all present and future indebtedness of the Managing Member to third parties relating to the Company, including, but not limited to, any funds borrowed by the Managing Member for lines of credit, construction loans, general commercial purposes or otherwise;

(e)    borrow money and issue evidences of indebtedness necessary, convenient, or incidental to the accomplishment of the purposes of the Company, and secure the same by mortgage, pledge, or other lien on any Company Property;

(f)    execute, in furtherance of any or all of the purposes of the Company, any deed, lease, mortgage, deed of trust, mortgage note, promissory note, bill of sale, contract, or other instrument purporting to convey or encumber any or all of the Company Property;

(g)    prepay in whole or in part, refinance, recast, increase, modify, or extend any liabilities affecting any Company Property, and in connection therewith execute any extensions or renewals of encumbrances on any or all of the Company Property;

(h)    care for and distribute funds to the Members by way of cash, income, return of capital, or otherwise, all in accordance with the provisions of this Agreement, and perform all matters in furtherance of the objectives of the Company and this Agreement;

(i)    contract on behalf of the Company for the employment and services of employees and/or independent contractors, such as lawyers, accountants, and investment advisors, and delegate to such Persons the duty to manage or supervise any of the Property or operations of the Company;

(j)    engage in any kind of activity and perform and carry out contracts of any kind (including contracts of insurance covering risks to Company Property and Managing Member liability) necessary or incidental to, or in connection with, the accomplishment of the purposes of the Company, as may be lawfully carried on or performed by a limited liability company under the laws of the State of Louisiana;

(k)    unless expressly prescribed or limited by this Agreement, take, or refrain from taking, all actions as may be necessary or appropriate to accomplish the purposes of the Company;

(l)    institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought by, on behalf of, or against, the Company or the Members in connection with activities arising out of, connected with, or incidental to this Agreement, and to engage counsel or others in connection therewith;

(m)    make any and all elections for federal, state, and local tax purposes including, without limitation, any election, if permitted by applicable law: (i) to adjust the basis of Company Property pursuant to Code Sections 754, 734(b), and 743(b), or comparable provisions of state or local law, in connection with Dispositions of Interests and Company distributions; (ii) to extend the statute of limitations for assessment of tax deficiencies against the Members with respect to adjustments to the Company's

federal, state, or local tax returns; and (iii) to represent the Company and the Members before taxing authorities or courts of competent jurisdiction in tax matters affecting the Company and the Members in their capacities as Managing Member or Class A Members, and to file any tax returns and execute any agreements or other documents relating to or affecting such tax matters, including, to the extent provided in Code Sections 6221 through 6231, agreements or other documents that bind the Managing Member and Class A Members with respect to such tax matters or otherwise affect the rights of the Company, the Managing Member, and the Class A Member(s). The Managing Member is specifically authorized to act as the "Tax Matters Partner" under the Code and in any similar capacity under state or local law and only the Managing Member as the "Tax Matters Partner" shall have the authority to execute an extension of the statute of limitations for the Company or a power of attorney binding upon the Company;

(n)    execute any construction loan agreements, notes, collateral and security documents, and process all draw requests related to any such construction loan agreements; and

(o)    take or omit to take any action requested by the CIT Member that may be necessary to maintain the REIT's status as a real estate investment trust under sections 856 through and including 859 of the Code.

In no event, however, is the Managing Member authorized to create any liability which is recourse to the Class A Members personally.

Section 9.2    **Limitation on the Managing Member's Authority**.

(a)    Notwithstanding any other provision of this Agreement, without the consent of all Class A Members, the Managing Member shall not have the authority to, and covenants and agrees that it shall not:

(i)    accept or require any contribution to the capital of the Company from any Member;

(ii)    (A) knowingly do any act in contravention of this Agreement; (B) knowingly do any act which would make it impossible to carry on the ordinary business of the Company, except as otherwise provided in this Agreement; (C) knowingly do any act that would subject any Class A Member to liability as a managing member in any jurisdiction; (D) conduct any business of the Company other than that contemplated by this Agreement; or (E) knowingly do any act that would cause the Company to become classified as an association taxable as a corporation for U.S. federal income tax purposes;

(iii)    prior to the dissolution of the Company pursuant to Article 12, sell or otherwise dispose of all or substantially all of the Company Property to any Person;

(iv)    admit additional or substitute Members except as authorized in Article 10 of this Agreement;

(v)    amend this Agreement except as authorized in Section 3.4(b)(v), 3.4(e)(viii) and Section 15.5 of this Agreement;

(vi)    cause the Company to engage in any voluntary bankruptcy proceeding;

(vii)    cause the Company to merge, consolidate or be a party to a reorganization with any other Person;

(viii)    amend, modify or terminate the Management Agreement;

(ix)    change, modify, amend or reinstate any loan document evidencing, securing or guaranteeing any loan to the Company, including, without limitation, any Loan secured by a First Mortgage; or

(x)     take any action, or fail to take any action, which would violate or contravene the provisions of Section 3.4 of this Agreement.

(b)     Notwithstanding any other provision of this Agreement, without the consent of the CIT Member, the Managing Member shall not have the authority to, and covenants and agrees that it shall not:

(i)     cause the Company to sell the Land, the MOB or the related parking facilities, or any other material property or assets of the Company;

(ii)     except for expenses relating to insurance, taxes or utility charges, expend Company funds or commit to expend Company funds that in the aggregate exceed more than 5% of the expenses reflected in the annual operating budget of the Company, which shall be submitted to the CIT Member annually for review and approval not less than sixty (60) days prior to the end of the prior Fiscal Year (beginning in 2007 for the 2008 Fiscal Year) (the "Annual Budget") (Such proposed budget shall be approved or disapproved by the CIT Member within 30 days of its receipt by the CIT Member.  In the event the Members are unable to agree on an Annual Budget for any particular year, until such an agreement is reached, the Annual Budget for the prior year, increased by 5%, shall be deemed to be the Company's Annual Budget.);

(iii)     cause the Company to issue additional Interests or rights to acquire additional Interests;

(iv)     cause the Company, other than in connection with the Loan, the First Mortgage, or a loan made in accordance with Section 11.3(b) (including liens and encumbrances permitted under each of these) directly or indirectly to: (A) create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to any indebtedness or capital lease obligations other than those reflected in the Annual Budget or those that in the aggregate do not exceed 5% of the liabilities represented in the Annual Budget; or (B) create, incur or assume any consensual liens or encumbrances of any kind against or upon the Company's properties or assets, including without limitation on the Land, the MOB or the related parking facilities; provided, however, this provision shall not apply to non-consensual lien claims that may occur in the ordinary course, provided that such claims are addressed in accordance with the First Mortgage.

(v)     cause the Company to enter into any business combination arrangement or agreement or to otherwise change or agree to change its structure or state of formation;

(vi)     cause the Company to enter into a joint venture or partnership arrangement with any other person, or to invest in the equity or debt securities of another person;

(vii)     change the Company's business purpose or the conduct of the Company's business;

(viii)     except in accordance with the terms of this Agreement, cause the Company to pay any distributions on, or redeem, purchase, acquire or make a Liquidation payment with respect to, any Member's Interests;

(ix)     except in accordance with the terms of this Agreement and except upon terms and conditions that are commercially reasonable and substantially similar to those that would be available on an arms-length basis with unrelated third parties, cause the Company to make loans, advances or guarantees, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, with or for the benefit of the Managing Member or any of its Affiliates;

(x)     cause the Company to voluntarily prepay, defease or change the material terms of a First Mortgage with any Lender;

(xi)    acquire or develop, or enter into a contract or arrangement for the acquisition or development of, any medical office buildings;

(xii)    resign as Managing Member, or admit an additional or substitute Managing Member;

(xiii)    effect a Disposition of the Managing Member's Interest or the Cambridge Class A Member's Interest except as set forth in Sections 10.2(b)(ii) or 10.4;

(xiv)    except as set forth in the Management Agreement, (A) commingle funds and other assets of the Company with those of any Affiliate, the Managing Member, any Affiliate of the Managing Member, or any other Person, or (B) maintain the Company's assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its funds or assets, as the case may be, from those of any Affiliate, the Managing Member, or any other Person; provided, however, the Members agree that the matters contemplated by the Escrow Agreement shall not violate this subsection 9.2(b)(xiv);

(xv)    cause or permit the Company to acquire or hold, directly or indirectly, as beneficial owner or owner of record, any stock of the REIT;

(xvi)    cause or permit the Company to violate any of the terms of Section 9.2(c); and

(xvii)    modify any provisions of this Section 9.2(b) or Section 9.2(a).

(c)    The REIT is currently qualified and intends to continue to qualify as a real estate investment trust and is subject to the requirements set forth in the Code that are applicable to REITs. Notwithstanding any other provision of this Agreement, the Managing Member, solely for the REIT's benefit as a third party beneficiary, shall cause the Company and any subsidiary entities or Affiliates thereof, including, without limitation, the manager, when acting on behalf of the Company, to act in accord with this Section 9.2(c) under all circumstances unless the Managing Member receives the prior written consent of the REIT, which consent may be withheld in the REIT's sole discretion:

(i)    the Company shall operate, and shall cause its subsidiary entities to operate, in a manner substantially in conformity with operations as of the date of this Agreement, and shall receive rents pursuant to leases existing on the date of this Agreement or pursuant to leases on substantially similar terms;

(ii)    the Company shall not, directly or indirectly, provide new tenant services at any Project;

(iii)    the Company shall not, directly or indirectly, as beneficial owner or owner of record, own stock of any entity that is a corporation for U.S. federal income tax purposes;

(iv)    the Company shall not, directly or indirectly, lend money to any person; and

(v)    the Company shall not, directly or indirectly, sell property to customers in the ordinary course of business; provided, however, that entering into leases for federal income tax purposes in the ordinary course of business in accordance with subsection 9.2(c)(i) above shall not constitute a violation of this subsection 9.2(c)(v).

(d)    In the event that the Members are unable, after good faith discussions, to reach agreement with respect to any of the issues set forth in Sections 9.2(a) or 9.2(b) above, the Members shall within twenty (20) days after failure to reach agreement refer such matter (a "Material Dispute") to Scott Kellman (or his successor) of the REIT and Jean-Claude Saada (or his successor) of the Managing Member (the "Executives"). Any decision of the Executives shall be binding on the Members and the Company. Any Material Dispute that cannot be resolved by good faith discussion(s) between the Executives (with such Executives making decisions consistent with the well-being and purpose of the Company) within fourteen (14) business days after such decision has been submitted to them shall be submitted to mediation before a mutually agreeable mediator who has experience with mediating

controversies involving the relevant subject matter. The mediation process shall be initiated by either party giving written notice to the other party of the Executives' inability to resolve a Material Dispute with the fourteen business day period. The mediation shall be held within 30 days after the parties agree on a mediator. If at any time more than 5 hours into the mediation conference the mediator determines that the controversy cannot be settled in mediation, the mediator may declare an impasse and the mediation process shall end at the point. The mediation process shall be completed no later than 60 days after the written notice which initiated the mediation. In the event of a declaration of an impasse by the mediator or expiration of the 60 day period without a full settlement, there shall be a deadlock (a "Deadlock"). In the event of a Deadlock, any Member may demand arbitration of any claim, controversy, issue or dispute (hereafter "Dispute") arising out of or relating to the Deadlock, unless the amount of the damage or loss is at issue in pending litigation with a third party, in which event arbitration shall not be commenced until such amount is ascertained or both parties agree to arbitration.

(i)     Arbitration shall be conducted in the city where the Project is located under the Commercial Arbitration Rules then in effect of the American Arbitration Association ("AAA"), and administered by the AAA.

(ii)    In the event of arbitration with an amount in controversy equal to or less than $50,000, arbitration shall be conducted by one (1) neutral arbitrator mutually agreed upon by the parties. If no arbitrator is agreed upon within ten (10) business days of commencement of arbitration, or if the arbitrator selected by the parties is unable or unwilling to arbitrate the Dispute, the parties shall request that a neutral arbitrator be selected by the AAA.

(iii)   In the event of arbitration with an amount in controversy greater than $50,000, Arbitration shall be conducted by three (3) neutral arbitrators. Within fifteen (15) business days of commencement of arbitration, each party shall select one (1) neutral arbitrator in whatever area(s) of expertise such party believes is relevant to the dispute. Within ten (10) business days of their appointment, the two (2) neutral arbitrators so selected shall select the third neutral arbitrator from a list provided by the AAA who shall be a practicing attorney having experience in the area of commercial contracts and who shall act as chair of the arbitration panel. If the arbitrators selected by the parties are unable or fail to agree upon the third arbitrator, the third arbitrator shall be selected by the AAA.

(iv)    The arbitrator(s) shall set a limited time period and establish procedures designed to reduce the cost and time for discovery while allowing the parties an opportunity, in the discretion of the arbitrator(s), to discover relevant information from the opposing party about the subject matter of the Dispute. Any dispute regarding discovery, or the relevance or scope thereof, shall be determined by the sole arbitrator or the chair of the arbitration panel, as the case may be, and shall be governed by the Federal Rules of Civil Procedure. The award by the arbitrator(s) shall be in writing, shall be signed by the sole arbitrator or a majority of the arbitrators, as the case may be, and shall include a statement of findings of fact and conclusions regarding the reasons for the disposition of any claim. No statements by, or communications between, the parties during negotiation or mediation, or both, will be admissible for any purpose in arbitration.

(v)     Each party shall bear its own expenses and its attorney's fees and expenses, and shall equally share the arbitrators' fees, administrative fees and arbitrators' travel expenses. Judgment on the award entered by the arbitrator(s) may be entered in and enforced by any court of competent jurisdiction.

(vi)    Notwithstanding the foregoing, either party may resort to a court by applying for interim, injunctive or other equitable relief if such party reasonably determines that such relief is necessary to prevent irreparable injury to it or to a third party.

Section 9.3    **Right to Rely on the Managing Member**. No Person dealing with the Company shall be required to inquire into, or obtain any consents or other documentation as to, the authority of the Managing Member to take any action allowed by Section 9.1 hereof or otherwise by this Agreement or to exercise any such rights or powers. Without limiting the scope of the preceding sentence, no Person to which a Company loan application is made by the Managing Member shall be required to inquire into the purposes for which such loan

is sought, and as between the Company and such Person, it shall be conclusively presumed that the proceeds of such loan are to be and will be used solely for purposes authorized under this Agreement.

Section 9.4    **Obligations of the Managing Member.**

(a)    The Managing Member shall devote such time as is reasonably needed to manage the Company's business. It is hereby expressly recognized by all Members that the officers, managers, and members of the Managing Member are engaged and can be expected to engage in the future in other businesses that are in competition with the business of the Company and it is hereby expressly agreed that such will not constitute a breach of the Managing Member's fiduciary duties to the Company; provided, however, that without the prior written consent of the CIT Member, the Managing Member shall not, directly or indirectly (i) encourage or entice any Person at that time leasing space from the Company to terminate, breach or fail to renew such lease, or (ii) knowingly take any act or fail to take any act with regard to tenants leasing space from the Company that could reasonably be expected to have a Material Adverse Effect.

(b)    The Managing Member agrees that the restrictions contained in this Section 9.4 are reasonable and necessary to protect the legitimate interests of the CIT Member and the Company and that any violation of this provision would result in damages to the CIT Member and the Company which cannot be compensated by money alone.  The Managing Member agrees that the CIT Member and the Company will be entitled to injunctive relief without proving actual damages or posting any bond.  If a court shall hold that the duration and/or scope (geographic or otherwise) of the agreement contained in this Section 9.4 is unreasonable, then, to the extent permitted by law, the court may prescribe a duration and/or scope (geographic or otherwise) that is reasonable and judicially enforceable. The Members and the Company shall accept such determination, subject to their rights of appeal, which the parties hereto agree shall be substituted in place of any and every offensive part of this Section 9.4, and as so modified, this Section 9.4 shall be as fully enforceable as if set forth herein by the parties in the modified form.

(c)    The Managing Member shall act in good faith in the performance of its obligations hereunder, but shall have no liability or obligation to the Class A Members or the Company for any decision made or action taken in connection with the discharge of its duties hereunder if such decision or action is made or taken in good faith, irrespective of whether the same may be reasonably prudent or whether bad judgment or negligence (excluding gross negligence) was exercised or involved in connection therewith. Except as expressly set forth in this Agreement, the Managing Member shall not be liable for any act or omission except those resulting from gross negligence, fraud, bad faith or breach of fiduciary duty.

Section 9.5    **Indemnification of the Managing Member.**  The Managing Member, and all agents, partners, stockholders, officers, directors and employees of the Managing Member, shall be indemnified, defended, and held harmless by the Company from and against any and all claims, demands, liabilities, costs (including, without limitation, the cost of litigation and attorneys' fees), damages and causes of action of any nature whatsoever (including, without limitation, those based on negligence) arising out of or incidental to the management of the Company affairs, except where the claim at issue is based upon:

(a)    the gross negligence, breach of fiduciary duty, bad faith or willful misconduct of the indemnified party; or

(b)    the breach by the indemnified party of any material provision of this Agreement (provided that any breach of this Agreement that creates a default under any First Mortgage or other indebtedness secured by the Company's Property shall be deemed a breach of a material provision of this Agreement).

The indemnification rights herein contained shall be cumulative of, and in addition to, any and all rights, remedies and recourses to which the indemnified parties described herein shall be entitled, whether pursuant to some other provision of this Agreement, at law or in equity.

Section 9.6    **Power of Attorney.** By the execution of this Agreement, or a counterpart hereof, each Class A Member hereby irrevocably constitutes and appoints the Managing Member, and any successor thereto, with full power of substitution, as its true and lawful attorney-in-fact and agent with full power and authority to act in its name, place and stead in the execution, acknowledgment, swearing to, delivering, filing and recording of all certificates and other documents which the Managing Member deems necessary or reasonably appropriate:

  (a)  to qualify or continue the Company as a limited liability company;

  (b)  to reflect a change in the identity of any Member, the addition of any new Class A Member pursuant to this Agreement, or an amendment of this Agreement made pursuant to the provisions of this Agreement, or the Articles as required by any such change or amendment;

  (c)  to effect any transactions approved by the written approval of the Members pursuant to this Agreement;

  (d)  to reflect the dissolution and termination of the Company after same has been dissolved and terminated in accordance herewith;

  (e)  to comply with the fictitious or assumed name statutes in effect in the State of Louisiana and all other jurisdictions in which the Company conducts or plans to conduct business; or

  (f)  to execute any amendment to this Agreement which is necessary to cause the Special Allocation provisions in Section 6.3 hereof to qualify as "minimum gain charge back" and "qualified income offset" provisions, consistent with the Regulations promulgated under Section 704 of the Code.

The power of attorney granted herein shall be deemed to be coupled with an interest, shall be irrevocable and shall survive the death, incompetency or legal disability of any Member, and shall be binding on any assignee or vendee of a Member's Interest, or any portion thereof, including, without limitation, the distributive rights relating thereto.

Section 9.7    **Removal of the Managing Member.**

  (a)(i)  Subject to the provisions of this Section 9.7, the Managing Member may be removed at the election of the CIT Member for "cause", which shall be defined as follows:

  (A) a failure of the Managing Member to comply with any covenant or agreement contained in this Agreement that is deemed to be material, as defined in Section 9.7(a)(ii) below (subject to the applicable cure provisions provided below);

  (B) any of the following that has a Material Adverse Effect:  (1) the gross negligence or willful misconduct of the Managing Member in carrying out its duties under this Agreement; (2) the conviction of, or the entering of a guilty plea or plea of no contest with respect to, a felony, the equivalent thereof, or of a misdemeanor involving fraud or dishonesty of Mr. Jean-Claude Saada or any direct or indirect beneficial owner of the Managing Member; (3) a willful act (or willful failure to act) by Mr. Jean-Claude Saada or any direct or indirect beneficial owner of the Managing Member that impedes or obstructs a government investigation, or a failure to materially cooperate with such an investigation; or (4) termination of the Management Agreement in accordance with its default provisions; or

  (C) the gross negligence or willful misconduct of the Managing Member in carrying out its duties under this Agreement with respect to Section 9.2(c) has a Material Adverse Effect or in the opinion of the CIT Member upon advice of counsel could reasonably be expected to result in a loss of the REIT's qualification as a real estate investment trust.

To effect such removal, written notice thereof shall be given to the Managing Member by the CIT Member. Such removal shall become effective five (5) days following receipt of such notice by the Managing Member. Upon any such removal, the CIT Member shall designate the successor Managing Member, subject to the provisions of Section 9.7(b)(iv).

(ii)    Each of the following shall be deemed to be a material covenant or agreement for purposes of this Section 9.7:

(A)    Section 3.4, for so long as a First Mortgage exists on any portion of the Project, subject to any cure rights contained in the First Mortgage documentation that would prevent a default thereunder;

(B)    Section 9.2, to the extent that the Managing Member knowingly takes any such actions without obtaining the consent of the CIT Member, provided the CIT Member has provided the Managing Member with written notice of the Managing Member's failure to comply with Section 9.2 and the Managing Member has not cured such failure to comply within ten (10) business days of such notice and such action results in a Material Adverse Effect; and

(C)    Section 9.2(c), to the extent that the Managing Member knowingly takes any such actions without obtaining the consent of the CIT Member, provided the CIT Member has provided the Managing Member with written notice of the Managing Member's failure to comply with Section 9.2(c) and the Managing Member has not cured such failure to comply within ten (10) business days of such notice and such action results in a Material Adverse Effect or in the opinion of the CIT Member upon advice of counsel could reasonably be expected to result in a loss of the REIT's qualification as a real estate investment trust.

(b)(i)    The Managing Member shall be deemed to have been removed automatically upon the occurrence of (A) a Bankruptcy Event, (B) a Change in Control of the Managing Member or a Person directly or indirectly controlling the Managing Member without consent of the CIT Member, or (C) dissolution of the Managing Member. Upon any such deemed removal, the CIT Member shall designate the successor Managing Member, subject to the provisions of Section 9.7(b)(iv).

For purposes of this Agreement, "Change in Control" shall mean any voluntary sale, lease, assignment, merger, consolidation or other disposition, direct or indirect, by operation of law or otherwise of more than 50% of the ownership interest in a Person; provided, however, that a Disposition by a Person to an entity controlled by such Person, including a trust or other entity formed for estate planning purposes controlled by such Person, shall not constitute a Change in Control. For purposes of this Agreement, "control" shall mean the ability to elect or appoint the majority of such Person's governing body, whether as a result of contract, ownership or otherwise.

(ii)    If the Managing Member has been removed pursuant to subsection (a) above or is deemed to have been removed pursuant to subsection (b)(i) above and the Company is continued and reconstituted in accordance with the terms of Section 12.2,

(A)    the Managing Member shall promptly either:

(1) in the event that the Managing Member has been removed pursuant to subsection (a) above, the removed Managing Member shall be entitled to elect either to (1) receive from the substitute Managing Member the Redemption Price for its Interest and any Interest held by any Affiliate of the removed Managing Member, reduced by any damages caused to the Company by such removed Managing Member or (2) have its Interest converted to that of a Class A Member (and added to its Affiliate's limited liability company interest) and receive no payment for its Interest; or

(2) in the event that the Managing Member is deemed to have been removed pursuant to subsection (b)(i) above, the removed Managing Member shall be entitled to receive from the substitute Managing Member the Redemption Price for its Interest and any Interest held by any Affiliate of the removed Managing Member, reduced by any damages caused to the Company by such removed Managing Member.

(B)    the substitute Managing Member shall cause the Company to amend this Agreement and the Articles to remove the name "Cambridge" from the name of the Company and shall cause the Company to cease using the name "Cambridge" and any trademarks associated with such name in connection with the ownership or operation of the Company Property as soon as reasonably practicable.

(iii)    In the event the removed Managing Member

(A)    elects to have its Interest converted to that of a Class A Member as provided in subsection (b)(ii) above, the removed Managing Member shall become a Class A Member upon the admission of the substitute Managing Member pursuant to this Section 9.7;

(B)    elects to receive the Redemption Price for its Interest as provided in subsection (b)(ii) above, the Interest of a removed Managing Member until the transfer and assignment to a substitute Managing Member shall be converted to that of a Class A Member, but the removed Managing Member shall not have any rights to participate in the management and affairs of the Company; or

(C)    makes no election within 30 days of date of the Managing Member's removal, the removed Managing Member shall be deemed to have elected to receive the Redemption Price for its Interest as provided in subsection (b)(ii) above.

(iv)    A Person shall be admitted as a substitute Managing Member only if the following terms and conditions are satisfied:

(A)    the Person to be admitted as a substitute Managing Member shall have accepted and agreed to be bound by all the terms and provisions of this Agreement by executing a counterpart thereof and such other documents or instruments as may be required or appropriate in order to effect the admission of such Person as a Managing Member, and a certificate evidencing the admission of such Person as a Managing Member shall have been filed for recordation and all other actions required in connection with such admission shall have been performed;

(B)    if the Person to be admitted as a substitute Managing Member is a corporation, partnership, or other entity, it shall have provided the Company with evidence satisfactory to counsel for the Company of such Person's authority to become a Managing Member and to be bound by the terms and provisions of this Agreement;

(C)    counsel for the Company shall have rendered an opinion (relying on such opinions from other counsel as may be necessary) that the admission of the Person to be admitted as a substitute Managing Member is in conformity with the Act, and that none of the actions taken in connection with the admission of such Person as a substitute Managing Member will cause (i) the Company to be classified other than as a partnership for federal income tax purposes, or (ii) the loss of any Class A Member's limited liability (other than that of the removed Managing Member to the extent that the Managing Member is also a Class A Member); and

(D)    solely in the event that the removed Managing Member elects to have its Interest converted to that of a Class A Member as provided in subsection (b)(ii) above, the removed Managing Member shall have consented to the admission of such Person as a substitute Managing Member, which consent shall not be unreasonably withheld or delayed and shall not be

conditioned on any payments to the removed Managing Member other than as otherwise specifically provided herein.

(c)    "Redemption Price" means an amount equal to the fair market value of the Interest being purchased. Such fair market value will be determined as follows:

(i)    The fair market value shall be determined by mutual agreement of the Managing Member and the CIT Member, which determination shall be final and binding on the parties hereto; however, if they do not agree on the fair market value within ten (10) business days after notice is given by one of them to the other of a request for determination of fair market value, the fair market value shall be determined as follows.

(ii)    The Managing Member and the CIT Member shall jointly select a Qualified Appraiser (as defined below). If the parties so jointly select a Qualified Appraiser, the appraiser so selected shall promptly determine the fair market value of the Interest, which determination shall be final and binding on the parties hereto. If they fail to jointly select a Qualified Appraiser within ten (10) business days after a request by either party to make the joint selection, then the Managing Member and the CIT Member shall each select one Qualified Appraiser. If either party fails to name a Qualified Appraiser within ten (10) business days after the notice by the other party that the other party has selected a Qualified Appraiser (such notice to contain the name of such appraiser), the Qualified Appraiser which has been timely selected shall be instructed to promptly determine the fair market value of the Interest, which determination shall be final and binding on the parties hereto. If two Qualified Appraisers have been timely selected, they shall be instructed to promptly determine, independently of the other, the fair market value of the Interest.

(iii)    If two Qualified Appraisers are selected and either appraiser fails, within 30 days after the first appraiser delivers its report to the Managing Member and the CIT Member containing the fair market value of the Interest as determined by such appraiser, the determination of the fair market value of the Interest of the appraiser who has delivered his report to the Managing Member and the CIT Member shall be determinative of the fair market value of the Interest and shall be final and binding on the parties hereto.

(iv)    If two Qualified Appraisers are selected, both appraisals are delivered within the 30-day period described above, and the difference between the two amounts of their determinations of the fair market value of the Interest does not exceed 10% of the greater of such amounts, then the fair market value of the Interest shall be the average of the fair market value of the Interest as determined by each of the two appraisers.

(v)    If two Qualified Appraisers are selected, both appraisals are delivered within the 30-day period described above, and the difference between the two amounts so determined exceeds 10% of the greater of such amounts, then such two appraisers shall select a third Qualified Appraiser who shall determine the fair market value of the Interest. Of the three appraisals, the appraisal which differs most in terms of dollar amount from the average of the three appraisals shall be excluded and the average of the remaining two appraisals shall be final and binding upon the parties hereto.

(vi)    In the event that a third Qualified Appraiser is to be selected and the original two appraisers fail to agree on the selection of the third Qualified Appraiser within ten (10) business days after notice to both appraisers of the need for a third appraiser, the third Qualified Appraiser shall be designated by the original appraisers, whose determination shall be binding upon the parties. The Managing Member and the CIT Member shall have the right to submit such data and memoranda to each of the appraisers in support of their respective positions as they may deem necessary or appropriate. The determination of the fair market value of the Interest by the Qualified Appraisers in accordance with the foregoing provisions shall be final and binding upon all parties.

(vii)     Each appraiser to be appointed pursuant to the appraisal procedures above shall (i) be an investment banking firm or business valuation firm, (ii) not have any bias or material financial or personal interest in the Company, its Members or any Affiliates thereof, and (iii) have experience in valuing businesses or assets to be valued, as applicable, which, to the extent possible, are similar in character to the Company (each a "Qualified Appraiser").

(viii)     Any determination of fair market value shall be based upon the terms and conditions of this Agreement, and under no circumstances shall the Qualified Appraisers appointed add to, modify, disregard or change any of the provisions of this Agreement, and the jurisdiction and scope of such Qualified Appraisers shall be limited accordingly. Each Member shall give prompt written notice to the other Members of the appointment of a Qualified Appraiser, such notice to identify the Qualified Appraiser.

(ix)     The Managing Member and the CIT Member shall each pay the fees and expenses of the Qualified Appraiser, if any, selected by it and one-half (1/2) of the fees and expenses of the Qualified Appraiser, if any, jointly selected hereunder.

## ARTICLE 10

### Class A Members and Disposition of Membership Interests

Section 10.1     **Rights and Obligations of the Class A Members**.

(a)     The Class A Members shall not be:

(i)     personally liable (except as otherwise provided for by the Act) for any of the debts or losses of the Company;

(ii)     allowed, in their capacity as Class A Members, to take part in the management or control of the Company business, or to sign for or bind the Company;

(iii)     entitled to be paid any salary or to have a Company drawing account;

(iv)     except as otherwise expressly provided herein, entitled to receive any interest on their Capital Contributions;

(v)     entitled to a partition of any Company Property, notwithstanding any other provision or law to the contrary;

(vi)     entitled to a return of their Capital Contributions except to the extent provided in this Agreement and permitted by the Act; or

(vii)     except as set forth in Article 4 and permitted in accordance with Sections 9.2 and 11.3(b) of this Agreement, required to contribute or lend funds to the Company.

The foregoing limitations shall not prevent a Class A Member from being employed by the Company to perform services for the Company, either as a direct employee or as an independent contractor.

Section 10.2     **Disposition of Membership Interests**.

(a)     Except as provided in Section 10.4 and Section 10.5, notwithstanding anything in this Agreement or the limited liability company laws of Louisiana (including the Act) to the contrary, no Disposition shall be effective unless and until the following conditions have been satisfied, unless compliance with any of the conditions has been specifically waived by the Managing Member in its sole discretion:

(i)       Except as provided in Subsection 10.2(b), no Disposition may be made at any time without the written approval of the Managing Member in its sole discretion.

(ii)       No Disposition may be made unless the transferor furnishes to the Managing Member for the benefit of the Company an opinion of counsel satisfactory to the Managing Member to the effect that the Disposition may be made without violation of the Securities Act of 1933 and any applicable state securities or Blue Sky laws.

(iii)       No Disposition may be made unless the transferee furnishes to the Managing Member on behalf of the Company a written confirmation executed by the transferee making all of the representations of a Class A Member contained in this Agreement.

(iv)       No Disposition may be made unless the transferor has furnished to the transferee a written statement showing the name and taxpayer identification number of the Company, in such form and together with such other information as may be required by Section 6111 of the Code and the regulations thereunder.

(v)       No Disposition may be made unless the transferee shall furnish to the Company all such information concerning such transferee (including, without limitation, name, address, and taxpayer identification number) as the Managing Member shall reasonably require, and shall pay the Company all costs and expenses, including, without limitation, all filing fees and all reasonable attorneys' fees, incurred by the Company in connection with such Disposition.

(vi)       No Disposition shall be made unless the transferee executes an instrument, in form reasonably acceptable to the Managing Member, in which such transferee specifically, assumes all existing and future obligations of the transferor Class A Member to the Company.

(b)  (i)  If the Disposition is other than as provided in Section 10.4 or Section 10.5, once the above conditions are satisfied, the successor shall become a substituted Class A Member hereunder.  (ii) Notwithstanding the foregoing, any Member may, without the consent of the other Members or the Company, transfer all or any part of its Interest to an Affiliate; provided that such Member shall pay the Company all costs and expenses, including, without limitation, all filing fees and all reasonable attorneys' fees, incurred by the Company in connection with such transfer.

Section 10.3       **Failure to Comply**. Any purported Disposition other than as described in Section 10.4 or Section 10.5, that is consummated without first complying with Section 10.2 above shall be null and void and of no effect whatsoever; provided, however, that if the Company is required to recognize a Disposition made in violation of Section 10.2 hereof, the Interest Disposed of shall be strictly limited to the transferor's rights to allocations and distributions as provided in this Agreement with respect to the Disposed of Interest, which allocations and distributions may be held and applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee of such Interest may have to the Company. Except to the extent required by the Act, any such transferee shall have no right or authority to (i) participate in any decisions required or permitted to be made by a Member, (ii) inspect the Company's books, or (iii) exercise any rights or powers of a Member or to otherwise be treated as a Member.

Section 10.4       **Right of First Refusal.** If, on or after the seventh anniversary of the effective date of this Agreement, the CIT Member, the Cambridge Class A Member or the Managing Member (the "Selling Member") receives or obtains an offer from a third-party other than as provided in Section 10.5 or from an Affiliate as permitted by Section 10.2(b) (the "Offeror") to acquire in any manner all or any part of its Interest, which offer the Selling Member intends to accept, the Selling Member shall promptly notify the other Members in writing of the offer received, including the name of the Offeror, the Interest offered to be purchased, the proposed purchase price and the other terms and conditions of the offer.  Such notice shall include a copy of the offer which shall (i) be in writing; (ii) set forth with specificity all of the material terms and conditions of the offer; (iii) be made by a person that is financially capable of completing such offer; and (iv) be consummated no later than one hundred twenty (120) days after the date on which such offer is received (the "Offer").  The CIT Member (in the event that the Managing Member or the Cambridge Class A Member is the Selling Member) and the Managing Member (in the

event that the CIT Member is the Selling Member) shall have the right (the "Right of First Refusal") for a period of sixty (60) days from the day they receive notice of such offer to purchase the Interest subject to the Offer on the same terms and conditions contained in the Offer. The CIT Member or the Managing Member may exercise such Right of First Refusal by notifying the Selling Member prior to the end of the sixty (60) day period of its intent to exercise such right. If the other Member fails to exercise the Right of First Refusal or indicates in writing that it will not exercise the Right of First Refusal within the period provided, or if the other Member exercises the Right of First Refusal but fails to effect the purchase within the prescribed period, the Selling Member may, subject to Section 10.2(a) hereof, convey or dispose of the Interest, but only at the price, terms and conditions, and to the Offeror. If terms and conditions more favorable to the proposed purchaser than, or in any material manner different from, those offered to the other Member should be agreed to by the Selling Member, the other Member shall again have the right to purchase the Selling Member's Interest in the Company which is subject to the more favorable or different purchase terms in accordance with this Section 10.4. The other Member may assign the rights in this Section 10.4 to the Company, in which event the Member's interest may be liquidated (rather than purchased) by the Company. The Member and the Company shall not be liable or accountable to any Selling Member that attempts to transfer its interest in the Company for any loss, damage, expense, cost or liability resulting from the Member's exercise or failure to exercise the Right of First Refusal under this Section 10.4, delay in notifying the Selling Member of its intention not to exercise the Right of First Refusal, or its enforcement of the requirements of this Section 10.4 in the event that it elects not to exercise the Right of First Refusal. A Member's failure to exercise the Right of First Refusal or to indicate in writing that it is electing not to exercise the Right of First Refusal shall not be deemed a consent of the Member to allow any third party transferee to become a substituted Member, such consent being controlled by the provisions of Section 10.2(a) hereof.

Section 10.5    **Transfer of CIT Member's Financial Rights**. Notwithstanding anything in this Agreement to the contrary, the CIT Member may, without the consent of the other Members, transfer its ownership interest in all or any portion of income, expense, profit, gain or loss allocations or distributions allocable or payable to the CIT Member to any other Person, provided that the CIT Member provides notice of any such transfer to the Managing Member and provided, further, that, notwithstanding the foregoing, the CIT Member remains a Class A Member until the seventh anniversary of the effective date of this Agreement.

## ARTICLE 11

### Fees, Reimbursements and Loans

Section 11.1    **Authority to Engage Others**. Subject to the terms and conditions of this Agreement, the Managing Member shall, at the expense of the Company, engage Cambridge Healthcare Management, Inc. to act as the manager of the Property, and as the leasing agent for the Property. Subject to the terms and conditions of this Agreement, the Managing Member may engage other Persons who are not Affiliates of the Managing Member to perform legal and accounting services for the Company, and perform other services for the benefit of the Company which are of a professional or specialized nature.

Section 11.2    **Reimbursement to the Managing Member and Its Affiliates**. Subject to the terms and conditions of this Agreement, in addition to the sums to be distributed to the Managing Member and the Class A Members under the other provisions of this Agreement, the Managing Member and its Affiliates shall also be entitled to be reimbursed for any and all direct costs and expenses incurred by it or them, including, but not limited to costs and expenses incurred to engage Persons pursuant to Section 11.1, whether before or after the date on which this Company is formed, in relation to the formation of the Company, the operation of the Company, the acquisition of the Project, tests, investigations, studies and plans performed on or developed with respect to the Project, and the operation of the Project by the Company. Such reimbursements shall be paid by the Company as soon as funds are available therefor. Any non-budgeted payments to the Managing Member or its Affiliates shall require the consent of all Class A Members.

Section 11.3    **Loans**.

(a)    Subject to the terms and conditions of this Agreement, any Member, or an Affiliate of any Member may but is not obligated to, with the consent of the Managing Member, lend or advance money to the Company. If any Member shall make any loan to the Company, the amount of any such loan

shall not be treated as a Capital Contribution but shall be a debt due from the Company. The amount of any such loan by a lending Member shall be repayable out of the Company's cash and, subject to loans made pursuant to Subsection 11.3(b), shall be paid prior to the payment of any cash distributions to the Members under Section 7.1 hereof. The Managing Member, or any Affiliate of the Managing Member, as the case may be, at its election, may treat any unpaid portion of any amount due to it from the Company under this Article 11 as a loan to the Company under this Section 11.3 with interest accruing at the Prime Rate from the due date of any such amount. Notwithstanding the foregoing, no Member shall be obligated to make a loan to the Company.

(b)      Solely in the event that the Managing Member proposes, but the CIT Member does not consent to, a call for capital contributions pursuant to Section 9.2(a)(i), and subject to the terms and conditions of this Agreement, the Managing Member may but is not obligated to lend or advance money to the Company in an amount not to exceed the amount set forth on Exhibit "C" during any calendar year; provided, however, that, prior to the Conversion Date, any funds from such loan shall be used exclusively for capital expenditures required to maintain the Property in good operating condition. Any such loan shall bear interest at annual rate of eight percent (8%) and shall be evidenced by a written promissory note including commercially reasonable terms. The amount of any such loan shall not be treated as a Capital Contribution but shall be a debt due from the Company subordinated for all purposes to the CIT Member's Minimum Quarterly Distribution and, pursuant to Section 7.1 above, after the Conversion Date, shall be paid prior to distributions in accordance with the Members' respective Percentage Interests. The aggregate of all such loans by the Managing Member to the Company during any calendar year shall not exceed the amount set forth on Exhibit "C". The aggregate of all loans by the Managing Member or its Affiliates to any or all of the Operating Companies during any calendar year shall not exceed three million dollars ($3,000,000).

## ARTICLE 12

### Dissolution and Liquidation

Section 12.1      **Dissolution of the Company**. Except as provided in Section 12.2, the Company shall immediately be dissolved upon:

(a)      The express written consent of the Managing Member and all Class A Members;

(b)      The sale, exchange, abandonment, foreclosure or other disposition of all of the Project;

(c)      The occurrence of any circumstance which, by law, would require that the Company be dissolved; or

(d)      The occurrence of an event or the existence of a condition which makes it unlawful for the Company's business to be conducted.

Upon the occurrence of any of the above listed events, the Managing Member shall no longer be entitled to make distributions as provided in Section 7.1 hereof, but all distributions thereafter shall be made in accordance with the provisions of Section 12.3(c) hereof.

Section 12.2      **Reconstitution**.

(a)      If the Company is dissolved pursuant to the withdrawal of the Managing Member under Section 12.1(c) hereof, then the Class A Members shall have the right to agree, in writing or by vote, to cause the Company to be continued and reconstituted as herein provided. If the Managing Member is removed pursuant to Section 9.7, the Company shall not be dissolved if the CIT Member determines to cause the Company to be continued and reconstituted as herein provided; provided, however, that if required under applicable law, all Class A Members other than the CIT Member agree, in writing or by vote as requested by the CIT Member, to take affirmative action to agree to such continuation and

reconstitution. The right to continue and reconstitute the Company shall in either case be exercised, if at all, within ninety (90) days after the occurrence of the event described in Section 12.1(c) hereof.

(b)    If the Class A Members elect to continue and reconstitute the Company as described in Section 12.2(a) hereof, within sixty (60) days after electing to continue and reconstitute the Company pursuant to Section 12.2(a) hereof, the Class A Members shall designate another Person, regardless whether such Person is an existing Member or not, that agrees to become the new Managing Member ("New Managing Member") of the Company. The New Managing Member shall become the Managing Member of the Company for all purposes and shall possess all of the rights, powers and authorities of the Managing Member hereunder and shall succeed to the Interest and Percentage Interest of the previous Managing Member ("Old Managing Member") from and after the date on which the New Managing Member agrees to accept the designation as Managing Member of this Company, as continued and reconstituted.

(c)    If the Class A Members elect to continue and reconstitute the Company pursuant to the provisions of Section 12.2(a) hereof, then the income, gains, losses and deductions recognized by the Company prior to the occurrence of the event described in Section 12.1(c) hereof shall be allocated as provided in Article 6 as though such event had occurred at the end of a Fiscal Year and the Capital Account balances of the Members shall be adjusted accordingly.

(d)    If the Capital Account balance of the Old Managing Member is not positive after the adjustments required by Section 12.2(c) hereof, then the Old Managing Member shall not be a Member in the continued and reconstituted Company, and the Old Managing Member shall make a contribution to the continued and reconstituted Company equal to the amount which it would have been obligated to contribute pursuant to Section 4.3 hereof if the dissolution had caused a termination of the Company and the assets of the Company had been sold on the next day following the cause of dissolution of the Company (i) for cash equal to the adjusted basis for federal income tax purposes of each item of Company Property or (ii) if a Section 754 election is in effect and an adjustment to the Old Managing Member's Capital Account is required by Treasury Regulation Section 1.704-1 (b)(2)(iv)(m)(4), for cash equal to each item's respective Gross Asset Value. If the Old Managing Member has a positive Capital Account balance after the adjustment required by Section 12.2(c) hereof, then the Old Managing Member shall become a Class A Member in the continued and reconstituted Company and shall retain such Capital Account balance and receive a distribution upon subsequent dissolution and termination of the continued and reconstituted Company pursuant to Section 12.3(c) hereof, but shall have no further share in other income, gains, losses, deductions or distributions of the continued and reconstituted Company.

(e)    The Old Managing Member's consent shall not be required for any continuation or reconstitution hereunder or for the designation of the New Managing Member hereunder.

Section 12.3    **Winding Up**.

(a)    Upon the dissolution of the Company, the Managing Member shall act as liquidating trustee (the "Liquidating Trustee") and immediately proceed to terminate the business of the Company. The Liquidating Trustee shall first determine or have determined the fair market value of all Company Property and then attempt to sell all Company Property (except cash and current receivables) at such time, at such prices, and on such terms as the Liquidating Trustee, in the exercise of its best business judgment under the circumstances then presented, deems in the best interest of the Members. The Managing Member (or an Affiliate of the Managing Member) shall have the right to purchase any Company Property to be sold on Liquidation, provided that the terms on which such sale is made are no less favorable to the Class A Members than would otherwise be available from third parties. The proceeds of the sale of the Company Property, together with cash and proceeds of Company receivables as received by the Liquidating Trustee from time to time, shall be distributed in accordance with Section 12.3(c) hereof.

(b)    The Liquidating Trustee (including any officer, director, or other agent of the Liquidating Trustee) shall be defended, indemnified, and held harmless by the Company from and against any and all claims, demands, liabilities, costs, damages and causes of action of any nature whatsoever, (including, without limitation, those based on negligence) arising out of or incidental to the Liquidating Trustee taking

any action authorized under, or within the scope of, this Section 12.3 or any Person acting as officer or director thereof while the Liquidating Trustee was so acting; provided, however, that neither the Liquidating Trustee nor any officer, director or other agent thereof shall be entitled to indemnification hereunder where the claim at issue arose out of the following:

> (i)    A matter entirely unrelated to the Liquidating Trustee's acting under the provisions of this Article 12; or

> (ii)    The proven gross negligence or proven willful misconduct of the Liquidating Trustee, or of any officer, director or other agent thereof; or

> (iii)    The breach by the Liquidating Trustee of any of its obligations under this Article 12.

The indemnification rights herein contained shall be cumulative of, and in addition to, any and all other rights, remedies and recourses to which the Liquidating Trustee, or any officer, director or other agent thereof, shall be entitled under this Agreement, the Act, at law or in equity.

> (c)    After the Liquidating Trustee has sold all of the Company Property as provided herein, Company income, gain, loss or deduction shall be credited or charged to the Capital Accounts of the Members in accordance with Article 6 hereof. The net proceeds from such sales (after deducting all selling costs and expenses in connection therewith) shall be applied or distributed on or before the later to occur of (i) the last day of the Fiscal Year on which the Liquidation of the Company occurs, or (ii) ninety (90) days after the date upon which the Liquidation of the Company occurs in the following order of priority:

> (i)    First, in payment of all third-party costs incurred in connection with the sale of the Company Property;

> (ii)    Second, in payment of all liabilities of the Company to third-party creditors;

> (iii)    Third, in payment of all loans and other liabilities of the Company to Members;

> (iv)    Fourth, to the Members, in accordance with their Percentage Interest.

Section 12.4    **Final Accounting**. The Liquidating Trustee shall furnish to each Member a copy of an accounting of all Company assets, liabilities and operations from the date of the last previous accounting to the date of dissolution of the Company and from the date of dissolution of the Company to the date of termination of the Company.

## ARTICLE 13

### Representations and Indemnification

Section 13.1    **Representations of the Class A Members**. Each Class A Member hereby represents and warrants to the Company and all Members that the following statements are true:

> (a)    Such Class A Member is financially able to comply with its obligations hereunder; and it has adequate means of providing for its current financial needs and possible contingencies, exclusive of its investment in the Company;

> (b)    Such Class A Member understands that the Internal Revenue Service (the "Service") may disallow some or all of the deductions or losses to be claimed by the Company;

> (c)    Such Class A Member is aware that the Managing Member and Affiliates of the Managing Member will engage in businesses which are competitive with that of the Company, and, except

as specifically provided in this Agreement, it consents to and approves such activities even though there are conflicts of interest inherent therein; provided, however, nothing herein shall limit the obligations of the Managing Member pursuant to Section 9.4 hereof.

(d)       Such Class A Member recognizes that Section 4(2) of the Securities Act of 1933, as amended (the "Securities Act of 1933"), and similar provisions of applicable state securities laws exempt the issue and sale of securities from registration with the applicable securities law regulatory bodies in transactions not involving any public offering and that it is purchasing its Interest for its own account, for investment and with no present intention of distributing, reselling, pledging, or otherwise disposing of its Interest;

(e)       Such Class A Member has been furnished with sufficient written and oral information about the Company, the Managing Member and the Project to allow it to make an informed investment decision prior to purchasing an Interest, and has been furnished access to any additional information that it may require;

(f)       Such Class A Member is fully familiar with the business proposed to be conducted by the Company and with the Company's use and proposed use of the Company Property;

(g)       That this Agreement has been drafted in the course of a negotiated transaction involving direct communication between such Class A Member and the Managing Member on behalf of the Company;

(h)       Such Class A Member either (a) has experience in business enterprises or investments entailing risks of a type or to a degree substantially similar to those entailed in an investment in the Company; or (b) has obtained independent financial advice with respect to its investment in the Company; and (c) is an "Accredited Investor" as that term is defined in the Securities Act of 1933;

(i)       Such Class A Member has been advised that its Interest may not be sold, transferred or otherwise disposed of in the absence of either an effective registration statement covering said Interest under the Securities Act of 1933, or an opinion of counsel satisfactory to the Company and its counsel that registration of its Interest is not required under the Securities Act of 1933, and, in view of the nature of the transaction, that registration is neither contemplated nor likely.

Section 13.2       **Indemnification**. Each Class A Member shall and does hereby agree to indemnify, defend, and save harmless the Company, the Managing Member and each other Class A Member from any damages, claims, expenses, losses or actions resulting from (i) a breach by such Class A Member of any of the warranties and representations contained in Section 13.1 hereof, or (ii) the untruth of any of the warranties and representations contained in Section 13.1 hereof.

## ARTICLE 14

### Default By Members

Section 14.1       **Events Constituting Default by a Class A Member**. The following events shall be deemed to be "Events of Default" by a Class A Member:

(a)       the making of an assignment for the benefit of creditors or the filing of a petition under any section or chapter of the U.S. Bankruptcy Code, as amended, or under any similar law or statute of the United States, Canada, or any state or province of either;

(b)       the classification of a Class A Member as a debtor or insolvent in proceedings under any section or chapter of the U.S. Bankruptcy Code, as amended, or under any similar law or statute of the United States, Canada, or any state or province of either for a period of ninety (90) days without a dismissal of such proceedings;

(c)     the appointment of a receiver for all or substantially all of the assets of a Class A Member and the failure to have such receiver discharged within ninety (90) days after appointment; and

(d)     the material breach by a Class A Member of any of the provisions of this Agreement.

Section 14.2     **Remedies Upon Default by a Class A Member**.

(a)     Upon the occurrence of an Event of Default by a Class A Member (herein called a "Defaulting Class A Member"), other than for failure to make Additional Capital Contributions (for which defaults remedies are provided in Article 4 hereof), at any time within one (1) year after the date of such Event of Default, the Managing Member shall give the Defaulting Class A Member thirty (30) days' written notice of such Event of Default, provided such Event of Default is continuing on the date such notice is given, to allow the Defaulting Class A Member to cure the Event of Default, if possible. Upon the expiration of thirty (30) days after such notice and if the Event of Default has not been cured, the other Members (herein called the "Non-Defaulting Members") shall be entitled, on behalf of the Company, to seek all such remedies as are allowed by law or in equity.

(b)     The foregoing remedy is provided in view of the fact that the Interests of the Non-Defaulting Members will be put in jeopardy in the event of any Event of Default by a Defaulting Class A Member which is not timely cured after notice, with potential damages to the Non-Defaulting Members in amounts which cannot be foreseen.

(c)     No waiver of any Event of Default shall be deemed or construed to constitute a waiver of any other Event of Default or of any breach of any of the terms, provisions, and covenants herein contained, and forbearance to enforce one or more of the remedies herein provided upon an Event of Default shall not be deemed or construed to constitute a waiver of such Event of Default.

**ARTICLE 15**

**Miscellaneous**

Section 15.1     **Notices**. All notices or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be considered as properly given if (i) mailed by first class United States mail, postage prepaid, certified mail, return receipt requested, or (ii) sent by (a) facsimile or (b) personal delivery. A notice so mailed shall be effective upon the expiration of three (3) business days after its deposit with the United States Postal Service. A notice sent by facsimile or personal delivery shall be effective upon receipt by the addressee. For purposes of notice, the address of each Member shall be the address recited on such Member's signature page to this Agreement; provided, however, that a Member shall have the right to change its address for notice hereunder to any other location within the continental United States by the giving of thirty (30) days notice to the Managing Member (or, in the case of the Managing Member changing its address, to all the Class A Members) in the manner set forth herein.

Section 15.2     **Law Governing**. This Agreement, and the obligations of the Members hereunder, shall be governed by and construed in accordance with the laws of the State of Louisiana, excluding any conflicts of law, rule or principle which might refer such construction to the laws of another state. Venue shall be in the Parish of East Baton Rouge, Louisiana.

Section 15.3     **Successors and Assigns**. This Agreement, together with the Escrow Agreement, and all the terms, provisions and conditions hereof, shall be binding upon and shall inure to the benefit of the Members, and their respective legal representatives, successors and assigns; provided, however, that nothing contained herein shall negate or diminish the restrictions set forth in Article 10 hereof or elsewhere in this Agreement.

Section 15.4    **Entire Agreement.**  This Agreement contains the entire agreement among the Members relating to the subject matter hereof, and all other agreements relative hereto which are not contained herein are terminated.

Section 15.5    **Amendments**. Except as otherwise explicitly provided herein, amendments, variations, modifications or changes to this Agreement may be effective and binding upon the Members by, and only by, setting the same forth in a document duly executed and consented to by all Members, and any alleged amendment, variation, modification or change to this Agreement which is not so documented shall not be effective as to any Member.

Section 15.6    **Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be an original, but all of which shall constitute but one (1) instrument.

Section 15.7    **Attachments**. All annexes, exhibits, and schedules hereto are incorporated in this Agreement and made a part hereof by reference.

Section 15.8    **Severability**. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations. If any provision of this Agreement or the application thereof to any Person or circumstance shall, for any reason or to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

Section 15.9    **Article and Section Titles**. The article and section titles and headings used in this Agreement are solely for convenience and neither modify nor limit the provisions of this Agreement.

WITNESS THE EXECUTION HEREOF as of the 31st day of December, 2007.

MANAGING MEMBER:

**CHMP MANAGER, LLC**, a
Louisiana limited liability company

By: _____
        Jean-Claude Saada, Sole Member

Address:
1717 Main Street, 59th Floor
Dallas, Texas 75201

CAMBRIDGE CLASS A MEMBER:

**CAMBRIDGE B/R, INC.**, a
Louisiana corporation

By: _____
        Jean-Claude Saada, President

Address:
1717 Main Street, 59th Floor
Dallas, Texas 75201

CIT MEMBER:

**ERC SUB, L.P.**, a
Delaware limited partnership

By: ERC Sub, LLC, a Delaware limited liability company,
     its General Partner

        By: _____
        Name:   F. Scott Kellman
        Title:    President and Chief Executive Officer

Address:
ERC Sub, L.P.
c/o Care Investment Trust Inc.
505 Fifth Avenue
6th Floor
New York, NY  10017
Attention: Chief Executive Officer
Facsimile:  734-913-0712

Second Amended and Restated Operating Agreement of Cambridge Howell Medical Plaza, LLC
Signature Page

## EXHIBIT A

### Percentage Interests

Class A Members:

| | |
|---|---:|
| Cambridge B/R, Inc. | 14.0% |
| ERC Sub, L.P. | 85.0% |

Managing Member:

| | |
|---|---:|
| CHMP Manager, LLC | <u>1.0%</u> |
| Total | 100.0% |

EXHIBIT B

Real Property Description

See attached.

Property Legal Description (Baton Rouge)

A CERTAIN PIECE OR PARCEL OF LAND LOCATED IN SECTION 94, 95 AND 96, T6S-R1E, GREENSBURG LAND DISTRICT, PARISH OF EAST BATON ROUGE, STATE OF LOUISIANA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCING AT THE APPARENT INTERSECTION OF THE SOUTHERLY RIGHT OF WAY LINE OF HARDING BOULEVARD AND THE WESTERLY RIGHT OF WAY LINE OF HOWELL BOULEVARD, PROCEED ALONG SAID WESTERLY RIGHT OF WAY LINE OF HOWELL BOULEVARD, SOUTH 01 DEGREES 49 MINUTES 51 SECONDS EAST FOR A DISTANCE OF 142.57 FEET TO A POINT; THENCE CONTINUE ALONG SAID WESTERLY RIGHT OF WAY LINE, 508.99 FEET ALONG THE ARC OF A TANGENT CURVE TO THE LEFT HAVING A RADIUS OF 898.02 FEET, A DELTA ANGLE OF 32 DEGREES 28 MINUTES 30 SECONDS, A CHORD BEARING OF SOUTH 18 DEGREES 04 MINUTES 06 SECONDS EAST, AND A CHORD DISTANCE OF 502.21 FEET TO A FOUND 1/2 INCH IRON PIPE; SAID POINT BEING THE POINT OF BEGINNING;

THENCE CONTINUE ALONG SAID WESTERLY RIGHT OF WAY LINE OF HOWELL BOULEVARD, 282.60 FEET ALONG THE ARC OF A CURVE TO THE LEFT HAVING A RADIUS OF 898.02 FEET, A DELTA ANGLE OF 18 DEGREES 01 MINUTES 49 SECONDS, A CHORD BEARING OF SOUTH 43 DEGREES 19 MINUTES 15 SECONDS EAST, AND A CHORD DISTANCE OF 281.43 FEET TO A FOUND "X" CUT IN CONCRETE; THENCE CONTINUE ALONG SAID WESTERLY RIGHT OF WAY LINE, SOUTH 52 DEGREES 20 MINUTES 10 SECONDS EAST FOR A DISTANCE OF 168.77 FEET TO A SET "X" CUT IN CONCRETE; THENCE CONTINUE ALONG SAID WESTERLY RIGHT OF WAY LINE, 65.57 FEET ALONG THE ARC OF A TANGENT CURVE TO THE RIGHT HAVING A RADIUS OF 788.57 FEET, A DELTA ANGLE OF 04 DEGREES 45 MINUTES 50 SECONDS, A CHORD BEARING OF SOUTH 49 DEGREES 57 MINUTES 15 SECONDS EAST, AND A CHORD DISTANCE OF 65.55 FEET TO A FOUND 1/2 INCH IRON PIPE; THENCE LEAVING SAID WESTERLY RIGHT OF WAY LINE, PROCEED SOUTH 56 DEGREES 40 MINUTES 53 SECONDS WEST FOR A DISTANCE OF 833.40 FEET TO A FOUND 1/2 INCH IRON PIPE; THENCE PROCEED NORTH 39 DEGREES 37 MINUTES 12 SECONDS WEST FOR A DISTANCE OF 88.24 FEET TO A FOUND 1/2 INCH IRON PIPE; THENCE PROCEED NORTH 03 DEGREES 35 MINUTES 08 SECONDS WEST FOR A DISTANCE OF 593.65 FEET TO A FOUND 1/2 INCH IRON PIPE; THENCE PROCEED NORTH 56 DEGREES 44 MINUTES 10 SECONDS EAST FOR A DISTANCE OF 17.56 FEET TO A SET 1/2 INCH IRON PIPE; THENCE PROCEED NORTH 70 DEGREES 55 MINUTES 19 SECONDS EAST FOR A DISTANCE OF 421.41 FEET BACK TO THE POINT OF BEGINNING. THE PROPERTY DESCRIBED HEREIN CONTAINS A TOTAL OF 8.289 ACRES, (361,101 SQUARE FEET).

STEWART TITLE GUARANTY COMPANY

EXHIBIT C

$128,350

SCHEDULE 1.8

DB Holdback Reserves

$2,579,723

SCHEDULE 1.32

Gross Asset Value

$28,097,482