# EXHIBIT D

**THIRD AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**CAMBRIDGE WALNUT HILL, L.P.,**
a Delaware Limited Partnership

THE PARTNERSHIP INTERESTS REPRESENTED BY THIS DOCUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY JURISDICTION IN RELIANCE UPON EXEMPTION FROM REGISTRATION AS PROVIDED IN THOSE STATUTES. NO PARTNERSHIP INTERESTS MAY BE SOLD OR OFFERED FOR SALE (WITHIN THE MEANING OF ANY SECURITIES LAW) UNLESS A REGISTRATION STATEMENT UNDER ALL APPLICABLE SECURITIES LAWS WITH RESPECT TO THE PARTNERSHIP INTEREST IS THEN IN EFFECT OR AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THOSE LAWS IS THEN APPLICABLE TO THE PARTNERSHIP INTEREST. A PARTNERSHIP INTEREST ALSO MAY NOT BE TRANSFERRED OR ENCUMBERED UNLESS THE PROVISIONS OF ARTICLE 10 OF THIS AGREEMENT ARE SATISFIED. SEE ARTICLE 13 FOR REPRESENTATIONS AND WARRANTIES REQUIRED BY LIMITED PARTNERS WITH RESPECT TO AN INVESTMENT IN THIS LIMITED PARTNERSHIP.

**THIRD AMENDED AND RESTATED**
**AGREEMENT OF LIMITED PARTNERSHIP**
**OF**
**CAMBRIDGE WALNUT HILL, L.P.**

This Third Amended and Restated Agreement of Limited Partnership of Cambridge Walnut Hill, L.P. (the "Agreement") is entered into effective the 31st day of December, 2007, by and between 6000 GREENVILLE, INC. (the "General Partner"), a Texas corporation, as the general partner; and CAMBRIDGE-GREENVILLE DALLAS, LLC (the "Cambridge Limited Partner"), a Delaware limited liability company, and ERC Sub, L.P. (the "CIT Limited Partner"), a Delaware limited partnership, as the limited partners. The Cambridge Limited Partner, the CIT Limited Partner and any other Person hereafter admitted to the Partnership as a limited partner are hereafter referred to collectively as the "Limited Partners" and individually as a "Limited Partner". The General Partner and the Limited Partners are sometimes referred to collectively as the "Partners" and individually as a "Partner". This Agreement and the related annexes, exhibits and schedules attached hereto contain the entire understanding of the Partners relating to the terms, conditions, and covenants of the partnership agreement between them and supersede all prior and contemporaneous written or oral agreements and understandings relating to the subject matter hereof.

## RECITALS:

A.     Effective as of July 24, 2002, the Certificate of Limited Partnership (the "Certificate") of Cambridge-LaSalle Dallas, L.P. (the "Partnership") was duly filed in the office of the Secretary of State of Delaware.

B.     Effective as of July 24, 2002, LaSalle Medical Office Fund, LLC ("LMOF"), LMOF-Dallas GP, LLC (the "LMOF General Partner"), the General Partner, and the Cambridge Limited Partner entered into that certain Limited Partnership Agreement (the "Original LP Agreement") of Cambridge-LaSalle Dallas, L.P.

C.     Pursuant to that certain First Amendment to Certificate of Limited Partnership filed June 15, 2004, in the office of the Secretary of State of Delaware, the name of the Partnership was changed to Cambridge Walnut Hill, L.P.

D.     Pursuant to that certain Purchase and Sale Agreement (the "Contract") dated as of June 11, 2004, by and among LMOF, the LMOF General Partner, the General Partner, and the Cambridge Limited Partner, LMOF agreed to sell and convey the entire interest of LMOF in the Partnership to the Cambridge Limited Partner; and the LMOF General Partner agreed to sell and convey to the General Partner the entire interest of the LMOF General Partner in the Partnership to the General Partner.

E.     Effective as of June 28, 2004, LMOF sold, assigned, transferred, conveyed, and delivered to the Cambridge Limited Partner the entire interest of LMOF in the Partnership pursuant to the Contract and LMOF has resigned as a limited partner of the Partnership and has withdrawn from the Partnership.

F.     Effective as of June 28, 2004, the LMOF General Partner sold, assigned, transferred, conveyed, and delivered to the General Partner the entire interest of the LMOF General Partner in the Partnership pursuant to the Contract and the LMOF General Partner has resigned as a general partner of the Partnership and has withdrawn from the Partnership.

G.     As a result of the consummation of the transactions contemplated in the Contract, the General Partner and the Cambridge Limited Partner were the sole partners of the Partnership.

H.     The General Partner and the Cambridge Limited Partner elected and agreed to continue the business of the Partnership and entered into that certain First Amended and Restated Agreement of

Limited Partnership of Cambridge Walnut Hill, L.P. (the "First Amended LP Agreement") dated as of June 28, 2004, to set forth their agreements with respect to the operation of the Partnership from and after the effective date of the First Amended LP Agreement.

I.      The General Partner and the Cambridge Limited Partner elected and agreed to continue the business of the Partnership and entered into that certain Second Amended and Restated Agreement of Limited Partnership of Cambridge Walnut Hill, L.P. (the "Second Amended LP Agreement") dated as of October 17, 2006, to set forth their agreements with respect to the operation of the Partnership from and after the effective date of the Second Amended LP Agreement.

J.      Pursuant to that certain Amendment to Certificate of Limited Partnership filed July 6, 2007 in the office of the Secretary of State of Delaware, the name of the LMOF General Partner was removed from the Certificate to reflect its withdrawal as a general partner of the Partnership.

K.      Pursuant to that certain Purchase Agreement (the "CIT Purchase Agreement"), dated as of December 31, 2007, by and among the CIT Limited Partner and certain affiliates of the General Partner, the Cambridge Limited Partner agreed to sell and convey to the CIT Limited Partner an 85% Interest in the Partnership, reducing the Cambridge Limited Partner's Interest in the Partnership to a 13.5% Interest in the Partnership.

L.      The General Partner has a 1.5% Interest in the Partnership.

M.      Effective as of the date hereof, the Cambridge Limited Partner sold, assigned, transferred, conveyed and delivered to the CIT Limited Partner an 85% Interest in the Partnership pursuant to the CIT Purchase Agreement.

N.      The transaction contemplated by the CIT Purchase Agreement in which the CIT Limited Partner acquired an 85% Interest in the Partnership also involved the acquisition of interests in other Companies from the same or affiliated owners. As an integral part of the transaction, the CIT Limited Partner is entitled to a Minimum Quarterly Distribution on a quarterly basis equal to a specified return on the aggregate investment in all Companies until the Conversion Date. If the distribution from the Companies is insufficient to meet the Minimum Quarterly Distribution in any quarter, all or a portion of the distribution that would otherwise go to the Cambridge Limited Partner and the General Partner (in that order) will instead be paid to the CIT Limited Partner to the extent necessary to equal the Minimum Quarterly Distribution. In the event one or more of the other Companies is unable to make distributions sufficient to comply with the Minimum Quarterly Distribution for such entity, any shortfall in the Minimum Quarterly Distribution is required to be made up by the distributions of Available Cash from one or more of the other Companies (including the Partnership) pertaining to the quarter to equal such shortfall. In order to implement the terms of this Agreement, the Partners have agreed that, prior to the Conversion Date, all distributions payable to the Partners will be paid to the Escrow Agent which will aggregate all such distributions and, if appropriate, pay the distributions as instructed in order to provide the CIT Limited Partner its Minimum Quarterly Distribution. In the event the aggregate distributions of the Companies for a quarter do not equal the Minimum Quarterly Distribution, pursuant to the terms of the Escrow Agreement, the Escrow Agent shall utilize certain amounts or property placed in the escrow account by the Sellers (as defined in the Escrow Agreement). Pursuant to the Escrow Agreement, the Escrow Agent shall inform in writing the relevant general partner or managing member, as the case may be, of the amount of distribution made by such Company that would otherwise be considered distributed first to the Cambridge limited partner or member, as the case may be, and then to the general partner or managing member, as the case may be (in that order) that was actually distributed to the CIT Limited Partner (the "Supplemental Distribution"). The books and records of the Partnership will reflect such distributions as being made by the Partnership to the CIT Limited Partner. To the extent of the Supplemental Distribution, the CIT Limited Partner shall receive a special allocation of Profits (first ordinary income and then capital gain) equal to the Supplemental Distribution and the Cambridge Limited Partner (first) and the General Partner (second) will have its respective allocated income reduced accordingly.

O.        As a result of the consummation of the transactions contemplated by the CIT Purchase Agreement, the General Partner, the Cambridge Limited Partner and the CIT Limited Partner are the only partners of the Partnership.

P.        The General Partner, the Cambridge Limited Partner and the CIT Limited Partner have agreed and the Lender has consented to the amendment and restatement of the Second Amended LP Agreement as provided in this Agreement.

Any capitalized terms above that are not defined above, shall have the definition as provided subsequently herein.

**NOW THEREFORE**, for and in consideration of the mutual covenants, rights, and obligations set forth in this Agreement, the benefits to be derived from this Agreement, and other good and valuable consideration, the receipt and sufficiency of which each Partner acknowledges, the General Partner, the Cambridge Limited Partner and the CIT Limited Partner hereby continue the Partnership under and pursuant to the Act, upon the terms and conditions set forth in this Agreement.

## ARTICLE 1

### Definitions

The following terms, when used with initial capital letters in this Agreement, have the meanings assigned to them in this Article unless the context otherwise requires:

Section 1.1        **Act** means the Delaware Revised Uniform Limited Partnership Act, 6 Del. C. Sec. 17-101, et seq., and any successor statute, as amended from time to time.

Section 1.2        **Agreement** means this Third Amended and Restated Agreement of Limited Partnership.

Section 1.3        **Additional Capital Contributions** is defined in Section 4.3.

Section 1.4        **Adjusted Capital Account Deficit** means, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)        credit to such Capital Account any amounts which such Partner is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(b)        debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

Section 1.5        **Affiliate** is defined in Section 3.4(e).

Section 1.6        **Annual Budget** is defined in Section 9.2(b)(ii).

Section 1.7        **Available Cash** means the positive difference between (i) cash actually received, from time to time, by the Partnership from the conduct of the Partnership's business and the sale or refinancing of Partnership property and (ii) the sum of (a) cash payments actually made, from time to time, by the Partnership in connection with the conduct of the Partnership's business, (b) cash which may not be distributed to the Partners pursuant to restrictions imposed by any Person not an affiliate of a Partner loaning money to the Partnership for any purpose, and (c) a reasonable reserve not to exceed three (3) months of expenses and debt service. Available Cash

generated from the conduct of the Partnership's business shall be referred to as "Available Cash from Operations", and Available Cash generated from sale or refinancing of Partnership Property shall be referred to as "Available Cash from Special Event". The determination of the amount of Available Cash from Operations or Available Cash from Special Event shall be made no less than quarterly by the General Partner.

Section 1.8     **Bankruptcy Event** means any event where the General Partner: (i) makes an assignment for the benefit of creditors; (ii) files a voluntary petition in bankruptcy; (iii) is adjudged bankrupt or insolvent, or has entered against it an order for relief in any bankruptcy or insolvency proceeding; (iv) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature; (vi) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the General Partner or of all or any substantial part of its properties; or (vii) one hundred twenty (120) days after the commencement of any proceeding against the General Partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within ninety (90) days after the appointment without the General Partner's consent or acquiescence of a trustee, receiver or liquidator of the General Partner or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within ninety (90) days after the expiration of any such stay, the appointment is not vacated.

Section 1.9     **Cambridge Limited Partner** is defined in the Preamble.

Section 1.10     **Capital Account** means the tax capital account maintained by the Partnership for each Partner, the initial balance of each of which shall be zero. Each Partner's Capital Account shall be increased by (i) the amount of money contributed by such Partner to the Partnership, (ii) the fair market value of property contributed by such Partner to the Partnership (net of liabilities securing such contributed property that the Partnership is considered to assume or take subject to under Section 752 of the Code), and (iii) allocations to such Partner of any income or gain (or items thereof) by the Partnership, including income and gain exempt from tax and income and gain described in Section 1.704-1(b)(2)(iv)(g) of the Treasury Regulations promulgated under Section 704(b) of the Code, but excluding income and gain described in Section 1.704-1(b)(4)(i) of the Treasury Regulations promulgated under Section 704(b) of the Code; and shall be decreased by (iv) the amount of money distributed to such Partner by the Partnership, (v) the fair market value of property distributed to such Partner by the Partnership (net of liabilities securing such distributed property that such Partner is considered to assume or take subject to under Section 752 of the Code), (vi) allocations to such Partner of expenditures of the Partnership described in Section 705(a)(2)(B) of the Code, and (vii) allocations of loss and deduction (or items thereof) from the Partnership, including loss and deduction described in of Section 1.704-1(b)(2)(iv)(g) of the Final Treasury Regulations promulgated under Section 704(b) of the Code, but excluding items described in clause (vi) above and loss or deduction described in Section 1.704-1(b)(4)(i) or (4)(iii) of the Treasury Regulations promulgated under Section 704(b) of the Code. It is the intention of the Partners that each Partner's Capital Account shall be maintained in accordance with the rules set forth in Section 1.704-1(b)(2)(iv) of the Treasury Regulations promulgated under Section 704(b) of the Code, and to the extent that the rules set forth therein with respect to the maintenance of Capital Account balances differ from the provisions of this definition of "Capital Account", the rules set forth therein shall apply. A transferee of an interest in the Partnership shall succeed to the Capital Account of the transferor. A Partner who has more than one interest in the Partnership shall have a Capital Account for each such interest.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the General Partner shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Partnership or any Partner) are computed in order to comply with such Regulations, the General Partner may make such modification, provided that it will not have a material effect on the amounts distributable to any Partner pursuant to Section 7.2 upon a sale of all or substantially all of the assets of the Partnership. The General Partner also shall make any adjustments that are necessary or appropriate to maintain equality between the aggregate Capital Accounts of the Partners and the amount of Partnership capital reflected on the Partnership's balance sheet, as computed for book purposes, in accordance with Regulations Section 1.704-1(b)(2)(iv)(q).

Section 1.11 **Capital Contribution** means the total contributions to the capital of the Partnership which a Partner makes pursuant to Article 4 of this Agreement.

Section 1.12 **Certificate** is defined in Recital A, and includes all amendments thereto.

Section 1.13 **Change in Control** is defined in Section 9.7(b)(i).

Section 1.14 **CIT Limited Partner** is defined in the Preamble.

Section 1.15 **CIT Purchase Agreement** is defined in Recital K.

Section 1.16 **Code** means the Internal Revenue Code of 1986, as amended.

Section 1.17 **Companies** has the meaning assigned to it in the Escrow Agreement.

Section 1.18 **Contributing Partner** is defined in Section 4.5.

Section 1.19 **Control** is defined in Section 9.7(b)(i).

Section 1.20 **Conversion Date** means the date that is the earlier of (i) the seventh anniversary of the effective date of this Agreement or (ii) the first business day of the calendar quarter immediately following the calendar quarter in which the Escrow Release Formula is satisfied.

Section 1.21 **Deadlock** is defined in Section 9.2(d).

Section 1.22 **Defaulting Limited Partner** is defined in Section 14.2(a).

Section 1.23 **Depreciation** means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such year or other period; provided, however, that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, further that if the federal income tax depreciation, amortization, or other cost recovery deduction for such year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the General Partner.

Section 1.24 **Development Agreement** is defined in Section 3.1.

Section 1.25 **Disposition** means any sale, assignment, conveyance, transfer, pledge or hypothecation, by operation of law or otherwise, of any Interest of a Partner or any right, title or interest therein or thereto (excluding any assignment of a right to receive cash distributions), including without limitation, disposition upon death or, in case of a Partner that is an entity, any sale, assignment, conveyance, transfer, pledge or hypothecation, by operation of law or otherwise, of any interest in such Partner; provided, however, that a sale, assignment, conveyance, transfer, pledge or hypothecation by a Limited Partner in accordance with Section 10.2(b)(ii) or Section 10.5 shall not be deemed to be a Disposition.

Section 1.26 **Escrow Agent** means Amegy Bank National Association, a national banking association, or its successors and assigns.

Section 1.27 **Escrow Agreement** means the escrow agreement by and among the Escrow Agent, the Partnership and certain other parties entered into pursuant to the CIT Purchase Agreement. The Partners acknowledge and agree that consummation of the transaction contemplated by the Escrow Agreement shall not be deemed to be a breach or violation by any Partner of this Agreement.

1485385.59

Section 1.28    **Escrow Release Formula** means the occurrence of both (i) a calendar quarter that is a Qualifying Quarter and is preceded by five consecutive calendar quarters in which at least three of such five quarters are Qualifying Quarters and (ii) during such six calendar quarters, the average of the Buyer's Quarterly Distribution Amounts (as defined in the Escrow Agreement) from all Companies in the aggregate for such six quarters exceeds the average Minimum Quarterly Distribution from all Companies in the aggregate for such six quarters.

Section 1.29    **Events of Default** is defined in Section 14.1.

Section 1.30    **Executives** is defined in Section 9.2(d).

Section 1.31    **First Mortgage** is defined in Section 3.4(b).

Section 1.32    **Fiscal Year** means the fiscal year of the Partnership, which shall be the calendar year.

Section 1.33    **General Partner** means 6000 Greenville, Inc., a Texas corporation, and any successor General Partner pursuant to the terms of this Agreement.

Section 1.34    **Gross Asset Value** means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)    The initial Gross Asset Value of any asset contributed by a Partner to the Partnership shall be the gross fair market value of such asset, as determined by the contributing Partner and the General Partner, provided that the initial Gross Asset Value of the assets as of the date hereof owned by the Partnership shall be as set forth in Schedule 1.34 and provided further that, if the contributing Partner is a General Partner, the determination of the fair market value of any other contributed asset shall require the consent of the CIT Limited Partner;

(ii)    The Gross Asset Value of all Partnership assets shall be adjusted to equal their respective gross fair market values, as determined by the General Partner as of the following times: (a) the acquisition of an additional Interest by any new or existing Partner in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Partnership to a Partner of more than a de minimis amount of Property as consideration for an Interest; and (c) the liquidation of the Partnership within the meaning of Regulations Section 1.704-1 (b)(2)(ii)(g): provided, however, that adjustments pursuant to clauses (a) and (b) above shall be made only if the General Partner reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Partners in the Partnership;

(iii)    The Gross Asset Value of any Partnership asset distributed to any Partner shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the distributee and the General Partner, provided that, if the distributee is a General Partner, the determination of the fair market value of the distributed asset shall require the consent of the CIT Limited Partner; and

(iv)    The Gross Asset Value of Partnership assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(*m*), subparagraph (vi) of the definition of "Profits" and "Losses" or Section 8.5(b) hereof; provided, however, that Gross Asset Value shall not be adjusted pursuant to this subparagraph (iv) to the extent the General Partner determines that an adjustment pursuant to subparagraph (ii) hereof is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraph (i), (ii), or (iv) hereof, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses.

Section 1.35    **Institutional Investor** is defined in Section 3.4(c).

Section 1.36    **Interest** means the entire ownership interests and rights of a Partner in the Partnership.

Section 1.37    **Lender** is defined in Section 3.4(b).

Section 1.38    **Limited Partner** means the Cambridge Limited Partner, the CIT Limited Partner and any other Person hereafter admitted to the Partnership as a limited partner.

Section 1.39    **Liquidation** has the meaning assigned to it in Treasury Regulation 1.704(b)-1(b)(2)(ii)(g) promulgated under Section 704(b) of the Code.

Section 1.40    **Loan** is defined in Section 3.4(b)

Section 1.41    **Management Agreement** is defined in Section 3.1.

Section 1.42    **Material Adverse Effect** means an event, change or circumstance which would be reasonably expected to have a material adverse effect on the financial condition or results of operations of the business of the Partnership or the Property.

Section 1.43    **Material Dispute** is defined in Section 9.2(d).

Section 1.44    **Minimum Quarterly Distribution** has the meaning assigned to it in the Escrow Agreement.

Section 1.45    **New General Partner** is defined in Section 12.2(b).

Section 1.46    **Non-Contributing Partner** is defined in Section 4.5.

Section 1.47    **Non-Defaulting Partners** is defined in Section 14.2(a).

Section 1.48    **Nonrecourse Distribution** is defined in Section 6.3(d).

Section 1.49    **Offer** is defined in Section 10.4.

Section 1.50    **Offeror** is defined in Section 10.4.

Section 1.51    **Old General Partner** is defined in Section 12.2(b).

Section 1.52    **Original LP Agreement** is defined in Recital B.

Section 1.53    **Partners** means, collectively, the General Partner and the Limited Partners.

Section 1.54    **Partnership** is defined in Recital A.

Section 1.55    **Percentage Interest** means the respective Interest of each Partner expressed as a percentage of the Interests owned by all Partners. The Percentage Interest of each Partner as of the effective date of this Agreement is set forth beside each Partner's name on Exhibit "A" to this Agreement.

Section 1.56    **Person** is defined in Section 3.4(e).

Section 1.57    **Prime Rate** means the rate of interest per annum equal to *The Wall Street Journal* prime rate as quoted in the money rates section of *The Wall Street Journal* with adjustments to be made on the same date as any change in the rate, but in no event to exceed the maximum nonusurious rate allowed by law.

Section 1.58    **Profits or Losses** means, for each Fiscal Year or other period, an amount equal to the Partnership's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)     Any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.58 shall be added to such taxable income or loss;

(b)     Any expenditures of the Partnership described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Regulations and not otherwise taken into account in computing Profits or Losses pursuant to this Section 1.58 shall be subtracted from such taxable income or loss;

(c)     In the event the Gross Asset Value of any Partnership Property is adjusted pursuant to Section 8.5 hereof or subparagraph (ii) or (iii) of the definition of "Gross Asset Value", the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(d)     Gain or loss resulting from any disposition of Partnership Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the Property disposed of, notwithstanding that the adjusted tax basis of such Property differs from its Gross Asset Value;

(e)     In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account depreciation for such Fiscal Year or other period, computed in accordance with the definition of "Depreciation";

(f)     To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Code Section 734(b) is requested pursuant to Regulations Section 1.704-11(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Partner's Interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

(g)     Notwithstanding any other provision in this Section 1.58, any items which are specially allocated pursuant to Section 6.3 or Section 6.4 hereof shall not be taken into account in computing Profits or Losses.

Section 1.59     **Project** means the Partnership's ground leasehold estate in and to the real property described on Exhibit "B" attached hereto (the "Land"), plus the improvements thereto, including the medical office building (the "MOB") located thereon and related parking facilities.

Section 1.60     **Property** means all of the real and personal property contributed to or otherwise acquired by the Partnership.

Section 1.61     **Qualifying Quarter** means any calendar quarter in which the aggregate amount paid to the CIT Limited Partner solely from distributions of the Buyer's Quarterly Distribution Amounts for all Companies in the aggregate is equal to or greater than the Minimum Quarterly Distribution payable by the Companies on an aggregate basis as set forth in Exhibit C to the Escrow Agreement.

Section 1.62     **Redemption Price** is defined in Section 9.7.

Section 1.63     **Regulations** means the Income Tax Regulations, including Temporary Regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

Section 1.64     **REIT** means Care Investment Trust Inc., a Maryland corporation and an Affiliate of the CIT Limited Partner.

Section 1.65    **Securities Act of 1933** is defined in Section 13.1(d)

Section 1.66    **Selling Partner** is defined in Section 10.4.

Section 1.67    **Service** is defined in Section 13.1(b).

Section 1.68    **Term** is defined in Section 2.5.

## ARTICLE 2

### Formation and Name

Section 2.1    **Formation of Partnership**. The Partners have voluntarily associated themselves together for the purpose of continuing the Partnership pursuant to the laws of the State of Delaware, including the Act. The provisions of this Agreement, as amended in writing, as provided herein, govern the rights and obligations of the Partners unless the Act expressly provides that a particular statute supersedes any provision to the contrary in a partnership agreement. The Partners agree to continue the existence of the Partnership in accordance with the provisions of this Agreement and the Act. The General Partner has previously admitted the Limited Partners to the Partnership pursuant to the terms hereof and the Limited Partners have previously joined in the Partnership pursuant to, and hereby agree to be bound by, all of the provisions of this Agreement.

Section 2.2    **Filings**. Subject to the terms and conditions of this Agreement, the General Partner shall execute such documents and shall take all such other actions as the General Partner deems necessary or appropriate to permit the Partnership to transact business under the laws of the State of Delaware. Subject to the terms and conditions of this Agreement, the General Partner shall from time to time take appropriate action, including the preparation and filing of such amendments to the Certificate and other certificates as may be required under the laws of the State of Delaware and the filing of such registrations, and amendments thereto, in order to enable the Partnership to operate the business of the Partnership in the State of Texas or such other state in which the Partnership has or operates the business. The Limited Partners shall execute such documents and instruments and take such other action as may be necessary to enable the General Partner to fulfill its responsibilities under this Section.

Section 2.3    **Partnership Name**. The name of the Partnership shall be, and the business of the Partnership shall be conducted under the name of, **CAMBRIDGE WALNUT HILL, L.P.** or such modifications or variations thereof as the General Partner may determine from time to time, subject to the terms and conditions of this Agreement. The General Partner shall execute and file such certificates, if any, as are required by applicable law to reflect the Partnership's operation under an assumed name. The Partnership has the sole and exclusive right to the Partnership name and its usage. No Partner shall use or permit any Person (other than the Partnership) to use the name of the Partnership for any commercial purpose without the approval of all Partners.

Section 2.4    **Principal Office**. The principal place of business and office of the Partnership is located at 1717 Main Street, 59th Floor, Dallas, Texas 75201, or at such other place or places as the General Partner may from time to time designate by notice to the Limited Partners. In addition, the Partnership may maintain such other offices as the General Partner deems advisable.

Section 2.5    **Term of Partnership**. The term of the Partnership (the "Term") commenced on July 24, 2002, the date the Certificate was duly filed with the Secretary of State of Delaware, and continues until December 31, 2062, unless sooner terminated in accordance with the provisions of this Agreement.

Section 2.6    **Name and Designation of Partners**. The name and the designation of who is a General Partner and who is a Limited Partner is set forth on Exhibit "A" hereof.

Section 2.7    **Partnership Expenses**. Except as specifically provided in this Agreement, all partnership expenses, including a pro rata share of Escrow Agent fees and expenses,  shall be paid from funds which are

Partnership Property. All payments under this Section 2.7 shall be treated as Partnership costs and expenses for accounting purposes and not as a payment or partial distribution of the Partnership profits, income, or gains to any of the Partners.

Section 2.8    **Agent for Service of Process.** The Partnership's agent for service of process in the State of Texas is Robert J. Brill, and the address of such agent is 1360 Post Oak Blvd., Suite 1750, Houston, Texas 77056.

Section 2.9    **Licenses and Permits**. The General Partner shall use its best efforts to obtain, as soon as practicable, and maintain in good standing and in full force and effect during the Term, all licenses and permits needed for the establishment and continued operation of the Project.

Section 2.10    **Registered Office and Agent**. The Partnership's registered office in the State of Delaware is CT Corporation, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. The registered agent shall forward a copy of all materials received as a result of being the registered agent to each of the Partners at the addresses set forth in this Agreement.

## ARTICLE 3

### Purposes and Powers

Section 3.1    **Purpose**. Subject to the limitations set forth in this Agreement, the purpose of the Partnership is to (i) ground lease the Land; (ii) develop and construct the Project; (iii) finance the development and construction of the Project; (iv) enter into a development agreement with Cambridge Healthcare Development Corp., a Delaware corporation (the "Development Agreement"); (v) enter into a management and leasing agreement with Cambridge Healthcare Management, Inc., a Delaware corporation (the "Management Agreement"); (vi) acquire, own, advertise, manage, operate, finance, refinance, maintain, lease, and sell the Project; and (vii) in general, to do whatever is necessary and proper to effectuate the foregoing in the ownership, operation, and management of the Project. The Partnership has the power to do everything necessary, advisable, proper or convenient for the accomplishment of the purposes specified above.

Section 3.2    **Title to Partnership Property**. All property owned by the Partnership shall be owned by the Partnership as an entity and, insofar as permitted by applicable law, no Partner shall have any ownership interest in any Partnership Property in its individual name or right, and each Partner's Interest shall be personal property for all purposes.

Section 3.3    **Effect of Bankruptcy, Death or Incompetency of a Limited Partner**. The bankruptcy, death, dissolution, termination or adjudication of incompetency of a Limited Partner shall not cause the termination or dissolution of the Partnership and the business of the Partnership shall continue. Upon any such occurrence, the trustee, receiver, executor, administrator, committee, guardian or conservator of such Limited Partner shall have all the rights of such Limited Partner for the purpose of settling or managing its estate or property, subject to satisfying the conditions precedent to the admission of such assignee as a substitute Limited Partner. Any Disposition by such trustee, receiver, executor, administrator, committee, guardian or conservator of any Interest shall be subject to all of the restrictions hereunder to which such Disposition would have been subject if such Disposition had been made by such bankrupt, deceased, dissolved, liquidated, terminated or incompetent Limited Partner.

Section 3.4    **SPE Provisions**. Notwithstanding any other provisions of this Agreement or the Certificate, the Partners agree as follows:

(a)    **Limited Purpose**. The nature of the business and of the purposes to be conducted and promoted by the Partnership is to engage solely in the following activities:

(i)    to own, hold, sell, assign, transfer, operate, manage, lease, mortgage, pledge, and otherwise deal with the Land described on Exhibit "B" attached hereto, together with the MOB and all improvements thereon; and

(ii)    to exercise all rights, remedies, and powers not prohibited under the applicable laws of the State of Texas necessary or convenient to the conduct, promotion, or attainment of the business or purposes otherwise set forth herein.

(b)    **Prohibited Activities**.

(i)    For so long as any first mortgage lien (a "First Mortgage") in favor of any lender (including, without limitation, Deutsche Banc Mortgage Capital. L.L.C., its successors or assigns) (each, a "Lender") exists on any portion of the Project, the Partnership shall not incur, assume, or guaranty any indebtedness other than (A) the indebtedness (the "Loan") secured by a First Mortgage, (B) mezzanine debt expressly in accordance with the provisions of any First Mortgage, (C) ordinary course trade payables or expenses in connection with the Project; and (D) any other debt expressly permitted by a First Mortgage.

(ii)    For so long as a First Mortgage exists on any portion of the Project, the Partnership shall not voluntarily dissolve or liquidate.

(iii)    For so long as a First Mortgage exists on any portion of the Project, the Partnership shall not consolidate or merge with or into any other entity or convey or transfer its properties and assets substantially as an entirety to any entity unless (A) the entity (if other than the Partnership) formed or surviving such consolidation or merger or that acquires by conveyance or transfer the properties and assets of the Partnership substantially as an entirety (1) shall be organized and existing under the laws of the United States of America or any State or the District of Columbia, (2) shall include in its organizational documents the same limitations as set forth in Section 3.4, and (3) shall expressly assume the due and punctual performance of the Partnership's obligations; and (B) immediately after giving effect to such transaction, no default or event of default under any agreement to which it is a party shall have been committed by the Partnership and be continuing.

(iv)    For so long as a First Mortgage exists on any portion of the Project, the Partnership will not voluntarily commence a case with respect to itself, as debtor, under the Federal Bankruptcy Code or any similar federal or state statute without the unanimous consent of all of the Partners of the Partnership.

(v)    For so long as a First Mortgage exists on any portion of the Project, no material amendment to this Agreement may be made without first obtaining approval of the Lender holding a Loan secured by a First Mortgage on any portion of the Project, or, after the securitization of a Loan, only if the Partnership receives (A) confirmation from each of the applicable rating agencies that such amendment would not result in the qualification, withdrawal, or downgrade of any securities rating and (B) approval of such amendment by the Lender holding the Loan.

(c)    **Limitation on Transfers**.    Except in connection with mezzanine debt expressly in accordance with the provisions of any First Mortgage and except as permitted in Sections 10.2(b)(ii) or 10.5, no transfer of any direct or indirect ownership interest in the Partnership may be made such that the transferee owns, in the aggregate with the ownership interests of its Affiliates and family members in the Partnership, more than a 49% interest in the Partnership, unless such transfer is conditioned upon the delivery of an acceptable non-consolidation opinion to the Lender holding a Loan secured by a First Mortgage and to any applicable rating agency concerning, as applicable, the Partnership, the new transferee, and/or their respective owners; provided, however, notwithstanding the limitations on transfers set forth above, up to 85% of the limited partnership interests in the Partnership may be transferred without the consent of any Lender holding a Loan secured by a First Mortgage to an Institutional Investor (as defined below) provided (i) such Lender receives prior written notice of such transfer and (ii) those Persons

responsible for the management of the Project and the Partnership remain unchanged. For the purposes of this Section 3.4(c), an "Institutional Investor" is any Person that has total assets (in name or under management) in excess of $10,000,000 and capital/statutory surplus, stockholder equity, or net worth of $2,000,000 or more.

(d)    **Indemnification**. Notwithstanding any other provisions of this Agreement, including, without limitation, the provisions of Sections 9.5 and 13.2 hereof, any indemnification of the Partners shall be fully subordinated to any obligations respecting the Project (including, without limitation, any First Mortgage).

(e)    **Separateness Covenants**. For so long as a First Mortgage exists on any portion of the Project, in order to preserve and ensure its separate and distinct identity, in addition to the other provisions set forth in this Agreement, the Partnership shall conduct its affairs in accordance with the following provisions:

(i)    It will establish and maintain an office through which its business shall be conducted separate and apart from those of any Affiliate(s) or, if it shares office space with any Affiliate(s), it shall allocate fairly and reasonably any overhead and expense for shared office space.

(ii)    It will not own any asset or property other than (i) the Project and (ii) personal property in connection with the ownership or operation of the Project.

(iii)    It will not engage, directly or indirectly, in any business other than to own, hold, sell, assign, transfer, operate, manage, lease, mortgage, pledge, and otherwise deal with the Project.

(iv)    It will not enter into any contract or agreement with any Affiliate except upon terms and conditions that are commercially reasonable and substantially similar to those that would be available on an arms-length basis with unrelated third parties.

(v)    It will not incur any indebtedness, secured or unsecured, direct or indirect, absolute or contingent (including guaranteeing any obligation), other than (A) the Loan, (B) mezzanine debt expressly in accordance with the provisions of any First Mortgage, (C) ordinary course trade payables or expenses in connection with the Project, and (D) any other debt expressly permitted by a First Mortgage. No indebtedness other than a Loan may be secured (subordinate or pari passu) by the Project.

(vi)    It will not make any loans or advances to any third party, including any Affiliate or the General Partner and will not acquire obligations or securities of its Affiliate(s).

(vii)    It will remain solvent and will pay its debts and liabilities from its assets as the same become due and payable.

(viii)    It will do all things necessary to observe organizational formalities and preserve its existence, and it will not materially amend, modify, or otherwise change the Certificate or this Agreement without the prior written consent of any Lender or, after the securitization of a Loan, only if the Partnership receives (i) confirmation from each of the applicable rating agencies that such amendment would not result in the qualification, withdrawal, or downgrade of any securities rating and (ii) approval of such amendment by the Lender holding a Loan.

(ix)    It will maintain all of its books, records, financial statements and bank accounts separate from those of its Affiliate(s) and the General Partner and will file its own separate tax returns. It will maintain its books, records, resolutions and agreements as official records.

(x)    It will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate and the General Partner), will correct any known misunderstanding regarding its status as a separate entity, will conduct and operate its business in its own name, and will not identify itself or any of its Affiliates as a division of the other entity.

(xi)    It will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

(xii)    Neither the Partnership nor the General Partner will seek or permit the dissolution, winding up, Liquidation, consolidation or merger in whole or in part, of the Partnership, or acquire by purchase or otherwise all or substantially all of the business or assets of, or any stock or other evidence of beneficial ownership of, any other person or entity.

(xiii)    It will not commingle the funds and other assets of the Partnership with those of its Affiliates, the General Partner, any affiliate of the General Partner, or any other Person.

(xiv)    It will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its funds or assets, as the case may be, from those of any Affiliate, the General Partner, or any other Person.

(xv)    It shall not pledge its assets or hold itself out to be responsible for the debts or obligations of any other Person.

(xvi)    It shall pay its liabilities out of its own funds.

(xvii)    It shall maintain a sufficient number of employees in light of its contemplated business operations.

(xviii)    It shall not guarantee or become obligated for the debts of any other Person.

(xix)    It shall have a general partner which shall be organized to be a single purpose, "bankruptcy remote" entity.

For purposes of this Agreement, the following terms shall have the following meanings:

"Affiliate" means any Person directly or indirectly controlling or controlled by or under common control with the Partnership, including, without limitation (i) any Person who has a familial relationship, by blood, marriage or otherwise with any partner or employee of the Partnership, or any Affiliate thereof, (ii) any officer, director or general partner of the Partnership and (iii) any Person which receives compensation for administrative, legal or accounting services from the Partnership or any Affiliate. For purposes of this definition, "control" when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), estate, custodian, unincorporated organization, or government or any agency or political subdivision thereof.

(f)     **Limitations on Dissolution**.

(i)      The Partnership shall not terminate or dissolve solely as a consequence of the bankruptcy or insolvency of one or more of the general partners of the Partnership but the Partnership shall continue so long as there remains a solvent general partner of the Partnership.

(ii)     Subject to applicable law, dissolution of the Partnership shall not occur so long as the Partnership remains owner of the Project subject to a First Mortgage.

(iii)    Upon the dissociation or withdrawal of the General Partner from the Partnership or the bankruptcy, insolvency, or Liquidation of the General Partner, the CIT Limited Partner shall appoint a new General Partner in accordance with the provisions of Section 9.7(b)(i) and deliver an acceptable non-consolidation opinion to any holder of a Loan secured by a First Mortgage on the Project and to any applicable rating agency concerning, as applicable, the Partnership, the new General Partner, and its owners.

(iv)    The unanimous consent of all Partners (including that of the General Partner) shall be required for the Partnership to: (A) file or consent to the filing of any bankruptcy, insolvency, or reorganization case or proceeding; institute any proceedings under any applicable insolvency law, or otherwise seek any relief under any laws relating to the relief from debts or the protection of debtors generally, (B) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian, or any similar official for the Partnership or a substantial portion of its Property; (C) make any assignment for the benefit of the Partnership's creditors, or (D) take any action in furtherance of the foregoing.

## ARTICLE 4

## Capital Contributions

Section 4.1     **Partners' Capital Contribution**. The General Partner, the Cambridge Limited Partner, LMOF and the LMOF General Partner have previously contributed to the capital of the Partnership in accordance with the Original LP Agreement.

Section 4.2     **Return of Contributions**. Except as expressly provided herein, no Partner shall be entitled to the return of its Capital Contribution or any other contribution to the Partnership nor entitled to be paid any interest, salary or drawing in respect of either its Capital Account or any Capital Contribution made by it to the Partnership. No unrepaid Capital Contribution shall be deemed or considered to be a liability of the Partnership or of any Partner. Except as expressly provided herein, no Partner shall be required to contribute or loan any cash or property to the Partnership to enable the Partnership to return any Partner's contributions to the Partnership or to balance Capital Accounts.

Section 4.3     **Additional Contributions**. Subject to Section 4.5 and Section 9.2(a) hereof, the General Partner and the Limited Partners will, upon written notice from the General Partner, in the ratio of their respective Percentage Interests, make such additional contributions to the capital ("Additional Capital Contributions") of the Partnership as the General Partner deems to be necessary to fund one hundred percent (100%) of the cash needs of the Partnership in excess of those provided by the conduct of the Partnership's business, debt financing or capital contributions by the Partners otherwise required pursuant to this Article 4.  Additional Capital Contributions shall be added to and increase the Capital Account of each Partner.

Section 4.4     **Partner Contributed Capital Account.**    A contributed capital account shall be maintained for each Partner, which account shall have a credit balance equal to that Partner's contributions to the capital of the Partnership, as increased by the value of any Additional Capital Contributions to the Partnership capital by the Partner in that capacity, and as decreased by the amount of distributions made to such Partner pursuant to Section 7.2(c) or Section 12.3(c)(iv) hereof.

Section 4.5        <u>**Effect of Failure to Make Additional Contributions.**</u>

(a)        If any Partner fails to contribute its proportionate share of the Additional Capital Contributions required in accordance with the terms and conditions of this Agreement and needed by the Partnership after the expiration of thirty (30) days after the due date of such contribution, as specified in the General Partner's Notice for Additional Capital Contributions (such Partner is hereinafter referred to as a "<u>Non-Contributing Partner</u>"), then the other Partners, if any, or such of them as elect to do so (the "<u>Contributing Partners</u>"), shall be entitled (but not obligated) to contribute the share of such Non-Contributing Partner's Additional Capital Contributions. Any Contributing Partners who elect to contribute such shares shall have the right to contribute the same in such proportions as they agree amongst themselves, or, in the absence of any such agreement, then in the proportion of their then respective Percentage Interests.

(b)        Upon the classification of a Partner as a Non-Contributing Partner, such Partner's Percentage Interest in the Partnership shall be diluted on a dollar-for-dollar basis by allocating a portion of the Non-Contributing Partner's Percentage Interest to the other Contributing Partners who made their pro rata share of the Additional Capital Contributions for which the Non-Contributing Partner is delinquent, by allocating Additional Percentage Interests to each Contributing Partner based on the proportion of each Contributing Partner's Additional Capital Contributions to the Partnership.

(c)        The foregoing remedy is provided in view of the fact that the Interests of the other Partners will be put in jeopardy as a result of the actions of a Non-Contributing Partner, with potential damages to the other Partners in amounts which cannot be foreseen. Each Partner hereby agrees that it shall execute and deliver such conveyances, agreements or other documents which may be necessary to confirm and render fully effective the dilution of its Percentage Interest in the Partnership as herein provided. In the event any appropriate instruments are not delivered after five (5) days' written notice by the General Partner to the Non-Contributing Partner, the General Partner may, as the Non-Contributing Partner's irrevocable agent and attorney-in-fact, execute any such legal instruments conveying, transferring or assigning the diluted portion of the Non-Contributing Partner's Percentage Interest and the Partners agree that the General Partner shall not have any individual liability for any actions taken in connection with the foregoing. Such power of attorney granted in favor of the General Partner shall be deemed to be coupled with an interest and shall survive the death or incompetency of each Limited Partner.  In the event the General Partner is the Non-Contributing Partner and any appropriate instruments are not delivered after five (5) days' written notice by any other Partner to such Non-Contributing Partner, any other Partner may, as such Non-Contributing Partner's irrevocable agent and attorney-in-fact, execute any such legal instruments conveying, transferring or assigning the diluted portion of such Non-Contributing Partner's Percentage Interest and the Partners agree that such other Partner shall not have any individual liability for any actions taken in connection with the foregoing. Such power of attorney granted in favor of such other Partner shall be deemed to be coupled with an interest and shall survive the death or incompetency of each such Non-Contributing Partner.

## ARTICLE 5

### Partnership Property

Section 5.1        <u>**Management of Partnership Property**</u>. The General Partner has entered into the Management Agreement; provided, however, the General Partner shall still be responsible on a day-to-day basis to manage, or cause to be managed, all of the Property of the Partnership and it shall receive only the consideration therefor set forth in Article 11 hereof. Except as specifically set forth in this Section 5.1, the General Partner shall not enter into any other agreement with any Affiliate of the General Partner whereby such Affiliate will provide goods or services to the Partnership.

## ARTICLE 6

### Allocations

Section 6.1     **Profits**. After giving effect to the special allocations set forth in Sections 6.3 and 6.4 hereof, Profits for any Fiscal Year shall be allocated among the Partners in the following order and priority:

(a)     First, to the CIT Limited Partner, Profits (first items of ordinary income and then items of capital gain if necessary) in the amount, if any, equal to the excess of the cash distribution received by the CIT Limited Partner for the period pursuant to Section 7.1 over the amount of cash the CIT Limited Partner would have received if cash had been distributed solely in accordance with the CIT Limited Partner's Percentage Interest;

(b)     Second, among the Partners in proportion to each Partner's share of cumulative Losses allocated to the Partners under Section 6.2(a) as limited by Section 6.2(b) hereof for all prior Fiscal Years until the cumulative Profits allocated to the Partners pursuant to this Section 6.1(b) for the current and all prior Fiscal Years are equal to the cumulative Losses allocated to the Partners pursuant to Section 6.2(a) as limited by Section 6.2(b) hereof for all prior Fiscal Years;

(c)     Third, the balance, shall be allocated to the Partners in the ratio of their respective Percentage Interests.

Section 6.2     **Losses**. After giving effect to the special allocations set forth in Sections 6.3 and 6.4 hereof, Losses for any Fiscal Year shall be allocated as set forth in Section 6.2(a), subject to the limitations in Section 6.2(b).

(a)     Losses for any Fiscal Year shall be allocated among the Partners in proportion to their Percentage Interests in the Partnership.

(b)     The Losses allocated pursuant to Section 6.2(a) hereof shall not exceed the maximum amount of Losses that can be so allocated without causing the CIT Limited Partner or the Cambridge Limited Partner to have an Adjusted Capital Account Deficit at the end of any Fiscal Year. In the event the CIT Limited Partner or the Cambridge Limited Partner would have an Adjusted Capital Account Deficit as a consequence of an allocation of Losses pursuant to Section 6.2(a), the remaining Losses shall be allocated to the General Partner.

Section 6.3     **Special Allocations**. The following special allocations shall be made in the following order:

(a)     **Depreciation.** In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period computed in accordance with Section 1.23 hereof and allocated among the Partners as required by Section 1.704-1(b)(2)(iv) of the Regulations.

(b)     **Minimum Gain Chargeback**. Except as otherwise provided in Section 1.704-2(f) of the Regulations, notwithstanding any other provision of this Article 6, if there is a net decrease in partnership minimum gain during any Fiscal Year, each General Partner and each Limited Partner shall be specially allocated items of Partnership income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Limited Partner's share of the net decrease in partnership minimum gain, determined in accordance with Section 1.704-2(g) of the Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each General Partner and each Limited Partner pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Regulations. This Section 6.3(b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Regulations and shall be interpreted consistently therewith.

(c)    **Partner Minimum Gain Chargeback**. Except as otherwise provided in Section 1.704-2(i)(4) of the Regulations, notwithstanding any other provision of this Article 6, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain (as defined in the Regulations) attributable to a Partner Nonrecourse Debt (as defined in the Regulations) during any Fiscal Year, each General Partner and each Limited Partner who has a share of the Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Regulations, shall be specially allocated items of Partnership income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Person's share of the net decrease in Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(4) of the Regulations. Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each General Partner and each Limited Partner pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Regulations. This Section 6.3(c) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Regulations and shall be interpreted consistently therewith.

(d)    **Qualified Income Offset**. In the event any Limited Partner unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5), or Section 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Partnership income and gain shall be specially allocated to each such Limited Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Limited Partner as quickly as possible. Provided, however, a distribution to a Partner of the proceeds of a nonrecourse liability (hereinafter referred to as a "Nonrecourse Distribution") within the meaning of Section 1.704-2(h)(1) of the Regulations shall not require an allocation of Partnership income and gain under this Section 6.3(d). Instead, such Nonrecourse Distribution shall increase partnership minimum gain to the extent required by Section 1.704-2(h)(1) of the Regulations, and any increase in partnership minimum gain resulting from a Nonrecourse Distribution shall be allocated to the Partners receiving said distribution as required by Section 1.704-2(g)(1) of the Regulations.

(e)    **Gross Income Allocation**.  In the event any Limited Partner has a deficit Capital Account at the end of any Fiscal Year that is in excess of the sum of (i) the amount such Limited Partner is obligated to restore pursuant to any provision of this Agreement and (ii) the amount the Limited Partner is deemed to be obligated to restore pursuant to Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the final Treasury Regulations, each such Limited Partner shall be specially allocated items of Partnership income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Section 6.3(e) shall be made if and to the extent such Limited Partner would have a deficit Capital Account in excess of such sum after all of the allocations provided for in this Article 6 have been made as if Section 6.3(d) and this Section 6.3(e) were not in the Agreement.

(f)    **Nonrecourse Deductions**. Nonrecourse Deductions (as defined in the Regulations) for any Fiscal Year or other period shall be specially allocated to the Limited Partners and the General Partner in the same proportions as their respective Percentage Interests in the Partnership.

(g)    **Partner Nonrecourse Deductions**. Any Partner Nonrecourse Deductions (as defined in the Regulations) for any Fiscal Year or other period shall be specially allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Section 1.704-2(i)(1) of the Regulations.

(h)    **Section 754 Adjustments**. To the extent an adjustment to the adjusted tax basis of any Partnership Property pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Section 1.704-1 (b)(2)(iv)(m)(2) or Section 1.704-1(b)(2)(iv)(m)(4) of the Regulations, to be taken into account in determining Capital Accounts, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the Property) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the General Partner and Limited Partners in accordance with their respective Interests in the Partnership in the event Section 1.704-

1(b)(2)(iv)(m)(2) of the Regulations applies, or to the Person to whom such distribution was made in the event Section 1.704-1(b)(2)(iv)(m)(4) of the Regulations applies.

Section 6.4     **Section 704(c) Allocations**. Income, gain, loss and deduction with respect to any item of property contributed to the Partnership shall, solely for federal income tax purposes, be allocated among the Partners so as to take into account any difference between the Gross Asset Value of such item of property and its adjusted basis on the date of such contribution, in accordance with the requirements of Section 704(c) of the Code. If the Gross Asset Value of any item of Partnership Property is adjusted pursuant to Sections 1.34 or 8.5 hereof, then subsequent allocations of income, gain, loss and deduction with respect to such item of Partnership Property shall take account of any variation between the adjusted basis for federal income tax purposes of such item of Partnership Property and its newly adjusted Gross Asset Value, in the same manner as provided for in Section 704(c) of the Code. All allocations under this Section 6.4 shall be made in such a manner as the General Partner shall, in its discretion, determine reasonably reflects the requirements of Section 704(c) of the Code. No allocations pursuant to this Section 6.4 shall be reflected as an adjustment in any Partner's Capital Account.

Section 6.5     **Allocations and Distributions Among Partners**. In the event of a sale of all or substantially all of the assets of the Partnership, all allocations to the Partners, or a class of Partners, in the aggregate pursuant to this Article 6 shall be made to the Partners in a manner to cause their ending Capital Account balances to equal as near as possible the cash each such Partner will receive pursuant to Section 12.3(c)(iv). All distributions to a class of Partners, in the aggregate, pursuant to Article 7, shall be made to the Partners in the proportion that each Partner's Percentage Interest bears to the aggregate of the Percentage Interests of all Partners entitled to such class distribution.

Section 6.6     **Allocations on Disposition**. Items of income, gain, loss, deduction, and/or credit attributable to any Interest which has been Disposed of pursuant to the terms of this Agreement shall be allocated between the transferor and the transferee:

     (a)     for the months prior to the Disposition, to the transferor;

     (b)     for the months subsequent to the Disposition, to the transferee; and

     (c)     for the month of the Disposition, to the transferor if the Disposition occurs on or before the 15th day of such month and to the transferee if occurring thereafter.

Section 6.7     **Reg. 1.704-1(b)(2)(iv)(g) Adjustments to Capital Accounts**. For purposes of computing the amount of any item of income, gain, loss or deduction to be reflected in the Capital Accounts of the Partners, the determination, recognition and classification of such items shall be the same as their respective determination, recognition and classification for federal income tax purposes, except that (a) gain or loss resulting from any disposition of an item of Partnership Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed with reference to the Gross Asset Value of such item of Partnership Property, rather than its adjusted basis for federal income tax purposes and (b) depreciation, amortization or other cost recovery deductions with respect to an item of Partnership Property shall be computed with reference to the Gross Asset Value of such item of Partnership Property rather than its adjusted basis for federal income tax purposes.

## ARTICLE 7

## Cash Distributions

Section 7.1     **Operating Distributions**. The General Partner shall cause the Partnership to make cash distributions to the Partners of Available Cash from Operations, at such times as cash is available, and in such amounts as the General Partner may determine and consistent with Section 7.3, as follows:

     (a)     First, in payment of all loans and other liabilities of the Partnership to the Partners; and

(b)     Second, the balance, if any, in accordance with the Partners' respective Percentage Interests;

provided, however, that, notwithstanding the foregoing, including (a) above, prior to the Conversion Date, the General Partner shall cause the Partnership to make quarterly cash distributions of Available Cash from Operations for the benefit of the CIT Limited Partner equal to the CIT Limited Partner's Minimum Quarterly Distribution from all Companies in the aggregate (including distributions otherwise made to the Cambridge Limited Partner and General Partner but for the actions of the Escrow Agent's actual distribution to the CIT Limited Partner as communicated to the General Partner by the Escrow Agent); and provided, further, that, notwithstanding the foregoing, prior to the Conversion Date, the General Partner shall cause the Partnership to make all distributions of Available Cash from Operations to the Escrow Agent on behalf of the Partners.

Section 7.2     **Distributions from Sales or Refinancing**. The General Partner shall cause the Partnership to make cash distributions of Available Cash from Special Event (as defined in Section 1.7 of this Agreement) to the Partners at such times and in such amounts as the General Partner may determine after giving effect to Section 7.3, as follows:

(a)     First, in payment of all third-party costs incurred in connection with the sale or refinancing of the Project;

(b)     Second, in payment of all liabilities of the Partnership to third-party creditors of amounts then due or if upon a sale of all or substantially all of the assets, all outstanding liabilities of the Partnership to third-party creditors;

(c)     Third, in payment of all loans and other liabilities of the Partnership to the Partners; and

(d)     Fourth, the balance, if any, in accordance with the Partners' respective Percentage Interests.

Section 7.3     **Cash Distribution Requirements**. The General Partner shall use its reasonable best efforts to cause the Partnership to distribute all Available Cash from Operations and Available Cash from Special Event in accordance with the terms of this Agreement.

## ARTICLE 8

### Fiscal Matters

Section 8.1     **Fiscal Year, Partnership Books, Financial Statements and Reports**.

(a)     The Fiscal Year of the Partnership is the calendar year. The Partnership's books shall be kept in accordance with U.S. generally accepted accounting principles, consistently applied; shall be maintained in the business office of the Partnership or in the office of its accountants; and shall be available for inspection by the Partners during reasonable business hours. The General Partner may, at Partnership expense, engage accountants to keep and audit the books and records of the Partnership, prepare tax returns, and perform other accounting services for the Partnership. The General Partner shall cause to be delivered to each Partner the following within ninety (90) days after the end of each Fiscal Year:

(i)     U.S. federal income tax Form K-1 and any similar forms required by any state or local taxing authority; and

(ii)     any other information concerning the Partnership reasonably necessary for the preparation of the Partners' federal and state income tax returns.

The General Partner, upon showing "Good Cause", shall be entitled to a reasonable extension of the ninety (90) day period. "Good Cause" shall be determined without regard to the foreseeability of such cause. All financial statements and reports shall be prepared at the expense of the Partnership.

(b)       In addition to the reporting obligations of the General Partner set forth elsewhere in this Agreement, the General Partner shall deliver to the CIT Limited Partner:

(i)       a balance sheet and statements of cash flow and operations of the Partnership no later than: (1) 15 business days following the end of each of the first 11 calendar months and (2) 20 business days following the end of the calendar month ending December 31;

(ii)       quarterly statements of cash flow and operations of the Partnership no later than 15 business days following the end of each of the first three fiscal quarters;

(iii)       annual statements of cash flow and operations of the Partnership no later than 20 business days following the end of the Fiscal Year;

(iv)       simultaneously with the delivery of the quarterly and year-end financial statements, a certificate by the chief executive officer and the chief financial officer of the General Partner as to the accuracy and completeness of the financial statements provided by the General Partner;

(v)       if requested by the CIT Limited Partner based on its review of the questionnaires prepared and delivered by the General Partner pursuant to Section 8.1(c) below, good faith projections of the amount of gross income to be derived by the Partnership that the CIT Limited Partner specifies may not qualify for the 95% income test of section 856(c) of the Code (the Partnership's activities producing such income to be identified by the CIT Limited Partner) within five (5) calendar days of such request; and

(vi)       in connection with the quarterly and year-end financial statements, no later than 20 business days following the end of each of the first three fiscal quarters and no later than 25 business days following the end of  the Fiscal Year, such supplemental financial statement information pertaining to the Partnership's properties and assets or operations as the CIT Limited Partner in its reasonable discretion may, upon reasonable notice, request.  In addition, upon the CIT Limited Partner's reasonable request and, upon reasonable notice, the General Partner will use its reasonable best efforts to deliver (i) the financial information enumerated above within a shorter time period than outlined above, and (ii) such other financial information concerning the Partnership and its properties and assets as is reasonably necessary, as determined by the CIT Limited Partner, for the preparation of filings with Internal Revenue Service or the U.S. Securities and Exchange Commission by the REIT or its Affiliates.

(c)       The General Partner, at the request of the CIT Limited Partner and no more frequently than quarterly, shall forward to Cambridge Healthcare Management, Inc. questionnaires prepared by the CIT Limited Partner and reasonably acceptable to the General Partner that are relevant to the determination of whether any income generated by a Project would violate the terms of Section 9.2(c).  The General Partner shall use its commercially reasonable efforts to ensure that such questionnaires are completed and returned to the CIT Limited Partner within thirty (30) calendar days after such questionnaires are received by the General Partner.

(d)       At the expense of the CIT Limited Partner, subject to advance written notice, the General Partner shall permit necessary and reasonable access by the CIT Limited Partner or its agents to all of the Partnership's books and records as determined necessary in the CIT Limited Partner's reasonable discretion, including for the purpose of performing one or more audits at the expense of the CIT Limited Partner.  Notwithstanding any provision in this Agreement to the contrary, the Partnership shall not be

required to incur an expense that arises solely as a result of the CIT Limited Partner's affiliation with the REIT and its status as a publicly-traded company.

(e)    In the event that (i) the General Partner fails to comply with the provisions of Sections 8.1(b), (c) or (d), (ii) the CIT Limited Partner provides the General Partner with written notice of the General Partner's failure to comply, (iii) the cause of such failure to comply is within the General Partner's control and (iv) the General Partner has not cured such failure to comply within five days (or, in the event such five-day period includes a weekend preceded or followed by a Friday or Monday, respectively, that is a national bank holiday, six days) of such notice, the CIT Limited Partner may, at its sole discretion and at the expense of the General Partner, perform or cause to be performed the obligations of the General Partner pursuant to the provisions of Section 8.1(b), (c) or (d) that are described in such notice.

(f)    The General Partner agrees to indemnify, defend and hold harmless the Limited Partners from and against any and all losses, liabilities, damages, dues, assessments, fines, penalties, fees, costs (including court costs and costs of appeal and including costs with respect to enforcement of an indemnity claim), taxes, amounts paid in settlement and expenses (including attorney's, accountant's or other professional's fees) that the Limited Partners or their Affiliates incur as a result of, or with respect to (and whether or not in connection with any third-party claim) the non-compliance with or failure to perform any agreement or covenant contained in Section 8.1.

Section 8.2    **Partnership Bank Accounts**. All funds of the Partnership shall be deposited in its name in an account or accounts maintained at a national or state bank designated by the General Partner. Checks shall be drawn upon the Partnership and shall be signed by the General Partner or any Person designated by the General Partner in writing.

Section 8.3    **Subchapter K**. Any provision hereof to the contrary notwithstanding, solely for United States Federal income tax purposes, each of the Partners hereby recognizes that the Partnership will be subject to all provisions of Subchapter K of Chapter 1 of Subtitle A of the Code; provided, however, the filing of U.S. Partnership Returns of Income shall not be construed to extend to the purposes of the Partnership or expand the obligations or liabilities of the Partners.

Section 8.4    **Tax Returns**. The General Partner shall cause to be prepared and filed all tax returns and statements, if any, which must be filed on behalf of the Partnership with any taxing authority, and shall submit copies of all such returns and statements to the Partners.

Section 8.5    **Reg. 1.704-(1)(b)(2)(iv)(f) Revaluations of Property**. On the occurrence of either of the following:

(a)    a contribution of money or other Property (other than a *de minimis* amount) to the Partnership by a new or existing Partner as consideration for an Interest in the Partnership; or

(b)    a distribution of money or other Property (other than a *de minimis* amount) by the Partnership to a retiring, withdrawing, or continuing Partner as consideration for an Interest in the Partnership, then the General Partner shall determine the Gross Asset Value of each item of Partnership Property as of the date the event described in Section 8.5(a) or (b) occurs. Upon the revaluation of all items of Partnership Property in accordance with this Section 8.5, the Partners' respective Capital Accounts shall be adjusted in the same manner as if each item of Partnership Property had been sold at its newly determined Gross Asset Value.

Section 8.6    **Section 754 Election**. Immediately prior to the admission of the CIT Limited Partner, the Partnership shall make an election under Section 754 of the Code in the case of distributions of Partnership Property within the provisions of Section 734 of the Code or in the case of a Disposition of an Interest in the Partnership permitted by this Agreement made within the provisions of Section 743 of the Code, the Partnership shall file an election under Section 754 of the Code in accordance with the procedure set forth in the applicable Regulations.

Section 8.7     **Meetings**.

(a)     The Partners shall meet at least once during each Fiscal Year to discuss the Annual Budget for the succeeding Fiscal Year and other matters of Partnership business. Special meetings of the Partners may be held at any time or place whenever called by the General Partner, or by written request of any Limited Partner, notice thereof being given to each Limited Partner by the General Partner.

(b)     Notwithstanding the foregoing, meetings may be held at any time without formal notice provided all of the Partners are present or those not present shall at any time waive or have waived notice thereof. Except as otherwise specifically provided herein, notice of any special meetings shall be given at least ten (10) days previous thereto by written notice delivered personally, by facsimile transmission or by mail. If given by mail, such notice shall be deemed to be delivered three (3) days after being delivered to the postal service.

(c)     At the request of any Partner, the Partners may participate in a regular or special meeting by, or conduct the meeting through, the use of any means of communication by which all Partners participating may simultaneously hear each other during the meeting. A Partner participating in a meeting by this means is deemed to be present in person at the meeting.

(d)     A quorum shall consist of a majority of the Partners so long as such majority includes the CIT Limited Partner and the Cambridge Limited Partner; provided, however, that if a meeting of the Partners shall have been noticed in accordance with this Section 8.7, and a quorum fails for the absence of the CIT Limited Partner or the Cambridge Limited Partner, then the meeting shall be adjourned by the General Partner until a quorum is present.

(e)     Any action required to be taken at a meeting of the Partners, or any other action which may be taken at a meeting of the Partners, may be taken without a meeting if the affirmative vote of the Partners is obtained that is otherwise required by this Agreement. The action must be evidenced by one or more written consents describing the action taken and shall be filed with the Partnership records reflecting the action taken.

## ARTICLE 9

## General Partner

Section 9.1     **Rights and Powers of the General Partner.**     Subject to the limitations set forth in Section 3.4 and Section 9.2 of this Agreement, and to the limitations imposed upon it by applicable law, the General Partner (i) shall have full, exclusive and complete authority and discretion to manage and control in accordance with the terms of this Agreement, and shall make all decisions affecting, the Partnership business; (ii) shall have full authority to effectuate the purposes of the Partnership and to take any action required, permitted or authorized pursuant to the terms of this Agreement; and (iii) shall have full power to exercise all rights and powers generally inferred or conferred by law in connection therewith, including, without limitation, the right and power to:

(a)     acquire by purchase, lease, or otherwise any real or personal property which may be necessary, convenient, or incidental to the accomplishment of the purposes of the Partnership;

(b)     operate, maintain, finance, refinance, improve, construct, grant options with respect to, sell, convey, assign, mortgage, and lease any real estate and any personal property necessary, convenient, or incidental to the accomplishment of the purposes of the Partnership; all permits, licenses, entitlements, easements and appurtenances to real estate shall be issued to and taken in the name of the Partnership or, if taken in the name of another entity, shall be assigned to the Partnership;

(c)     execute any and all agreements, contracts, documents, certificates, and instruments necessary or convenient in connection with the management, maintenance, and operation of the Partnership Property, or in connection with managing the affairs of the Partnership, including executing amendments to

this Agreement and the Certificate in accordance with the terms of this Agreement pursuant to any power of attorney granted by a Limited Partner to the General Partner;

(d)    execute any and all agreements, contracts, documents, certificates and instruments obligating the Partnership to guarantee the repayment of all present and future indebtedness of the General Partner to third parties relating to the Partnership, including, but not limited to, any funds borrowed by the General Partner for lines of credit, construction loans, general commercial purposes or otherwise;

(e)    borrow money and issue evidences of indebtedness necessary, convenient, or incidental to the accomplishment of the purposes of the Partnership, and secure the same by mortgage, pledge, or other lien on any Partnership Property;

(f)    execute, in furtherance of any or all of the purposes of the Partnership, any deed, lease, mortgage, deed of trust, mortgage note, promissory note, bill of sale, contract, or other instrument purporting to convey or encumber any or all of the Partnership Property;

(g)    prepay in whole or in part, refinance, recast, increase, modify, or extend any liabilities affecting any Partnership Property, and in connection therewith execute any extensions or renewals of encumbrances on any or all of the Partnership Property;

(h)    care for and distribute funds to the Partners by way of cash, income, return of capital, or otherwise, all in accordance with the provisions of this Agreement, and perform all matters in furtherance of the objectives of the Partnership and this Agreement;

(i)    contract on behalf of the Partnership for the employment and services of employees and/or independent contractors, such as lawyers, accountants, and investment advisors, and delegate to such Persons the duty to manage or supervise any of the Property or operations of the Partnership;

(j)    engage in any kind of activity and perform and carry out contracts of any kind (including contracts of insurance covering risks to Partnership Property and General Partner liability) necessary or incidental to, or in connection with, the accomplishment of the purposes of the Partnership, as may be lawfully carried on or performed by a partnership under the laws of the State of Delaware;

(k)    unless expressly prescribed or limited by this Agreement, take, or refrain from taking, all actions as may be necessary or appropriate to accomplish the purposes of the Partnership;

(l)    institute, prosecute, defend, settle, compromise, and dismiss lawsuits or other judicial or administrative proceedings brought by, on behalf of, or against, the Partnership or the Partners in connection with activities arising out of, connected with, or incidental to this Agreement, and to engage counsel or others in connection therewith;

(m)    make any and all elections for federal, state, and local tax purposes including, without limitation, any election, if permitted by applicable law: (i) to adjust the basis of Partnership Property pursuant to Code Sections 754, 734(b), and 743(b), or comparable provisions of state or local law, in connection with Dispositions of Interests and Partnership distributions; (ii) to extend the statute of limitations for assessment of tax deficiencies against the Partners with respect to adjustments to the Partnership's federal, state, or local tax returns; and (iii) to represent the Partnership and the Partners before taxing authorities or courts of competent jurisdiction in tax matters affecting the Partnership and the Partners in their capacities as the General Partner or Limited Partners, and to file any tax returns and execute any agreements or other documents relating to or affecting such tax matters, including, to the extent provided in Code Sections 6221 through 6231, agreements or other documents that bind the General Partner and Limited Partners with respect to such tax matters or otherwise affect the rights of the Partnership, the General Partner, and the Limited Partner(s). The General Partner is specifically authorized to act as the "Tax Matters Partner" under the Code and in any similar capacity under state or local law and

only the General Partner as the "Tax Matters Partner" shall have the authority to execute an extension of the statute of limitations for the Partnership or a power of attorney binding upon the Partnership;

(n)    execute any construction loan agreements, notes, collateral and security documents, and process all draw requests related to any such construction loan agreements; and

(o)    take or omit to take any action requested by the CIT Limited Partner that may be necessary to maintain the REIT's status as a real estate investment trust under sections 856 through and including 859 of the Code.

In no event, however, is the General Partner authorized to create any liability which is recourse to the Limited Partners personally.

Section 9.2    **Limitation on the General Partner's Authority.**

(a)    Notwithstanding any other provision of this Agreement, without the consent of all Limited Partners, the General Partner shall not have the authority to, and covenants and agrees that it shall not:

(i)    accept or require any contribution to the capital of the Partnership from any Partner;

(ii)    (A) knowingly do any act in contravention of this Agreement; (B) knowingly do any act which would make it impossible to carry on the ordinary business of the Partnership, except as otherwise provided in this Agreement; (C) knowingly do any act that would subject any Limited Partner to liability as a general partner in any jurisdiction; (D) conduct any business of the Partnership other than that contemplated by this Agreement; or (E) knowingly do any act that would cause the Partnership to become classified as an association taxable as a corporation for U.S. federal income tax purposes;

(iii)    prior to the dissolution of the Partnership pursuant to Article 12, sell or otherwise dispose of all or substantially all of the Partnership Property to any Person;

(iv)    admit additional or substitute Partners except as authorized in Article 10 of this Agreement;

(v)    amend this Agreement except as authorized in Section 3.4(b)(v), 3.4(e)(viii) and Section 15.5 of this Agreement;

(vi)    cause the Partnership to engage in any voluntary bankruptcy proceeding;

(vii)    cause the Partnership to merge, consolidate or be a party to a reorganization with any other Person;

(viii)    amend, modify or terminate the ground lease agreement covering the Land or the Management Agreement;

(ix)    change, modify, amend or reinstate any loan document evidencing, securing or guaranteeing any loan to the Partnership, including, without limitation, any Loan secured by a First Mortgage; or

(x)    take any action, or fail to take any action, which would violate or contravene the provisions of Section 3.4 of this Agreement.

(b)     Notwithstanding any other provision of this Agreement, without the consent of the CIT Limited Partner, the General Partner shall not have the authority to, and covenants and agrees that it shall not:

(i)     cause the Partnership to sell the Land, the MOB or the related parking facilities, or any other material property or assets of the Partnership;

(ii)     except for expenses relating to insurance, taxes or utility charges, expend Partnership funds or commit to expend Partnership funds that in the aggregate exceed more than 5% of the expenses reflected in the annual operating budget of the Partnership, which shall be submitted to the CIT Limited Partner annually for review and approval not less than sixty (60) days prior to the end of the prior Fiscal Year (beginning in 2007 for the 2008 Fiscal Year) (the "Annual Budget") (Such proposed budget shall be approved or disapproved by the CIT Limited Partner within 30 days of its receipt by the CIT Limited Partner. In the event the Partners are unable to agree on an Annual Budget for any particular year, until such an agreement is reached, the Annual Budget for the prior year, increased by 5%, shall be deemed to be the Partnership's Annual Budget.);

(iii)     cause the Partnership to issue additional Interests or rights to acquire additional Interests;

(iv)     cause the Partnership, other than in connection with the Loan, the First Mortgage, or a loan made in accordance with Section 11.3(b) (including liens and encumbrances permitted under each of these) directly or indirectly to: (A) create, incur, issue, assume, guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to any indebtedness or capital lease obligations other than those reflected in the Annual Budget or those that in the aggregate do not exceed 5% of the liabilities represented in the Annual Budget; or (B) create, incur or assume any consensual liens or encumbrances of any kind against or upon the Partnership's properties or assets, including without limitation on the Land, the MOB or the related parking facilities; provided, however, this provision shall not apply to non-consensual lien claims that may occur in the ordinary course, provided that such claims are addressed in accordance with the First Mortgage;

(v)     cause the Partnership to enter into any business combination arrangement or agreement or to otherwise change or agree to change its structure or state of formation;

(vi)     cause the Partnership to enter into a joint venture or partnership arrangement with any other person, or to invest in the equity or debt securities of another person;

(vii)     change the Partnership's business purpose or the conduct of the Partnership's business;

(viii)     except in accordance with the terms of this Agreement, cause the Partnership to pay any distributions on, or redeem, purchase, acquire or make a Liquidation payment with respect to, any Partner's Interests;

(ix)     except in accordance with the terms of this Agreement and except upon terms and conditions that are commercially reasonable and substantially similar to those that would be available on an arms-length basis with unrelated third parties, cause the Partnership to make loans, advances or guarantees, make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, with or for the benefit of the General Partner or any of its Affiliates;

(x)    cause the Partnership to voluntarily prepay, defease or change the material terms of a First Mortgage with any Lender;

(xi)    acquire or develop, or enter into a contract or arrangement for the acquisition or development of, any medical office buildings;

(xii)    resign as General Partner, or admit an additional or substitute General Partner;

(xiii)    effect a Disposition of the General Partner's Interest or the Cambridge Limited Partner's Interest except as set forth in Sections 10.2(b)(ii) or 10.4;

(xiv)    except as set forth in the Management Agreement, (A) commingle funds and other assets of the Partnership with those of any Affiliate, the General Partner, any Affiliate of the General Partner, or any other Person, or (B) maintain the Partnership's assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its funds or assets, as the case may be, from those of any Affiliate, the General Partner, or any other Person; provided, however, the Partners agree that the matters contemplated by the Escrow Agreement shall not violate this subsection 9.2(b)(xiv);

(xv)    cause or permit the Partnership to acquire or hold, directly or indirectly, as beneficial owner or owner of record, any stock of the REIT;

(xvi)    cause or permit the Partnership to violate any of the terms of Section 9.2(c); and

(xvii)    modify any provisions of this Section 9.2(b) or Section 9.2(a).

(c)    The REIT is currently qualified and intends to continue to qualify as a real estate investment trust and is subject to the requirements set forth in the Code that are applicable to REITs. Notwithstanding any other provision of this Agreement, the General Partner, solely for the REIT's benefit as a third party beneficiary, shall cause the Partnership and any subsidiary entities or Affiliates thereof, including, without limitation, the manager, when acting on behalf of the Partnership, to act in accord with this Section 9.2(c) under all circumstances unless the General Partner receives the prior written consent of the REIT, which consent may be withheld in the REIT's sole discretion:

(i)    the Partnership shall operate, and shall cause its subsidiary entities to operate, in a manner substantially in conformity with operations as of the date of this Agreement, and shall receive rents pursuant to leases existing on the date of this Agreement or pursuant to leases on substantially similar terms;

(ii)    the Partnership shall not, directly or indirectly, provide new tenant services at any Project;

(iii)    the Partnership shall not, directly or indirectly, as beneficial owner or owner of record, own stock of any entity that is a corporation for U.S. federal income tax purposes;

(iv)    the Partnership shall not, directly or indirectly, lend money to any person; and

(v)    the Partnership shall not, directly or indirectly, sell property to customers in the ordinary course of business; provided, however, that entering into leases for federal income tax purposes in the ordinary course of business in accordance with subsection 9.2(c)(i) above shall not constitute a violation of this subsection 9.2(c)(v).

(d)    In the event that the Partners are unable, after good faith discussions, to reach agreement with respect to any of the issues set forth in Sections 9.2(a) or 9.2(b) above, the Partners shall within twenty (20) days after failure to reach agreement refer such matter (a "Material Dispute") to Scott Kellman (or his

successor) of the REIT and Jean-Claude Saada (or his successor) of the General Partner (the "Executives"). Any decision of the Executives shall be binding on the Partners and the Partnership. Any Material Dispute that cannot be resolved by good faith discussion(s) between the Executives (with such Executives making decisions consistent with the well-being and purpose of the Partnership) within fourteen (14) business days after such decision has been submitted to them shall be submitted to mediation before a mutually agreeable mediator who has experience with mediating controversies involving the relevant subject matter. The mediation process shall be initiated by either party giving written notice to the other party of the Executives' inability to resolve a Material Dispute with the fourteen business day period. The mediation shall be held within 30 days after the parties agree on a mediator. If at any time more than 5 hours into the mediation conference the mediator determines that the controversy cannot be settled in mediation, the mediator may declare an impasse and the mediation process shall end at the point. The mediation process shall be completed no later than 60 days after the written notice which initiated the mediation. In the event of a declaration of an impasse by the mediator or expiration of the 60 day period without a full settlement, there shall be a deadlock (a "Deadlock"). In the event of a Deadlock, any Partner may demand arbitration of any claim, controversy, issue or dispute (hereafter "Dispute") arising out of or relating to the Deadlock, unless the amount of the damage or loss is at issue in pending litigation with a third party, in which event arbitration shall not be commenced until such amount is ascertained or both parties agree to arbitration.

(i)     Arbitration shall be conducted in the city where the Project is located under the Commercial Arbitration Rules then in effect of the American Arbitration Association ("AAA"), and administered by the AAA.

(ii)     In the event of arbitration with an amount in controversy equal to or less than $50,000, arbitration shall be conducted by one (1) neutral arbitrator mutually agreed upon by the parties. If no arbitrator is agreed upon within ten (10) business days of commencement of arbitration, or if the arbitrator selected by the parties is unable or unwilling to arbitrate the Dispute, the parties shall request that a neutral arbitrator be selected by the AAA.

(iii)     In the event of arbitration with an amount in controversy greater than $50,000, Arbitration shall be conducted by three (3) neutral arbitrators. Within fifteen (15) business days of commencement of arbitration, each party shall select one (1) neutral arbitrator in whatever area(s) of expertise such party believes is relevant to the dispute. Within ten (10) business days of their appointment, the two (2) neutral arbitrators so selected shall select the third neutral arbitrator from a list provided by the AAA who shall be a practicing attorney having experience in the area of commercial contracts and who shall act as chair of the arbitration panel. If the arbitrators selected by the parties are unable or fail to agree upon the third arbitrator, the third arbitrator shall be selected by the AAA.

(iv)     The arbitrator(s) shall set a limited time period and establish procedures designed to reduce the cost and time for discovery while allowing the parties an opportunity, in the discretion of the arbitrator(s), to discover relevant information from the opposing party about the subject matter of the Dispute. Any dispute regarding discovery, or the relevance or scope thereof, shall be determined by the sole arbitrator or the chair of the arbitration panel, as the case may be, and shall be governed by the Federal Rules of Civil Procedure. The award by the arbitrator(s) shall be in writing, shall be signed by the sole arbitrator or a majority of the arbitrators, as the case may be, and shall include a statement of findings of fact and conclusions regarding the reasons for the disposition of any claim. No statements by, or communications between, the parties during negotiation or mediation, or both, will be admissible for any purpose in arbitration.

(v)     Each party shall bear its own expenses and its attorney's fees and expenses, and shall equally share the arbitrators' fees, administrative fees and arbitrators' travel expenses. Judgment on the award entered by the arbitrator(s) may be entered in and enforced by any court of competent jurisdiction.

(vi)    Notwithstanding the foregoing, either party may resort to a court by applying for interim, injunctive or other equitable relief if such party reasonably determines that such relief is necessary to prevent irreparable injury to it or to a third party.

Section 9.3    **Right to Rely on the General Partner**. No Person dealing with the Partnership shall be required to inquire into, or obtain any consents or other documentation as to, the authority of the General Partner to take any action allowed by Section 9.1 hereof or otherwise by this Agreement or to exercise any such rights or powers. Without limiting the scope of the preceding sentence, no Person to which a Partnership loan application is made by the General Partner shall be required to inquire into the purposes for which such loan is sought, and as between the Partnership and such Person, it shall be conclusively presumed that the proceeds of such loan are to be and will be used solely for purposes authorized under this Agreement.

Section 9.4    **Obligations of the General Partner**.

(a)    The General Partner shall devote such time as is reasonably needed to manage the Partnership's business. It is hereby expressly recognized by all Partners that the officers, managers, and members of the General Partner are engaged and can be expected to engage in the future in other businesses that are in competition with the business of the Partnership and it is hereby expressly agreed that such will not constitute a breach of the General Partner's fiduciary duties to the Partnership; provided, however, that without the prior written consent of the CIT Limited Partner, the General Partner shall not, directly or indirectly (i) encourage or entice any Person at that time leasing space from the Partnership to terminate, breach or fail to renew such lease, or (ii) knowingly take any act or fail to take any act with regard to tenants leasing space from the Partnership that could reasonably be expected to have a Material Adverse Effect.

(b)    The General Partner agrees that the restrictions contained in this Section 9.4 are reasonable and necessary to protect the legitimate interests of the CIT Limited Partner and the Partnership and that any violation of this provision would result in damages to the CIT Limited Partner and the Partnership which cannot be compensated by money alone. The General Partner agrees that the CIT Limited Partner and the Partnership will be entitled to injunctive relief without proving actual damages or posting any bond. If a court shall hold that the duration and/or scope (geographic or otherwise) of the agreement contained in this Section 9.4 is unreasonable, then, to the extent permitted by law, the court may prescribe a duration and/or scope (geographic or otherwise) that is reasonable and judicially enforceable. The Partners and the Partnership shall accept such determination, subject to their rights of appeal, which the parties hereto agree shall be substituted in place of any and every offensive part of this Section 9.4, and as so modified, this Section 9.4 shall be as fully enforceable as if set forth herein by the parties in the modified form.

(c)    The General Partner shall act in good faith in the performance of its obligations hereunder, but shall have no liability or obligation to the Limited Partners or the Partnership for any decision made or action taken in connection with the discharge of its duties hereunder if such decision or action is made or taken in good faith, irrespective of whether the same may be reasonably prudent or whether bad judgment or negligence (excluding gross negligence) was exercised or involved in connection therewith. Except as expressly set forth in this Agreement, the General Partner shall not be liable for any act or omission except those resulting from gross negligence, fraud, bad faith or breach of fiduciary duty.

Section 9.5    **Indemnification of the General Partner**. The General Partner, and all agents, partners, stockholders, officers, directors and employees of the General Partner, shall be indemnified, defended, and held harmless by the Partnership from and against any and all claims, demands, liabilities, costs (including, without limitation, the cost of litigation and attorneys' fees), damages and causes of action of any nature whatsoever (including, without limitation, those based on negligence) arising out of or incidental to the management of the Partnership affairs, except where the claim at issue is based upon:

(a)    the gross negligence, breach of fiduciary duty, bad faith or willful misconduct of the indemnified party; or

(b)    the breach by the indemnified party of any material provision of this Agreement (provided that any breach of this Agreement that creates a default under any First Mortgage or other indebtedness secured by the Partnership's Property shall be deemed a breach of a material provision of this Agreement).

The indemnification rights herein contained shall be cumulative of, and in addition to, any and all rights, remedies and recourses to which the indemnified parties described herein shall be entitled, whether pursuant to some other provision of this Agreement, at law or in equity.

Section 9.6    **Power of Attorney**. By the execution of this Agreement, or a counterpart hereof, each Limited Partner hereby irrevocably constitutes and appoints the General Partner, and any successor thereto, with full power of substitution, as its true and lawful attorney-in-fact and agent with full power and authority to act in its name, place and stead in the execution, acknowledgment, swearing to, delivering, filing and recording of all certificates and other documents which the General Partner deems necessary or reasonably appropriate:

(a)    to qualify or continue the Partnership as a limited partnership;

(b)    to reflect a change in the identity of any Partner, the addition of any new Limited Partner pursuant to this Agreement, or an amendment of this Agreement made pursuant to the provisions of this Agreement, or the Certificate as required by any such change or amendment;

(c)    to effect any transactions approved by the written approval of the Partners pursuant to this Agreement;

(d)    to reflect the dissolution and termination of the Partnership after same has been dissolved and terminated in accordance herewith;

(e)    to comply with the fictitious or assumed name statutes in effect in the State of Texas and all other jurisdictions in which the Partnership conducts or plans to conduct business; or

(f)    to execute any amendment to this Agreement which is necessary to cause the Special Allocation provisions in Section 6.3 hereof to qualify as "minimum gain charge back" and "qualified income offset" provisions, consistent with the Regulations promulgated under Section 704 of the Code.

The power of attorney granted herein shall be deemed to be coupled with an interest, shall be irrevocable and shall survive the death, incompetency or legal disability of any Partner, and shall be binding on any assignee or vendee of a Partner's Interest, or any portion thereof, including, without limitation, the distributive rights relating thereto.

Section 9.7    **Removal of the General Partner**.

(a)(i)    Subject to the provisions of this Section 9.7, the General Partner may be removed at the election of the CIT Limited Partner for "cause", which shall be defined as follows:

(A)    a failure of the General Partner to comply with any covenant or agreement contained in this Agreement that is deemed to be material, as defined in Section 9.7(a)(ii) below (subject to the applicable cure provisions provided below);

(B)    any of the following that has a Material Adverse Effect:  (1) the gross negligence or willful misconduct of the General Partner in carrying out its duties under this Agreement; (2) the conviction of, or the entering of a guilty plea or plea of no contest with respect to, a felony, the equivalent thereof, or of a misdemeanor involving fraud or dishonesty of Mr. Jean-Claude Saada or any direct or indirect beneficial owner of the General Partner; (3) a willful act (or willful failure to act) by Mr. Jean-Claude Saada or any direct or indirect beneficial owner of the General Partner that impedes or obstructs a government investigation, or a failure to materially cooperate with such an investigation;

or (4) termination of the Management Agreement in accordance with its default provisions; or

(C)    the gross negligence or willful misconduct of the General Partner in carrying out its duties under this Agreement with respect to Section 9.2(c) has a Material Adverse Effect or in the opinion of the CIT Limited Partner upon advice of counsel could reasonably be expected to result in a loss of the REIT's qualification as a real estate investment trust.

To effect such removal, written notice thereof shall be given to the General Partner by the CIT Limited Partner. Such removal shall become effective five (5) days following receipt of such notice by the General Partner. Upon any such removal, the CIT Limited Partner shall designate the successor General Partner, subject to the provisions of Section 9.7(b)(iv).

(ii)    Each of the following shall be deemed to be a material covenant or agreement for purposes of this Section 9.7:

(A)    Section 3.4, for so long as a First Mortgage exists on any portion of the Project, subject to any cure rights contained in the First Mortgage documentation that would prevent a default thereunder;

(B)    Section 9.2, to the extent that the General Partner knowingly takes any such actions without obtaining the consent of the CIT Limited Partner, provided the CIT Limited Partner has provided the General Partner with written notice of the General Partner's failure to comply with Section 9.2 and the General Partner has not cured such failure to comply within ten (10) business days of such notice and such action results in a Material Adverse Effect; and

(C)    Section 9.2(c), to the extent that the General Partner knowingly takes any such actions without obtaining the consent of the CIT Limited Partner, provided the CIT Limited Partner has provided the General Partner with written notice of the General Partner's failure to comply with Section 9.2(c) and the General Partner has not cured such failure to comply within ten (10) business days of such notice and such action results in a Material Adverse Effect or in the opinion of the CIT Limited Partner upon advice of counsel could reasonably be expected to result in a loss of the REIT's qualification as a real estate investment trust.

(b)(i)    The General Partner shall be deemed to have been removed automatically upon the occurrence of (A) a Bankruptcy Event, (B) a Change in Control of the General Partner or a Person directly or indirectly controlling the General Partner without consent of the CIT Limited Partner, or (C) dissolution of the General Partner. Upon any such deemed removal, the CIT Limited Partner shall designate the successor General Partner, subject to the provisions of Section 9.7(b)(iv).

For purposes of this Agreement, "Change in Control" shall mean any voluntary sale, lease, assignment, merger, consolidation or other disposition, direct or indirect, by operation of law or otherwise of more than 50% of the ownership interest in a Person; provided, however, that a Disposition by a Person to an entity controlled by such Person, including a trust or other entity formed for estate planning purposes controlled by such Person, shall not constitute a Change in Control. For purposes of this Agreement, "control" shall mean the ability to elect or appoint the majority of such Person's governing body, whether as a result of contract, ownership or otherwise.

(ii)    If the General Partner has been removed pursuant to subsection (a) above or is deemed to have been removed pursuant to subsection (b)(i) above and the Partnership is continued and reconstituted in accordance with the terms of Section 12.2,

(A)    the General Partner shall promptly either:

(1) in the event that the General Partner has been removed pursuant to subsection (a) above, the removed General Partner shall be entitled to elect either to (1) receive from the substitute General Partner the Redemption Price for its Interest and any Interest held by any Affiliate of the removed General Partner, reduced by any damages caused to the Partnership by such removed General Partner or (2) have its Interest converted to that of a Limited Partner (and added to its Affiliate's limited partnership interest) and receive no payment for its Interest; or

(2) in the event that the General Partner is deemed to have been removed pursuant to subsection (b)(i) above, the removed General Partner shall be entitled to receive from the substitute General Partner the Redemption Price for its Interest and any Interest held by any Affiliate of the removed General Partner, reduced by any damages caused to the Partnership by such removed General Partner.

(B)    the substitute General Partner shall cause the Partnership to amend this Agreement and the Certificate to remove the name "Cambridge" from the name of the Partnership and shall cause the Partnership to cease using the name "Cambridge" and any trademarks associated with such name in connection with the ownership or operation of the Partnership Property as soon as reasonably practicable.

(iii)    In the event the removed General Partner

(A)    elects to have its Interest converted to that of a Limited Partner as provided in subsection (b)(ii) above, the removed General Partner shall become a Limited Partner upon the admission of the substitute General Partner pursuant to this Section 9.7;

(B)    elects to receive the Redemption Price for its Interest as provided in subsection (b)(ii) above, the Interest of a removed General Partner until the transfer and assignment to a substitute General Partner shall be converted to that of a Limited Partner, but the removed General Partner shall not have any rights to participate in the management and affairs of the Partnership; or

(C)    makes no election within 30 days of date of the General Partner's removal, the removed General Partner shall be deemed to have elected to receive the Redemption Price for its Interest as provided in subsection (b)(ii) above.

(iv)    A Person shall be admitted as a substitute General Partner only if the following terms and conditions are satisfied:

(A)    the Person to be admitted as a substitute General Partner shall have accepted and agreed to be bound by all the terms and provisions of this Agreement by executing a counterpart thereof and such other documents or instruments as may be required or appropriate in order to effect the admission of such Person as a General Partner, and a certificate evidencing the admission of such Person as a General Partner shall have been filed for recordation and all other actions required in connection with such admission shall have been performed;

(B)    if the Person to be admitted as a substitute General Partner is a corporation, partnership, or other entity, it shall have provided the Partnership with evidence satisfactory to counsel for the Partnership of such Person's authority to become a General Partner and to be bound by the terms and provisions of this Agreement;

(C)    counsel for the Partnership shall have rendered an opinion (relying on such opinions from other counsel as may be necessary) that the admission of the Person to be

admitted as a substitute General Partner is in conformity with the Act, and that none of the actions taken in connection with the admission of such Person as a substitute General Partner will cause (i) the Partnership to be classified other than as a partnership for federal income tax purposes, or (ii) the loss of any Limited Partner's limited liability (other than that of the removed General Partner to the extent that the General Partner is also a Limited Partner); and

(D)    solely in the event that the removed General Partner elects to have its Interest converted to that of a Limited Partner as provided in subsection (b)(ii) above, the removed General Partner shall have consented to the admission of such Person as a substitute General Partner, which consent shall not be unreasonably withheld or delayed and shall not be conditioned on any payments to the removed General Partner other than as otherwise specifically provided herein.

(c)    "Redemption Price" means an amount equal to the fair market value of the Interest being purchased. Such fair market value will be determined as follows:

(i)    The fair market value shall be determined by mutual agreement of the General Partner and the CIT Limited Partner, which determination shall be final and binding on the parties hereto; however, if they do not agree on the fair market value within ten (10) business days after notice is given by one of them to the other of a request for determination of fair market value, the fair market value shall be determined as follows.

(ii)    The General Partner and the CIT Limited Partner shall jointly select a Qualified Appraiser (as defined below). If the parties so jointly select a Qualified Appraiser, the appraiser so selected shall promptly determine the fair market value of the Interest, which determination shall be final and binding on the parties hereto. If they fail to jointly select a Qualified Appraiser within ten (10) business days after a request by either party to make the joint selection, then the General Partner and the CIT Limited Partner shall each select one Qualified Appraiser. If either party fails to name a Qualified Appraiser within ten (10) business days after the notice by the other party that the other party has selected a Qualified Appraiser (such notice to contain the name of such appraiser), the Qualified Appraiser which has been timely selected shall be instructed to promptly determine the fair market value of the Interest, which determination shall be final and binding on the parties hereto. If two Qualified Appraisers have been timely selected, they shall be instructed to promptly determine, independently of the other, the fair market value of the Interest.

(iii)    If two Qualified Appraisers are selected and either appraiser fails, within 30 days after the first appraiser delivers its report to the General Partner and the CIT Limited Partner containing the fair market value of the Interest as determined by such appraiser, the determination of the fair market value of the Interest of the appraiser who has delivered his report to the General Partner and the CIT Limited Partner shall be determinative of the fair market value of the Interest and shall be final and binding on the parties hereto.

(iv)    If two Qualified Appraisers are selected, both appraisals are delivered within the 30-day period described above, and the difference between the two amounts of their determinations of the fair market value of the Interest does not exceed 10% of the greater of such amounts, then the fair market value of the Interest shall be the average of the fair market value of the Interest as determined by each of the two appraisers.

(v)    If two Qualified Appraisers are selected, both appraisals are delivered within the 30-day period described above, and the difference between the two amounts so determined exceeds 10% of the greater of such amounts, then such two appraisers shall select a third Qualified Appraiser who shall determine the fair market value of the Interest. Of the three appraisals, the appraisal which differs most in terms of dollar amount from the average of the three appraisals shall be excluded and the average of the remaining two appraisals shall be final and binding upon the parties hereto.

(vi)     In the event that a third Qualified Appraiser is to be selected and the original two appraisers fail to agree on the selection of the third Qualified Appraiser within ten (10) business days after notice to both appraisers of the need for a third appraiser, the third Qualified Appraiser shall be designated by the original appraisers, whose determination shall be binding upon the parties. The General Partner and the CIT Limited Partner shall have the right to submit such data and memoranda to each of the appraisers in support of their respective positions as they may deem necessary or appropriate. The determination of the fair market value of the Interest by the Qualified Appraisers in accordance with the foregoing provisions shall be final and binding upon all parties.

(vii)     Each appraiser to be appointed pursuant to the appraisal procedures above shall (i) be an investment banking firm or business valuation firm, (ii) not have any bias or material financial or personal interest in the Partnership, its Partners or any Affiliates thereof, and (iii) have experience in valuing businesses or assets to be valued, as applicable, which, to the extent possible, are similar in character to the Partnership (each a "Qualified Appraiser").

(viii)     Any determination of fair market value shall be based upon the terms and conditions of this Agreement, and under no circumstances shall the Qualified Appraisers appointed add to, modify, disregard or change any of the provisions of this Agreement, and the jurisdiction and scope of such Qualified Appraisers shall be limited accordingly. Each Partner shall give prompt written notice to the other Partners of the appointment of a Qualified Appraiser, such notice to identify the Qualified Appraiser.

(ix)     The General Partner and the CIT Limited Partner shall each pay the fees and expenses of the Qualified Appraiser, if any, selected by it and one-half (1/2) of the fees and expenses of the Qualified Appraiser, if any, jointly selected hereunder.

## ARTICLE 10

### Limited Partners and Disposition of Partnership Interests

Section 10.1     **Rights and Obligations of the Limited Partners**.

(a)     The Limited Partners shall not be:

(i)     personally liable (except as otherwise provided for by the Act) for any of the debts or losses of the Partnership;

(ii)     allowed, in their capacity as Limited Partners, to take part in the management or control of the Partnership business, or to sign for or bind the Partnership;

(iii)     entitled to be paid any salary or to have a Partnership drawing account;

(iv)     except as otherwise expressly provided herein, entitled to receive any interest on their Capital Contributions;

(v)     entitled to a partition of any Partnership Property, notwithstanding any other provision or law to the contrary;

(vi)     entitled to a return of their Capital Contributions except to the extent provided in this Agreement and permitted by the Act; or

(vii)     except as set forth in Article 4 and permitted in accordance with Sections 9.2 and 11.3(b) of this Agreement, required to contribute or lend funds to the Partnership.

The foregoing limitations shall not prevent a Limited Partner from being employed by the Partnership to perform services for the Partnership, either as a direct employee or as an independent contractor.

Section 10.2    **Disposition of Partnership Interests.**

(a)    Except as provided in Section 10.4 and Section 10.5, notwithstanding anything in this Agreement or the partnership laws of Delaware (including the Act) to the contrary, no Disposition shall be effective unless and until the following conditions have been satisfied, unless compliance with any of the conditions has been specifically waived by the General Partner in its sole discretion:

(i)    Except as provided in Subsection 10.2(b), no Disposition may be made at any time without the written approval of the General Partner in its sole discretion.

(ii)    No Disposition may be made unless the transferor furnishes to the General Partner for the benefit of the Partnership an opinion of counsel satisfactory to the General Partner to the effect that the Disposition may be made without violation of the Securities Act of 1933 and any applicable state securities or Blue Sky laws.

(iii)    No Disposition may be made unless the transferee furnishes to the General Partner on behalf of the Partnership a written confirmation executed by the transferee making all of the representations of a Limited Partner contained in this Agreement.

(iv)    No Disposition may be made unless the transferor has furnished to the transferee a written statement showing the name and taxpayer identification number of the Partnership, in such form and together with such other information as may be required by Section 6111 of the Code and the regulations thereunder.

(v)    No Disposition may be made unless the transferee shall furnish to the Partnership all such information concerning such transferee (including, without limitation, name, address, and taxpayer identification number) as the General Partner shall reasonably require, and shall pay the Partnership all costs and expenses, including, without limitation, all filing fees and all reasonable attorneys' fees, incurred by the Partnership in connection with such Disposition.

(vi)    No Disposition shall be made unless the transferee executes an instrument, in form reasonably acceptable to the General Partner, in which such transferee specifically, assumes all existing and future obligations of the transferor Limited Partner to the Partnership.

(b)    (i) If the Disposition is other than as provided in Section 10.4 or Section 10.5, once the above conditions are satisfied, the successor shall become a substituted Limited Partner hereunder.  (ii) Notwithstanding the foregoing, any Partner may, without the consent of the other Partners or the Partnership, transfer all or any part of its Interest to an Affiliate; provided that such Partner shall pay the Partnership all costs and expenses, including, without limitation, all filing fees and all reasonable attorneys' fees, incurred by the Partnership in connection with such transfer.

Section 10.3    **Failure to Comply.** Any purported Disposition other than as described in Section 10.4 or Section 10.5, that is consummated without first complying with Section 10.2 above shall be null and void and of no effect whatsoever; provided, however, that if the Partnership is required to recognize a Disposition made in violation of Section 10.2 hereof, the Interest Disposed of shall be strictly limited to the transferor's rights to allocations and distributions as provided in this Agreement with respect to the Disposed of Interest, which allocations and distributions may be held and applied (without limiting any other legal or equitable rights of the Partnership) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee of such Interest may have to the Partnership. Except to the extent required by the Act, any such transferee shall have no right or authority to (i) participate in any decisions required or permitted to be made by a Partner, (ii) inspect the Partnership's books, or (iii) exercise any rights or powers of a Partner or to otherwise be treated as a Partner.

Section 10.4    **Right of First Refusal.** If, on or after the seventh anniversary of the effective date of this Agreement, the CIT Limited Partner, the Cambridge Limited Partner or the General Partner (the "Selling Partner") receives or obtains an offer from a third-party other than as provided in Section 10.5 or from an Affiliate as permitted by Section 10.2(b) (the "Offeror") to acquire in any manner all or any part of its Interest, which offer the Selling Partner intends to accept, the Selling Partner shall promptly notify the other Partners in writing of the offer received, including the name of the Offeror, the Interest offered to be purchased, the proposed purchase price and the other terms and conditions of the offer. Such notice shall include a copy of the offer which shall (i) be in writing; (ii) set forth with specificity all of the material terms and conditions of the offer; (iii) be made by a person that is financially capable of completing such offer; and (iv) be consummated no later than one hundred twenty (120) days after the date on which such offer is received (the "Offer"). The CIT Limited Partner (in the event that the General Partner or the Cambridge Limited Partner is the Selling Partner) and the General Partner (in the event that the CIT Limited Partner is the Selling Partner) shall have the right (the "Right of First Refusal") for a period of sixty (60) days from the day they receive notice of such offer to purchase the Interest subject to the Offer on the same terms and conditions contained in the Offer. The CIT Limited Partner or the General Partner may exercise such Right of First Refusal by notifying the Selling Partner prior to the end of the sixty (60) day period of its intent to exercise such right. If the other Partner fails to exercise the Right of First Refusal or indicates in writing that it will not exercise the Right of First Refusal within the period provided, or if the other Partner exercises the Right of First Refusal but fails to effect the purchase within the prescribed period, the Selling Partner may, subject to Section 10.2(a) hereof, convey or dispose of the Interest, but only at the price, terms and conditions, and to the Offeror. If terms and conditions more favorable to the proposed purchaser than, or in any material manner different from, those offered to the other Partner should be agreed to by the Selling Partner, the other Partner shall again have the right to purchase the Selling Partner's Interest in the Company which is subject to the more favorable or different purchase terms in accordance with this Section 10.4. The other Partner may assign the rights in this Section 10.4 to the Partnership, in which event the Partner's interest may be liquidated (rather than purchased) by the Partnership. The Partner and the Partnership shall not be liable or accountable to any Selling Partner that attempts to transfer its interest in the Partnership for any loss, damage, expense, cost or liability resulting from the Partner's exercise or failure to exercise the Right of First Refusal under this Section 10.4, delay in notifying the Selling Partner of its intention not to exercise the Right of First Refusal, or its enforcement of the requirements of this Section 10.4 in the event that it elects not to exercise the Right of First Refusal. A Partner's failure to exercise the Right of First Refusal or to indicate in writing that it is electing not to exercise the Right of First Refusal shall not be deemed a consent of the Partner to allow any third party transferee to become a substituted Partner, such consent being controlled by the provisions of Section 10.2(a) hereof.

Section 10.5    **Transfer of CIT Limited Partner's Financial Rights.** Notwithstanding anything in this Agreement to the contrary, the CIT Limited Partner may, without the consent of the other Partners, transfer its ownership interest in all or any portion of income, expense, profit, gain or loss allocations or distributions allocable or payable to the CIT Limited Partner to any other Person, provided that the CIT Limited Partner provides notice of any such transfer to the General Partner and provided, further, that, notwithstanding the foregoing, the CIT Limited Partner remains a Limited Partner until the seventh anniversary of the effective date of this Agreement.

## ARTICLE 11

### Fees, Reimbursements and Loans

Section 11.1    **Authority to Engage Others.** Subject to the terms and conditions of this Agreement, the General Partner shall, at the expense of the Partnership, engage Cambridge Healthcare Management, Inc. to act as the manager of the Property, and as the leasing agent for the Property. Subject to the terms and conditions of this Agreement, the General Partner may engage other Persons who are not Affiliates of the General Partner to perform legal and accounting services for the Partnership, and perform other services for the benefit of the Partnership which are of a professional or specialized nature.

Section 11.2    **Reimbursement to the General Partner and Its Affiliates.** Subject to the terms and conditions of this Agreement, in addition to the sums to be distributed to the General Partner and the Limited Partners under the other provisions of this Agreement, the General Partner and its Affiliates shall also be entitled to be reimbursed for any and all direct costs and expenses incurred by it or them, including, but not limited to costs and expenses incurred to engage Persons pursuant to Section 11.1, whether before or after the date on which this

Partnership is formed, in relation to the formation of the Partnership, the operation of the Partnership, the acquisition of the Project, tests, investigations, studies and plans performed on or developed with respect to the Project, and the operation of the Project by the Partnership. Such reimbursements shall be paid by the Partnership as soon as funds are available therefor. Any non-budgeted payments to the General Partner or its Affiliates shall require the consent of all Limited Partners.

Section 11.3    **Loans**.

(a)    Subject to the terms and conditions of this Agreement, any Partner, or an Affiliate of any Partner may but is not obligated to, with the consent of the General Partner, lend or advance money to the Partnership. If any Partner shall make any loan to the Partnership, the amount of any such loan shall not be treated as a Capital Contribution but shall be a debt due from the Partnership. The amount of any such loan by a lending Partner shall be repayable out of the Partnership's cash and, subject to loans made pursuant to Subsection 11.3(b), shall be paid prior to the payment of any cash distributions to the Partners under Section 7.1 hereof. The General Partner, or any Affiliate of the General Partner, as the case may be, at its election, may treat any unpaid portion of any amount due to it from the Partnership under this Article 11 as a loan to the Partnership under this Section 11.3 with interest accruing at the Prime Rate from the due date of any such amount. Notwithstanding the foregoing, no Partner shall be obligated to make a loan to the Partnership.

(b)    Solely in the event that the General Partner proposes, but the CIT Limited Partner does not consent to, a call for capital contributions pursuant to Section 9.2(a)(i), and subject to the terms and conditions of this Agreement, the General Partner may but is not obligated to lend or advance money to the Partnership in an amount not to exceed the amount set forth on Exhibit "C" during any calendar year; provided, however, that, prior to the Conversion Date, any funds from such loan shall be used exclusively for capital expenditures required to maintain the Property in good operating condition. Any such loan shall bear interest at annual rate of eight percent (8%) and shall be evidenced by a written promissory note including commercially reasonable terms. The amount of any such loan shall not be treated as a Capital Contribution but shall be a debt due from the Partnership subordinated for all purposes to the CIT Limited Partner's Minimum Quarterly Distribution and, pursuant to Section 7.1 above, after the Conversion Date, shall be paid prior to distributions in accordance with the Partners' respective Percentage Interests. The aggregate of all such loans by the General Partner to the Partnership during any calendar year shall not exceed the amount set forth on Exhibit "C". The aggregate of all loans by the General Partner or its Affiliates to any or all of the Companies during any calendar year shall not exceed three million dollars ($3,000,000).

## ARTICLE 12

### Dissolution and Liquidation

Section 12.1    **Dissolution of the Partnership**. Except as provided in Section 12.2, the Partnership shall immediately be dissolved upon:

(a)    The express written consent of the General Partner and all Limited Partners;

(b)    The sale, exchange, abandonment, foreclosure or other disposition of all of the Project;

(c)    Except as provided in Section 3.4(f), the withdrawal or removal of the General Partner; or

(d)    The occurrence of any other circumstance which, by law, would require that the Partnership be dissolved.

Upon the occurrence of any of the above listed events, the General Partner shall no longer be entitled to make distributions as provided in Section 7.1 hereof, but all distributions thereafter shall be made in accordance with the provisions of Section 12.3(c) hereof.

Section 12.2    **Reconstitution**.

(a)    If the Partnership is dissolved pursuant to the withdrawal of the General Partner under Section 12.1(c) hereof, then the Limited Partners shall have the right to agree, in writing or by vote, to cause the Partnership to be continued and reconstituted as herein provided. If the General Partner is removed pursuant to Section 9.7, the Partnership shall not be dissolved if the CIT Limited Partner determines to cause the Partnership to be continued and reconstituted as herein provided; provided, however, that if required under applicable law, all Limited Partners other than the CIT Limited Partner agree, in writing or by vote as requested by the CIT Limited Partner, to take affirmative action to agree to such continuation and reconstitution. The right to continue and reconstitute the Partnership shall in either case be exercised, if at all, within ninety (90) days after the occurrence of the event described in Section 12.1(c) hereof.

(b)    If the Limited Partners elect to continue and reconstitute the Partnership as described in Section 12.2(a) hereof, within sixty (60) days after electing to continue and reconstitute the Partnership pursuant to Section 12.2(a) hereof, the Limited Partners shall designate another Person, regardless whether such Person is an existing Partner or not, that agrees to become the new General Partner ("New General Partner") of the Partnership. The New General Partner shall become the General Partner of the Partnership for all purposes and shall possess all of the rights, powers and authorities of the General Partner hereunder and shall succeed to the Interest and Percentage Interest of the previous General Partner ("Old General Partner") from and after the date on which the New General Partner agrees to accept the designation as General Partner of this Partnership, as continued and reconstituted.

(c)    If the Limited Partners elect to continue and reconstitute the Partnership pursuant to the provisions of Section 12.2(a) hereof, then the income, gains, losses and deductions recognized by the Partnership prior to the occurrence of the event described in Section 12.1(c) hereof shall be allocated as provided in Article 6 as though such event had occurred at the end of a Fiscal Year and the Capital Account balances of the Partners shall be adjusted accordingly.

(d)    If the Capital Account balance of the Old General Partner is not positive after the adjustments required by Section 12.2(c) hereof, then the Old General Partner shall not be a Partner in the continued and reconstituted Partnership, and the Old General Partner shall make a contribution to the continued and reconstituted Partnership equal to the amount which it would have been obligated to contribute pursuant to Section 4.3 hereof if the dissolution had caused a termination of the Partnership and the assets of the Partnership had been sold on the next day following the cause of dissolution of the Partnership (i) for cash equal to the adjusted basis for federal income tax purposes of each item of Partnership Property or (ii) if a Section 754 election is in effect and an adjustment to the Old General Partner's Capital Account is required by Treasury Regulation Section 1.704-1 (b)(2)(iv)(m)(4), for cash equal to each item's respective Gross Asset Value. If the Old General Partner has a positive Capital Account balance after the adjustment required by Section 12.2(c) hereof, then the Old General Partner shall become a limited partner in the continued and reconstituted Partnership and shall retain such Capital Account balance and receive a distribution upon subsequent dissolution and termination of the continued and reconstituted Partnership pursuant to Section 12.3(c) hereof, but shall have no further share in other income, gains, losses, deductions or distributions of the continued and reconstituted Partnership.

(e)    The Old General Partner's consent shall not be required for any continuation or reconstitution hereunder or for the designation of the New General Partner hereunder.

Section 12.3    **Winding Up**.

(a)    Upon the dissolution of the Partnership, the General Partner shall act as liquidating trustee (the "Liquidating Trustee") and immediately proceed to terminate the business of the Partnership. The Liquidating Trustee shall first determine or have determined the fair market value of all Partnership Property and then attempt to sell all Partnership Property (except cash and current receivables) at such time, at such prices, and on such terms as the Liquidating Trustee, in the exercise of its best business judgment under the circumstances then presented, deems in the best interest of the Partners. The General Partner (or

an Affiliate of the General Partner) shall have the right to purchase any Partnership Property to be sold on Liquidation, provided that the terms on which such sale is made are no less favorable to the Limited Partners than would otherwise be available from third parties. The proceeds of the sale of the Partnership Property, together with cash and proceeds of Partnership receivables as received by the Liquidating Trustee from time to time, shall be distributed in accordance with Section 12.3(c) hereof.

(b)    The Liquidating Trustee (including any officer, director, or other agent of the Liquidating Trustee) shall be defended, indemnified, and held harmless by the Partnership from and against any and all claims, demands, liabilities, costs, damages and causes of action of any nature whatsoever, (including, without limitation, those based on negligence) arising out of or incidental to the Liquidating Trustee taking any action authorized under, or within the scope of, this Section 12.3 or any Person acting as officer or director thereof while the Liquidating Trustee was so acting; provided, however, that neither the Liquidating Trustee nor any officer, director or other agent thereof shall be entitled to indemnification hereunder where the claim at issue arose out of the following:

(i)    A matter entirely unrelated to the Liquidating Trustee's acting under the provisions of this Article 12; or

(ii)    The proven gross negligence or proven willful misconduct of the Liquidating Trustee, or of any officer, director or other agent thereof; or

(iii)    The breach by the Liquidating Trustee of any of its obligations under this Article 12.

The indemnification rights herein contained shall be cumulative of, and in addition to, any and all other rights, remedies and recourses to which the Liquidating Trustee, or any officer, director or other agent thereof, shall be entitled under this Agreement, the Act, at law or in equity.

(c)    After the Liquidating Trustee has sold all of the Partnership Property as provided herein, Partnership income, gain, loss or deduction shall be credited or charged to the Capital Accounts of the Partners in accordance with Article 6 hereof. The net proceeds from such sales (after deducting all selling costs and expenses in connection therewith) shall be applied or distributed on or before the later to occur of (i) the last day of the Fiscal Year on which the Liquidation of the Partnership occurs, or (ii) ninety (90) days after the date upon which the Liquidation of the Partnership occurs in the following order of priority:

(i)    First, in payment of all third-party costs incurred in connection with the sale of the Partnership Property;

(ii)    Second, in payment of all liabilities of the Partnership to third-party creditors;

(iii)    Third, in payment of all loans and other liabilities of the Partnership to Partners;

(iv)    Fourth, to the Partners, in accordance with their Percentage Interest.

Section 12.4    **Final Accounting**. The Liquidating Trustee shall furnish to each Partner a copy of an accounting of all Partnership assets, liabilities and operations from the date of the last previous accounting to the date of dissolution of the Partnership and from the date of dissolution of the Partnership to the date of termination of the Partnership.

## ARTICLE 13

### Representations and Indemnification

Section 13.1    **Representations of the Limited Partners**. Each Limited Partner hereby represents and warrants to the Partnership and all Partners that the following statements are true:

(a)       Such Limited Partner is financially able to comply with its obligations hereunder; and it has adequate means of providing for its current financial needs and possible contingencies, exclusive of its investment in the Partnership;

(b)       Such Limited Partner understands that the Internal Revenue Service (the "Service") may disallow some or all of the deductions or losses to be claimed by the Partnership;

(c)       Such Limited Partner is aware that the General Partner and Affiliates of the General Partner will engage in businesses which are competitive with that of the Partnership, and, except as specifically provided in this Agreement, it consents to and approves such activities even though there are conflicts of interest inherent therein; provided, however, nothing herein shall limit the obligations of the General Partner pursuant to Section 9.4 hereof.

(d)       Such Limited Partner recognizes that Section 4(2) of the Securities Act of 1933, as amended (the "Securities Act of 1933"), and similar provisions of applicable state securities laws exempt the issue and sale of securities from registration with the applicable securities law regulatory bodies in transactions not involving any public offering and that it is purchasing its Interest for its own account, for investment and with no present intention of distributing, reselling, pledging, or otherwise disposing of its Interest;

(e)       Such Limited Partner has been furnished with sufficient written and oral information about the Partnership, the General Partner and the Project to allow it to make an informed investment decision prior to purchasing an Interest, and has been furnished access to any additional information that it may require;

(f)       Such Limited Partner is fully familiar with the business proposed to be conducted by the Partnership and with the Partnership's use and proposed use of the Partnership Property;

(g)       That this Agreement has been drafted in the course of a negotiated transaction involving direct communication between such Limited Partner and the General Partner on behalf of the Partnership;

(h)       Such Limited Partner either (a) has experience in business enterprises or investments entailing risks of a type or to a degree substantially similar to those entailed in an investment in the Partnership; or (b) has obtained independent financial advice with respect to its investment in the Partnership; and (c) is an "Accredited Investor" as that term is defined in the Securities Act of 1933;

(i)       Such Limited Partner has been advised that its Interest may not be sold, transferred or otherwise disposed of in the absence of either an effective registration statement covering said Interest under the Securities Act of 1933, or an opinion of counsel satisfactory to the Partnership and its counsel that registration of its Interest is not required under the Securities Act of 1933, and, in view of the nature of the transaction, that registration is neither contemplated nor likely.

Section 13.2    **Indemnification**. Each Limited Partner shall and does hereby agree to indemnify, defend, and save harmless the Partnership, the General Partner and each other Limited Partner from any damages, claims, expenses, losses or actions resulting from (i) a breach by such Limited Partner of any of the warranties and representations contained in Section 13.1 hereof, or (ii) the untruth of any of the warranties and representations contained in Section 13.1 hereof.

## ARTICLE 14

### Default By Partners

Section 14.1    **Events Constituting Default by a Limited Partner**. The following events shall be deemed to be "Events of Default" by a Limited Partner:

(a)     the making of an assignment for the benefit of creditors or the filing of a petition under any section or chapter of the U.S. Bankruptcy Code, as amended, or under any similar law or statute of the United States, Canada, or any state or province of either;

(b)     the classification of a Limited Partner as a debtor or insolvent in proceedings under any section or chapter of the U.S. Bankruptcy Code, as amended, or under any similar law or statute of the United States, Canada, or any state or province of either for a period of ninety (90) days without a dismissal of such proceedings;

(c)     the appointment of a receiver for all or substantially all of the assets of a Limited Partner and the failure to have such receiver discharged within ninety (90) days after appointment; and

(d)     the material breach by a Limited Partner of any of the provisions of this Agreement.

Section 14.2     Remedies Upon Default by Limited Partner.

(a)     Upon the occurrence of an Event of Default by a Limited Partner (herein called a "Defaulting Limited Partner"), other than for failure to make Additional Capital Contributions (for which defaults remedies are provided in Article 4 hereof), at any time within one (1) year after the date of such Event of Default, the General Partner shall give the Defaulting Limited Partner thirty (30) days' written notice of such Event of Default, provided such Event of Default is continuing on the date such notice is given, to allow the Defaulting Limited Partner to cure the Event of Default, if possible. Upon the expiration of thirty (30) days after such notice and if the Event of Default has not been cured, the other Partners (herein called the "Non-Defaulting Partners") shall be entitled, on behalf of the Partnership, to seek all such remedies as are allowed by law or in equity.

(b)     The foregoing remedy is provided in view of the fact that the Interests of the Non-Defaulting Partners will be put in jeopardy in the event of any Event of Default by a Defaulting Limited Partner which is not timely cured after notice, with potential damages to the Non-Defaulting Partners in amounts which cannot be foreseen.

(c)     No waiver of any Event of Default shall be deemed or construed to constitute a waiver of any other Event of Default or of any breach of any of the terms, provisions, and covenants herein contained, and forbearance to enforce one or more of the remedies herein provided upon an Event of Default shall not be deemed or construed to constitute a waiver of such Event of Default.

## ARTICLE 15

### Miscellaneous

Section 15.1     **Notices**. All notices or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be considered as properly given if (i) mailed by first class United States mail, postage prepaid, certified mail, return receipt requested, or (ii) sent by (a) facsimile or (b) personal delivery. A notice so mailed shall be effective upon the expiration of three (3) business days after its deposit with the United States Postal Service. A notice sent by facsimile or personal delivery shall be effective upon receipt by the addressee. For purposes of notice, the address of each Partner shall be the address recited on such Partner's signature page to this Agreement; provided, however, that a Partner shall have the right to change its address for notice hereunder to any other location within the continental United States by the giving of thirty (30) days notice to the General Partner (or, in the case of the General Partner changing its address, to all the Limited Partners) in the manner set forth herein.

Section 15.2     **Law Governing**. This Agreement, and the obligations of the Partners hereunder, shall be governed by and construed in accordance with the laws of the State of Delaware, excluding any conflicts of law, rule or principle which might refer such construction to the laws of another state. Venue shall be in Dallas County, Texas.

Section 15.3    **Successors and Assigns**. This Agreement, together with the Escrow Agreement, and all the terms, provisions and conditions hereof, shall be binding upon and shall inure to the benefit of the Partners, and their respective legal representatives, successors and assigns; provided, however, that nothing contained herein shall negate or diminish the restrictions set forth in Article 10 hereof or elsewhere in this Agreement.

Section 15.4    **Entire Agreement.**  This Agreement contains the entire agreement among the Partners relating to the subject matter hereof, and all other agreements relative hereto which are not contained herein are terminated.

Section 15.5    **Amendments**. Except as otherwise explicitly provided herein, amendments, variations, modifications or changes to this Agreement may be effective and binding upon the Partners by, and only by, setting the same forth in a document duly executed and consented to by all Partners, and any alleged amendment, variation, modification or change to this Agreement which is not so documented shall not be effective as to any Partner.

Section 15.6    **Counterparts**. This Agreement may be executed in multiple counterparts, each of which shall be an original, but all of which shall constitute but one (1) instrument.

Section 15.7    **Attachments**. All annexes, exhibits, and schedules hereto are incorporated in this Agreement and made a part hereof by reference.

Section 15.8    **Severability**. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations. If any provision of this Agreement or the application thereof to any Person or circumstance shall, for any reason or to any extent, be invalid or unenforceable, the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

Section 15.9    **Article and Section Titles**. The article and section titles and headings used in this Agreement are solely for convenience and neither modify nor limit the provisions of this Agreement.

Section 15.10    **Conflict with First Mortgage**.  Notwithstanding anything contained in this Agreement to the contrary, for so long as a First Mortgage exists on any portion of the Project, to the extent that there is a conflict between the terms and conditions contained in this Agreement and any First Mortgage and all other documents executed in connection therewith, including but not limited to that certain Acknowledgment, Consent and Reaffirmation Agreement, dated on or about the date hereof, by and among the Partnership, Cambridge Holdings Incorporated, the Cambridge Limited Partner, the General Partner, the CIT Limited Partner and Lender (collectively, the "Loan Documents"), the terms of the Loan Documents shall control.

WITNESS THE EXECUTION HEREOF as of the *31ˢᵗ* day of *December*, 2007.

GENERAL PARTNER:

**6000 GREENVILLE, INC.** a
Texas corporation

By: _____
Jean-Claude Saada, President

Address:
1717 Main Street, 59ᵗʰ Floor
Dallas, Texas 75201

CAMBRIDGE LIMITED PARTNER:

**CAMBRIDGE-GREENVILLE DALLAS, LLC**, a
Delaware limited liability company

By: _____
Jean-Claude Saada, Sole Member *Managing Member*

Address:
1717 Main Street, 59ᵗʰ Floor
Dallas, Texas 75201

CIT LIMITED PARTNER:

**ERC SUB, L.P.**, a
Delaware limited partnership

By: ERC Sub, LLC, a Delaware limited liability company, its
General Partner

By: _____
Name:    F. Scott Kellman
Title:    President and Chief Executive Officer

Address:
ERC Sub, L.P.
c/o Care Investment Trust Inc.
505 Fifth Avenue
6ᵗʰ Floor
New York, NY 10017
Attention: Chief Executive Officer
Facsimile: 734-913-0712

1485385

Third Amended and Restated Agreement of Limited Partnership of Cambridge Walnut Hill, L.P.
Signature Page

EXHIBIT A

Percentage Interests

Limited Partners:

| | |
|---|---|
| Cambridge-Greenville Dallas, LLC | 13.5% |
| ERC Sub, L.P. | 85% |

General Partner:

| | |
|---|---|
| 6000 Greenville, Inc. | <u>1.5%</u> |
| Total | 100.0% |

EXHIBIT B

Real Property Description

See attached.

## Property Legal Description (Walnut Hill)

Leasehold Estate as created and defined by the terms, conditions and provisions of that certain Ground Lease Agreement dated May 1, 2001, by and between Texas Health System, as ground lessor, and Cambridge Capital Corporation, as ground lessee, which Ground Lease Agreement is described and referred to in that certain Memorandum of Ground Lease Agreement dated May 1, 2001, by and between Texas Health System and Cambridge Capital Corporation recorded August 16, 2001, in Volume 2001161, Page 642, Real Property Records, Dallas County, Texas. As assigned to Cambridge-LaSalle Dallas, L.P., a Texas limited partnership, by that certain Assignment and Assumption of Ground Lease filed August 5, 2002, recorded in Volume2002151, Page 10163, Real Property Records, Dallas County, Texas. As amended by that First Amendment to Ground Lease Agreement dated 04/22/2003, filed 6/3/04, recorded in Volume 2004107, Page 3947, Real Property Records, Dallas County, Texas.

PARCEL I

Being a tract of land situated in the Neal McCreary Survey, Abstract No. 996, City of Dallas, Dallas County, Texas, being a part of Block A/5213 and part of Tract No. 1 of Presbyterian Hospital of Dallas, an addition to the City of Dallas according to the plat recorded in Volume 76045, Page 1918, Deed Records of Dallas County, Texas, and being more particularly described as follows:

BEGINNING at a ½" iron rod with yellow plastic cap stamped "RLG" set in the northwesterly line of Greenville Avenue (100' right-of-way), said iron rod being the most easterly southeast corner of said Presbyterian Hospital of Dallas addition and the northeasterly corner of Lakeview Two Addition, an addition to the City of Dallas according to the plat recorded in Volume 94209, Page 3226, Deed Records of Dallas County, Texas, from which a found 5/8" iron rod bears South 74° 20' 19" West a distance of 0.85 feet;

THENCE North 69° 27' 06" West along the common line between said Lakeview Two addition and said Presbyterian Hospital of Dallas addition for a distance of 288.17 feet to a ½" iron rod with yellow plastic cap stamped "RLG" set for corner;

THENCE North 20° 43' 54" East for a distance of 170.63 feet to a ½" iron rod with yellow plastic cap stamped "RLG" set for corner, and the beginning of a curve to the left;

THENCE in a northeasterly direction and along said curve to the left whose chord bears North 19° 13'41" East a distance of 39.88 feet, having a radius of 760.00 feet, a central angle of 03° 00' 24" and an arc length of 39.88 feet to a ½" iron rod with yellow plastic cap stamped "RLG" set for corner, and the end of said curve to the left;

THENCE North 71° 41' 40" West for a distance of 13.78 feet to a ½ inch iron rod with yellow plastic cap stamped "Raymond L. Goodson, Jr., Inc." set for corner;

THENCE North 18° 18' 20" East for a distance of 126.08 feet to a ½ inch iron rod with yellow plastic cap stamped "Raymond L. Goodson. Jr., Inc." set for corner;

THENCE North 37° 23' 51" West for a distance of 47.40 feet to a ½ inch iron rod with yellow plastic cap stamped "Raymond L. Goodson, Jr., Inc." set for corner;

THENCE South 82° 51' 08" East, generally 10.00 feet south of and parallel to the southwesterly curb of Fogelson Lane (a private drive), for a distance of 25.66 feet to a ½ inch iron rod with yellow plastic cap stamped "Raymond L. Goodson, Jr., Inc." set for corner at the beginning of a tangent curve to the left;

THENCE in a northeasterly direction, generally 10.00 feet southeasterly of and parallel to the southeasterly curb of said Fogelson Lane, and along said tangent curve to the left whose chord bears North 59° 59' 47" East a distance of 224.06 feet, having a radius of 185.50 feet, a central angle of 74° 18'10", and an arc length of 240.56 feet to a ½ inch iron rod with yellow plastic cap stamped "Raymond L Goodson, Jr., Inc." set for corner, and the end of said curve to the left;

Stewart Title Guaranty Company

T-1 Form Prescribed by Texas Department of Insurance (Revised 1/1/93)

File No.: 06304319                                                      Policy No.: 5893 88676

THENCE North 22° 50' 42" East, generally 10.00 feet southeast of and parallel to the southeasterly curb of said Fogelson Lane, for a distance of 57.14 feet to a ½" iron rod with yellow plastic cap stamped "RLG" set for corner;

THENCE North 68° 14' 46" East for a distance of 41.67 feet to a ½" iron rod with yellow plastic cap stamped "RLG" set for corner;

THENCE South 67° 09' 18" East, generally 10.50 feet southwest of and parallel to the southwesterly curb of Phoenix Drive (a private drive), for a distance of 72.78 feet to a ½" iron rod with yellow plastic cap stamped "RLG" set for corner, and the beginning of a curve to the right;

THENCE in a southeasterly direction and along said curve to the right whose chord bears South 21° 57' 30" East a distance of 120.62 feet, having a radius of 85.00 feet, a central angle of 90° 23' 35" and an arc length of 134.10 feet to a ½" iron rod with yellow plastic cap stamped "RLG" set for corner in the northwesterly line of said Greenville Avenue, and the end of said curve to the right and being in a curve to the left whose radius point bears South 66° 45' 43" East;

THENCE in a southwesterly direction along the northwesterly line of said Greenville Avenue and along said curve to the left whose chord bears South 21° 59' 05" West a distance of 252.82 feet, having a radius of 5779.58 feet, a central angle of 2° 30' 23" and an arc length of 252.84 feet to a ½" iron rod with yellow plastic cap stamped "RLG" set for corner, and the end of said curve to the left;

THENCE South 20° 43' 54" West along the northwesterly line of said Greenville Avenue for a distance of 280.63 feet to the POINT OF BEGINNING, containing 161,270 square feet or 3.7022 acres, more or less.


PARCEL 2


Being a tract of land situated in the Neal McCreary Survey, Abstract No, 996, City of Dallas, Dallas County, Texas, being a part of Block A/5213 and part of Tract No. 1 of Presbyterian Hospital of Dallas, an addition to the City of Dallas according to the plat recorded in Volume 76045, Page 1918, Deed Records of Dallas County, Texas, and being more particularly described as follows:

COMMENCING at a ½" iron rod with yellow plastic cap stamped "RLG" set in the northwesterly line of Greenville Avenue (100' right-of-way), said iron rod being the most easterly southeast corner of said Presbyterian Hospital of Dallas addition and the northeasterly corner of Lakeview Two Addition, an addition to the City of Dallas according to the plat recorded in Volume 94209, Page 3226, Deed Records of Dallas County, Texas, from which a found 5/8" iron rod bears South 74° 20' 19" West a distance of 0.85 feet;

THENCE North 20° 43' 54" East along the northwesterly line of said Greenville Avenue for a distance of 280.63 feet to a ½" iron rod with yellow plastic cap stamped "RLG" set for corner, and the beginning of a curve to the right;

THENCE in a northeasterly direction along the northwesterly line of said Greenville Avenue and along said curve to the right whose chord bears North 22° 54' 04" East a distance of 437.61 feet, having a radius of 5779.58 feet, a central angle of 4° 20' 21" and an arc length of 437.72 feet to a ½" iron rod with yellow plastic cap stamped "RLG" set for corner at the end of said curve to the right and the beginning of a curve to the left, and being the POINT OF BEGINNING of the herein described tract;

THENCE South 69° 16' 11" West, departing the northwesterly line of said Greenville Avenue, for a distance of 42.42 feet to a ½ inch iron rod with yellow plastic cap stamped "Raymond L. Goodson, Jr., Inc." set for corner;

THENCE North 67° 09' 18" West, and generally 10.50 feet northeast of and parallel to the northeasterly curb of Phoenix Drive (a private drive), for a distance of 131.27 feet to a ½ inch iron rod with yellow plastic cap stamped "Raymond L. Goodson, Jr., Inc." set for corner;

THENCE North 22° 33'13" West for a distance of 41.67 feet to a ½ inch iron rod with yellow plastic cap stamped "Raymond L.

Stewart Title Guaranty Company

T-1 Form Prescribed by Texas Department of Insurance (Revised 1/1/93)

File No.: 06304319

Policy No.: 5893 88676

Goodson, Jr., Inc." set for corner;

THENCE North 22° 50'42" East, and generally 10.00 feet southeast of and parallel to the southeasterly line of Fogelson Lane (a private drive), for a distance of 69.20 feet to a ½ inch iron rod with yellow plastic cap stamped "Raymond L. Goodson, Jr., Inc." set for corner, being the beginning of a tangent curve to the left;

THENCE in a northeasterly direction, and generally 10.00 feet southeast of and parallel to the southeasterly line of said Fogelson Lane, and along said tangent curve to the left whose chord bears North 09° 19' 13" East a distance of 102.27 feet, having a radius of 218.65 feet, a central angle of 27° 02' 59", and an arc length of 103.23 feet to a ½ inch iron rod with yellow plastic cap stamped "Raymond L. Goodson, Jr., Inc." set for corner;

THENCE South 64° 15' 13" East a distance of 224.14 feet to a ½ inch iron rod with yellow plastic cap stamped "Raymond L. Goodson, Jr., Inc." set for corner in the northwesterly line of said Greenville Avenue, being in a non-tangent curve to the left, whose radius bears South 63°22'03" East a distance of 5779.58 feet;

THENCE in a southwesterly direction along the northwesterly line of said Greenville Avenue, and along said non-tangent curve to the left whose chord bears South 25° 51' 06" West a distance of 157.53 feet, having a radius of 5779.58 feet, a central angle of 01° 33' 42", and an arc length of 157.53 feet to the POINT OF BEGINNING and containing 37,241 square feet or 0.8549 acres of land more or less.

PARCEL 3 - ACCESS EASEMENT

Being a tract of land situated in the Neal McCreary Survey, Abstract No. 996, City of Dallas, Dallas County, Texas, being a part of Block A/5213 and part of Tract No. 1 of Presbyterian Hospital of Dallas, an addition to the City of Dallas according to the plat recorded in Volume 76045, Page 1918, Deed Records of Dallas County, Texas, and being more particularly described as follows:

COMMENCING at a ½" iron rod with yellow plastic cap stamped "RLG" set in the northwesterly line of Greenville Avenue (100' right-of-way), said iron rod being the most easterly corner of said Presbyterian Hospital of Dallas addition and the northeasterly corner of Lakeview Two Addition, an addition to the City of Dallas according to the plat recorded in Volume 94209, Page 3226, Deed Records of Dallas County, Texas, from which a found 5/8" iron rod bears South 74° 20' 19" West a distance of 0.85 feet;

THENCE North 20° 43' 54" East along the northwesterly line of said Greenville Avenue for a distance of 280.63 feet to a ½" iron rod with yellow plastic cap stamped "RLG" set for corner, and the beginning of a curve to the right;

THENCE in a northeasterly direction along the northwesterly line of said Greenville Avenue and along said curve to the right whose chord bears North 21° 59' 05" East a distance of 252.82 feet, having a radius of 5779.58 feet, a central angle of 2° 30' 23" and an arc length of 252.84 feet to a ½" iron rod with yellow plastic cap stamped "RLG" set for corner at the end of said curve to the right and the beginning of a curve to the left, and being the POINT OF BEGINNING of herein described tract;

THENCE in a northwesterly direction along said curve to the left whose chord bears North 21° 57' 30" West a distance of 120.62 feet, having a radius of 85.00 feet, a central angle of 90° 23' 35" and an arc length of 134.10 feet to a ½" iron rod with yellow plastic cap stamped "RLG" set for corner and the end of said curve to the left;

THENCE North 67° 09' 18" West, generally 10.50 feet southwest of and parallel to the southwesterly curb of Phoenix Drive (a private drive), for a distance of 72.78 feet to a ½" iron rod with yellow plastic cap stamped "RLG" set for corner;

THENCE South 68° 14' 46" West for a distance of 41.67 feet to a ½" iron rod with yellow plastic cap stamped "RLG" set for corner;

THENCE South 22° 50' 42" West, generally 10.00 feet southeast of and parallel to the southeasterly curb of Fogelson Lane (a private drive), for a distance of 57.14 feet to a ½" iron rod with yellow plastic cap stamped "RLG" set and the beginning of a curve to the right;

Stewart Title Guaranty Company

T-1 Form Prescribed by Texas Department of Insurance (Revised 1/1/93)

File No.: 06304319

Policy No.: 5893 88676

THENCE in a southwesterly direction, generally 10.00 feet southeast of and parallel to the southeasterly curb of said Fogelson Lane, and along said curve to the right whose chord bears South 59° 59' 47" West a distance of 224.06 feet, having a radius of 185.50 feet, a central angle of 74° 18' 10" and an arc length of 240.56 feet to a ½" iron rod with yellow plastic cap stamped "RLG" set for corner and end of said curve to the right;

THENCE North 82° 51'08" West, generally 10.00 feet south of and parallel to the southerly curb of said Fogelson Lane, for a distance of 25.66 feet to a ½" iron rod with yellow plastic cap stamped "RLG" set for corner;

THENCE North 07° 08' 52" East, crossing said Fogelson Lane, for a distance of 45.00 feet to a ½" iron rod with yellow plastic cap stamped "RLG" set for corner;

THENCE South 82° 51' 08" East, generally 10.00 feet north of and parallel to the northerly curb of said Fogelson Lane, for a distance of 25.66 feet to a ½" iron rod with yellow plastic cap stamped "RLG" set for corner and the beginning of a curve to the left;

THENCE in a northeasterly direction, generally 10.00 feet northwest of and parallel to the northwesterly curb of said Fogelson Lane, and along said curve to the left whose chord bears North 59° 59' 47" East a distance of 169.70 feet, having a radius of 140.50 feet, a central angle of 74° 18' 10" and an arc length of 182.20 feet to a ½" iron rod with yellow plastic cap stamped "RLG" set for corner and the end of said curve to the left;

THENCE North 22° 50' 42" East, generally 10.00 feet northwest of and parallel to the northwesterly curb of said Fogelson Lane, for a distance of 241.23 feet to a ½" iron rod with yellow plastic cap stamped "RLG" set for corner;

THENCE South 67° 09' 18" East, crossing said Fogelson Lane, for a distance of 45.00 feet to a ½ inch iron rod with yellow plastic cap stamped "Raymond L. Goodson, Jr., Inc." set for corner;

THENCE South 22° 50' 42" West, generally 10.00 feet southeast of and parallel to the southeasterly curb of said Fogelson Lane, for a distance of 55.57 feet to a ½ inch iron rod with yellow plastic cap stamped "Raymond L. Goodson, Jr., Inc." set for corner;

THENCE South 22° 33' 13" East for a distance of 41.67 feet to a ½ inch iron rod with yellow plastic cap stamped "Raymond L. Goodson, Jr., Inc." set for corner;

THENCE South 67° 08' 18" East, and generally 10.50 feet northeast of and parallel to the northeasterly curb of said Phoenix Drive. for a distance of 131.27 feet to a ½ inch iron rod with yellow plastic cap stamped "Raymond L. Goodson, Jr., Inc." set for corner;

THENCE North 69° 16' 11" East a distance of 42.42 feet to a ½ inch iron rod with yellow plastic cap stamped "Raymond L, Goodson, Jr., Inc." set for corner in the northwesterly line of said Greenville Avenue, being in a non-tangent curve to the left, whose radius bears South 64°55'45" East a distance of 5779.58 feet;

THENCE in a southwesterly direction along the northwesterly line of said Greenville Avenue and said non-tangent curve to the left whose chord bears South 24° 09' 16" West a distance of 184.87 feet, having a radius of 5779.58 feet, a central angle of 01° 49' 58" and an arc length of 184.88 feet to the POINT OF BEGINNING, containing 37,687 square feet or 0.8652 acres, more or less.

Stewart Title Guaranty Company

EXHIBIT C

$327,703

SCHEDULE 1.34

Gross Asset Value

$47,694,684