# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| CARE INVESTMENT TRUST, INC.,<br><br>        Plaintiff,<br><br>   v.<br><br>JEAN-CLAUDE SAADA; CAMBRIDGE ONALP, INC.; CAMBRIDGE NASSAU BAY GP LLC; 6000 GREENVILLE, INC.; ALLEN MOB, INC.; 5280 MEDICAL DRIVE, INC.; CAMBRIDGE GORBUTT MOB, INC.; CAMBRIDGE TARRANT, INC.; CHMP MANAGER, LLC; CAMBRIDGE B/R, INC.; CAMBRIDGE-GREENVILLE DALLAS, LLC; PMC CAMBRIDGE OF PLANO, LTD; CAMBRIDGE-CROWN ATRIUM LLC; and CAMBRIDGE NORTH TEXAS HOLDINGS, LLC,<br><br>        Defendants. | No. 3:09-cv-02256-K |
| JEAN-CLAUDE SAADA; CAMBRIDGE ONALP, INC.; CAMBRIDGE NASSAU BAY GP LLC; 6000 GREENVILLE, INC.; ALLEN MOB, INC.; 5280 MEDICAL DRIVE, INC.; CAMBRIDGE GORBUTT MOB, INC.; CAMBRIDGE TARRANT, INC.; CHMP MANAGER, LLC; CAMBRIDGE B/R, INC.; CAMBRIDGE-GREENVILLE DALLAS, LLC; PMC CAMBRIDGE OF PLANO, LTD; CAMBRIDGE-CROWN ATRIUM LLC; and CAMBRIDGE NORTH TEXAS HOLDINGS, LLC,<br><br>        Counterclaim Plaintiffs,<br><br>   v.<br><br>CARE INVESTMENT TRUST, INC.; CIT HEALTHCARE, LLC; FLINT D. BESECKER; ERC SUB, LP; and ERC SUB, LLC,<br><br>        Counterclaim and Third Party Defendants. | |

## ANSWER, COUNTERCLAIMS, AND THIRD PARTY COMPLAINT

### ANSWER, COUNTERCLAIMS, AND THIRD PARTY COMPLAINT

Defendants and Counterclaim Plaintiffs, Cambridge Onalp Inc.,

Cambridge Nassau Bay GP LLC, 6000 Greenville Inc., Allen MOB Inc., 5280 Medical

Drive Inc., Cambridge Gorbutt MOB Inc., Cambridge Tarrant Inc. and CHMP Manager

LLC (collectively "Counterclaim Plaintiff Managing Owners"), and Cambridge B/R Inc.,

Cambridge-Greenville Dallas LLC, PMC Cambridge of Plano Ltd., Cambridge Crown

Atrium LLC, Cambridge North Texas Holdings LLC, and Jean-Claude Saada

(collectively "Counterclaim Plaintiff Sellers" and, along with Counterclaim Plaintiff

Managing Owners, "Counterclaim Plaintiffs" or "Defendants"), by and through their

undersigned counsel, provide the following answer to the Complaint and assert the

following Counterclaims and Third Party Claims against Counterclaim Defendant, Care

Investment Trust, Inc. ("Care"), and Third Party Defendants, CIT Healthcare, LLC

("CIT"), Flint D. Besecker ("Mr. Besecker") and ERC Sub, LP ("ERC Sub"), ERC Sub,

LLC ("ERC GP" and together with Care, CIT, Mr. Besecker and ERC Sub,

"Counterclaim and Third Party Defendants"), and in support thereof state as follows:

### PRELIMINARY STATEMENT

1.    Counterclaim Plaintiffs and certain of their affiliates (collectively,

the "Cambridge Companies") are a group of related companies and individuals that

develop, own, acquire, and manage healthcare facilities across the United States in

association with leading health systems and physicians.

2.    On or around December 31, 2007, Counterclaim Plaintiffs entered

into a business arrangement with Care and its affiliates, ERC GP and ERC Sub

(collectively the "Care Parties").  The essence of the arrangement, which was

documented in a series of related agreements, was the formation of a joint venture between the Care Parties and the Cambridge Companies.  Counterclaim Plaintiffs would sell ERC Sub an 85% interest (the "Partnership Interests") in partnerships that owned nine medical office buildings in Texas and Louisiana (the "Partnerships"), which the Cambridge Companies would continue to manage.  The Cambridge Companies also granted ERC Sub an option to purchase another five properties they owned and managed with the understanding that those properties would become a part of the joint venture as well.  Counterclaim Plaintiffs and their affiliates thus brought to this venture a portfolio of high-quality properties as well as expertise in developing and managing such properties.  Care, in turn, brought to the venture access to capital, as well as contacts in the healthcare field, which were to be used to obtain and develop additional properties. One of Care's principal shareholders and its manager, CIT, would provide additional healthcare contacts in furtherance of the venture.

3.      At the core of the transaction was a commitment to a long-term relationship.  The relevant agreements documenting the transaction reflect the parties' intent to create a partnership of at least seven years. Among other things, they provide that Care was guaranteed a substantial minimum return on its investment in the venture for up to seven years; that at the end of the seventh year Care and Counterclaim Plaintiffs would each have rights of first refusal on the sale of the others' interests in the venture; and that over the course of this seven-year period transfers of certain interests in Care and its subsidiaries would be subject to Counterclaim Plaintiffs' approval.

4.      It was essential to the Cambridge Companies that the transferability of Care's and its affiliates' interests in the Partnerships would be restricted.

Prior to entering into the joint venture with Care in December 2007, the Cambridge Companies explained to Care that one of the reasons they required the right to approve transfers of Care's interests in the joint venture was that they needed to ensure that any future partner had characteristics and incentives that were consistent with their long-term goals. Thus, for example, the Cambridge Companies could not permit competitors or short-term investors to own such a stake. If that happened, any such competitor would then be able to access proprietary information, which would have a potentially devastating effect on the Cambridge Companies' business. As was ultimately reflected in Section 10.2(a)(i) of the Partnerships' operating agreements, the parties agreed that, with limited exceptions, there would be no transfers of Care's or its subsidiaries' interests in the Partnerships for a seven-year period "without the written approval of [the relevant Counterclaim Plaintiff Managing Owner] at its sole discretion."

5.    The ultimate goal of the parties was to combine the expertise and experience of the Cambridge Companies with the contacts and financial clout of Care and CIT to build a healthcare-focused REIT that would grow and create substantial value for all involved.

6.    Because of misconduct by Care and its affiliates, however, this goal was never realized. Within weeks of embarking on the venture, Care effectively shut it down in furtherance of its own narrow financial interests as well as those of its principals. Indeed, scarcely six weeks had passed before (by February 12, 2008 at the latest) it became evident that Care was already exploring ways to sell itself and its interests in the joint venture. All of these actions were taken by Care and its affiliates at the expense of the joint venture. In breach of fiduciary and contractual duties owed to the

Cambridge Companies, and at the direction of the other Counterclaim and Third Party Defendants, ERC Sub and its controlling persons not only failed to work to grow the parties' joint venture, but actively sought to frustrate it by, among other things, declining to pursue possible fruitful business opportunities and stripping Care's management of its ability to consider them. Their failure to pursue such opportunities was not due to a lack of resources or opportunity. Indeed, on August 6, 2009, a member of Care's board of directors represented to the Cambridge Companies that Care's legal and financial advisors warned Care that "the record shows you turned away from running the business." In further breach of its duties, ERC Sub and its controlling persons refused to release the options ERC Sub held on properties owned by the Cambridge Companies. They did so despite having no intention of exercising these options, thereby preventing the Cambridge Companies from pursuing other business opportunities with respect to these properties, with a resulting loss to the Cambridge Companies of approximately $45 million.

7.     In reality, on information and belief, Care and CIT never intended to enter into a long-term arrangement with the Cambridge Companies. Unbeknownst to the Cambridge Companies, Care and CIT, along with Care's director and CIT president Flint Besecker, invented the idea of a joint venture with the Cambridge Companies because they needed Counterclaim Plaintiffs' properties and management expertise in order to carry out their plan to improve the marketability of Care.

8.     In furtherance of this plan, Care and CIT – along with Mr. Besecker, acting in part to promote his own private interests – fraudulently induced Counterclaim Plaintiffs to enter into the transaction by making false promises and

representations regarding the joint venture. Care, CIT and Mr. Besecker further induced Counterclaim Plaintiffs to accept an approximately $5.7 million reduction in the purchase price for the properties Care acquired in the transaction in exchange for a corresponding increase in the exercise price of one of the option properties, with the express promise that the option property would be purchased by the Care Parties in a timely manner. They also induced Counterclaim Plaintiffs to take $10.5 million of the purchase price in limited partnership units in ERC Sub rather than in cash, on the promise of a long-term joint enterprise between the parties. CIT and Care failed to perform their promises subsequent to the closing of the transaction and they otherwise took actions that were completely inconsistent with their prior representations.

9.      As a result of Counterclaim and Third Party Defendants' conduct, Counterclaim Plaintiffs have sustained damages in an amount to be determined at trial, but which Counterclaim Plaintiffs believe to be at least $100 million, in addition to reasonable attorney's fees and costs. Counterclaim Plaintiffs seek to recover these damages in this action.

10.     CIT and Care have now laid bare their original plan and have undertaken to liquidate Care and otherwise dispose of the Partnership Interests. On December 28, 2009, Care filed a proxy statement ("Proxy Statement") that is replete with misrepresentations concerning the extent of Care's efforts to negotiate a transaction with the Cambridge Companies, and that requests shareholder approval of a plan of liquidation ("Plan of Liquidation"), which would permit the wholesale liquidation of Care, including all of its subsidiaries. In connection with its Plan, Care has taken positions, based on

audacious misreadings of the relevant agreements, that would award Care and its shareholders a substantial windfall to the severe detriment of their joint venture partners.

11.    Specifically, in connection with the Plan of Liquidation, Care has taken the position that: (i) Care and/or its subsidiaries may transfer their interests in Counterclaim Plaintiffs' properties to a third party without Counterclaim Plaintiff Managing Owners' prior written consent; (ii) the transferee that received these interests and/or its subsidiaries would be entitled to receive a minimum return on investment in spite of provisions in the relevant agreements that preclude assignment of the guaranteed return; (iii) certain limited partnership units in ERC Sub – which Counterclaim Plaintiff Sellers and their affiliates received as partial consideration in their transaction with the Care Parties – are not entitled to whatever distributions are paid to Care shareholders if Care undergoes liquidation, even though the operating agreement for ERC Sub explicitly provides that these units "shall be treated in a manner economically commensurate" with Care stock; and (iv) Care may unilaterally liquidate and dissolve ERC Sub and/or the Partnerships in connection with the execution of the Plan of Liquidation and thereafter distribute its assets.

12.    Each of these positions is contradicted by the terms of the agreements among Care, Counterclaim Plaintiffs, and their respective affiliates, as well as by the intent of the parties and, if implemented, would have severe consequences for Counterclaim Plaintiffs.  Accordingly, Counterclaim Plaintiffs seek a declaratory judgment as to each of these issues.

13.    The Care Parties' new-found litigation position is flatly inconsistent with their own interpretations and course of conduct in relation to the Deeds

of Trust pursuant to which the outstanding debt of each of the Partnerships is secured. The relevant language of these documents parallels provisions in the operating agreements for each of the Partnerships.  First, contrary to the position they are now taking in this litigation, the Care Parties have previously asserted that the language of the Deeds of Trust (and thus of the Partnerships' operating agreements) require Counterclaim Plaintiff Managing Owners' consent to any transfer of direct or indirect interests in the Partnerships, including transfers of interests in Care.  Second, on the Care Parties' own prior reading of the relevant documents, the implementation of the Plan of Liquidation could give rise to an assertion by the Partnerships' lenders that there has been a breach of the Deeds of Trust.  Given that Care has now taken the contradictory position that the transfer of its 85% interest does not require consent, and thus that lender consent will not be sought or obtained, there is a substantial risk that lenders will make this assertion, which, if sustained, would entitle them to accelerate repayment of the approximately $175 million balance on the Partnerships' loans.

14.     When Care's misconduct became evident, Cambridge attempted to engage in constructive negotiations to reacquire the Partnership Interests, or, if necessary, to acquire Care in its entirety.  Although Care appeared at first to be willing to pursue negotiations, and indeed the parties reached agreement (on terms proposed by Care) on a $76 million purchase price – far greater than the value realizable from Care's Plan of Liquidation – Care abruptly reversed course and commenced litigation instead.

15.     Finally, for the reasons discussed above, Counterclaim and Third Party Defendants are in possession, or will be in possession, of money and/or property that in equity and good conscience belongs to Counterclaim Plaintiffs, which Care

threatens to dispose of through the Plan of Liquidation and to the detriment of Counterclaim Plaintiffs.  Accordingly, Counterclaim Plaintiffs request that the Court impose a constructive trust on this property and declare that Counterclaim and Third Party Defendants hold such property in trust for the benefit of Counterclaim Plaintiffs.

## ANSWER TO NUMBERED PARAGRAPHS OF COMPLAINT

1.      Defendants deny the allegations of paragraph 1 and respectfully refer to the Care Press Release dated November 9, 2009 (Compl., Ex. A) for the contents thereof, except admit that it is Defendants' position that any transfer of a controlling interest in Care or in any entity through which Care holds an interest in the eight limited liability companies defined as "Owners" in paragraph 27 of the Complaint is subject to the written approval of the Owners' general partner or managing member (the "Managing Owners").

2.      Defendants deny the allegations of paragraph 2, except admit that ERC Sub is an indirect subsidiary of Care and that Defendants' position is based on a construction of several agreements among the parties.

3.      Defendants deny the allegations of paragraph 3.

4.      Defendants deny the allegations of paragraph 4, except admit:  that it is Defendants' position that Defendants' rights under the Put Agreement would be triggered by the strategic transactions being considered by Care to the extent that they amount to a "Change in Control" as that term is defined in the Put Agreement (Compl., Ex. B); and that the Limited Partnership Units held by Defendants under the Partnership Agreement would entitle them to receive cash distributions from ERC Sub in the event of a liquidation of Care.

5.    Defendants deny the allegations of paragraph 5, except: admit that Mr. Saada received a letter from Torey Riso on behalf of Care dated May 8, 2009 (the "May 8 letter"), and respectfully refer to the May 8 letter for the contents thereof; admit that the Managing Owners notified Care that the transaction referenced in the May 8 letter could not be consummated without the written approval of each Managing Owner in its sole discretion; and admit that the Managing Owners did not provide Care with written approval of the transaction referenced in the May 8 letter.

6.    Defendants admit the allegations of paragraph 6.

7.    Defendants admit the allegations of paragraph 7, except deny that Mr. Saada is the President of any of the Saada Entities, and aver that Mr. Saada is the Chairman and Chief Executive Officer, Sole Member, and/or Managing Member of all of the Saada Entities.

8.    Defendants admit the allegations of paragraph 8.

9.    Defendants admit the allegations of paragraph 9, except deny the second sentence thereof, and aver that the sole member of Cambridge Nassau Bay GP LLC is Mr. Saada, a resident of Texas.

10.    Defendants admit the allegations of paragraph 10.

11.    Defendants admit the allegations of paragraph 11.

12.    Defendants admit the allegations of paragraph 12.

13.    Defendants admit the allegations of paragraph 13.

14.    Defendants admit the allegations of paragraph 14.

15.    Defendants admit the allegations of paragraph 15, except deny that the principal place of place of business of CHMP Manager, LLC is in Texas, and aver that the principal place of business of CHMP Manager, LLC is in Louisiana.

16.    Defendants admit the allegations of paragraph 16, except deny that the principal place of business of Cambridge B/R, Inc. is in Texas, and aver that the principal place of business of Cambridge B/R, Inc. is in Louisiana.

17.    Defendants admit the allegations of paragraph 17.

18.    Defendants admit the allegations of paragraph 18, except deny that there are limited partners of PMC Cambridge of Plano, Ltd., and aver that Mr. Saada is the sole limited partner of PMC Cambridge of Plano, Ltd.

19.    Defendants admit the allegations of paragraph 19, and aver that Mr. Saada is the sole member of Cambridge-Crown Atrium LLC.

20.    Defendants admit the allegations of paragraph 20, and aver that Mr. Saada is the sole member of Cambridge North Texas Holdings, LLC.

21.    Defendants admit the allegations of paragraph 21.

22.    Defendants admit the allegations of paragraph 22.

23.    Defendants admit the allegations of paragraph 23.

24.    Defendants admit the allegations of paragraph 24, except deny the first sentence thereof.

25.    Defendants admit the allegations of paragraph 25.

26.    Defendants admit the allegations of paragraph 26.

27.    Defendants admit the allegations of paragraph 27, except deny the first sentence thereof.

28.     Defendants deny the allegations of paragraph 28 and respectfully refer to the Put Agreement dated as of December 31, 2007 (Compl., Ex. B) for the contents thereof.

29.     Defendants admit the first sentence of paragraph 29, deny the allegations of the remainder of paragraph 29, and respectfully refer to the operating agreements identified in the Complaint (Compl., Exs. C – J) for the contents thereof.

30.     Defendants admit the allegations of paragraph 30 except deny the last sentence thereof and respectfully refer to the Amended and Restated Agreement of Limited Partnership of ERC Sub, L.P. (Compl., Ex. K) for the contents thereof.

31.     Defendants deny the allegations of paragraph 31 except admit that Mr. Saada received the May 8 letter (Compl., Ex. M) and respectfully refer to the May 8 letter for the contents thereof.

32.     Defendants admit the allegations of paragraph 32.

33.     Defendants deny the allegations of paragraph 33, except admit that counsel for Petitioners received a letter from counsel for Care, ERC Sub LP, and ERC Sub LLC dated May 14, 2009 (the "May 14 letter"), and respectfully refer to the May 14 letter for the contents thereof.

34.     Defendants deny the allegations of paragraph 34 except admit that counsel for petitioners sent a letter dated May 18, 2009 to counsel for Care, ERC Sub LP, and ERC Sub LLC (the "May 18 letter"), and respectfully refer to the May 18 letter for the contents thereof.

35.     Defendants deny the allegations of paragraph 35, except admit that counsel for Petitioners sent a letter dated May 26, 2009 to counsel for Care, ERC Sub LP,

and ERC Sub LLC (the "May 26 letter"), and respectfully refer to the May 26 letter for the contents thereof.

36.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 36, except admit: that Mr. Saada advised executives and directors of Care that the Operating Agreements provide for a right of approval that encompasses the transaction referenced in the May 8 letter; that the Managing Owners would not approve the transaction referenced in the May 8 letter; and that the Managing Owners were prepared to move forward to enforce their rights and remedies under the Operating Agreements in the appropriate forum, should that become necessary.

37.     Defendants deny the allegations of paragraph 37.

38.     Defendants deny the allegations of paragraph 38 except deny knowledge or information sufficient to form a belief as to the truth of the last sentence thereof.

39.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 39, except admit that Care issued a press release on November 9, 2009 (Compl., Ex. A) and respectfully refer to the press release for the contents thereof.

40.     Defendants deny the allegations of paragraph 40, except: admit that Mr. Saada has stated to executives and directors of Care that the Managing Owners were prepared to move forward to enforce their rights and remedies under the Operating Agreements in the appropriate forum, should that become necessary; and aver that: in early November 2009, Flint Besecker, a member of Care's board of directors, advised the

Saada Entities of the precise terms of an offer that Care would accept, which offer Mr. Besecker requested that the Saada Entities submit in writing; and that on November 11, 2009, the Saada Entities submitted an offer to Care incorporating terms identical to those submitted by Mr. Besecker.

        41.     Defendants deny the allegations of paragraph 41, except admit: that the parties identified as Seller Parties in the May 8 letter ("Seller Parties") did not attempt to exercise any rights under the Put Agreement in response to the May 8 letter; that it is Defendants' position that any sale of Care or its interest in the Facilities would trigger the put option in the Put Agreement; that it is Defendants' position that the Class B Units would entitle them to receive an amount of cash per Unit equal to whatever cash distributions are paid per share to the shareholders of Care if Care undergoes liquidation, and respectfully refer to the Amended and Restated Agreement of Limited Partnership of ERC Sub, LP for the contents thereof.

        42.     Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 42, except admit that discussions among the parties have not resolved their dispute over their respective rights and obligations under the agreements.

        43.     In response to paragraph 43, Defendants repeat and reallege the responses contained in paragraphs 1 through 42 of this Answer.

        44.     Defendants deny the allegations of paragraph 44, except admit that the operating agreements identified in the Complaint (Compl., Exs. C – J) require written approval of the Managing Owners as a condition precedent to a "Disposition," as defined therein, and respectfully refer to the operating agreements for the contents thereof.

45.     Defendants deny the allegations of paragraph 45 and respectfully refer to the operating agreements identified in the complaint (Compl., Exs. C – J) for the contents thereof.

46.     Defendants deny the allegations of paragraph 46 and respectfully refer to the operating agreements identified in the Complaint (Compl., Exs. C – J) for the contents thereof.

47.     Defendants deny the allegations of paragraph 47.

48.     Defendants deny the allegations of paragraph 48 and respectfully refer to the operating agreements identified in the Complaint (Compl., Exs. C. through J) for the contents thereof.

49.     Defendants deny the allegations of paragraph 49 and respectfully refer to the Put Agreement dated as of December 31, 2007 (Compl., Ex. B) and the operating agreements identified in the Complaint (Compl., Exs. C – J) for the contents thereof.

50.     Defendants deny the allegations of paragraph 50 and respectfully refer to the Contribution and Purchase Agreement dated as of December 31, 2007 (Compl., Ex. L) and the "other related documents and agreements" referenced in paragraph 50 for the contents thereof.

51.     The allegations in paragraph 51 state legal or other conclusions that do not require a response.  To the extent a response is required, Defendants deny the allegations of paragraph 51.

52.     In response to paragraph 52, Defendants repeat and reallege the responses contained in paragraphs 1 through 51 of this Answer.

53.     Defendants deny the allegations of paragraph 53 and respectfully refer to the Put Agreement dated as of December 31, 2007 (Compl., Ex. B) for the contents thereof.

54.     Defendants deny the allegations of paragraph 54, except admit that Mr. Saada received the May 8 letter (Compl., Ex. M) and respectfully refer to the May 8 letter for the contents thereof.

55.     Defendants deny the allegations of paragraph 55, except: admit that Seller Parties did not attempt to exercise any rights under the Put Agreement in response to the May 8 letter; admit that counsel for the Seller Parties thereafter sent a letter dated May 26, 2009 to counsel for Care, ERC Sub, LP, and ERC Sub, LLC, and respectfully refer to the letter for the contents thereof; and admit that Seller Parties have taken the position that the purported notice in the May 8 letter was null and void and did not trigger the Seller Parties' rights under the Put Agreement because the transaction identified in that letter was not approved by the Managing Owners.

56.     Defendants deny the allegations of paragraph 56.

57.     The allegations of paragraph 57 state legal or other conclusions that do not require a response. To the extent a response is required, Defendants deny the allegations of paragraph 57.

58.     In response to paragraph 58, Defendants repeat and reallege the responses contained in paragraphs 1 through 57 of this Answer.

59.     Defendants deny the allegations of paragraph 59 and refer to the Amended and Restated Agreement of Limited Partnership of ERC Sub, L.P. (Compl., Ex. K) for the contents thereof.

60.    Defendants deny the allegations of paragraph 60, except admit that it is Defendants' position that, if Care undergoes liquidation, the Class B Units would entitle Defendants to receive cash distributions per Unit equal to those paid per share to the shareholders of Care.

61.    Defendants deny the allegations of paragraph 61 and respectfully refer to the Amended and Restated Agreement of Limited Partnership of ERC Sub, L.P. (Compl., Ex. K) for the contents thereof.

62.    The allegations of paragraph 62 state legal or other conclusions that do not require a response.  To the extent a response is required, Defendants deny the allegations contained in paragraph 62.

63.    Defendants neither admit nor deny the allegations of paragraph 63, as they are the subject of Defendants' motion to dismiss.

64.    Defendants neither admit nor deny the allegations of paragraph 64, as they are the subject of Defendants' motion to dismiss.

65.    Defendants neither admit nor deny the allegations of paragraph 65, as they are the subject of Defendants' motion to dismiss.

66.    Defendants neither admit nor deny the allegations of paragraph 66, as they are the subject of Defendants' motion to dismiss.

67.    Defendants neither admit nor deny the allegations of paragraph 67, as they are the subject of Defendants' motion to dismiss.

68.    Defendants neither admit nor deny the allegations of paragraph 68, as they are the subject of Defendants' motion to dismiss.

69.     Defendants neither admit nor deny the allegations of paragraph 69, as they are the subject of Defendants' motion to dismiss.

70.     Defendants neither admit nor deny the allegations of paragraph 70, as they are the subject of Defendants' motion to dismiss.

71.     Defendants neither admit nor deny the allegations of paragraph 71, as they are the subject of Defendants' motion to dismiss.

72.     Defendants neither admit nor deny the allegations of paragraph 72, as they are the subject of Defendants' motion to dismiss.

73.     Defendants neither admit nor deny the allegations of paragraph 73, as they are the subject of Defendants' motion to dismiss.

74.     Defendants neither admit nor deny the allegations of paragraph 74, as they are the subject of Defendants' motion to dismiss.

75.     Defendants neither admit nor deny the allegations of paragraph 75, as they are the subject of Defendants' motion to dismiss.

76.     The allegations in paragraph 76 state legal or other conclusions that do not require a response.  To the extent a response is required, Defendants deny the allegations contained in paragraph 76.

## AFFIRMATIVE DEFENSES

## FIRST DEFENSE

77.     Plaintiff's claims are barred, in whole or in part, because the Complaint fails to state a claim upon which relief may be granted.

## SECOND DEFENSE

78.    Plaintiff's claims are barred, in whole or in part, because Defendants have fully performed under the terms of all applicable, enforceable agreements.

## THIRD DEFENSE

79.    Plaintiff's claims are barred, in whole or in part, because Care has not suffered any damages or injury as a result of the actions or inactions of the Defendants.

## FOURTH DEFENSE

80.    Plaintiff's claims are barred, in whole or in part, by the doctrine of laches.

## FIFTH DEFENSE

81.    Plaintiff's claims are barred, in whole or in part, by the doctrines of waiver, estoppel, and acquiescence.

## SIXTH DEFENSE

82.    Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.

## SEVENTH DEFENSE

83.    Plaintiff's claims are barred, in whole or in part, because there is no actual case or controversy between the parties.

## COUNTERCLAIMS AND THIRD PARTY COMPLAINT

### PARTIES

1.      Counterclaim Plaintiff Jean-Claude Saada resides and works in the State of Texas.

2.      Counterclaim Plaintiff Cambridge Onalp, Inc. is incorporated under the laws of Texas with its principal place of business in Texas.

3.      Counterclaim Plaintiff Cambridge Nassau Bay GP LLC is a limited liability company formed under the laws of Texas with its principal place of business in Texas.

4.      Counterclaim Plaintiff 6000 Greenville, Inc. is incorporated under the laws of Texas with its principal place of business in Texas.

5.      Counterclaim Plaintiff Allen MOB, Inc. is incorporated under the laws of Texas with its principal place of business in Texas.

6.      Counterclaim Plaintiff 5280 Medical Drive, Inc. is incorporated under the laws of Texas with its principal place of business in Texas.

7.      Counterclaim Plaintiff Cambridge Gorbutt MOB, Inc. is incorporated under the laws of Texas with its principal place of business in Texas.

8.      Counterclaim Plaintiff Cambridge Tarrant, Inc. is incorporated under the laws of Texas with its principal place of business in Texas.

9.      Counterclaim Plaintiff CHMP Manager, LLC is a limited liability company formed under the laws of Louisiana with its principal place of business in Louisiana.

10.      Counterclaim Plaintiff Cambridge B/R, Inc. is incorporated under the laws of Louisiana with its principal place of business in Louisiana.

11.     Counterclaim Plaintiff Cambridge-Greenville Dallas, LLC is a limited liability company formed under the laws of Delaware with its principal place of business in Texas.

12.     Counterclaim Plaintiff PMC Cambridge of Plano, Ltd. is a limited partnership formed under the laws of Texas with its principal place of business in Texas.

13.     Counterclaim Plaintiff Cambridge-Crown Atrium LLC is a limited liability company formed under the laws of Delaware with its principal place of business in Texas.

14.     Counterclaim Plaintiff Cambridge North Texas Holdings, LLC is a limited liability company formed under the laws of Delaware with its principal place of business in Texas.

15.     Counterclaim Defendant Care is incorporated under the laws of Maryland with its principal place of business in New York.

16.     Third Party Defendant Flint Besecker resides in the State of New York.  Mr. Besecker is the chairman of the board of directors of Care and has been a member of the board of Care since its formation.  In addition, Mr. Besecker served as the President of CIT from November 2004 until his termination in May 2008.

17.     Third Party Defendant CIT is a limited liability company formed under the laws of Delaware with its principal place of business in New York.

18.     Third Party Defendant ERC Sub is a limited partnership formed under the laws of Delaware with its principal place of business in New York. A majority of interests of ERC Sub are owned by its general partner, Third Party Defendant ERC

GP, a limited liability company formed under the laws of Delaware and a wholly-owned direct subsidiary of Care.

## JURISDICTION AND VENUE

19.    The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because complete diversity exists among the original parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.  The Court has supplemental jurisdiction over the third party claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same Article III case or controversy as the original claims and the Counterclaims.

20.    The Court has personal jurisdiction over Counterclaim and Third Party Defendants because: (a) Counterclaim and Third Party Defendants continuously transact business within, and purposefully avail themselves of, the State of Texas and this judicial district; (b) the events giving rise to this suit occurred in Texas; and (c) Counterclaim and Third Party Defendants should reasonably expect their actions to have consequences within the State of Texas and this judicial district.  Further, the Court has personal jurisdiction over Counterclaim Defendant Care because Care consented to personal jurisdiction by purposefully availing itself of the privileges of this State by filing the Complaint dated November 25, 2009.  Further, Third Party Defendant ERC Sub has consented to jurisdiction in Texas by way of contractual forum selection clauses.

21.    Venue in this judicial district is proper under 28 U.S.C. §§ 1391(a)(1) and (2) because: (i) Counterclaim and Third Party Defendants reside in this district within the meaning of 28 U.S.C. § 1391(c); and (ii) a substantial part of the events giving rise to this action occurred within this district.  Further, this is a lawsuit arising in part out of agreements stating that venue shall be in Dallas County, Texas.

## STATEMENT OF FACTS

**A.     Background to the Transaction**

22.     Care is a publicly owned healthcare real estate investment trust that was formed in March 2007.  CIT – a healthcare-related financial services company – is Care's external manager and one of its principal shareholders.

23.     Care completed an initial public offering of its stock in June 2007. However, only around 60% of the shares issued in connection with Care's IPO were placed with third party investors.  CIT and its affiliate were ultimately forced to acquire nearly 40% of the unsold shares.

24.     On information and belief, CIT thereafter began exploring ways to make Care more appealing to investors so that CIT and its affiliate could sell their unwanted interest in Care via a secondary offering or a business combination transaction involving Care.  At the time of its IPO, Care's sole assets were approximately 15 mortgage loans secured by healthcare facilities that Care had acquired from CIT.  CIT and Care believed that they could make Care more appealing to potential investors by changing its operating strategy to place greater emphasis on acquiring equity investments in healthcare-related properties and to move away from mortgage assets.

25.     In connection with their efforts to build Care's equity portfolio, CIT and Care approached the Cambridge Companies to discuss a possible transaction in which Care would acquire an interest in the Cambridge Companies' properties.

26.     Over the course of these discussions, the Cambridge Companies indicated that they were not interested in selling any interest in their properties to a passive outside investor.

27.    The Cambridge Companies indicated that they were especially disinclined to sell to an investor that might thereafter seek to transfer its interests to a party that the Cambridge Companies regarded as a competitor or a short term investor; any competitor would then be able to access proprietary information and, if known to customers of the Cambridge Companies, such a relationship would have a devastating effect on the Cambridge Companies' business.

28.    The Cambridge Companies indicated to CIT and Care that they were interested, however, in pursuing a long-term joint venture with an appropriate partner with whom they could collaborate in the acquisition, development, leasing and management of healthcare-related properties.  The Cambridge Companies stated that they were specifically interested in pursuing such a venture with Care because of the financial resources, investment expertise, and extensive contacts within the healthcare industry that the Cambridge Companies were led to believe that Care and CIT possessed.

29.    Without disclosing that they were only interested in acquiring an interest in the Cambridge Companies' properties so that they could turn around and sell Care, CIT and Care advised the Cambridge Companies that they shared the Cambridge Companies' goals and agreed to their terms.  The parties agreed that Care and the Cambridge Companies would pursue a long-term partnership that would capitalize on the partners' respective strengths – the Cambridge Companies would contribute their expertise in property development and management, while Care and CIT would provide access to capital and use their extensive relationships with healthcare services providers to provide the venture with new acquisition, development, and management opportunities.

30.     Against the backdrop of this agreement, the Cambridge Companies and Care negotiated a transaction, which the parties represented and agreed would be the first step in their joint venture, pursuant to which the Cambridge Companies would sell and otherwise grant Care a purchase option over interests in the vast majority of the Cambridge Companies' real property assets.

**B.     The Transaction Agreements**

31.     Accordingly, on or around December 31, 2007, Counterclaim Plaintiffs entered into the Contribution and Purchase Agreement (Compl., Ex. L) with the Care Parties.  Pursuant to this agreement, ERC Sub acquired from Counterclaim Plaintiff Sellers an 85% limited partnership or non-managing membership interest in each of the Partnerships.  Each of the Partnerships owned at least one medical office building that collectively amounted to a material proportion of the Cambridge Companies' assets.

32.     Pursuant to the Contribution and Purchase Agreement, the Care Parties paid Counterclaim Plaintiff Sellers and their affiliates an aggregate purchase price of $72.4 million (the "Aggregate Purchase Price") for the interests they acquired in the Partnerships.  Of this amount, $10.5 million was paid in the form of 700,000 limited partnership units in ERC Sub (the "Units").  The Amended and Restated Agreement of Limited Partnership of ERC Sub LP (the "ERC Sub Partnership Agreement) (Compl., Ex. K), provides that the Units are entitled to quarterly distributions equivalent to quarterly dividends paid to holders of Care stock, and otherwise provides that it is "the intent of the parties that the Restricted Units shall be treated in a manner economically commensurate with [Care stock]." (Compl., Ex. K, §  8.6(b)).

33.     On or around the same date, ERC Sub and several of the Cambridge Companies also entered into two option agreements (the "Option Agreements") the purpose of which was to provide an avenue for Care to expand the scope of the joint venture with the Cambridge Companies.  The Option Agreements entitled ERC Sub to acquire an interest in one or more of five limited liability entities affiliated with the Cambridge Companies (the "Optioned Partnerships") that owned additional healthcare-related properties in various stages of development (the "Optioned Development Facilities").  At the time the parties entered into the Option Agreements, the Optioned Development Facilities constituted a material portion of the Cambridge Companies' assets.

34.     In addition to the Contribution and Purchase Agreement, the Option Agreements and the ERC Sub Agreement, other agreements entered into by the parties in connection with the transaction and at issue in this lawsuit include eight essentially identical Operating Agreements pertaining to each of the Partnerships (the "Operating Agreements") (Compl., Exs. C  – J) and an Escrow Agreement pertaining to the distributions ERC Sub was to receive in connection with its interests in the Partnerships (collectively the "Agreements").

**C.     Fraudulent Representations Made by Counterclaim and Third Party Defendants in Connection with the Transaction**

35.     Prior to consummation of the above-described transactions, CIT and Care, through Mr. Besecker, Scott Kellman (Care's then-CEO), Kirk Gorman (Care's then-board chairman) and others, made several promises and representations to the Cambridge Companies regarding the parties' future dealings in order to induce Counterclaim Plaintiffs to enter into the Agreements.  They did so at meetings in New

York on April 30, May 1, and December 6, 2007 and on multiple other occasions in 2007.  Over the course of these meetings, CIT and Care, through Mr. Besecker and others, consistently promised and represented (i) that Care was committed to a seven-year relationship with them; (ii) that over this period Care would grow its business and make additional investments in properties owned by the Cambridge Companies; and (iii) that over this period CIT and Care would use their connections to bring the Cambridge Companies property acquisition, development, and management opportunities.  Thus, for example, at the May 1, 2007 meeting, Mr. Besecker, along with other officers and directors of CIT and Care, promised and represented to the Cambridge Companies that Care was committed to a long-term relationship with the Cambridge Companies and to a profitable cross-pollination of their businesses.  At the December 6, 2007 meeting, Messrs. Besecker, Kellman and Gorman promised and represented that Care was committed to pursuing investment opportunities with the Cambridge Companies and to leveraging its relationships with hospital systems to that end.

36.     In addition to the foregoing, the Care Parties made various representations and promises to induce the Cambridge Companies to agree to the Aggregate Purchase Price.

37.     First, the Care Parties, through Messrs. Besecker and Kellman, induced the Cambridge Companies to agree to the Aggregate Purchase Price – an amount approximately $5.7 million less than the amount previously agreed to by the Cambridge Companies – by making certain representations and promises concerning the Option Agreements.  Specifically, on or around December 14, 2007, the Care Parties induced the Cambridge Companies to accept a $5.7 million reduction in the purchase price for the

Partnerships in exchange for a corresponding increase in the previously negotiated exercise price for the option ERC Sub would hold on one of the Optioned Partnerships. In connection with this proposal, on or around this date the Care Parties promised and represented that ERC Sub would exercise this option.

38.     Second, the Care Parties, through Messrs. Besecker and Kellman, induced the Cambridge Companies to accept $10.5 million of the Aggregate Purchase Price in Units rather than in cash by representing and promising that Care was committed to a long-term and productive relationship between the parties.

**D.     Care Refuses to Pursue the Joint Venture and Refuses to Release its Options**

39.     Upon entering into the Partnerships, ERC Sub assumed fiduciary duties to the Cambridge Companies in connection with the joint venture that the parties had agreed to pursue.  Those duties required that, a minimum, ERC Sub take actions in furtherance of the joint venture.  Nevertheless, in breach of these duties and contrary to Counterclaim and Third Party Defendants' prior promises and representations, the Care Parties thereafter failed to take any such action.  Indeed, the Care Parties' conduct was designed to frustrate rather than further efforts to grow the joint venture.

40.     On information and belief, the Care Parties never had any intention of pursuing their joint venture with the Cambridge Companies.  Instead, from the outset, they were interested only in selling Care so as to satisfy the agenda of CIT and Care's other shareholders.  Thus, as Care now admits in its proxy statement dated December 28, 2009, at least as early as February 2008, only weeks after Care closed its transaction with Counterclaim Plaintiffs and their affiliates, Care's board of directors and managers were already exploring certain "strategic alternatives," including a sale of the company for cash and pursuing a merger with another healthcare REIT.

41.     Contrary to their promises and representations, the Care Parties never exercised their options on any of the Optioned Partnerships or made any other investments in properties owned by the Cambridge Companies.  Nor did CIT or the Care Parties provide the Cambridge Companies with any property acquisition, development, or management opportunities as promised.  On information and belief, neither CIT nor the Care Parties ever undertook any effort to do so.

42.     For example, in early 2008 the Cambridge Companies made several proposals to Care regarding specific outside investment opportunities for the joint venture to pursue, all of which Care declined to pursue.  In response, the Cambridge Companies were informed that the board of Care was not interested in pursuing any more transactions and that it had in fact prohibited Care's management from doing so and intended instead to sell the company.

43.     On information and belief, CIT's and the Care Parties' failure to pursue activities in furtherance of their joint venture with the Cambridge Companies was not due to a lack of resources or opportunity.  Rather, it was due to the fact that CIT, the Care Parties, and Care's board of directors were only interested in improving their ability to sell Care, and were under significant pressure from large institutional shareholders to adopt this strategy.  Indeed, in May 2008, one such shareholder, GoldenTree Asset Management LP, objected to the Care board that the company's strategic plan was infeasible and that the company should instead be sold.

44.     On information and belief, and in stark contrast to Care, public real estate investment trusts that actively invested in healthcare-related properties between 2008 and the present have performed well and realized corresponding increases in share

price.  As of the beginning of 2010, for example, the shares of comparable REITs were trading at an approximately 28 percent premium to net asset value, while the shares of Care were trading at an approximately 28 percent discount.

45.     In fact, on information and belief, Care's legal and financial advisors criticized Care for failing to pursue available investment and business opportunities over this period.  Specifically, on August 6, 2009, a member of Care's board of directors represented to the Cambridge Companies that these advisors warned Care that "the record shows you turned away from running the business."

46.     The harm to the joint venture and to the Cambridge Companies that has resulted from CIT's and the Care Parties' deliberate course of action has been severe.  Because of their deliberate failure to pursue the joint venture, the venture failed to appreciate in a manner consistent with other public REITs invested in the healthcare industry.  Had Care performed similarly to comparable REITs in connection with its joint venture with the Cambridge Companies, Care and the Cambridge Companies would both have realized substantial profits.  As a result of the Care Parties' and CIT's failure to perform as promised, the Cambridge Companies suffered the loss of such profits, in an amount to be proven at trial but believed to be in the tens of millions of dollars.

47.     The injuries that the Cambridge Companies sustained from the Care Parties' failure to pursue the joint venture have been compounded by the Care Parties' refusal to release the options they hold in connection with that venture.

48.     Sometime after the Cambridge Companies discovered that the Care Parties had no intention of doing anything that would benefit the joint venture, the Cambridge Companies approached them to inquire about their intentions regarding the

as-yet unexpired options that ERC Sub held on each of the five Optioned Development Facilities.

49.     The Care Parties responded to this inquiry by indicating that they had no intention of exercising any of the options.  The Cambridge Companies requested that the Care Parties release the options so that the Cambridge Companies could explore and pursue other business opportunities in relation to the Optioned Development Facilities.  The Care Parties refused to do so.

50.     The Cambridge Companies have suffered substantial injury from the Care Parties' refusal to release the options.  In the period between the execution of the Option Agreements on or around December 31, 2007 and the expiration of the options, the total value of the Optioned Development Facilities declined by approximately $45 million.

51.     When Care's misconduct became evident, the Cambridge Companies attempted to engage in constructive negotiations to reacquire the Partnership Interests, or, if necessary, to acquire Care in its entirety.  Although Care appeared at first to be interested in conducting such negotiations, its decision to abort those negotiations and file this lawsuit demonstrate the contrary.  By way of example, in November 2009, Care had proposed terms for the sale to the Cambridge Companies of the properties and mortgages of Care and its subsidiaries, and the Cambridge Companies had accepted those terms.  That transaction would have resulted in a cash payment of $76 million to Care, and would have delivered greater value to Care, more expeditiously and with higher certainty, than any other alternative available to the company, including any alternative that may be effected through Care's Plan of Liquidation. The negotiations proceeded, and

on November 20 Care told Cambridge to expect revisions to the transaction

documentation on November 23.  These revisions never arrived.  Instead, without any

notice to the Cambridge Companies, Care filed the twenty-two page complaint in this

action on November 25, a clear indication that Care was preparing to sue the Cambridge

Companies even while purporting to negotiate with them.

**E.    Care Attempts to Dispose of its Interests in the Partnerships**

52.    As discussed above, Counterclaim and Third Party Defendants

injured Counterclaim Plaintiffs by deliberately failing to honor their commitment to a

joint venture with the Cambridge Companies.  CIT and Care have now laid bare their

original plan and have undertaken to liquidate Care and all of its subsidiaries and to

dispose of their interests in the Partnerships.  This undertaking is plainly contrary to

Counterclaim and Third Party Defendants' prior representations to the Cambridge

Companies.  It is moreover based on audacious misreadings of the Agreements that

would award Care and its shareholders a substantial windfall to the severe detriment of

their joint venture partners.

53.    On December 28, 2009, Care filed the Proxy Statement requesting

shareholder approval of the Plan of Liquidation.  The section of the Proxy Statement

entitled "Background of the Plan of Liquidation" is riddled with misrepresentations

concerning the extent of Care's efforts to negotiate a transaction with the Cambridge

Companies, and serves merely as pretextual support for the proposed Plan of Liquidation.

The Proxy Statement provides that pursuant to the Plan of Liquidation, Care's board "will

be authorized to sell all of our assets, liquidate and dissolve our subsidiaries, and

distribute the net proceeds of such liquidation in accordance with the provisions of our

charter and the laws of the State of Maryland." (Proxy Statement, p.ii). The Plan of Liquidation itself states in relevant part that "the Company shall sell, convey, transfer and deliver or otherwise dispose of all of the assets of the Company in one or more transactions, or cause its subsidiaries to sell, convey, transfer and deliver or otherwise dispose of all of the assets of the subsidiaries in one or more transactions. . . ." (Plan of Liquidation, ¶2). The Plan of Liquidation additionally provides that if the board of Care determines that it is "advantageous or appropriate to do so, it may cause the Company to make the Final Distribution as a distribution in kind of beneficial interests in a trust (the "Liquidating Trust"), at such time as they deem appropriate in their sole discretion… ." (Plan of Liquidation, ¶9). In such an event, the Plan of Liquidation provides that Care "may transfer and assign, or may cause its subsidiaries to transfer and assign, to the Liquidating Trust all of the assets of the Company and its subsidiaries of every sort whatsoever… ." (Plan of Liquidation, ¶9).

54.    Through the Proxy Statement and Plan of Liquidation, Care has adopted positions regarding the rights and obligations of Care, ERC Sub, and Counterclaim Plaintiffs that are wholly inconsistent with both the terms of the Agreements and the parties' intent. Each of these positions seeks to extract a substantial and unwarranted windfall from the Care Parties' interests in the Partnerships that would deprive Counterclaim Plaintiffs of critical protections and valuable consideration to which they are entitled under the Agreements.

55.    First, Care has taken the position that Care and/or its subsidiaries may transfer their interests in the Partnerships to a third party without Counterclaim Plaintiff Managing Owners' prior written consent. This position is flatly contradicted by

the terms of the Operating Agreements, which Counterclaim Plaintiffs sought and obtained to ensure that Care could not sell its interests to a party that the Cambridge Companies regarded as a competitor or that might otherwise jeopardize the Cambridge Companies' relationships with its existing and prospective customers.

56.     Second, Care has taken the position that in the event of a transfer of Care's or its subsidiaries' interests in the Partnerships pursuant to the Plan of Liquidation, the transferee and/or its subsidiaries would be entitled to receive a minimum return on investment contractually guaranteed to ERC under the Escrow Agreement. Care's position is inconsistent with the terms of the guarantee itself, which demonstrate that the parties intended the guarantee to apply only so long as the Care Parties continued their agreed-upon joint venture with the Cambridge Companies.  Such a transfer is moreover plainly prohibited by certain anti-assignment provisions of the Escrow Agreement.

57.     Third, Care has taken the position that the Units – which Counterclaim Plaintiff Sellers and their affiliates received as partial consideration for the interests in the Partnerships acquired by the Care Parties – are not entitled to whatever distributions are paid per share to the shareholders of Care if Care undergoes liquidation. This position is contradicted by the terms of the ERC Sub Agreement and by the assumptions underlying the value that the parties imputed to the Units pursuant to the Contribution and Purchase Agreement.

58.     Fourth, Care has taken the position that it may unilaterally liquidate and dissolve ERC Sub and/or the Partnerships and distribute the proceeds to its shareholders in connection with the execution of the Plan of Liquidation.  Contrary to this

position, the operating agreements for both ERC Sub and the Partnerships expressly provide that these entities may not be liquidated as contemplated by the Plan of Liquidation.

59.     Fifth, Care has taken the position that Care and its subsidiaries may transfer their interests in the Partnerships to a liquidating trust without the consent of Counterclaim Plaintiff Managing Owners.  This position is contrary to the Operating Agreements, which provide that such a transfer is prohibited in the absence of such consent.

60.     Counterclaim Plaintiffs strongly disagree with Care's positions on each of the foregoing matters which, as discussed herein, are contrary to the terms of the Agreements.

61.     In addition to the foregoing, Counterclaim Plaintiff Managing Owners are entitled to indemnification pursuant to the Operating Agreements for costs incurred, and to be incurred, in connection with the defense of the claims asserted against them in the Complaint.

F.     **Damages Sustained by Counterclaim Plaintiffs**

62.     As a result of Counterclaim and Third Party Defendants' conduct, Counterclaim Plaintiffs have sustained substantial injury, including but not limited to: (i) lost profits arising out of the Care Parties' and CIT's failure to pursue activities in furtherance of the joint venture; (ii) the loss of value on the Optioned Development Facilities over the period of ERC Sub's refusal to release the options it held on those properties; and (iii) deprivation of the full consideration to which Counterclaim Plaintiffs were entitled in exchange for the Partnership Interests they transferred to the Care Parties.

63.    As a result of Counterclaim and Third Party Defendants' conduct, Counterclaim Plaintiffs have sustained damages in an amount to be determined at trial, but which Counterclaim Plaintiffs believe to be at least $100 million.

64.    The harm suffered by Counterclaim Plaintiffs resulted from fraud and/or malice on the part of Counterclaim and Third Party Defendants.  Accordingly, Counterclaim Plaintiffs are entitled to recovery of exemplary damages.

## FIRST CAUSE OF ACTION
### (Breach of Fiduciary Duty – ERC Sub)

65.    Counterclaim Plaintiffs hereby repeat and reallege paragraphs 1-64 as if restated in full.

66.    As a partner or member of each of the Partnerships, ERC Sub owed fiduciary duties of care, good faith and loyalty to the Cambridge Companies.

67.    In accordance with these duties, ERC Sub was required to pursue activities in furtherance of the joint venture between the Cambridge Companies and Care, which include making additional investments in properties owned by the Cambridge Companies and bringing the Cambridge Companies property acquisition, development, and management opportunities.

68.    By failing to pursue such activities, ERC Sub breached its fiduciary duties to the Cambridge Companies.

69.    Also in accordance with the duties it owed to the Cambridge Companies, ERC Sub was required to release the options it held on the Optioned Partnerships once the Care Parties determined that they would not exercise them.

70.    By refusing to release the Cambridge Companies from these options, ERC Sub breached its fiduciary duties to them.

71.     In addition, pursuant to the duties it owed to the Cambridge Companies, ERC Sub was required to negotiate in good faith with the Cambridge Companies in connection with their attempts to reacquire the Care Parties' interests in the Partnerships.

72.     By failing to negotiate in good faith with the Cambridge Companies, ERC Sub breached its fiduciary duties to them.

73.     As a result of ERC Sub's conduct, ERC Sub has obtained benefit and Counterclaim Plaintiffs have sustained damages in an amount to be determined at trial, together with interest, costs and attorneys' fees and expenses.

**SECOND CAUSE OF ACTION**
**(Aiding and Abetting Breach of Fiduciary Duty – Care, CIT, Mr. Besecker and ERC GP)**

74.     Counterclaim Plaintiffs hereby repeat and reallege paragraphs 1-73 as if restated in full.

75.     As discussed above, ERC Sub owed fiduciary duties to the Cambridge Companies, which it breached by (i) failing to pursue activities in furtherance of the joint venture between the Cambridge Companies and Care, (ii) refusing to release the Cambridge Companies from the options it held on the Optioned Partnerships once the Care Parties determined that they would not exercise them, and (iii) failing to negotiate in good faith with the Cambridge Companies in connection with their attempts to reacquire the Care Parties' interests in the Partnerships.

76.     By virtue of their control over ERC Sub and their involvement in the management of its activities, each of Care, CIT, Mr. Besecker and ERC GP knew of the fiduciary relationship between ERC Sub and the Cambridge Companies.

77.     By virtue of both their control over ERC Sub and their involvement in the management of its activities, each of Care, CIT, Mr. Besecker and ERC GP knowingly caused or otherwise participated in the foregoing breaches by ERC Sub of its fiduciary duties to the Cambridge Companies.

78.     As a result of Care's, CIT's, Mr. Besecker's and ERC GP's conduct, Counterclaim Plaintiffs have sustained damages in an amount to be determined at trial, together with interest, costs and attorneys' fees and expenses.

### THIRD CAUSE OF ACTION
**(Breach of the Covenant of Good Faith and Fair Dealing – ERC Sub)**

79.     Counterclaim Plaintiffs hereby repeat and reallege paragraphs 1-78 as if restated in full.

80.     The contractual relationship created by the Option Agreements and the Contribution and Purchase Agreement gives rise to an implied covenant of good faith and fair dealing between ERC Sub on the one hand, and the Cambridge Companies on the other.

81.     The fiduciary relationship created by the Operating Agreements is of a special nature that imposed upon ERC Sub an implied covenant of good faith and fair dealing with respect to the Cambridge Companies and the business dealings contemplated by the Option Agreements.

82.     ERC Sub acted in bad faith and violated the implied covenant of good faith and fair dealing by (i) failing to pursue activities in furtherance of the joint venture between the Cambridge Companies and Care, which include making additional investments in properties owned by the Cambridge Companies and bringing the Cambridge Companies property acquisition, development, and management

opportunities, (ii) refusing to release the Cambridge Companies from the options it held

on the Optioned Partnerships once the Care Parties determined that they would not

exercise them, and (iii) failing to negotiate in good faith with the Cambridge Companies

in connection with their attempts to reacquire the Care Parties' interests in the

Partnerships.

83.     As a result of ERC Sub's conduct, Counterclaim Plaintiffs have

sustained damages in an amount to be determined at trial, together with interest, costs and

attorneys' fees and expenses.

### FOURTH CAUSE OF ACTION
**(Aiding and Abetting Breach of the Covenant of Good Faith and Fair Dealing –
Care, CIT, Mr. Besecker and ERC GP)**

84.     Counterclaim Plaintiffs hereby repeat and reallege paragraphs 1-83

as if restated in full.

85.     As discussed above, the contractual and fiduciary relationships

variously created by the Option Agreements, the Contribution and Purchase Agreement

and the Operating Agreements imposed upon ERC Sub an implied covenant of good faith

and fair dealing with respect to the Cambridge Companies and the business dealings

contemplated by the Option Agreements.  Also as discussed above, ERC Sub acted in bad

faith and violated the implied covenant of good faith and fair dealing by (i) failing to

pursue activities in furtherance of the joint venture between the Cambridge Companies

and Care, (ii) refusing to release the Cambridge Companies from the options it held on

the Optioned Partnerships once the Care Parties determined that they would not exercise

them, and (iii) failing to negotiate in good faith with the Cambridge Companies in

connection with their attempts to reacquire the Care Parties' interests in the Partnerships.

86.    By virtue of their control over ERC Sub and their involvement in the management of its activities, each of Care, CIT, Mr. Besecker and ERC GP knew of the implied covenant of good faith and fair dealing that existed between ERC Sub and the Cambridge Companies pursuant to these agreements.

87.    By virtue of both their control over ERC Sub and their involvement in the management of its activities, each of Care, CIT, Mr. Besecker and ERC GP knowingly caused or otherwise participated in the foregoing breaches by ERC Sub of the implied covenant of good faith and fair dealing.

88.    As a result of Care's, CIT's, Mr. Besecker's and ERC GP's conduct, Counterclaim Plaintiffs have sustained damages in an amount to be determined at trial, together with interest, costs and attorneys' fees and expenses.

## FIFTH CAUSE OF ACTION
### (Fraudulent Inducement – CIT, Care, Mr. Besecker)

89.    Counterclaim Plaintiffs hereby repeat and reallege paragraphs 1-88 as if restated in full.

90.    Prior to the consummation of the transaction whereby the Care Parties acquired the Partnership Interests, CIT and Care, through Messrs. Besecker, Kellman, Gorman and others, made a series of representations and promises to the Cambridge Companies concerning their present intentions and the parties' future activities and dealings.  At meetings in New York on April 30, May 1, and December 6, 2007 and on multiple other occasions in 2007, they promised and represented to the Cambridge Companies: (i) that Care was committed to a seven year relationship with them; (ii) that over this period Care would grow its business and make additional investments in properties owned by the Cambridge Companies; and (iii) that over this

period CIT and Care would use their connections to bring the Cambridge Companies property acquisition, development, and management opportunities.

91.     In addition to the foregoing, the Care Parties induced the Cambridge Companies to agree to the Aggregate Purchase Price by making certain representations and promises concerning the Option Agreements.  In negotiating the terms of the Contribution and Purchase Agreement, the Cambridge Companies had previously agreed to a purchase price of no less than $78.1 million, a figure approximately $5.7 million higher than the Aggregate Purchase Price that Care ultimately paid under that Agreement.  On or around December 14, 2007, Messrs. Besecker and Kellman proposed that Counterclaim Plaintiffs accept a $5.7 million reduction in the purchase price for the Partnerships in exchange for a corresponding increase in the previously negotiated exercise price for the option ERC Sub would hold on one of the Optioned Partnerships.  In connection with this proposal, they promised and represented that ERC Sub would exercise this option.

92.     Also in December 2007, the Care Parties, through Messrs. Besecker and Kellman, further induced the Cambridge Companies to accept $10.5 million of the Aggregate Purchase Price in Units rather than in cash, by representing and promising that Care was committed to a long-term and productive relationship between the parties, and that the Care Parties would undertake specific steps to expand the business relationship and properties under management.

93.     On information and belief, Counterclaim and Third Party Defendants made all of the foregoing promises and representations in order to induce Counterclaim Plaintiffs to enter into the Agreements and to accept the terms of the

Aggregate Purchase Price. Further, on information and belief, at the time Counterclaim

and Third Party Defendants made these promises and representations, they did not intend

to perform as promised, and they either knew the representations were false or made the

representations recklessly, as positive assertions, and without knowledge of their truth.

94.      These promises and representations were material to Counterclaim

Plaintiffs' decision to enter into the Agreements and to accept the terms of the Aggregate

Purchase Price, and Counterclaim Plaintiffs reasonably relied on these representations in

doing so.

95.      Counterclaim and Third Party Defendants did not perform any of

the promised activities.

96.      As a result of Counterclaim and Third Party Defendants' conduct,

Counterclaim Plaintiffs have sustained damages in an amount to be determined at trial,

together with interest, costs and attorneys' fees and expenses.

### SIXTH CAUSE OF ACTION
**(Declaratory Judgment Construing Transfer Restriction Provisions
of the Operating Agreements in Connection with the Plan of Liquidation – Care,
ERC Sub and ERC GP)**

97.      Counterclaim Plaintiffs hereby repeat and reallege paragraphs 1-96

as if restated in full.

98.      Section 10.2(a)(i) of the Operating Agreements states that "no

Disposition may be made at any time without the written approval of [the relevant

Counterclaim Plaintiff Managing Owner] at its sole discretion." Section 1.24 or

comparable provisions of the Operating Agreements broadly define "Disposition" to

include not only the sale or transfer of "any Interest of a [Partner or Member] or any

right, title or interest therein", but also "any interest in such [Partner or Member]." (e.g.,

Compl., Ex. C § 1.24). Thus, by its plain terms, Section 10.2(a)(i) of the Operating Agreements covers any transfer of a direct or indirect interest in the Partnerships or in ERC Sub, and reaches upstream to include transfers of or by Care.

99.    The purpose of this provision is plain, particularly in light of the parties' stated intention to enter into a long-term joint venture. Counterclaim Plaintiffs sought and obtained that provision to ensure that Care could not simply sell itself or its interest in the joint venture to another party that lacked comparable expertise or resources to help grow the partnership, especially one that the Cambridge Companies regarded as a competitor or one that might otherwise jeopardize Cambridge's relationships with its existing and prospective customers.

100.    The Care Parties' own constructions of provisions similar to Section 10.2(a)(i) of the Operating Agreements establish that they understood it to cover any transfer of Care's interests in the Partnerships. Section 5.3(a) of the Deeds of Trust pursuant to which the outstanding debt of each of the Partnerships is secured (the "Deeds of Trust"), provides that an "Event of Default" shall occur upon the "transfer of the Trust Property or any direct or indirect interest therein, whether voluntary or involuntary (each, a "Transfer") without [the lender's] prior consent, which consent may be withheld in [the lender's] sole discretion." (§ 5.3(a)(i)). This provision of the Deeds of Trust vests the same right of consent in the lender that is granted to the Counterclaim Plaintiff Managing Owners under Section 10.2(a)(i) of the Operating Agreements.

101.    The Care Parties' own construction of this provision clearly shows that they understood it to apply to the disposition of any interests in Care, including the trading of shares of Care. Prior to entering into the Contribution and Purchase

Agreement, the Care Parties insisted on obtaining advance approval from the Partnerships' lenders that day-to-day trading in Care's stock would not run afoul of the transfer restrictions of Section 5.3(a) of the Deeds of Trust.  Thus, for example, in an email between counsel dated December 12, 2007 concerning consent by the lender for one of the Partnerships (the "December 12 Email"), Care informed the Cambridge Companies that "[we] [n]eed consent to upstream change in ownership.  … [F]or daily trading of CRE shares."  The Care Parties' position that Section 5.3(a) of the Deeds of Trust requires lender consent to transfers of any interest in Care shows that they understood that such transfers are also subject to the consent of Counterclaim Plaintiff Managing Owners pursuant to Section 10.2(a)(i) of the Operating Agreements.

102.    The Care Parties' new-found litigation position is also flatly inconsistent with other positions they have taken regarding the Deeds of Trust.  Quite aside from its position on the issue of day-to-day trading in Care stock, Care took the position in the December 12 Email that a transfer of its Partnership Interests was subject to the lender consent requirements of the Deed of Trust.  Specifically, in the December 12 Email, Care stated that "[we] need consent to transfer of 85% partnership interest in [one of the Partnerships].  This is not a permitted Transfer."  In making this statement, Care expressed the position that a transfer of its 85% Partnership Interests was subject to the lender consent requirements of Section 5.3(a) of the Deeds of Trust, and that it would not fall within the scope of any exception to those requirements.

103.    Thus, on the Care Parties' own prior reading of the relevant documents, implementation of the Plan of Liquidation could give rise to an assertion by the Partnerships' lenders that there has been a breach of the Deeds of Trust.  Given that

Care, in the context of its effort to sell the company, has now taken the contradictory position in letters to lenders dated on or around May 12, 2009 that the transfer of its 85% interest does not require consent and thus that lender consent will not be sought or obtained, the consequences of such an assertion by the lenders, if adopted by a court, would be straightforward and severe. The Deeds of Trust provide that the failure to obtain necessary lender approval constitutes an "Event of Default," entitling the lender to immediately accelerate the payment of the Partnerships' outstanding loans. (§§5.3(a), 13.1). As of the present date, the debt balance currently outstanding under the Deeds of Trust is approximately $175 million. The acceleration of this balance could cause hundreds of millions of dollars in damages to the Counterclaim Plaintiffs.

       104.     The structure and substance of the Operating Agreements, the Contribution and Purchase Agreement, the Escrow Agreement and various management and leasing agreements for the Partnerships confirm that the Counterclaim Plaintiff Managing Owner's right of consent was particularly intended to apply to those transfers of interests in ERC Sub, ERC GP or Care that would effect a change in control of these entities.

       105.     These documents demonstrate that the Cambridge Companies and the Care Parties contemplated a long-term joint venture. For example, Care explicitly acknowledged in the Contribution and Purchase Agreement that "[ERC Sub] is acquiring the Equity Interests for its own account, for investment purposes only, and not with a view to distribution or for sale in connection with any distribution thereof." (Compl., Ex. L, § 4.7(a)).

106.    Indeed, a number of provisions in these documents specifically reference a seven-year relationship.  The Escrow Agreement, for example, guarantees ERC Sub a minimum return on its investment in the Partnerships for up to seven years from its entry into the Partnerships.  (§4(f)).  Prior to the seventh year, ERC Sub may transfer "its ownership interest in all or any portion of income, expense, profit, gain or loss allocations or distributions" from any of the Partnerships without prior approval, so long as ERC Sub remains a limited partner or member of the Partnership.  (e.g., Compl., Ex. C §10.5).  After seven years, ERC Sub may sell its interest in the Partnerships themselves without the Counterclaim Plaintiff Managing Owners' prior approval and subject only to Counterclaim Plaintiffs' right of first refusal.  (e.g., Compl., Ex. C, §10.4).

107.    Taken together, these provisions reflect the parties' intent to promote a relationship in which the Care Parties would be guaranteed a substantial minimum return, while the Cambridge Companies would receive protection against any potentially detrimental changes in control of its strategic partner.

108.    In connection with the Plan of Liquidation, the Care Parties have taken the position that these restrictions and rewards were designed solely to create a seven-year relationship between the Cambridge Companies and ERC Sub.  Thus, the Proxy Statement states that Care "strongly believes" that it may sell itself or its interests in ERC GP and that the Cambridge Companies do not have the "*indirect* right to control the business combination and other activities of the parent entities of the entity through which we made our direct investment in the portfolio."  (Proxy Statement, p.13).  But this reading of the Operating Agreements, under which Counterclaim Plaintiff Managing Owners' consent rights are construed to apply, at most, to transfers of Partnership

Interests held by ERC Sub, makes no sense. ERC Sub, after all, is nothing more than a special purpose shell entity fully controlled by Care. It has no independent assets, no employees, and no subject expertise. It would be commercially pointless for the Cambridge Companies to enter into such a limited arrangement.

109.    Also contrary to both the plain language of Section 10.2 and the parties' clear intent with respect to its scope, the Care Parties have taken the position that, pursuant to the Plan of Liquidation, Care and its subsidiaries may transfer their interests in the Partnerships to a liquidating trust, in which those interests may be held for an indefinite duration. (Plan of Liquidation, ¶9).

110.    Accordingly, Counterclaim Plaintiffs request, and are entitled to, a declaratory judgment that any transfer of ownership – whether direct or indirect – of Care, ERC GP or ERC Sub or their interests in the Partnerships pursuant to the Plan of Liquidation (including any transfer of those interests to a liquidating trust), constitutes a "Disposition" under the Operating Agreements and that any such transfer is therefore subject to the written approval of Counterclaim Plaintiff Managing Owners.

### SEVENTH CAUSE OF ACTION
**(Declaratory Judgment Construing Distributions to Which the
Units Are Entitled Under the ERC Sub Partnership Agreement in Connection with
the Plan of Liquidation – Care, ERC Sub and ERC GP)**

111.    Counterclaim Plaintiffs hereby repeat and reallege paragraphs 1-110 as if restated in full.

112.    Pursuant to the Contribution and Purchase Agreement, $10.5 million of the Aggregate Purchase Price was paid to Counterclaim Plaintiff Sellers in the form of 700,000 Units.

113.    The Proxy Statement provides an estimate of the per-share total liquidation value of Care (the "Total Liquidation Value Range").  On information and belief, this estimated range assumes that the Units are not entitled to distributions that may be made to Care shareholders pursuant to the Plan of Liquidation.

114.    The Care Parties' position is contrary to the explicit language of the ERC Sub Partnership Agreement, which provides that it is "the intent of the parties that the Restricted Units shall be treated in a manner economically commensurate with the REIT Shares." (Compl., Ex. K, §  8.6(b)).

115.    The Care Parties' position is also inconsistent with the $10.5 million imputed value of the Units stated in the Contribution and Purchase Agreement. This value assumes that the Units would be entitled to per-share distributions equivalent to the per-share distributions to which holders of Care stock would be entitled in the event of a liquidation of Care.

116.    Accordingly, Counterclaim Plaintiffs request, and are entitled to, a declaratory judgment that, if Care undergoes liquidation pursuant to the Plan of Liquidation, Counterclaim Plaintiff Sellers and their affiliates are entitled to cash distributions equal to those paid per share to the shareholders of Care.

## EIGHTH CAUSE OF ACTION
### (Declaratory Judgment Construing the Escrow Agreement – Care, ERC Sub and ERC GP)

117.    Counterclaim Plaintiffs hereby repeat and reallege paragraphs 1-116 as if restated in full.

118.    Pursuant to the Escrow Agreement, ERC Sub is entitled to a minimum quarterly distribution of approximately 8% of its investment in the Partnerships with annual escalations until the earlier of the end of the seven-year period over which

the joint venture between the Care Parties and the Cambridge Companies was to run or the satisfaction by the Partnerships of certain performance benchmarks (the "Preferred Minimum Return"). (Escrow Agreement, Section 4(b)(ii)).

119.    The Proxy Statement provides that the Total Liquidation Value Range is based on "a net present value of the future cash flows that we expect to receive from our Cambridge investment, minus our estimated costs for operating our company during our projected holding period… ." (Proxy Statement, p. 5). Thus, on information and belief, it is the Care Parties' position that in the event of a transfer of Care's or its subsidiaries' interests in the Partnerships pursuant to the Plan of Liquidation, the transferee and/or its subsidiaries would be entitled to receive the Preferred Minimum Return.

120.    The Care Parties' position is inconsistent with the terms of the Preferred Minimum Return, which (in the absence of meeting certain economic thresholds) is payable for a seven-year period, thus demonstrating that it was only intended to apply so long as the Care Parties continued their agreed-upon joint venture with the Cambridge Companies.

121.    Their position is additionally contradicted by Section 15 of the Escrow Agreement, which provides that "this Agreement shall not be assignable by any party hereto without the prior written consent of the other parties." (Escrow Agreement, §15).

122.    Accordingly, Counterclaim Plaintiffs request, and are entitled to, a declaratory judgment that in the event of a transfer of Care's or its subsidiaries' interests

in the Partnerships pursuant to the Plan of Liquidation, neither the transferee nor its

subsidiaries would be entitled to receive the Preferred Minimum Return.

### NINTH CAUSE OF ACTION
**(Declaratory Judgment Concerning Dissolution of ERC Sub and the Partnerships –
Care, ERC Sub and ERC GP)**

123.    Counterclaim Plaintiffs hereby repeat and reallege paragraphs 1-

122 as if restated in full.

124.    The Proxy Statement provides that, pursuant to the Plan of

Liquidation, Care will "liquidate and dissolve our subsidiaries." (Proxy Statement, p.51).

On information and belief, the Care Parties have taken the position that Care may

unilaterally liquidate and dissolve ERC Sub and/or the Partnerships in connection with

the execution of the Plan of Liquidation.

125.    Care's position is inconsistent with the plain terms of the operating

agreements for the Partnerships and ERC Sub, all of which explicitly prohibit dissolution

of these entities as contemplated by the Plan of Liquidation.

126.    With respect to the Partnerships, the Operating Agreements

clearly prohibit any of them from "seek[ing] or permit[ting] the dissolution, winding up,

Liquidation, consolidation or merger in whole or in part, of the Partnership," (e.g.

Compl., Ex. C, §3.4(e)(xii)), and further provide that "dissolution of the Partnership shall

not occur so long as the Partnership's properties remain encumbered – as they in fact are

– by a first lien mortgage. (§3.4(f)(ii)).

127.    Nor may ERC Sub be liquidated and dissolved as contemplated by

the Plan of Liquidation.  The ERC Sub Agreement provides that dissolution may not

occur absent one of several enumerated "Liquidating Events," (Compl., Ex. K  §13.1)).

On information and belief, the only Liquidating Event contemplated by the Plan of

Liquidation is the "sale of all or substantially all of the assets and properties of the Partnership." (§13.1)). Such a Liquidating Event would require ERC Sub to sell its interests in the Cambridge Partnerships which, for the reasons discussed herein, ERC Sub may not do in the absence of Counterclaim Plaintiff Managing Owners' approval.

128.    Accordingly, Counterclaim Plaintiffs request, and are entitled to, a declaratory judgment that neither the Partnerships nor ERC Sub may be dissolved or liquidated in connection with the Plan of Liquidation.

## TENTH CAUSE OF ACTION
### (Claim for Indemnification – ERC Sub)

129.    Counterclaim Plaintiffs hereby repeat and reallege paragraphs 1-128 as if restated in full.

130.    Section 9.5 of the Operating Agreements provides that Counterclaim Plaintiff Managing Owners "shall be indemnified, defended, and held harmless by the [Partnership] from and against any and all claims, demands, liabilities, costs (including, without limitation, the cost of litigation and attorneys' fees), damages and causes of action of any nature whatsoever (including, without limitation, those based on negligence) arising out of or incidental to the management of the [Partnership] affairs."

131.    The claims asserted against Counterclaim Managing Owners in the Complaint rest on allegations of conduct arising out of or incidental to the management of the Partnerships' affairs.

132.    Counterclaim Plaintiff Managing Owners have incurred and will incur expenses in defense of this action and are entitled to indemnification for those expenses pursuant to Section 9.5 of the Operating Agreements.

## ELEVENTH CAUSE OF ACTION
### (Constructive Trust – All Counterclaim and Third Party Defendants)

133.    Counterclaim Plaintiffs hereby repeat and reallege paragraphs 1-132 as if restated in full.

134.    Counterclaim and Third Party Defendants have committed actionable fraud and breached duties owed to Counterclaim Plaintiffs, and they have engaged in other actionable misconduct, as discussed herein.  Among other things, because Counterclaim and Third Party Defendants acquired interests in the Partnerships, without having performed as promised, they have been, and will continue to be, unjustly enriched.

135.    As a result of their wrongdoing, Counterclaim and Third Party Defendants are in possession, or will be in possession, of money and/or property that in equity and good conscience belongs to Counterclaim Plaintiffs.  Through the Plan of Liquidation, Counterclaim and Third Party Defendants threaten to dispose of all of their assets, including the Partnership interests and/or any proceeds derived therefrom, to the detriment of Counterclaim Plaintiffs.

136.    In order to prevent Counterclaim and Third Party Defendants' unjust enrichment, and to the extent necessary to redress the other wrongful acts described in this Counterclaim, Counterclaim Plaintiffs are entitled to a constructive trust over assets to be disposed of or otherwise distributed pursuant to the Plan of Liquidation and/or any proceeds derived therefrom, including but not limited to the interests in the Partnerships held by Care and its subsidiaries.

137.    Accordingly, Counterclaim Plaintiffs request that the Court impose a constructive trust upon the property and assets described in paragraph 136 hereof,

including any and all proceeds that have been or are intended to be distributed to shareholders, and declare that Counterclaim and Third Party Defendants hold such property in trust for the benefit of Counterclaim Plaintiffs.

## **PRAYER FOR RELIEF**

138.    In view of the foregoing, Counterclaim Plaintiffs respectfully request that the Court:

a.    Award Counterclaim Plaintiffs compensatory damages in an amount to be proved at trial, but not less than $100 million, against CIT, Care and Mr. Besecker for fraudulently inducing Counterclaim Plaintiffs to enter into the Contribution and Purchase Agreement;

b.    Award Counterclaim Plaintiffs compensatory damages in an amount to be proved at trial, but not less than $100 million, against ERC Sub for ERC Sub's violation of fiduciary duties owed to the Cambridge Companies as well as for its violation of its implied covenant of good faith and fair dealing with the Cambridge Companies;

c.    Award Counterclaim Plaintiffs compensatory damages in an amount to be proved at trial, but not less than $100 million, against Care, CIT, ERC GP and Mr. Besecker for aiding and abetting ERC Sub's violation of fiduciary duties owed to the Cambridge Companies as well as for its violation of its implied covenant of good faith and fair dealing with the Cambridge Companies;

d.    Award Counterclaim Plaintiffs exemplary damages, in an amount to be determined at trial, against Care, CIT, ERC GP, ERC Sub, and Mr. Besecker.

e.        Award Counterclaim Plaintiff Managing Owners costs and

expenses pursuant to the indemnification provisions of Section 9.5 (or comparable

provisions) of the Operating Agreements in connection with the costs and expenses

(including, without limitation, the cost of litigation and attorneys' fees) of defending the

claims asserted against them in the Complaint;

f.        Declare, with respect to the Operating Agreements, that any

transfer of ownership – whether direct or indirect – of Care, ERC GP or ERC Sub or their

interests in the Partnerships pursuant to the Plan of Liquidation (including any transfer of

those interests to a liquidating trust), constitutes a "Disposition" under the Operating

Agreements and that any such transfer is therefore subject to the written approval of

Counterclaim Plaintiff Managing Owners;

g.        Declare, with respect to the ERC Sub Partnership Agreement,

that if Care undergoes liquidation or otherwise makes a distribution to shareholders

pursuant to the Plan of Liquidation or otherwise, Counterclaim Plaintiff Sellers and their

affiliates are entitled to distributions equal to those paid per share to the shareholders of

Care;

h.        Declare, with respect to the Escrow Agreement, that in the

event of a transfer of Care's or its subsidiaries' interests in the Partnerships pursuant to

the Plan of Liquidation or otherwise, neither the transferee nor its subsidiaries would be

entitled to receive the Preferred Minimum Return;

i.        Declare, with respect to the ERC Sub Agreement and

Operating Agreements that neither the Partnerships nor ERC Sub may be dissolved or

liquidated in connection with the Plan of Liquidation;

        j.        Impose a constructive trust upon the property and assets described herein, including any and all proceeds that have been or are intended to be distributed to shareholders, and declare that Counterclaim and Third Party Defendants hold such property in trust for the benefit of Counterclaim Plaintiffs;

        k.        Order an expedited discovery schedule and an expedited trial on the claims described herein;

        l.        Award Counterclaim Plaintiffs such preliminary and permanent injunctive relief as they may request in connection with the causes of action asserted in their Counterclaims;

        m.        Award Counterclaim Plaintiffs their reasonable attorney's fees and costs for this action; and

        n.        Award Counterclaim Plaintiffs such other relief as the Court may deem just and proper.

Dated: January 27, 2010

JACKSON WALKER L.L.P.


By:   /s/ Robert M. Cohan___ _____
       Robert M. Cohan
       Texas Bar No. 04506600
       Email: bcohan@jw.com
       William D. Ellerman
       Texas Bar No. 24007151
       Email: wellerman@jw.com
       901 Main Street, Suite 6000
       Dallas, Texas 75202
       Telephone: (214) 953-6000
       Facsimile:  (214) 953-5822


PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP


By:   /s/ Richard A. Rosen___ _____
       Richard A. Rosen
       E-mail: rrosen@paulweiss.com
       James L. Brochin
       E-mail: jbrochin@paulweiss.com
       1285 Avenue of the Americas
       New York, New York 10019-6064
       Telephone: (212) 373-3000
       Facsimile:  (212) 757-3990


*Attorneys for Defendants and Counterclaim Plaintiffs Jean-Claude Saada, Cambridge Onalp Inc., Cambridge Nassau Bay GP LLC, 6000 Greenville Inc., Allen MOB Inc., 5280 Medical Drive Inc., Cambridge Gorbutt MOB Inc., Cambridge Tarrant Inc., CHMP Manager LLC, Cambridge B/R Inc., Cambridge-Greenville Dallas LLC, PMC Cambridge of Plano Ltd., Cambridge Crown Atrium LLC and Cambridge North Texas Holdings LLC*

## Certificate of Service

       This is to certify that on this 27th day of January, 2010, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. I hereby certify that I have served all counsel of record electronically as authorized by Federal Rule of Civil Procedure 5(b)(2).

                                     */s/ Robert M. Cohan*_____
                                       Robert M. Cohan

5713937v.1