# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| CARE INVESTMENT TRUST, INC.,<br><br>        Plaintiff,<br><br>    -v.-<br><br>JEAN-CLAUDE SAADA, *et al.*,<br><br>        Defendants. | No.  3:09-cv-02256-K |
| JEAN-CLAUDE SAADA, *et al.*,<br><br>        Counterclaim Plaintiffs,<br><br>    -v.-<br><br>CARE INVESTMENT TRUST, INC., *et al.*,<br><br>        Counterclaim and Third-Party<br>        Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS COUNTERCLAIMS AND THIRD-PARTY COMPLAINT

Bobby R. Burchfield (*pro hac vice*)
Jason A. Levine (*pro hac vice*)
McDERMOTT WILL & EMERY LLP
600 Thirteenth Street, N.W.
Washington, D.C. 20005-3096
Tel.  202.756.8000
Fax. 202.756.8087

Ernest E. Figari, Jr.
Texas Bar No. 06983000
FIGARI & DAVENPORT, L.L.P.
3400 Bank of America Plaza
901 Main Street, Suite 3400
Dallas, Texas 75202-3796
Tel.  214.939.2000
Fax  214.939.2090

*Attorneys for Plaintiff and Counterclaim Defendant*
*Care Investment Trust, Inc.; and for Third-Party*
*Defendants CIT Healthcare, LLC; Flint D.*
*Besecker; ERC Sub, L.P.; and ERC Sub, LLC*

Dated:  March 5, 2010

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................. 1

STATEMENT OF THE CASE ........................................................................... 4

STANDARD OF REVIEW ................................................................................ 6

ARGUMENT ..................................................................................................... 6

I.   COUNTERCLAIMS SIX THROUGH NINE FAIL BECAUSE THEY SEEK DECLARATORY JUDGMENTS THAT ARE CONTRARY TO THE PLAIN MEANING OF UNAMBIGUOUS CONTRACTS. ........................................... 6

    A.   Counterclaim Six Fails Because the Saada LP Agreements Do Not Apply to a Transfer of Ownership Interests in Care Itself. .............................. 7

    B.   Counterclaim Seven Fails Because the ERC Sub Agreement Does Not Grant the Saada Entities the Same Rights as Care Shareholders ...................... 10

    C.   Counterclaim Eight Fails Because the Escrow Agreement Does Not Condition ERC Sub, L.P.'s Rights on a "Joint Venture" or Bind Care Itself. .......................................................................................... 11

    D.   Counterclaim Nine Fails for Lack of an Actual Controversy .............................. 12

II.  COUNTERCLAIMS ONE THROUGH FOUR FAIL BECAUSE THE CARE PARTIES DO NOT OWE THE SAADA PARTIES ANY FIDUCIARY DUTIES OR A DUTY OF GOOD FAITH AND FAIR DEALING. ............................. 12

    A.   The Saada LP Agreements Impose No Duties on ERC Sub, L.P. ...................... 13

    B.   The Option Agreements and Purchase Agreement Do Not Support Claims for Breach of Fiduciary Duty or the Duty of Good Faith and Fair Dealing. ........ 15

        1.   The Option Agreements. ........................................................ 15

        2.   The Purchase Agreement. ...................................................... 17

    C.   The Claims for Aiding and Abetting Likewise Fail .............................................. 18

III. COUNTERCLAIM FIVE FOR FRAUDULENT INDUCEMENT IS BARRED BY THE AGREEMENTS' MERGER AND INTEGRATION CLAUSES ................... 19

IV.  COUNTERCLAIM TEN FAILS BECAUSE THE SAADA PARTIES ARE NOT ENTITLED TO INDEMNIFICATION FROM ANY OF THE CARE PARTIES. ........ 23

V.   COUNTERCLAIM ELEVEN FAILS BECAUSE THE SAADA PARTIES ARE NOT ENTITLED TO A CONSTRUCTIVE TRUST. .................................... 24

CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496 (N.Y. 2002)................17

*AON Props., Inc. v. Riveraine Corp.*, No. 14-96-00229, 1999 WL 12739
   (Tex. App.—Houston [14th Dist.] Jan. 14, 1999, no pet.) ......................................14

*Arnold v. Nat'l County Mut. Fire Ins. Co.*, 725 S.W.2d 165 (Tex. 1987) ...................16

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009)....................................................................6

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................6

*Caton v. Leach Corp.*, 896 F.2d 939 (5th Cir. 1990)...................................................17

*Coker v. Coker*, 650 S.W.2d 391 (Tex. 1983) ............................................................7

*Crawford v. Ancira*, No. 04-96-00078, 1997 WL 214835
   (Tex. App.—San Antonio Apr. 30, 1997, no pet.)............................................2, 14

*Crenshaw v. Swenson*, 611 S.W.2d 886 (Tex. App.—Austin 1981, writ ref'd n.r.e.) .................19

*Cronus Offshore, Inc. v. Kerr-McGee Oil & Gas Corp.*, 369 F. Supp. 2d 848
   (E.D. Tex. 2004), *aff'd*, 133 F.App'x 944 (5th Cir. 2005) ....................................22

*Dempsey v. King*, 662 S.W.2d 725 (Tex. App.—Austin 1983, writ dism'd) ...............9

*English v. Fischer*, 660 S.W.2d 521 (Tex. 1983) ..................................................3, 16

*Evan Street Prods., Ltd. v. Shkat Arrow Hafer & Weber, LLP*, 643 F. Supp. 2d 317
   (S.D.N.Y. 2008)........................................................................................................1, 6

*Forest Oil Corp. v. McAllen*, 268 S.W.3d 51 (Tex. 2008).........................................20

*Fox v. Thoreson*, 398 S.W.2d 88 (Tex. 1966) ..............................................................7

*Garza v. CTX Mortgage Co.*, 285 S.W.3d 919 (Tex. App.—Dallas 2009, no pet.) .....................20

*Gulf Ins. Co. v. Burns Motors, Inc.,* 22 S.W.3d 417 (Tex. 2000)................................23

*Heritage Res., Inc. v. Nationsbank*, 939 S.W.2d 118 (Tex. 1996) .............................7

*Hudspeth v. Stoker*, 644 S.W.2d 92 (Tex. App.—San Antonio 1982, writ ref'd n.r.e.).................3

*In re Bennett*, 989 F.2d 779 (5th Cir. 1993) ........................................................14, 19

*In re Haber Oil Co.*, 12 F.3d 426 (5th Cir.1994)......................................................24

*In re Katrina Canal Breaches Litig.*, 495 F.3d 191 (5th Cir. 2007) ...............................................4

*In re Miller*, 290 F.3d 263 (5th Cir. 2002) ...............................................................................23

*Jacuzzi, Inc. v. Franklin Elec. Co.*, No. 3:07-cv-1090-D, 2008 WL 190319
   (N.D. Tex. Jan. 22, 2008) ...............................................................................3, 20, 23

*Jones v. Kelley*, 614 S.W.2d 95 (Tex. 1981) .........................................................................7

*Kirke La Shelle Co. v. Paul Armstrong Co.*, 188 N.E. 163 (N.Y. 1933) .....................................17

*Lenape Resources Corp. v. Tennessee Gas Pipeline Co.,* 925 S.W.2d 565 (Tex. 1996).............22

*Lewis v. Bank of Am. NA*, 343 F.3d 540 (5th Cir. 2003).......................................................20

*MacBeth v. Carpenter*, 565 F.3d 171 (5th Cir. 2009) ............................................................14

*Morris v. Morris*, 631 S.W.2d 188 (Tex. App.—Tyler 1982), *aff'd*,
   642 S.W.2d 448 (Tex. 1982) ...............................................................................24

*Nance v. Resolution Trust Corp.*, 803 S.W.2d 323
   (Tex. App.—San Antonio 1990, writ denied) ...........................................................16

*Natividad v. Alexsis, Inc.*, 875 S.W.2d 695 (Tex. 1994)..........................................................16

*Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc.,* 394 A.2d 1160 (Del. Supr. Ct. 1978) ..........24

*R & P Enters. v. LaGuarta, Garvel & Kirk, Inc.,* 596 S.W.2d 517 (Tex. 1980). ..........................7

*Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527 (Tex. 1987) .........................................................7

*Schlumberger v. Swanson*, 959 S.W.2d 171 (Tex. 1997)........................................................20

*Shields v. Norton*, 289 F.3d 832 (5th Cir.), *cert. denied*, 537 U.S. 1071 (2002).....................2, 12

*Sonet v. Timber Co., L.P.*, 722 A.2d 319 (Del. Ct. Ch. 1998)...................................................15

*St. Joseph Hosp. v. Wolff*, 94 S.W.2d 513 (Tex. 2002).............................................................18

*Stokes v. Gann*, 498 F.3d 483 (5th Cir. 2007) ........................................................................6

*Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400 (2d Cir. 2006) ........................................3, 18

*Troxel v. Bishop*, 201 S.W.3d 290 (Tex. App.—Dallas 2006, no pet.) .........................................3

*Turner Indus. Group, L.L.C. v. Kansas City S. Ry. Co.*,
   989 So.2d 155 (La. App. Ct. 2008)......................................................................23

*U.S. Quest Ltd. v. Kimmons*, 228 F.3d 399 (5th Cir. 2000) ....................................................22

*Walker v. Fed. Kempler Life Assurance Co.*, 828 S.W.2d 442
(Tex. App.—San Antonio 1992, writ denied) .......................................................13

## STATUTES

Del. Code Ann. tit. 6, § 17-303..............................................................................23

La. Civ. Code Ann. art. 2844..................................................................................23

La. Rev. Stat. Ann. § 12:1314(A)(1).......................................................................15

Tex. Bus. Orgs. Code Ann. § 153.003 ....................................................................14

Tex. Bus. Orgs. Code Ann. § 153.204 ...............................................................13, 15

Tex. Bus. Orgs. Code Ann. §§ 152.203, 153.152(a)(1) ..........................................13

## RULES

Fed. R. Civ. P. 57...................................................................................................6

## OTHER AUTHORITIES

Byron F. Egan, *Fiduciary Duties of Corporate Directors and Officers in Texas*, 43 Tex. J. Bus.
L. 45, 341 (2009)..................................................................................................14

## INTRODUCTION

Jean-Claude Saada and 13 of his companies (the "Saada Parties") now seek to re-write the terms of their detailed contractual relationship with Care Investment Trust, Inc. ("Care") and its subsidiaries ERC Sub LLC and ERC Sub, L.P.  In an effort to trump Care's Complaint, the Saada Parties assert four declaratory judgment claims requesting contract interpretations that would contradict the unambiguous terms of the parties' agreements and confer Mr. Saada with extraordinary and untenable rights.  The Saada Parties also assert seven other claims, based on supposed verbal promises by Care representatives, which seek astronomical but baseless damages *and* a constructive trust.  These eleven causes of action asserted in the Counterclaims and Third-Party Complaint ("Counterclaims") all fail as a matter of law.

The declaratory judgment Counterclaims (Nos. 6–9) defy commercial logic and the express terms of the contracts they purport to interpret, and accordingly warrant dismissal.  *See generally Evan Street Prods., Ltd. v. Shkat Arrow Hafer & Weber, LLP*, 643 F. Supp. 2d 317, 324 (S.D.N.Y. 2008) ("Issues of contract interpretation are generally matters of law and therefore are suitable for disposition on a motion to dismiss.").  Counterclaim Six asserts that the Saada Parties have the contractual right to approve "in their sole discretion"—and therefore block by refusing to approve—*any* transfer of any ownership interest *in* Care or *of* Care, which is a publicly traded corporation with hundreds of shareholders.  Counterclaims ¶¶ 97–110.  Now ignoring the plain text of the pertinent contract, the Saada Parties read into it the terms of a different contract that actually *disprove* their requested interpretation.  *Id*. ¶¶ 100–03.  Further, the Saada Parties' describe their purported right of approval as a form of protection in the event that Care undergoes a "change of control" (*id.* ¶ 107), but this protection is expressly provided by the "put option" conferred upon Mr. Saada by the parties' Put Agreement.

Counterclaims Seven through Nine present equally baseless interpretations of other contract provisions. Counterclaim Seven asserts the Saada Parties' right to receive distributions equal to any payments made to Care shareholders in the event of a liquidation of Care (Counterclaims ¶¶ 111–16), even though the pertinent contract provides that the Saada Parties lack "*any rights whatsoever as shareholders* of [Care]" (Complaint Ex. K ¶ 15.12), and are entitled to receive only the equivalent of Care's *regular, quarterly* dividend payments. *Id.* ¶¶ 1.63, 5.1(a)(1). Counterclaim Eight posits that the Saada Parties are entitled to cease making certain payments to ERC Sub, L.P. under an Escrow Agreement if Care discontinues its "joint venture" with them. Counterclaims ¶¶ 117–22. This argument misapprehends the effect of a sale or liquidation of Care, which—contrary to the Saada Parties' apparent belief—would *not* result in the dissolution of ERC Sub, L.P. Likewise, Counterclaim Nine, based on "information and belief," would prohibit Care from dissolving ERC Sub, L.P. or certain of the Saada Parties (Counterclaims ¶¶ 123–28). Care has not asserted this right, however, so Counterclaim Nine is not ripe. *Shields v. Norton*, 289 F.3d 832, 835 (5th Cir.), *cert. denied*, 537 U.S. 1071 (2002).

The Saada Parties' seven other claims fare no better. Counterclaims One and Two seek to impose fiduciary duties on Care and the Third-Party Defendants ("Care Parties") based on ERC Sub, L.P.'s membership in limited partnerships with the Saada Parties. Counterclaims ¶¶ 65–78. The contracts provide, however, that ERC Sub, L.P. is a *non-managing* member and is *prohibited* from controlling the partnerships. *E.g.*, Complaint Ex. D ¶ 10.2(a)(ii). Accordingly, it did not owe the Saada Parties any fiduciary duties as a matter of law. *Crawford v. Ancira*, No. 04-96-00078, 1997 WL 214835, at *4 (Tex. App.—San Antonio Apr. 30,1997, no pet.).

Counterclaims Three and Four likewise seek to impose a duty of good faith and fair dealing upon the Care Parties based upon option contracts and a purchase agreement respectively

governed by Texas and New York law.  Counterclaims ¶¶ 79–88.  Under Texas law, however, there is no "implied duty of good faith and fair dealing" in ordinary commercial contracts of the kind at issue here.  *See English v. Fischer*, 660 S.W.2d 521, 522 (Tex. 1983).  Further, under New York law, the duty of good faith and fair dealing cannot be used to *add* obligations to a contract.  *See Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407–08 (2d Cir. 2006).  Because the obligations alleged by the Saada Parties are extraneous to the cited contracts, Counterclaims Three and Four cannot survive under Texas *or* New York law.

Counterclaim Five asserts that the Care Parties fraudulently induced the Saada Parties to enter into contracts with them.  Counterclaims ¶¶ 89–96.  Merger and integration clauses in *all* of the pertinent contracts, however, nullify the element of *reliance* that is necessary to state a claim for fraudulent inducement as a matter of law.  *See Jacuzzi, Inc. v. Franklin Elec. Co.*, No. 3:07-cv-1090-D, 2008 WL 190319, at *5–6 (N.D. Tex. Jan. 22, 2008) (dismissing fraudulent inducement claim based on merger clause).

In Counterclaim Ten, certain of the Saada Parties claim that they are entitled to indemnification from ERC Sub, L.P. for any defense costs or liability resulting from Care's Complaint (Counterclaims ¶¶ 129–32), but ERC Sub, L.P. has no indemnity obligation under the parties' Agreements and the cited indemnity provision expressly *excludes* the types of claims asserted by Care.  *See, e.g.,* Complaint Ex. D ¶ 9.4(a).  Finally, Counterclaim Eleven requests a "constructive trust" over Care's assets to prevent their liquidation.  Counterclaims ¶¶ 133–37.  Because the Saada Parties cannot state a claim for fraud, and because Care is not in possession of funds or property wrongly obtained from the Saada Parties, a constructive trust is inappropriate as a matter of law.  *See Troxel v. Bishop*, 201 S.W.3d 290, 297 (Tex. App.—Dallas 2006, no pet.); *Hudspeth v. Stoker*, 644 S.W.2d 92, 93 (Tex. App.—San Antonio 1982, writ ref'd n.r.e.).

## STATEMENT OF THE CASE

Notwithstanding the many lengthy contracts executed by the parties to consummate their transaction, it can be described in simple terms.  Mr. Saada owned numerous medical office buildings.  In 2007, he sought to sell a large stake in these buildings while retaining managerial control of them.  Mr. Saada also sought to protect himself in the event that the entity with which he dealt directly (here, ERC Sub, L.P.) were sold, and to provide himself with an escape hatch in the event that any ultimate parent entity (here, Care) underwent a change of control.  Care, in turn, sought, through subsidiaries, to obtain a stream of revenue from these medical office buildings without managerial responsibility for the properties.  Care also preferred a transaction that would not restrict its ability to manage itself, so it placed its ownership interest in an indirect subsidiary (here, ERC Sub, L.P.).  The parties satisfied their interests through the transaction at issue in this case, which now arises from a dispute over the parties' respective contractual rights and obligations in the event that Care seeks to sell or liquidate itself.  Because the Saada Parties' Counterclaims depend heavily on the various contracts entered by the parties, the Care Parties discuss them for the Court's reference.[1]

On December 31, 2007, Care—a publicly-traded corporation—along with Care's subsidiaries ERC Sub LLC and ERC Sub, L.P., concluded extensive negotiations and executed detailed agreements documenting a new business relationship with the Saada Parties.  ERC Sub, L.P. purchased from Mr. Saada an 85% limited partner interest in eight of his limited liability entities that owned nine medical office buildings ("Owners").  *See* Contribution and Purchase

---

[1] Care also discusses these contracts extensively in its Complaint, ¶¶ 24–30, 44–62.  Because the Counterclaims cite many of these documents as exhibits to the Complaint, Care does the same herein and does not re-submit them.  For the several other contracts relied upon by the Saada Parties, which they have *not* supplied to the Court, Care provides them as exhibits hereto.  *See In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (motion to dismiss may be supported by documents that are referred to in complaint and central to claims).

Agreement ("Purchase Agreement") ¶¶ 2.1–2.2 (Complaint Ex. L). ERC Sub LLC, a wholly-owned direct subsidiary of Care, is the managing general partner of ERC Sub, L.P. and owns a majority of its interests. Counterclaims ¶ 18. Mr. Saada received $72.4 million, including the value of 699,999.9 "Class B" Units in the ERC Sub, L.P. limited partnership. Complaint Ex. L ¶ 2.2; Amended and Restated Agreement of Limited Partnership of ERC Sub, L.P. ("ERC Sub Agreement") at page A-1 (Complaint Ex. K). A graphic depicting the relationships among these entities is attached as Exhibit A hereto (App. 1).

The Purchase Agreement (¶ 2.1) required the execution of several other contracts at closing. ERC Sub, L.P. executed identical Amended and Restated Agreements of Limited Partnership ("Saada LP Agreements") with each of the eight Owners, making it an 85% limited partner. *See* Complaint Exs. C–J. The remaining 15% interest in each limited partnership is divided between Mr. Saada or a limited partner that he controls ("Saada Limited Partners"), and a general partner that he also controls ("Saada General Partners"). *Id.* Exhibit A to Exs. C–J; Answer ¶ 7. Collectively, these are the Saada Parties. Importantly, Care is *not* a partner in any of the limited partnerships described above. *See* Complaint Exs. C–J at page 1. Equally important, none of the Saada Parties are members of ERC Sub LLC. *See* Counterclaims ¶ 18. Further, the Owners had managerial control over the buildings. *E.g.*, Complaint Ex. D ¶ 9.1.[2]

In addition, although the Saada Parties conspicuously disregard it, they also entered into a Put Agreement with Care, ERC Sub LLC, and ERC Sub, L.P. *See* Complaint Ex. B. The Put Agreement provides that, in the event of a "change in control" of Care or either of its ERC

---

[2] The contracts contain choice-of-law clauses: (1) the Purchase Agreement under New York law (Complaint Ex. L ¶ 8.6); (2) the Saada LP Agreements under the laws of Texas (for the five Texas limited partnerships) (*id.* Exs. E–F, H–J ¶ 15.2), Delaware (for the two Delaware limited partnerships) (*id.* Exs. D, G ¶ 15.2), and Louisiana (for the one Louisiana limited liability company) (*id.* Ex. C ¶ 15.2); and (3) the ERC Sub Agreement under Delaware law (*id.* Ex. K ¶ 15.9). This Memorandum of Law takes account of these different states' laws as appropriate.

subsidiaries, the Saada Parties would have the right to sell back their remaining 15% interests in the Owners. *Id.* ¶ 1.1.[3]

This litigation arises out of disputes among the parties over the meaning of their contracts, and two of the Saada Parties' declaratory judgment claims (Counterclaim Nos. 6–7) are the mirror image of two of Care's declaratory judgment claims (Complaint, Counts I–II).

## STANDARD OF REVIEW

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), federal courts accept "all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiffs." *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007). "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Further, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" such that the court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). This analysis applies to declaratory judgment claims. *See* Fed. R. Civ. P. 57 (applying Federal Rules of Civil Procedure to claims for declaratory judgment).

## ARGUMENT

**I.   COUNTERCLAIMS SIX THROUGH NINE FAIL BECAUSE THEY SEEK DECLARATORY JUDGMENTS THAT ARE CONTRARY TO THE PLAIN MEANING OF UNAMBIGUOUS CONTRACTS.**

The meaning of an unambiguous contract is a matter of law that this Court may decide on a Rule 12(b)(6) motion. *Evan Street Prods., Ltd.*, 643 F. Supp. 2d at 324. The determination whether a contract is unambiguous is also a matter of law. *R & P Enters. v. LaGuarta, Garvel &*

---

[3] Because the Put Agreement was part of the same transaction as the other contracts relied on by the Counterclaims,

(continued…)

*Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980).  A contract is unambiguous if it can be given a "definite and precise" legal meaning.  *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

In construing an unambiguous contract, courts are to "examine the entire document and consider each part with every other part so that the effect and meaning of one part on any other part may be determined."  *Heritage Res., Inc. v. Nationsbank*, 939 S.W.2d 118, 121 (Tex. 1996).  Contractual language is "given its plain grammatical meaning unless it definitely appears that the intention of the parties would thereby be defeated."  *Fox v. Thoreson*, 398 S.W.2d 88, 92 (Tex. 1966).  Courts will avoid when possible any construction that is "unreasonable, inequitable, and oppressive."  *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987).  As explained below, the Saada Parties' declaratory judgment claims are barred by unambiguous contractual language, and are rooted in unreasonable constructions of the parties' agreements.

### A.    Counterclaim Six Fails Because the Saada LP Agreements Do Not Apply to a Transfer of Ownership Interests in Care Itself.

Most importantly, the Saada Parties assert that the Saada LP Agreements give them approval rights over any sale of ownership interests in or liquidation of Care.  Counterclaims ¶¶ 98–110.  This contention is contrary to plain terms of the Saada LP Agreements, relies upon an inapt analogy to different contracts governing an entirely different aspect of the parties' relationship, and improperly ignores the Put Agreement.

Under the heading "Disposition of Partnership Interests," Section 10.2(a)(i) of each Saada LP Agreement provides that "no Disposition may be made at any time without the written approval of [the relevant Saada General Partner]."  Complaint Exs. C–J ¶ 10.2(a)(i).  Section 1.24 of the same Agreements defines the term "Disposition" to include only the sale or transfer of "any Interest *of* a Member or any right, title or interest therein or thereto . . . or, in the case of

---

it may be construed through this Motion to Dismiss. *See Jones v. Kelley*, 614 S.W.2d 95, 98 (Tex. 1981).

a Member that is an entity, any sale . . . of any interest *in* such Member." *Id.* ¶ 1.24.  Of the Care Parties, *only* ERC Sub, L.P.—which is two corporate levels below Care—and *not* Care itself, is a limited partner, or "Member," under the Saada LP Agreements. *Id*. Exhibit A (listing "members" or limited partners).  Accordingly, by their plain terms, these Agreements confer the Saada Parties with approval rights over *only* a sale or transfer of ERC Sub, L.P.'s partnership interests in the Owners, or ERC Sub LLC's interests in ERC Sub, L.P. itself. *Id.* ¶¶ 29, 44–51.

These limitations defeat any purported right of approval over a change of ownership of ERC Sub LLC or Care itself.  Indeed, even if Care undergoes a liquidation—the possibility of which is noted by the Saada Parties (*e.g.,* Counterclaims ¶¶ 108–09)—this transaction would *not* constitute a "Disposition" because it would *not* involve the sale or transfer of ERC Sub, L.P.'s limited partnership interests in the Owners, *or* any interests in ERC Sub, L.P.  On the contrary, it would involve only a transfer of Care's ownership interest in ERC Sub LLC to a third party, with ERC Sub LLC remaining the general managing partner and majority owner of ERC Sub, L.P. Nothing would happen to ERC Sub, L.P., except that there would be a new entity—two levels above it—that would receive indirect economic benefits from it through ERC Sub LLC.

The Saada Parties, however, assert that a "Disposition" also "reaches upstream to include transfers of or by Care," on the ground that the term should be construed to include "any transfer of direct *or indirect* interests" in the Owners or ERC Sub, L.P.  Counterclaims ¶ 98.  Care's interest in the Owners and ERC Sub, L.P. is "indirect" because these entities are several levels removed from Care.  Thus, the Saada Parties' argument requires a "Disposition" to encompass "indirect" changes in ownership interests at higher levels in the corporate chain, rather than the transfer of direct ownership interests in the Owners or ERC Sub, L.P. that is expressly provided

for in the Saada LP Agreements. These Agreements do *not* use the term "indirect" in describing the interests comprising a "Disposition," nor do the Saada Parties so argue.

Instead, the Saada Parties attempt to analogize the relevant agreements to Deeds of Trust that secure the Owners' outstanding debts. *See* Counterclaims ¶¶ 100–03; Ex. B hereto (App. 2–39) (exemplary Deed of Trust). They assert that the Deeds of Trust contain provisions "similar" to Section 10.2(a)(i) of the Saada LP Agreements (Counterclaims ¶ 100), and that Care itself has construed those provisions to cover "indirect" transfers of interest in the Owners. *Id.* ¶¶ 101–03. As the Saada Parties admit, however, the Deeds of Trust expressly refer to a "transfer of the Trust Property or any direct *or indirect* interest therein" without the lender's consent. *Id.* ¶ 100 (quoting Deeds of Trust ¶ 5.3(a) (emphasis added)). Accordingly, the Deeds of Trust actually *defeat* the Saada Parties' inference by analogy, because they expressly use the term "indirect" in describing covered transfers of interests, whereas the Saada LP Agreements conspicuously *do not* do so. Reinforcing this point, the Purchase Agreement also expressly refers to "direct or indirect" transfers of interests. Complaint Ex. L ¶ 5.6.

Plainly, the parties knew how to specify "indirect" interests when they meant to do so. They did *not* do so in the Saada LP Agreements. This omission demonstrates that indirect interests are *not* encompassed by the definition of a "Disposition" in the Saada LP Agreements. *See Dempsey v. King*, 662 S.W.2d 725, 728 (Tex. App.—Austin 1983, writ dism'd) ("Courts are without authority to supply the missing terms of a contract which the parties themselves had either not seen fit to place in their agreement, or which they omitted to agree upon.").[4]

---

[4] Further defeating the Saada Parties' reliance on the Deeds of Trust, their restrictions on transfers of "indirect" interests make an express exception for transfers of up to 85% of the interests of a limited partner—the exact percentage of ERC Sub, L.P.'s limited partner interest in the Owners. *See* Ex. B ¶ 5.3(a) (App. 13–14).

The Saada Parties also contend that if their interpretation of the Saada LP Agreements is not adopted, then they will be improperly deprived of a remedy in the event of a "change of control" of Care. *See* Counterclaims ¶ 107. This contention is flatly incorrect, and ignores the one Agreement that the Saada Parties fail to mention: the Put Agreement, which they entered into with Care along with the Saada LP Agreements. *See* Complaint Ex. B. The Put Agreement provides the Saada Parties with recourse in the event of a "change of control" (*e.g.*, a sale or liquidation) of Care: a "put option" entitling the Saada Parties to sell back their 15% interests in the Owners. *Id.* ¶ 1.1; *see also* Complaint ¶¶ 28, 53–57. Accordingly, the Saada Parties' purported concerns are addressed by the Put Agreement, *not* any concocted "approval" right.

### B. Counterclaim Seven Fails Because the ERC Sub Agreement Does Not Grant the Saada Entities the Same Rights as Care Shareholders.

In Counterclaim Seven, the Saada Parties assert that their Class B Units in ERC Sub, L.P. entitle them to cash distributions equal to those that will be paid per share of Care's common stock in the event of a liquidation or sale of Care. *See* Counterclaims ¶¶ 111–16. This contention directly contradicts the parties' plain contractual language.

Under Section 5.1(a) of the ERC Sub Agreement, the Class B Units are entitled to distributions in an amount "equal to a *quarterly dividend* made on a [Care] Share for a quarter." Complaint Ex. K ¶ 5.1(a) (emphasis added). Any distribution made to Care shareholders pursuant to a liquidation would, by definition, *not* be a "quarterly dividend" made "for a quarter" (*id.*). Moreover, the ERC Sub Agreement expressly provides that "[n]othing contained in [the Agreement] shall be construed as conferring upon the holders of Partnership Unit *any rights whatsoever as shareholders* of [Care]." *Id.* ¶ 15.12 (emphasis added).

Tactically ignoring these contractual provisions, the Saada Parties instead rely upon a portion of the ERC Sub Agreement that has nothing to do with cash dividends or cash

distributions, which states that the parties intend for the Class B Units to be "treated in a manner economically commensurate with [Care] shares." Counterclaims ¶ 114 (quoting ERC Sub Agreement (Complaint Ex. K) ¶ 8.6(b)). This clause, however, addresses only the number of the Class B Units held by the Saada Parties, and indicates that in the event of a stock split or other division of Care shares, the number of Class B Units will be adjusted to maintain relative proportionality to the number of Care shares outstanding. *See* Complaint Ex. K ¶ 8.6(b). Accordingly, this is merely an anti-dilution protection for the Saada Parties, not an indication that the Class B Units are tantamount to shares of Care common stock for purposes of liquidation payments, or that the Class B Units are otherwise entitled to such payments.

### C.    Counterclaim Eight Fails Because the Escrow Agreement Does Not Condition ERC Sub, L.P.'s Rights on a "Joint Venture" or Bind Care Itself.

The Saada Parties contend in their next Counterclaim that a provision in the Escrow Agreement entitling ERC Sub, L.P. to a certain minimum quarterly payments from the Owners for seven years is self-terminating if—before seven years have elapsed—the Care Parties discontinue "their agreed-upon joint venture with the [Owners]." Counterclaims ¶ 120. The provision cited by the Saada Parties, however, provides that ERC Sub, L.P. is unconditionally entitled to receive quarterly payments without reference to any joint venture. *See* Escrow Agreement ¶ 4(b)(ii) (Ex. C hereto (App. 40–58)). Recognizing this impediment to their argument, the Saada Parties contend that a provision of the Escrow Agreement preventing ERC Sub, L.P. from assigning it without their consent means that a unilateral liquidation of Care would void ERC Sub, L.P.'s payment rights. Counterclaims ¶ 121 (quoting Escrow Agreement ¶ 15). This argument disregards the fact, as explained above (at pages 7–8), that a liquidation of Care would *not* involve the dissolution or sale of ERC Sub, L.P. On the contrary, this entity would be unchanged, except that a new ultimate parent two levels above it would replace Care as

the owner of ERC Sub LLC.  Accordingly, a liquidation of Care would not cause an "assignment" of the Escrow Agreement.

### D.     Counterclaim Nine Fails for Lack of an Actual Controversy.

Last, the Saada Parties ask this Court to declare that Care is restricted from unilaterally dissolving either ERC Sub, L.P. or the Owners.  *See* Counterclaims ¶¶ 123–28.  Contrary to the "information and belief" upon which this claim is based, Care has *not* asserted such a right.  The language from Care's Proxy Statement cited by the Saada Entities (*id.* ¶ 124) is not to the contrary.  As discussed above, none of the Agreements cited by the Saada Parties prohibits Care from transferring its ownership interests in ERC Sub LLC and disbursing the cash proceeds by way of a liquidating dividend, which is what a liquidation would entail.  Because Counterclaim Nine assumes *incorrectly* that Care intends to liquidate ERC Sub, L.P. or the Owners, it presents no controversy and must be dismissed as unripe.  *Shields*, 289 F.3d at 835 ("[A] declaratory action must be ripe in order to be viable, and is ripe only where an 'actual controversy' exists.").

## II.     COUNTERCLAIMS ONE THROUGH FOUR FAIL BECAUSE THE CARE PARTIES DO NOT OWE THE SAADA PARTIES ANY FIDUCIARY DUTIES OR A DUTY OF GOOD FAITH AND FAIR DEALING.

In Counterclaim One, the Saada Parties allege that ERC Sub, L.P. owes them fiduciary duties and a duty of good faith and fair dealing pursuant to the Saada LP Agreements, and the "contractual relationship" created by the Purchase Agreement and the Option Agreements.  Counterclaims ¶¶ 66, 80–81.  The Saada Parties allege that these purported duties obligated ERC Sub, L.P. to: (1) "pursue activities in furtherance" of a supposed joint venture with the Saada Parties (*id.* ¶¶ 67, 75, 82, 85); (2) release certain options that it held under the Option Agreements (*id.* ¶¶ 69, 75, 82, 85); and (3) negotiate in good faith with the Saada Parties over their attempts to acquire the Care Parties' interest in the Owners, or to buy Care itself (*id.* ¶¶ 71, 75, 82, 85).  Because ERC Sub, L.P. did not fulfill these alleged obligations, the Saada Parties

assert that it breached its duties to them. *Id.* ¶¶ 68, 70, 72, 82. Relatedly, the Saada Parties also assert that the other Care Parties are liable for "aiding and abetting" this breach "[b]y virtue of their control over ERC Sub and their involvement in the management of its activities." *See id.* ¶¶ 76, 86. These claims fail because there is no basis for the "duties" asserted by the Saada Parties, and they do not adequately allege the Care Parties' failure to fulfill them.

### A.    The Saada LP Agreements Impose No Duties on ERC Sub, L.P.

The Saada Parties largely base their claims against ERC Sub, L.P.—and thus their "aiding and abetting" claims—on the Saada LP Agreements. *Id.* ¶¶ 66, 81.[5] These claims overlook the fact that because ERC Sub, L.P. was a *limited* partner, with no control over the management of the Owners, it owed *none* of the purported duties.

Fiduciary relationships arise under Texas law where one party solely subordinates its own interests to those of another. *See Walker v. Fed. Kempler Life Assurance Co.*, 828 S.W.2d 442, 452 (Tex. App.—San Antonio 1992, writ denied). If the relationship does not involve the element of a "solely subordinated interest," then it is not fiduciary in nature. *Id.* Under the Texas Business Organizations Code, general partners have, by default, the exclusive right and power to manage and conduct a limited partnership. *See* Tex. Bus. Orgs. Code Ann. §§ 152.203, 153.152(a)(1). Consequently, Texas imposes on those general partners codified fiduciary duties—including duties of care, good faith, and loyalty—that the general partner must follow "in the conduct . . . of the partnership business." *Id.* §§ 152.204, 153.152(a)(2). By contrast, limited partners are generally passive investors with limited (if any) power over the partnership.

---

[5] The Saada Parties assert two claims involving breach of fiduciary duties (Counterclaims One and Two) and two involving breach of a duty of good faith and fair dealing (Counterclaims Three and Four). The latter two claims, however, arise from the Saada LP Agreements only insofar as they give rise to fiduciary duties. *See* Counterclaims ¶ 81. Under Texas law, a duty of good faith and fair dealing is an *element* of fiduciary duties. *See* Tex. Bus. Orgs. Code Ann. § 153.204. Accordingly, the Care Parties address both duties together.

*See* Byron F. Egan, *Fiduciary Duties of Corporate Directors and Officers in Texas*, 43 Tex. J. Bus. L. 45, 341 (2009).  Consequently, they do *not* owe their partners fiduciary duties.  *See id.* ("The [Texas Business Organizations Code] makes it clear that *limited* partners, as limited partners, generally do not owe fiduciary duties to the partnership or to other partners."); *see also* Tex. Bus. Orgs. Code Ann. § 153.003 ("A limited partner shall not have any obligation or duty of a general partner solely by reason of being a limited partner.").

Given the nature of limited partners, Texas courts have also held that they do not owe fiduciary duties.  For example, in *Crawford*, the Texas Court of Appeals held that "[l]imited partners, like shareholders in a corporation, do not have the broad managerial powers that general partners have," and thus do "not fit within the categories of relationships deemed to be fiduciary as a matter of law."  1997 WL 214835, at *5; *accord AON Props., Inc. v. Riveraine Corp.*, No. 14-96-00229, 1999 WL 12739, at *23 (Tex. App.—Houston [14th Dist.] Jan. 14, 1999, no pet.) ("a limited partner does not owe a fiduciary duty unless it actively engages in control over the operation of the business so as to create duties that otherwise would not exist.")

To be sure, Texas courts have imposed fiduciary duties on limited partners where they are contractually entitled to *manage* the partnership.  For example, in *MacBeth v. Carpenter*, 565 F.3d 171 (5th Cir. 2009), the Fifth Circuit (applying Texas law) imposed fiduciary duties on limited partners that exercised *control* over the partnership, which "'has always been the critical fact looked to by the courts in imposing [fiduciary duties].'"  *Id.* at 177 (quoting *In re Bennett*, 989 F.2d 779, 789 (5th Cir. 1993)).  Further, the court ruled that its holding did *not* conflict with the principle that limited partners do not *per se* owe fiduciary duties.  *Id.* at 178 n.1.[6]

---

[6] The Delaware Limited Partnership Act, which governs two of the Owners (Complaint Exs. D, G), and the Louisiana Limited Liability Company Act, which governs the last of the Owners (*id.* Ex. C), also impose fiduciary obligations *only* on partners or members who exercise control over the partnership or limited liability company. *See*

(continued…)

In each of the Saada LP Agreements, ERC Sub, L.P. is a *limited* partner and it is expressly *prohibited* from taking part in the management or control of the partnership. Section 10.1(a) specifically provides that "Limited Partners *shall not be allowed* . . . to take part in the management or control of the . . . business, or to sign for or bind [it]." Complaint Exs. C–J ¶ 10.1(a). Because ERC Sub, L.P. has no right to control or manage any of the partnerships, it does *not* owe fiduciary duties to the other partners, or the partnership, as a matter of law. For this reason, ERC Sub, L.P. also owes no duty of good faith and fair dealing, which under Texas law is a component part of fiduciary duties. *See* Tex. Bus. Orgs. Code Ann. § 153.204; *supra* note 5. Absent liability for the breach of any duty by ERC Sub, L.P. (Counterclaims One and Three), there cannot be any "aiding and abetting" liability for the other Care Parties (Counterclaims Two and Four).

## B. The Option Agreements and Purchase Agreement Do Not Support Claims for Breach of Fiduciary Duty or the Duty of Good Faith and Fair Dealing.

### 1. The Option Agreements.

The Saada Parties also base their claims involving the duty of good faith and fair dealing on two Option Agreements entered into by ERC Sub, L.P. on December 31, 2007, which granted it the right—but not the obligation—to purchase additional properties in which Mr. Saada had an ownership interest. Counterclaims ¶ 80. *See* San Diego Option Agreement (Ex. D hereto (App. 59–68)); Development Facilities Option Agreement (Ex. E hereto (App. 69–82)). Importantly, *none* of the Saada Parties are parties to the San Diego Option Agreement. *See* Ex. D at page 1 (App. 59). Further, only one of them—Mr. Saada—is a party to the Development Facilities Option Agreement, as the seller of only one property. *See* Ex. E at page 1 (App. 69). Only this latter Option Agreement could potentially be the basis for an asserted duty of good faith and fair

_____

*Sonet v. Timber Co., L.P.*, 722 A.2d 319 (Del. Ct. Ch. 1998); La. Rev. Stat. Ann. § 12:1314(A)(1).

dealing.  *See Natividad v. Alexsis, Inc.*, 875 S.W.2d 695, 697 (Tex. 1994) (holding that privity of contract is necessary to state a claim for breach of duty of good faith and fair dealing).[7]

This Development Facilities Option Agreement provides that its application "as to each Seller shall be governed by and interpreted, construed and enforced in accordance with the Laws of the state in which each respective Development Facility is located . . . ."  Ex. E ¶ 3.7 (App. 75).  Because the facility associated with Mr. Saada—Methodist Boerne Medical Center— is in the State of Texas, Texas law governs.  *Id.* Exhibit A (App. 80); Complaint Ex. L ¶ 2.4(a)(ix).  Texas does *not* recognize an implied covenant of good faith and fair dealing in ordinary commercial contracts.  *English v. Fischer*, 660 S.W.2d 521, 522 (Tex. 1983).  Only where a contract gives rise to one of certain recognized "special relationships" will the courts find a duty of good faith and fair dealing.  *See Arnold v. Nat'l County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex.1987).  These relationships "'arise[] from the element of trust necessary to accomplish the goals of the undertaking, or [have] been imposed by the courts because of an imbalance of bargaining power.'"  *Nance v. Resolution Trust Corp.*, 803 S.W.2d 323 (Tex. App.—San Antonio 1990, writ denied) (quoting *English*, 660 S.W.2d at 524 (Spears, J., concurring)).

Here, the Saada Parties do not—and cannot—allege that the pertinent Option Agreement gave rise to any "special relationship" with ERC Sub, L.P.  On the contrary, it documents an ordinary arm's length commercial transaction, negotiated as part of the overall business arrangement at issue in this case, between sophisticated parties with ample bargaining power.  Further, contrary to the Saada Parties' assertion (Counterclaims ¶ 82), the Option Agreement contains no obligation (or mechanism) for ERC Sub, L.P. to "release" its option right.  The

---

[7] The Option Agreements preclude the creation of third-party beneficiaries.  Ex. E ¶ 3.9 (App. 76) ("The terms and provisions of this Option Agreement are intended solely for the benefit of the parties . . . and it is not the intention of the parties to confer third-party beneficiary rights upon any other Person.");  Ex. D ¶  2.9 (App. 66) (same).

option to purchase the Boerne facility was *self-terminating* 18 months after its execution—on June 31, 2009. Ex. E ¶ 1.1 and Exhibit B thereto (App. 69–70, 81). Because the Agreement by its very terms contemplated that ERC Sub, L.P. would hold the option until the specified termination date, ERC Sub, L.P. cannot be penalized for failing to "release" its rights in advance.

## 2.     The Purchase Agreement.

The Saada Parties also base their good faith and fair dealing claims on the Purchase Agreement, the interpretation and enforcement of which is expressly governed by New York law. *See* Complaint, Ex. L ¶ 8.6; *see also Caton v. Leach Corp.*, 896 F.2d 939, 943 (5th Cir. 1990) (applying choice-of-law provision to contract claim for breach of implied covenant of good faith and fair dealing).[8]

New York implies in all contracts a covenant of good faith and fair dealing that "'embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, (N.Y. 2002) (quoting *Kirke La Shelle Co. v. Paul Armstrong Co.*, 188 N.E. 163, 167 (N.Y. 1933)). This covenant

> only applies where an implied promise is so interwoven into the contract as to be necessary for effectuation of the *purposes of the contract*. For this to occur, a party's action must directly violate an *obligation that may be presumed to have been intended by the parties*. However, the implied covenant does not extend so far as to undermine *a party's general right to act on its own interests* in a way that may incidentally lessen the other party's anticipated fruits from the contract.

---

[8] The choice-of-law clause in the Purchase Agreement is controlling because the Saada Parties' claims are based only on the contract itself—and thus sound in contract—instead of being based on a "special relationship" and thus sounding in tort. Counterclaims ¶ 80; *see also Caton*, 896 F.2d at 943 (holding that good faith claim rooted in "special relationship" was tortious in nature under Texas law, and thus was subject to choice-of-law analysis of Texas as the forum state, as distinct from good faith claim rooted solely in the parties' contract, which was contractual in nature under Texas law and thus subject to choice-of-law clause). This distinction is significant to Care's Opposition to Defendants' Motion to Dismiss Counts IV–V, where Care explains that Texas law applies to its claim for breach of the duty of good faith and fair dealing because it is based on a "special relationship" of confidentiality between the parties. *See* Plaintiff's Opp. to Defs.' Mot. to Dismiss, Part I (March 5, 2010).

- 17 -

*Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 407–08 (2d Cir. 2006) (emphases added).
Here, the Saada Parties do not—and cannot—point to any provision of the Purchase Agreement demonstrating that any of the obligations they seek to impose upon the Care Parties are necessary to effectuate the purposes of the Agreement, or were presumptively intended by the parties to arise from the Agreement—a 50-page articulation of rights and obligations.

Nothing in the Purchase Agreement makes reference to a "joint venture," nor does it provide for any of the obligations that the purported joint venture would entail. Counterclaims ¶ 82. Indeed, one essential element of a joint venture is "a mutual right of control or management of the venture." *St. Joseph Hosp. v. Wolff*, 94 S.W.2d 513, 535 (Tex. 2002). As discussed above (at pages 13–15), the Saada LP Agreements *expressly deprive* ERC Sub, L.P. of any right of control or management over the Owners, meaning that the parties' relationship cannot be characterized as a joint venture as a matter of law. In addition, nothing in the Purchase Agreement (or any other Agreement) obligates ERC Sub, L.P. to forfeit (or "release") its bought-and-paid-for rights under the Option Agreements to purchase additional interests in other Saada properties for a defined time period. *See* Counterclaims ¶ 82. Finally, nothing in the Purchase Agreement obligates ERC Sub, L.P. to negotiate at all, let alone "in good faith," with the Saada Parties in their efforts to buy back the 85% limited partner interest in the Owners or to purchase Care outright. *See id.* Nevertheless, as the Saada Parties admit, the Care Parties *did* negotiate with them over these items. *Id.* ¶ 51. The mere fact that the Care Parties declined to accept the Saada Parties' terms does not demonstrate "bad faith."

### C.   The Claims for Aiding and Abetting Likewise Fail.

As discussed above, ERC Sub, L.P. did not owe fiduciary duties to the Saada Parties and its alleged conduct was not a breach of a duty of good faith and fair dealing as a matter of law. Consequently, there can be no liability for "aiding and abetting" this non-existent breach. In

addition, even if (contrary to fact and law) ERC Sub, L.P. were found liable for breaching duties to the Saada Parties, the "aiding and abetting" causes of action would still fail as to CIT Healthcare LLC and Mr. Besecker because—as pleaded by the Counterclaims—neither of them possessed the necessary level of control over ERC Sub, L.P. Texas courts have held that the liability of a multi-tiered *general* partner (which ERC Sub, L.P. is *not*) who breaches a duty may only be imposed on persons who exercise a high level of control over the general partner. *See Crenshaw v. Swenson*, 611 S.W.2d 886, 890 (Tex. App.—Austin 1981, writ ref'd n.r.e.) (imposing liability on manager of a managing partner). In *In re Bennett*, the Fifth Circuit noted that the court in *Crenshaw* "focused on the nature of the business relationship as a whole, in which one person . . . exercised almost total control over the project." 989 F.2d at 789.

Here, the managing partner of ERC Sub, L.P. is ERC Sub LLC, a wholly-owned subsidiary of Care. Whatever control Care itself may have exerted over ERC Sub LLC as the parent of ERC Sub, L.P. is not enough to impute "aiding and abetting" liability to Mr. Besecker or CIT Healthcare. As the Saada Parties themselves admit, Care is governed by a multi-member board of directors, an external manager (CIT Healthcare), and public shareholders. Counterclaims ¶ 43. This structure necessarily prevents either Mr. Besecker or CIT Healthcare from exercising *complete control* over ERC Sub, L.P. They accordingly cannot be held liable for "aiding and abetting" ERC Sub, L.P.'s alleged breaches of duties to the Saada Parties.

## III. COUNTERCLAIM FIVE FOR FRAUDULENT INDUCEMENT IS BARRED BY THE AGREEMENTS' MERGER AND INTEGRATION CLAUSES.

The Saada Parties allege that the Care Parties made promises to them regarding Care's "present intentions and the parties' future activities and dealings" during many months of negotiations, which they supposedly relied upon to their detriment and were thereby induced to enter into the parties' contractual relationship. *See* Counterclaims ¶¶ 39–41. This fraudulent

inducement claim fails as a matter of law because the alleged promises were part of verbal discussions between the parties that preceded—and were stripped of any binding import by—the written contracts, which contain express merger and integration clauses. These clauses nullified the element of "reliance" that is necessary for a fraudulent inducement claim. *Lewis v. Bank of Am. NA*, 343 F.3d 540, 544–45 (5th Cir. 2003) (identifying elements of claim).

Texas law recognizes the power of contracting parties to create disclaimers of reliance on prior representations or promises, and enforces such provisions on the basis of contractually evident intent. *See Schlumberger v. Swanson*, 959 S.W.2d 171 (Tex. 1997) (finding that a disclaimer of reliance precluded a fraud claim based on prior representations); *see also Garza v. CTX Mortgage Co.*, 285 S.W.3d 919 (Tex. App.—Dallas 2009, no pet.) ("[A] party's disclaimer of reliance on representations, if the intent is clear and specific, can defeat claims for . . . fraudulent inducement . . . because reliance is a necessary element"). The contract and the circumstances determine whether the disclaimer is binding. *Schlumberger*, 959 S.W.2d at 179–80. If they "evince clear and specific intent to disclaim reliance on prior representations, then the element of reliance in a fraudulent inducement claim is negated as a matter of law." *Id.* at 179.

In determining whether there is a sufficient expression of intent, Texas courts consider whether: "(1) the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties specifically discussed the . . . topic of the subsequent dispute; (2) the complaining party was represented by counsel; (3) the parties dealt with each other in an arm's length transaction; (4) the parties were knowledgeable in business matters; and (5) the release language was clear." *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 60 (Tex. 2008); *see also Jacuzzi, Inc.*, 2008 WL 190319, at *5–6 (holding that a fraudulent inducement claim is to be *dismissed* if "the contract on which [it] is based clearly and unequivocally disclaims reliance on

extrinsic representations" and "the complaint fails to allege the factual basis for avoiding

enforcement of the contract's reliance disclaimer.")

The Saada Parties contend that prior to the execution of the agreements with the Care

Parties, representatives of Care (including Mr. Besecker) "promised"—quite vaguely—that: (1)

Care was "committed to a seven year relationship," and that over this time period "Care would

grow its business and make additional investments in properties owned by" Mr. Saada; and (2)

Care and CIT Healthcare "would use their connections to bring" the Saada Parties additional

business opportunities. Counterclaims ¶ 90. Along the same lines, the Saada Parties allege that

Care vaguely promised that it was "committed to a long-term and productive relationship

between the parties." *Id.* ¶ 92. The Saada Parties also make allegations about promises

connected to the Option Agreements and the Purchase Agreement. *Id.* ¶ 91. *None* of these

generic and unverifiable "promises" appear in the parties' negotiated written agreements, which

contain merger and integration clause that disclaim reliance on prior oral discussions.

The Option Agreements provide that they contain "the entire agreement and

understanding of the parties with respect to the subject matter hereof and *supersede[] all prior

oral discussions* and written agreements with respect thereto. . . . *There are no . . . agreements,

promises, warranties, covenants, or undertakings other than those expressly set forth herein*"

and in the other transaction documents. Ex. E ¶ 3.4 (App. 74–75); Ex. D ¶ 2.4 (App. 65)

(emphasis added). The Purchase Agreement contains an identical provision. Complaint Ex. L ¶

8.3.[9] By expressly disclaiming any intent to be bound by prior verbal statements, the Care

---

[9] Although the Saada Parties cite only the Purchase Agreement and the Option Agreements, the other Agreements contain similar provisions. The Put Agreement contains an identical merger and integration clause. *See* Complaint Ex. B ¶ 3.3. The Saada LP Agreements provide that "[t]his agreement contains the entire agreement . . . relating to the subject matter hereof, and all other agreements relative hereto which are not contained herein are terminated." Complaint Exs. C–J ¶ 15.4. The ERC Sub Agreement also provides that it contains "the entire understanding and

(continued…)

Parties nullified any claim of reliance upon such statements, and the fraudulent inducement claim fails.

Further, the circumstances surrounding the formation of the parties' Agreements demonstrate that they intended these provisions to be binding. *First*, the Agreements were negotiated and reviewed by the parties and their counsel. Because Texas courts *presume* that parties to an agreement "intend[] every contractual provision to have some meaning," it follows that "the parties contemplated, by the inclusion of a disclaimer clause, that [they] would not rely" on prior oral statements made during negotiations. *Lenape Resources Corp. v. Tennessee Gas Pipeline Co.,* 925 S.W.2d 565, 574 (Tex. 1996) (holding that a "disclaimer of reliance is binding and, as a matter of law, precludes the claim that Plaintiffs were fraudulently induced.").

*Second*, the Saada Parties cannot (and do not) dispute that the Agreements were negotiated by sophisticated parties of equal bargaining strength, or that this was an arm's length transaction. *See Cronus Offshore, Inc. v. Kerr-McGee Oil & Gas Corp.*, 369 F. Supp. 2d 848, 859 (E.D. Tex. 2004) ("[W]here . . . a disclaimer of reliance in the contract is negotiated by parties of equal bargaining strength in an arm's[]length transaction, it is binding upon the parties and, as a matter of law, precludes claims of . . . fraudulent inducement"), *aff'd*, 133 F.App'x 944 (5th Cir. 2005). The several hundred pages of Agreements reflect that all sides were represented by counsel, that Mr. Saada is a substantial and sophisticated businessman who owned properties worth over $70 million, and that the parties well documented the details of their relationship *because* they were at arms' length and needed to protect themselves as explicitly as possible.

*Finally*, as set forth above, the Agreements use clear and specific language to disclaim any reliance on prior oral discussions. *See U.S. Quest Ltd. v. Kimmons*, 228 F.3d 399 (5th Cir.

_____

agreement among the Partners with respect to the subject matter hereof and . . . supersedes . . . the other prior written

(continued...)

2000) (holding that a merger clause superseding all prior "agreement, communications, or understandings" was a valid disclaimer of reliance upon representations). Accordingly, the merger and integration clauses preclude the element of reliance as a matter of law.[10]

## IV.   COUNTERCLAIM TEN FAILS BECAUSE THE SAADA PARTIES ARE NOT ENTITLED TO INDEMNIFICATION FROM ANY OF THE CARE PARTIES.

Certain of the Saada Parties—the Saada General Partners—claim that they are entitled to indemnification from ERC Sub, L.P. with respect to Care's Complaint. Counterclaims ¶¶ 129–32. This claim is defeated by the very contractual provision they seek to invoke. Pursuant to the Saada LP Agreements, the Saada General Partners "shall be indemnified . . . *by the* [*Partnership*] from and against all claims . . . arising out of or incidental to the management of the [Partnership] affairs, *except where the claim at issue is based upon* the gross negligence, breach of fiduciary duty, *bad faith* or *willful misconduct* of the indemnified party." Complaint Exs. C–J ¶ 9.5. Indemnity agreements are strictly construed. *Gulf Ins. Co. v. Burns Motors, Inc.,* 22 S.W.3d 417, 423 (Tex. 2000).[11] Further, "[g]ood faith is a prerequisite to corporate indemnification." *In re Miller,* 290 F.3d 263 (5th Cir. 2002).

The express language of the contractual indemnity provisions shows that they do not apply as a matter of law for at least three reasons. *First*, the Saada General Partners are entitled to indemnification only from the *Owners* (*i.e.*, the "Partnership"). ERC Sub, L.P., as a non-

---

or oral understandings of agreements among them with respect thereto." Complaint Ex. K ¶ 15.11.

[10] The Saada Parties will likely respond that because their entry into the Agreements containing the merger and integration clauses was fraudulently induced, dismissal without consideration of parol evidence is inappropriate. This contention is incorrect. As noted above (at pages 19–23), Texas courts *do dismiss* fraudulent inducement claims on the basis of merger and integration clauses where—as here—the parties' intent to disclaim reliance on prior representations is sufficiently clear, and the Counterclaims do not allege a factual basis for avoiding enforcement of the contract's reliance disclaimer. *See, e.g., Jacuzzi, Inc.,* 2008 WL 190319, at *5–6 .

[11] This strict-construction principle also applies to the Saada LP Agreements governed by Delaware and Louisiana law. *See Turner Industries Group, L.L.C. v. Kansas City Southern Ry. Co.,* 989 So.2d 155, 158 (La. App. Ct. 2008); *Oliver B. Cannon and Son, Inc. v. Dorr-Oliver, Inc.,* 394 A.2d 1160, 1165 (Del. Supr. Ct. 1978).

managing limited partner (Complaint Exs. C–J Exhibit A), is *not* liable for these obligations.  *See*
Tex. Bus. Orgs. Code § 17-303; Del. Code Ann. tit. 6, § 17-303; La. Civ. Code Ann. art. 2844.
*Second*, even if ERC Sub, L.P. were required to indemnify the Saada General Partners, the
indemnification provisions nonetheless expressly exclude claims based on "bad faith, or willful
misconduct of the indemnified party."  Complaint Exs. C–J ¶ 9.5.  Care's two tort claims in
Counts IV and V are specifically based on bad faith and willful misconduct.  *See* Complaint ¶¶
63–75.  *Finally*, Care's causes of action all relate to a dispute over Care's right to transfer certain
of its economic interests, *not* the management of partnership affairs.  *See* Complaint Exs. C–J ¶
9.5.  Accordingly, none of the Counts are subject to indemnification under the Saada LP
Agreements.

## V.    COUNTERCLAIM ELEVEN FAILS BECAUSE THE SAADA PARTIES ARE NOT ENTITLED TO A CONSTRUCTIVE TRUST.

The Saada Parties' cause of action for a constructive trust must also be dismissed.
Generally, a constructive trust arises when a fiduciary commits a fraudulent act through which it
obtains or holds a legal right to property to which it is not entitled in equity and good conscience.
*See Morris v. Morris*, 631 S.W.2d 188 (Tex. App.), *aff'd*, 643 S.W.2d 448 (Tex. 1982).  The
required elements are: (1) actual or constructive fraud; (2) unjust enrichment; and (3) tracing of
the property over which the trust is placed to some *res* in which the plaintiff has an interest.  *See
In re Haber Oil Co.*, 12 F.3d 426, 437 (5th Cir. 1994).  Counterclaim Eleven satisfies none of
these requirements.

As explained above (at pages 19–23), the Saada Parties' claim of fraudulent inducement
is barred by express merger and integration clauses in the parties' Agreements.  Without a viable
fraud allegation, there can be no constructive trust.  *In re Haber Oil Co.,* 12 F.3d at 437.  Further,
the Saada Parties' vague allegation that the Care Parties were somehow unjustly enriched

through their "acquired interests in the Partnerships" (Counterclaims ¶ 51), is nonsensical.  The Care Parties *paid* the Saada Parties $72.4 million, including the value of 699,999.9 partnership units, to acquire an 85% limited partnership interest in the Owners.  Complaint Ex. L ¶ 2.2; *see also id.* Ex. K at page A-1.  None of the Saada Parties' funds were used to acquire this interest, and there is no *res* belonging to the Saada Parties but in the possession of ERC Sub, L.P.

Finally, the Saada Parties' very grounds for a constructive trust is inappropriate: they seek the impoundment, for their sole benefit, of any proceeds that may accrue to Care's public shareholders in the event of a liquidation, because they *might* win a monetary judgment that *might* exceed the available funds of Care—or any of the Care Parties—to the extent it *might* be deemed liable.  *See* Counterclaims ¶¶ 134–37.  This highly contingent and speculative scenario is not properly redressed by the purely equitable remedy of a constructive trust.

## CONCLUSION

For the foregoing reasons, the Care Parties urge the Court to dismiss the Counterclaims and Third-Party Complaint with prejudice.

Respectfully submitted,

 /s/ Ernest E. Figari, Jr.

Bobby R. Burchfield (*pro hac vice*)
Jason A. Levine (*pro hac vice*)
McDERMOTT WILL & EMERY LLP
600 Thirteenth Street, N.W.
Washington, D.C. 20005-3096
Tel.  202.756.8000
Fax. 202.756.8087

Ernest E. Figari, Jr.
Texas Bar No. 06983000
FIGARI & DAVENPORT, L.L.P.
3400 Bank of America Plaza
901 Main Street, Suite 3400
Dallas, Texas 75202-3796
Tel.  214.939.2000
Fax  214.939.2090

*Attorneys for Plaintiff and Counterclaim Defendant Care Investment Trust, Inc.; and for Third-Party Defendants CIT Healthcare, LLC; Flint D. Besecker; ERC Sub, L.P.; and ERC Sub, LLC*

Dated:  March 5, 2010

## <u>CERTIFICATE OF SERVICE</u>

I, Lance V. Clack, hereby certify that on this day I caused a true and correct copy of the

foregoing Memorandum of Law in Support of Motion to Dismiss Counterclaims and Third-Party

Complaint to be served upon all counsel named below by Electronic Case Filing using the

CM/ECF system, which will send automatic notification of the filing to the following:

Richard A. Rosen
James L. Brochin
PAUL WEISS RIFKIND
   WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, N.Y. 10019

Robert M. Cohan
William D. Ellerman
JACKSON WALKER L.L.P.
NationsBank Plaza
901 Main Street, Suite 6000
Dallas, TX 75202

*Attorneys for Defendants and Counterclaim Plaintiffs Jean-Claude Saada; Cambridge Onalp, Inc.; Cambridge Nassau Bay GP LLC; 6000 Greenville, Inc.; Allen MOP, Inc.; 5280 Medical Drive, Inc.; Cambridge Gorbutt MOB, Inc.; Cambridge Tarrant, Inc.; CHMP Manager, LLC; Cambridge B/R, Inc.; Cambridge-Greenville Dallas, LLC; PMC Cambridge of Plano, Ltd.; Cambridge-Crown Atrium LLC; and Cambridge North Texas Holdings, LLC*

Dated: March 5, 2010                   /s/ Lance V. Clack
                                 Lance V. Clack