## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| CARE INVESTMENT TRUST, INC., <br><br> Plaintiff, <br><br> -v.- <br><br> JEAN-CLAUDE SAADA, *et al.*, <br><br> Defendants. | No.  3:09-cv-02256-K |
| JEAN-CLAUDE SAADA, *et al.*, <br><br> Counterclaim Plaintiffs, <br><br> -v.- <br><br> CARE INVESTMENT TRUST, INC., *et al.*, <br><br> Counterclaim and Third-Party Defendants. |  |

## REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS COUNTERCLAIMS AND THIRD-PARTY COMPLAINT

Bobby R. Burchfield (*pro hac vice*)
Jason A. Levine (*pro hac vice*)
McDERMOTT WILL & EMERY LLP
600 Thirteenth Street, N.W.
Washington, D.C. 20005-3096
Tel.  202.756.8000
Fax. 202.756.8087

Ernest E. Figari, Jr.
Texas Bar No. 06983000
FIGARI & DAVENPORT, L.L.P.
3400 Bank of America Plaza
901 Main Street, Suite 3400
Dallas, Texas 75202-3796
Tel.  214.939.2000
Fax  214.939.2090

*Attorneys for Plaintiff and Counterclaim Defendant*
*Care Investment Trust, Inc.; and for Third-Party*
*Defendants CIT Healthcare, LLC; Flint D.*
Dated:  April 9, 2010                    *Besecker; ERC Sub, L.P.; and ERC Sub, LLC*

The Saada Parties' Opposition Brief confirms that the Counterclaims and Third-Party Complaint are based on little more than wishful thinking. Disregarding unambiguous contract provisions that disprove their allegations, excerpting contractual phrases out of context, and inventing a "joint venture" that no contract identifies, the Saada Parties attempt to concoct rights and obligations with no basis in their actual agreements. Further, the Saada Parties fail to address the key grounds warranting dismissal of their tort claims. For these reasons, the Counterclaims and Third-Party Complaint should be dismissed with prejudice.[1]

## ARGUMENT

### I.   THE UNAMBIGUOUS CONTRACTS DEFEAT COUNTERCLAIMS SIX-NINE.

As the Care Parties explained in their opening brief (at pages 6-7), the contracts at issue are unambiguous and the Court may construe them as a matter of law. Apparently recognizing the weakness of their declaratory judgment Counterclaims (Six through Nine), the Saada Parties now suggest that certain contracts are ambiguous and require extrinsic evidence to illuminate their meaning. *See* Opp. Brief at 6-7, 9, 21. "An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract. For an ambiguity to exist, both interpretations must be reasonable." *Columbia Gas Trans. Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). As explained below, the Saada Parties' interpretations fail this test. Further, "a person who wishes to argue contract ambiguity must affirmatively plead it, or else the argument is waived." *Nichols v. Enterasys Networks, Inc.*, 495 F.3d 185, 190 (5th Cir. 2007). Despite this requirement, the Saada Parties did *not* affirmatively plead ambiguity.[2]

---

[1] The Opposition Brief relies heavily on a potential new "tender offer" transaction for Care common stock. Opp. Brief at 5-7, 20, 22, 25 & Saada App. In essence, the Saada Parties try to amend their Counterclaims and Third-Party Complaint through their Brief, which is improper. *See Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

[2] The Saada Parties also failed to raise ambiguity as an affirmative defense to Care's declaratory judgment claims
(continued…)

## A.     Counterclaim Six Fails Because the Saada Parties Have No Right To Approve a Change of Control of Care.

As previously explained, Section 10.2(a)(i) of the Saada LP Agreements entitles the Saada Parties to approve only a "Disposition," namely a sale or transfer of (1) ERC Sub, L.P.'s limited partnership interest in the Owners, or (2) ERC Sub LLC's interests in ERC Sub, L.P., but *not* any sale of ownership interests in Care.  *See* Care Brief at 7-8.[3]  The Saada Parties purport to interpret the contractually-defined term "Disposition" to include both direct *and* indirect interests in the limited partnerships, even though the contracts use only the term "interests."  *See* Opp. Brief at 7-8.  In doing so, the Saada Parties disregard the fact that the Deeds of Trust and the Purchase Agreement expressly use the term "indirect" in describing covered interests, thus (1) proving that the parties specified "indirect" interests when they meant to include them, and (2) defeating an inference that the term "interests" includes "indirect" interests.  *See* Care Brief at 9.

The Saada Parties also argue that several contractual terms invoking a seven-year relationship with the Care Parties imply a mutual intent to "protect" the Saada Parties, and thus necessitate a right to approve a change of control of Care.  *See* Opp. Brief at 8-9.  Tellingly, the "protective" provisions cited by the Saada Parties all involve only ERC Sub, L.P., *not* Care, and—as previously explained—even after a change of control of Care, the ownership of ERC Sub, L.P. (and ERC Sub LLC) will be unchanged.  *See* Care Brief at 8.  Accordingly, the Saada Parties' argument is a *non sequitur*.

Further, the Saada Parties' assertions about a seven-year relationship are belied by the Put Agreement, which they do not dispute (Opp. Brief at 9) provided them with "protection" by

---

construing the same contracts, further precluding the argument now.  *See Gulf & Basco Co. v. Buchanan*, 707 S.W.2d 655, 656 (Tex. App.—Houston [1st Dist.] 1986).

[3] As shown in the Care Parties' Appendix (at page 1): Care owns ERC Sub LLC, which is the majority owner and general partner of ERC Sub, L.P., which in turn owns an 85% limited partner interest in the Owners.

entitling them to sell back their 15% limited partnership interest if Care underwent a change of control even *before* seven years elapsed.  Complaint Ex. B ¶ 1.1.  In this respect, the Put Agreement does *not* preclude a change of control transaction until seven years (or any other amount of time) elapses, thus evidencing the parties' mutual understanding that Care could undergo a change of control at *any* time, subject to the requirements of the Put Agreement.

To be sure, the Saada Parties contend that the put option merely *supplements* their supposed right to approve a change of control of Care, but they provide no explanation for this remarkable double remedy.  *See* Opp. Brief at 9.  Moreover, their contention is self-defeating because the purported approval right would render the Put Agreement superfluous.  If, under their theory, the Saada Parties were to disapprove a change of control transaction, then they would block it and there would be no need for the put option.  If, on the other hand, the Saada Parties were to approve a change of control transaction, then they would not need "protection" from it.  Plainly, the Put Agreement—the only contract that expressly addresses a change of control transaction—provides the Saada Parties' *exclusive* recourse for such a transaction.[4]

### B. Counterclaim Seven Fails Because Only Care Shareholders Are Entitled to Cash Distributions Upon a Liquidation or Sale of Care.

As the Care Parties explained in their opening brief (at pages 10-11), the Class B Units held by the Saada Parties expressly entitle them to receive only cash distributions equaling any "quarterly dividend" paid to a shareholder of Care common stock, *not* other payments made to shareholders upon a sale or liquidation of Care.  ERC Sub Agreement ¶ 5.1 (Complaint Ex. K).  In response, the Saada Parties focus on an isolated snippet of the ERC Sub Agreement (¶ 8.6),

---

[4] The Saada Parties assert that it is "disingenuous" for the Care Parties to describe the put option as a remedy, given their position that the option has expired.  *See* Opp. Brief at 9.  Yet, ironically, the Saada Parties omit the fact that their put option expired only after they *declined* to exercise it in April 2009, when the Care Parties provided them with a put notice regarding a planned (but unconsummated) change of control transaction.  *See* Complaint ¶¶ 54-55.

that the Class B Units are to be treated "in a manner economically commensurate with the [Care shares]." Opp. Brief at 20. The Care Parties have already explained, however, that this language is part of a provision that, on its face, provides the Saada Parties only with anti-dilution protection in the event of a stock split or division of Care shares. *See* Care Brief at 11. In that context, such protection is appropriate because *quarterly* dividends would be affected.

The Saada Parties attempt to refute this point by noting that Section 8.6 presupposes that the Class B Units may be "redeemable" as Care stock (Opp. Brief at 20), but this does not mean that they are equal in all respects to Care stock. It means only that the Class B Units' redemption value will not be diluted in the event of a stock split or division of Care shares. Further, as the Saada Parties admit (Opp. Brief at 21), under the ERC Sub Agreement (¶ 15.12) they have "no [voting] rights whatsoever as shareholders" of Care, thus further undermining any asserted equivalence between the Class B Units and Care common stock.

### C. Counterclaim Eight Fails Because the Escrow Agreement Unconditionally Entitles ERC Sub, L.P. to Quarterly Payments.

Section 4(b)(ii) of the Escrow Agreement (Care App. Ex. C) unconditionally and expressly entitles ERC Sub, L.P. to quarterly payments from the Owners, notwithstanding a change of control of Care. *See* Care Brief at 11-12. The Saada Parties now contend that there was an *implied* condition to payment: that the parties' alleged "joint venture" must be ongoing. *See* Opp. Brief at 22. This claim is belied by the plain language of the Escrow Agreement, which cites no such condition and does not mention a "joint venture." Accordingly, Counterclaim Eight fails. *See Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987) (courts must avoid "unreasonable, inequitable, and oppressive" contract interpretations).

### D. Counterclaim Nine Sets Forth No Actual Controversy.

As the Care Parties have explained, because they have not asserted the right to dissolve

ERC Sub, L.P. or the Owners, Counterclaim Nine—seeking a declaration that the Care Parties have no such right—is unripe. *See* Care Brief at 12. The Saada Parties respond that a Proxy Statement filed by Care permits its Board of Directors to liquidate the company's subsidiaries "whenever and however it wishes," including the dissolution of ERC Sub, L.P., in alleged contravention of the Saada LP Agreements and the ERC Sub Agreement. *See* Opp. Brief at 22; Counterclaims ¶¶ 126-27. Yet the Saada Parties fail to acknowledge additional language in the very same sentence they quote from the Proxy Statement, which states that any liquidation would occur "in accordance with the law and the charter documents applicable to each of the subsidiaries." Saada App. at 84. Contrary to the Saada Parties' contention, the Proxy Statement does *not* purport to empower Care's Board of Directors to run roughshod over the parties' agreements, and the Care Parties have *not* asserted the right decried by Counterclaim Nine.

## II.   COUNTERCLAIMS ONE THROUGH FOUR FAIL BECAUSE NONE OF THE CARE PARTIES OWE ACTIONABLE DUTIES TO THE SAADA PARTIES.

The Saada Parties attempt to salvage their breach of duty and "aiding and abetting" Counterclaims (One through Four) by reference to: (1) the role of ERC Sub, L.P. as a limited partner in the Owners; and (2) the parties' purported overall "joint venture." *See* Opp. Brief at 14 n.4. Both of these grounds are unavailing as a matter of law.[5]

### A.   ERC Sub, L.P. Owes No Actionable Duties Under the Saada LP Agreements.

As the Care Parties have explained (Care Brief at 13-15), ERC Sub, L.P. owes the Saada Parties no fiduciary or "good faith" duties as a matter of law because it is a passive limited partner with no right to manage or control the Partnerships. *Crawford v. Ancira*, No. 04-96-

---

[5] Because the duty of good faith and fair dealing is an *element* of fiduciary duties (Tex. Bus. Orgs. Code Ann. § 153.204), the Care Parties address both duties together. *See* Care Brief at 13 n.5.

00078, 1997 WL 214835, at *4 (Tex. App.—San Antonio, Apr. 30, 1997, no pet.)  *See* Saada LP Agreements ¶ 10.1(a) (limited partners, including ERC Sub, L.P., "shall not be allowed . . . to take part in the management or control of the . . . business, or to sign for or bind [it]").

Ignoring this plain contractual language, the Saada Parties now ascribe powers of management and control to ERC Sub, L.P. merely because it has the contractual right of consent to prevent certain actions by the General Partners.  *See* Opp. Brief at 11-12.  This right, however, relates only to preserving the investment characteristics of the Partnerships.  Without this garden-variety consent right, ERC Sub, L.P.—*because* it is a passive investor—would have no ability to prevent fraud, waste, or abuse by the General Partners.  Further, the consent right involves no affirmative power to manage or control the Partnerships, but only the ability to *prevent* certain actions by the General Partners in *their* exercise of managerial authority and control.  Indeed, the fact that only the General Partners have such power—and not ERC Sub, L.P.—is made plain elsewhere in the Saada LP Agreements (¶ 9.1), which provide that *only* the General Partners:

> (i) shall have *full, exclusive and complete authority and discretion to manage and control* in accordance with the terms of [the Agreement], and *shall make all decisions* affecting, the Partnership business; (ii) *shall have full authority* to effectuate the purposes of the Partnership and to take any action required . . . pursuant to the terms of [the Agreement]; and (iii) shall *have full power to exercise all rights and power* generally inferred or conferred by law . . . therewith.

The Saada Parties also misstate the scope of fiduciary duties under Texas law, arguing that they (if applicable) obligated ERC Sub, L.P. to act in the best interests of the Saada Parties under the Option Agreements and the Purchase Agreement.  *See* Opp. Brief at 13-15.  As the Care Parties have explained, Texas Business Organizations Code §§ 152.204 and 153.152(a)(2) limit the fiduciary duties of partners to "the conduct . . . of the partnership business."  Care Brief

at 13.[6]  Pursuant to the Saada LP Agreements, the partnership business involves only *specific* parcels of land and *specific* office buildings.  *See* Complaint Exs. C-J ¶ 3.1.  For this reason, the Saada LP Agreements cannot create fiduciary duties encompassing Option Agreements that involve different properties and parties, or an amorphous "joint venture" under the Purchase Agreement that goes beyond the parties' specified partnership business.  *See* Opp. Brief at 15. There also can be no joint venture in any event because—at a minimum—the Saada LP Agreements deprive ERC Sub, L.P. of the necessary right of "joint" control over the Partnerships.  *St. Joseph Hosp. v. Wolff*, 94 S.W.2d 513, 535 (Tex. 2002).  *See* Care Brief at 18.

**B.      One Cannot "Aid and Abet" the Breach of a Non-Existent Duty.**

Tacitly admitting that the Care Parties lack sufficient control over ERC Sub, L.P. to aid and abet its alleged breaches of duty under the "control" theory of Counterclaims Two and Four (Care Brief at 18-19), the Saada Parties now say that control is *irrelevant*, and that it is sufficient to allege only that the Care Parties "knowingly participated" in the purported breaches of duty. *See* Opp. Brief at 16.  Even if the Court were to credit this new contention, however, the fact remains that in the absence of any duty owed by ERC Sub, L.P., there can be no "aiding and abetting" liability.  *See* Part II.A above.  Accordingly, Counterclaims Two and Four fail *ab initio*.

**III.    COUNTERCLAIM FIVE FOR FRAUDULENT INDUCEMENT IS BARRED BY SPECIFIC DISCLAIMERS OF RELIANCE IN THE PARTIES' CONTRACTS.**

As previously explained (Care Brief at 19-23), the Saada Parties' fraudulent inducement claim fails because the contracts at issue contain clear and specific merger clauses disclaiming

---

[6] The Saada Parties seek to escape from this limitation on fiduciary duties by distorting the holding of *Dunnagan v. Watson*, 204 S.W.3d 30 (Tex. App.—Fort Worth 2006, pet. denied).  *See* Opp. Br. at 11-12.  For example, the Saada Parties claim that *Dunnagan* imposed on a managing partner a limitless fiduciary duty to "not place his interests . . . before those of the limited partnership" (*id.* at 11), but the ellipses omit the court's key qualifier that a partner may not place his interests "therein"—that is, *in the partnership business*, not in general—"before those of the limited partners."  *Dunnagan*, 204 S.W.3d at 47.  Further, the Saada Parties disregard *Dunnagan*'s emphasis that fiduciary

(continued…)

reliance on prior promises.  *See, e.g.*, *Schlumberger v. Swanson*, 959 S.W.2d 171 (Tex. 1997).

The Saada Parties do not dispute this legal proposition, but contend that the merger clauses in the

Purchase Agreement and Option Agreements—the subjects of their fraudulent inducement

claim—are not specific disclaimers, but "simply recite[] that each agreement . . . supersedes all

prior agreements, with respect to the subject matter of the agreements."  Opp. Brief at 18.  This

contention omits the operative portions of the merger clauses, which provide that "[t]here are no

. . . *agreements, promises, warranties, covenants, or undertakings* other than those *expressly* set

forth herein and in the other Transaction Documents."  Complaint Ex. L ¶ 8.3 (Purchase

Agreement); Care App. Ex. E ¶ 3.4 (pages 74-75) and Ex. D ¶ 2.4 (page 65) (Option

Agreements).  *This* language is a clear and unequivocal disclaimer of reliance on any prior

promises, thus precluding a claim for fraudulent inducement as a matter of law.  *See* Care Brief

at 21; *see also U.S. Quest Ltd. v. Kimmons*, 228 F.3d 399, 403 (5th Cir. 2000) (holding

fraudulent inducement claim precluded by even *less* specific disclaimer language).[7]

## IV.    THE CARE PARTIES HAVE NO INDEMNIFICATION OBLIGATION.

As previously explained (Care Brief at 23-24), the indemnification obligation under the

Saada LP Agreements (¶ 9.5) expressly binds only the Owners, *not* ERC Sub, L.P. or any other

Care Party.  Yet the Saada Parties now assert that ERC Sub, L.P. must also "shoulder its pro rata

share of indemnification," based upon an entirely different provision of the Saada LP

Agreements (¶ 6.2) that does *not* pertain to indemnification, but to the pro rata distribution of

---

duties are limited to the "duty to exercise care *in the management of corporate affairs*."  *Id.* at 46 (emphasis added).

[7] The Saada Parties also purport to apply the Purchase Agreement's choice of law clause (New York law) to the fraudulent inducement claim (Opp. Brief at 17), but this is improper.  *Red Roof Inns, Inc. v. Murat Holdings, L.L.C.*, 223 S.W.3d 676, 684-85 (Tex. App.—Dallas 2007, pet. denied).  The outcome is the same under New York law in any event, because the merger clauses at issue "specifically and expressly" disclaim reliance on prior promises. *Green v. Beer*, No. 06-4156, 2009 WL 911015, at *8 n.18 (S.D.N.Y. Mar 31, 2009).

"losses" for a fiscal year.  *See* Opp. Brief at 23.  With no contractual connection to indemnification, this argument fails on its face.  *See Reilly*, 727 S.W.2d at 530.

The Saada Parties also attempt to shoehorn the Care Parties' causes of action into the terms of the indemnification provision—which pertains only to liability arising from the management of partnership affairs—by contending that the claims against them "arise from the potential sale of the majority ownership of the Partnerships to another party."  Opp. Brief at 23. As explained, however, *none* of the Care Parties' causes of action contemplates ERC Sub, L.P. selling its partnership interests.  *See* Care Brief at 8-9.  The Saada Parties also contend that, even though the indemnification obligation *excludes* claims based upon acts taken in bad faith, indemnification would be appropriate if these claims ultimately were to fail.  *See* Opp. Brief at 24.  The Saada LP Agreements include no exception based on outcome, however, and state only that indemnification does not encompass any "*claim . . . based on*" bad faith.  *Id.* ¶ 9.5.  The Court cannot now re-write the Saada LP Agreements to include an exception that the parties did not.  *Dempsey v. King*, 662 S.W.2d 725, 728 (Tex. App.—Austin 1983, writ dism'd).

## V.     THE SAADA PARTIES ARE NOT ENTITLED TO A CONSTRUCTIVE TRUST.

The Saada Parties do not dispute that Counterclaim Eleven for a constructive trust—over *all* of Care's assets, including cash—must be dismissed if Counterclaims One and Two (for breach of fiduciary duty) and Five (for fraudulent inducement) are dismissed.  *See* Opp. Brief at 24.  Further, the Saada Parties fail to identify any *res* rightfully belonging to them that could be won from the Care Parties and placed into a constructive trust.  On the contrary, the Saada Parties were *paid* $72.4 million, including the value of 699,999.9 partnership units, for the 85% limited partnership interest in the Owners that is now held by ERC Sub, L.P.  *See* Care Brief at 25; Complaint Ex. L ¶ 2.2.  It appears that Counterclaim Eleven seeks to impound the Care

Parties' assets only to pay a potential future judgment on the Saada Parties' tort claims. Because this would not be the equitable return of a *res*, it is an inappropriate use for a constructive trust.

Tacitly admitting that they have overreached, the Saada Parties now limit their requested constructive trust to proceeds "traced" from the liquidation or sale of ERC Sub, L.P.'s limited partnership interest. *See* Opp. Brief at 24. This shrunken trust *corpus* is imaginary, however, because it is based on the incorrect assumption that ERC Sub, L.P. will dispose of its limited partnership interest in the Owners. *Id.* at 25. As the Care Parties have explained, the contracts themselves show that this *not* the case. *See*, *e.g.,* Care Brief at 8-9. Accordingly, none of the contemplated transactions would result in any proceeds appropriate for a constructive trust.[8]

## CONCLUSION

For the foregoing reasons, the Care Parties urge the Court to dismiss the Counterclaims and Third-Party Complaint in their entirety and with prejudice.

                              Respectfully submitted,

                              /s/ Ernest E. Figari, Jr.
Bobby R. Burchfield (*pro hac vice*)      Ernest E. Figari, Jr.
Jason A. Levine (*pro hac vice*)          Texas Bar No. 06983000
McDERMOTT WILL & EMERY LLP                FIGARI & DAVENPORT, L.L.P.
600 Thirteenth Street, N.W.               3400 Bank of America Plaza
Washington, D.C. 20005-3096               901 Main Street, Suite 3400
Tel. 202.756.8000                         Dallas, Texas 75202-3796
Fax. 202.756.8087                         Tel. 214.939.2000
                                          Fax 214.939.2090

                              *Attorneys for Plaintiff and Counterclaim Defendant*
                              *Care Investment Trust, Inc.; and for Third-Party*
                              *Defendants CIT Healthcare, LLC; Flint D.*
Dated:  April 9, 2010         *Besecker; ERC Sub, L.P.; and ERC Sub, LLC*

---

[8] Moreover, even if (contrary to fact) appropriate proceeds were generated, at most a constructive trust could include only the amount of any purported "unjust enrichment" that accrued to Care from the Saada Parties. Given the failure of the Saada Parties' tort causes of action as a matter of law, this amounts to *nothing*.

## CERTIFICATE OF SERVICE

I, John H. Walker, hereby certify that on this day I caused a true and correct copy of the

foregoing Reply Memorandum of Law in Support of Motion to Dismiss Counterclaims and

Third-Party Complaint to be served upon all counsel named below by Electronic Case Filing

using the CM/ECF system, which will send automatic notification of the filing to the following:

Richard A. Rosen
James L. Brochin
PAUL WEISS RIFKIND
   WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, N.Y. 10019

Robert M. Cohan
William D. Ellerman
JACKSON WALKER L.L.P.
NationsBank Plaza
901 Main Street, Suite 6000
Dallas, TX 75202

*Attorneys for Defendants and Counterclaim
Plaintiffs Jean-Claude Saada; Cambridge
Onalp, Inc.; Cambridge Nassau Bay GP
LLC; 6000 Greenville, Inc.; Allen MOP,
Inc.; 5280 Medical Drive, Inc.; Cambridge
Gorbutt MOB, Inc.; Cambridge Tarrant,
Inc.; CHMP Manager, LLC; Cambridge
B/R, Inc.; Cambridge-Greenville Dallas,
LLC; PMC Cambridge of Plano, Ltd.;
Cambridge-Crown Atrium LLC; and
Cambridge North Texas Holdings, LLC*

Dated: April 9, 2010               /s/ John H. Walker  
                                  John H. Walker